ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 24-**1087**, **-1100**, -1132, -1158, -1195, -1196, -1197, -1206

# In the United States Court of Appeals for the District of Columbia Circuit

COMMONWEALTH OF KENTUCKY and
STATE OF WEST VIRGINIA, *et al.*,

*Petitioners*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*

ENVIRONMENTAL LAW & POLICY CENTER, *et al.*,

*Intervenors*

_____

On Petitions for Review of a Final Action
of the U.S. Environmental Protection Agency

_____

## INITIAL BRIEF FOR STATE PETITIONERS

**RUSSELL COLEMAN**
**Attorney General of Kentucky**

Matthew F. Kuhn
  *Solicitor General*
John H. Heyburn
  *Principal Deputy*
  *Solicitor General*
Victor B. Maddox
  *Counsel for Special Litigation*
Jacob M. Abrahamson
  *Assistant Solicitor General*

Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov
Victor.Maddox@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*          (Additional counsel below)

**PATRICK MORRISEY**
**Attorney General of West Virginia**

Michael R. Williams                    Office of the West Virginia
  *Solicitor General*                        Attorney General
                                       State Capitol, Bldg 1,
                                       Room E-26
                                       Charleston, West Virginia 25305
                                       (304) 558-2021
                                       Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

(Additional counsel listed after the signature block)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.  Parties and Amici

The State Petitioners are petitioners in Case No. 24-1087—the Commonwealth of Kentucky, the State of West Virginia, the State of Alabama, the State of Alaska, the State of Arkansas, the State of Florida, the State of Georgia, the State of Idaho, the State of Indiana, the State of Iowa, the State of Kansas, the State of Louisiana, the State of Mississippi, the State of Missouri, the State of Montana, the State of Nebraska, the State of New Hampshire, the State of North Dakota, the State of Ohio, the State of Oklahoma, the State of South Carolina, the State of South Dakota, the State of Utah, the Commonwealth of Virginia, and the State of Wyoming—and petitioner in consolidated Case No. 24-1100—the State of Texas. Along with the State Petitioners, the following are petitioners in the consolidated petitions for review: Warren Petersen, President of the Arizona State Senate, Ben Toma, Speaker of the Arizona House of Representatives, and Arizona Trucking Association (Case No. 24-1132); Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc. (Case No. 24-1158); American Fuel & Petrochemical Manufacturers, California Asphalt Pavement Association, California Manufacturers & Technology Association, Consumer Energy Alliance, Domestic Energy Producers Alliance, Energy Marketers of America, International Association of Machinists and

Aerospace Workers Lodge No. 823, Louisiana Mid-Continent Oil & Gas Association, National Association of Convenience Stores, The Petroleum Alliance of Oklahoma, Texas Oil & Gas Association, and Western States Petroleum Association (Case No. 24-1195); American Petroleum Institute, American Farm Bureau Federation, National Corn Growers Association, Baxter Ford, Inc., Celebrity Motor Cars, LLC, Celebrity Motors of Toms River, LLC, Celebrity of Springfield, LLC, Celebrity of Westchester, LLC, Gates Nissan LLC, AML Automotive Peoria, LLC, Loquercio Automotive, Inc., Loquercio Automotive GOE, LLC, Loquercio Automotive Goshen, LLC, Loquercio Automotive MCH, LLC, Loquercio Automotive MCK, LLC, Loquercio Automotive South, Inc., Loquercio Automotive West, LLC, Raecom Holdings, LLC, Tarver Motor Company, Inc. (Case No. 24-1196); American Free Enterprise Chamber of Commerce, Clean Fuels Development Coalition, ICM, Inc. Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association; Kentucky Corn Growers Association, Michigan Corn Growers Association, Minnesota Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Ohio Corn and Wheat Growers Association, South Dakota Corn Growers Association, Tennessee Corn Growers Association, Wisconsin Corn Growers Association, Diamond Alternative Energy, LLC, and Valero Renewable Fuels Company, LLC

ii

(Case No. 24-1197); Renewable Fuels Association and National Farmers Union (Case No. 24-1206).

Respondents are the United States Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency.

Intervenors in support of Respondents are Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Inc., Public Citizen, Inc., Sierra Club, Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, Appalachian Mountain Club, Center for Biological Diversity, Clean Air Council, Conservation Law Foundation, and Environmental Defense Fund; Alliance for Automotive Innovation; Zero Emission Transportation Association; Ford Motor Company; the States of California, Arizona, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts and Pennsylvania; the District of Columbia; the Cities of Chicago, Denver, Los Angeles, and New York; and the County of Denver.

## II.    Ruling Under Review

"Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27,842 (April 18, 2024) (effective June 17, 2024) (Standards).

## III.    Related Cases

The cases consolidated with this case are:

1.    *State of Texas v. Environmental Protection Agency, et al.*, No. 24-1100 (D.C. Cir.).

2.    *Warren Petersen, et al. v. Environmental Protection Agency, et al.*, No. 24-1132 (D.C. Cir.).

3.    *Western States Trucking Association, Inc., et al. v. Environmental Protection Agency, et al.*, No. 24-1158 (D.C. Cir.).

4.    *American Fuel & Petrochemical Manufacturers, et al. v. Environmental Protection Agency, et al.*, No. 24-1195 (D.C. Cir.).

5.    *American Petroleum Institute, et al. v. Environmental Protection Agency, et al.*, No. 24-1196 (D.C. Cir.).

6.    *American Free Enterprise Chamber of Commerce, et al. v. Environmental Protection Agency, et al.*, No. 24-1197 (D.C. Cir.).

7.    *Renewable Fuels Association, et al. v. Environmental Protection Agency, et al.*, No. 24-1206 (D.C. Cir.).

State Petitioners are unaware of any related cases pending in this Court other than the consolidated cases.

/s/ Jacob M. Abrahamson

Dated: September 6, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ...............................................................i

TABLE OF AUTHORITIES.......................................................vii

GLOSSARY ...............................................................................xiii

INTRODUCTION..........................................................................1

STATEMENT OF JURISDICTION ...............................................3

STATEMENT OF ISSUES..............................................................3

STATUTES AND REGULATIONS ................................................3

STATEMENT OF THE CASE ........................................................3

    A.    EPA used flawed social cost of carbon measures to calculate the Standards' benefits.......................................4

    B.    The resulting estimated "climate benefits" are significantly higher than those in the Proposed Rule. ...................6

STANDARD OF REVIEW...............................................................6

SUMMARY OF ARGUMENT ........................................................6

STANDING ....................................................................................7

ARGUMENT .................................................................................13

    I.    EPA lacked authority to promulgate the Standards.......................13

        A.    The Standards address major questions....................................14

        B.    EPA lacks clear authority to mandate electrification. ...........24

    II.    EPA's cost-benefit analysis was arbitrary and capricious. .........26

        A.    EPA's benefits calculation was flawed.....................................27

        B.    EPA downplays the Standards' unpredictable costs. ...............29

CONCLUSION .............................................................................31

CERTIFICATE OF COMPLIANCE.............................................40

CERTIFICATE OF SERVICE.......................................................41

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) ............................................................ 7, 8

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) (per curiam) ..................................................... 14. 15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................ 12

*Ams. for Clean Energy v. EPA,*
    864 F.3d 691 (D.C. Cir. 2017) ................................................................ 20

*ANR Storage Co. v. FERC,*
    904 F.3d 1020 (D.C. Cir. 2018) ............................................................. 27

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,*
    461 U.S. 375 (1983) ................................................................................ 11

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ........................................... 14, 15, 22, 24, 25, 26

*Del. Dep't of Nat. Res. & Env't Control v. EPA,*
    785 F.3d 1 (D.C. Cir. 2015) ................................................................... 30

*Delta Constr. Co. v. EPA,*
    783 F.3d 1291 (D.C. Cir. 2015) ............................................................. 10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................................... 26

*Dept. of Commerce v. New York*,
  588 U.S. 752 (2019)................................................................ 10

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)................................................................ 26

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)................................................................ 18

*ICC v. Cincinnati, N.O. & Tex. Pac. R. Co.*,
  167 U.S. 479 (1897)........................................................ 16, 24

*Int'l Harvester Co. v. Ruckelshaus*,
  478 F.2d 615 (D.C. Cir. 1973).................................. 22, 23, 26

*Kisor v. Wilkie*,
  588 U.S. 558 (2019)................................................................ 19

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) .......................................................... 24

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)................................................. 11, 12, 13

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012)............................................. 27

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)................................................. 28

*Ohio v. EPA*,
  98 F.4th 288 (D.C. Cir. 2024) ........................................ 12, 13

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ................................................................. 11

*Pennsylvania v. ICC*,
   561 F.2d 278 (D.C. Cir. 1977) ................................................. 19

*Portland Cement Ass'n v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011) ................................................. 31

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016) ................................................................. 29

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ................................................... 7

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
   590 U.S. 604 (2020) ................................................................. 24

*U.S. Telecom Ass'n v. FCC*,
   855 F.3d 381 (D.C. Cir. 2017) .......................................... 14, 15

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) ......................................................... 14, 15

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................... 2, 6, 14, 15, 16, 17, 18, 19, 21, 24

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) ................................................... 6

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ................................................................. 11

**Statutes**

42 U.S.C. § 13281 ...................................................................... 25

42 U.S.C. § 7401(b)(1)..................................................................29

42 U.S.C. § 7415(a).....................................................................29

42 U.S.C. § 7511b(h)(1)(A) .........................................................29

42 U.S.C. § 7521 ...........................................................................1

42 U.S.C. § 7521(a)(1) ......................................................2, 24, 25

42 U.S.C. § 7521(a)(2)..................................................................25

42 U.S.C. § 7543(a) ......................................................................12

42 U.S.C. § 7607(b)(1)..................................................................3, 6

42 U.S.C. § 7607(d)(9)...................................................................6

49 U.S.C. § 32902 ........................................................................19

Bipartisan Infrastructure Law § 25006(c)(1)(A),
    Pub. L. 117-58 (Nov 15, 2021) .............................................18

Pub. L. 91-604 (1970) ....................................................................1

Pub. L. 95-95 (1977) ......................................................................1

Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018).........18

Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. (2019).....18

**Other Authorities**

A. Reitze, Jr., *A Century of Air Pollution Control Law: What's Worked; What's Failed; What Might Work*, 21 Envtl. L. 1549 (1991)..................1

x

Dept. of Energy, *The Supply Chain Crisis Facing the Nation's Electric Grid* (Feb. 12, 2022), https://perma.cc/5PMF-7CB4 ............................ 17

EPA, *2022 EPA Automotive Trends Report* (2022), https://perma.cc/9BHV-8B3J ................................................................ 21

EPA, *Accomplishment and Successes of Reducing Air Pollution from Transportation in the United States*, https://perma.cc/2VRB-NGV3 ...... 2

EPA, *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (Nov. 2023), https://perma.cc/5M3R-YACH .................................................... 4, 27, 28

H. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721 (1991) .............................................................. 1

M. Colias, *Ford Shrinks its EV Rollout Plans as Demand Lags*, Wall St. J. (Aug. 21, 2024), https://perma.cc/YBP6-KZLW ................... 13, 18, 19

Note, *Smog—Can Legislation Clear the Air?*, 1 Stan. L. Rev. 452 (1949) .................................................................. 1

OMB, *Circular A-4* (Nov. 9, 2023), https://perma.cc/FH8V-KPSH .......... 5

OMB, *Circular A-4* (Sept. 17, 2003), https://perma.cc/G9MX-GWES .................................................. 4, 28, 29

R. Pielke Jr., *Secret Sauce*, The Honest Broker (Dec. 4, 2023), https://perma.cc/RCK2-MCNR ......................................................... 5, 27

U.S. Census Bureau, *American Community Survey 2022 5-Year Estimates, Physical Housing Characteristics for Occupied Housing Units*, https://perma.cc/UA49-JB6S .................................................. 16

xi

**Regulations**

75 Fed. Reg. 25,324 (May 7, 2010) ........................................................ 21

88 Fed. Reg. 29,184 (May 5, 2023) .................................................... 6, 27

89 Fed. Reg. 27,842 (Apr. 18, 2024) ....  2, 4, 5, 6, 8, 10, 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 27, 28, 29, 30, 31

# GLOSSARY

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| JA | Joint Appendix |
| Act | Clean Air Act |
| Standards | Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, 89 Fed. Reg. 27,842 (April 18, 2024) |
| MY | Model Year |
| BEV | Battery electric vehicle |
| PHEV | Plug-in hybrid electric vehicle |
| PEV | Plug-in electric vehicle, including BEVs and PHEVs |

## INTRODUCTION

Mid-twentieth-century American skies saw the "heavy fog" and "murky haze" of air pollution bring illness and death. Note, *Smog—Can Legislation Clear the Air?*, 1 Stan. L. Rev. 452, 452 (1949). In one example, smog "engulfed" New York City in 1963 and caused "200 deaths." A. Reitze, Jr., *A Century of Air Pollution Control Law: What's Worked; What's Failed; What Might Work*, 21 Envtl. L. 1549, 1586 (1991). For good reason, "public concern" remained "focused on air pollution." *Id.* at 1588.

So Congress intervened: The Clean Air Amendments of 1970 required MY 1975 vehicles to have 90 percent lower carbon monoxide and hydrocarbon emissions than MY 1970 vehicles. *Id.* at 1592; Sec. 202(b)(1)(A), Pub. L. 91-604 (1970). And in 1977, Congress again set specific emissions-reduction targets and timelines. Sec. 201(a), Pub. L. 95-95 (1977). But by 1990, more driving and lower-quality gasoline meant that vehicle emissions still made up a significant percentage of air pollution. *See* H. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721, 1768–69 (1991). So Congress acted again: the 1990 amendments set a two-tiered system of targets for vehicle emissions. *See* 42 U.S.C. § 7521(g)–(j).

Thanks to those legislative solutions, today there is no fog for Congress to lift. EPA highlights this "major success story" by noting that "[n]ew passenger vehicles are 98-99% cleaner for most tailpipe pollutants

compared to the 1960s." EPA, *Accomplishment and Successes of Reducing Air Pollution from Transportation in the United States*, https://perma.cc/2VRB-NGV3. Accordingly, Congress has not tightened vehicles emissions standards since the 1990 amendments. Instead, EPA's task (largely unchanged since 1970) is to "prescribe (and from time to time revise)" emissions standards for "any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines" that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger the public health or welfare." 42 U.S.C. § 7521(a)(1).

Yet in that provision, EPA now sees authority to upend the automobile industry—alongside America's transportation and power infrastructure—by mandating "more stringent emissions standards." "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27,842, 27,844 (Apr. 18, 2024) (Standards). The Standards pick winners (electric-powered vehicles) and losers (gas-powered vehicles). This decision comes at high costs to manufacturers and consumers, with purported social benefits that rest on a shaky foundation. It thus requires considering the "basic and consequential tradeoffs" of significant government action. *West Virginia v. EPA*, 597 U.S. 697, 730 (2022). Congress might make those policy choices—indeed, history shows that it has, when necessary. But EPA cannot make them on its own.

Because the Standards address major economic and political questions without clear congressional authorization, EPA acted outside its authority under Section 202 of the Clean Air Act in promulgating them. But even if the Standards are within EPA's authority, they are rooted in an arbitrary and capricious cost-benefit analysis. For these reasons, the Court should vacate the Standards.

## STATEMENT OF JURISDICTION

EPA published the Standards in the Federal Register on April 18, 2024. 89 Fed. Reg. 27,842 (effective June 17, 2024). State Petitioners filed their challenges that day (in 24-1087) and on April 29, 2024 (in 24-1100), invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

1.    Whether the Standards exceed EPA's authority under Section 202(a) of the Clean Air Act; and

2.    Whether EPA's cost-benefit analysis was arbitrary and capricious.

## STATUTES AND REGULATIONS

The Addendum contains the relevant statute.

## STATEMENT OF THE CASE

State Petitioners adopt private Petitioners' statement of the case. But as context for State Petitioners' arbitrary-and-capricious challenge

3

to EPA's cost-benefit analysis, State Petitioners offer supplemental background here.

### A. EPA used flawed social cost of carbon measures to calculate the Standards' benefits.

EPA estimates that the Standards will generate "climate benefits" of $1.6 trillion. Standards at 28,118, tbl.224, JA__. It does so only by relying on a flawed "social cost of carbon" metric. EPA describes the social cost of carbon as "the monetary value of the net harm to society associated with a marginal increase in GHG emissions in a given year, or the benefit of avoiding that increase." Standards at 28,115, JA__. EPA claims that its new measure—announced after comments closed, *see* EPA, *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (Nov. 2023), https://perma.cc/5M3R-YACH (*2023 Report*)— "reflect[s] recent advances in the scientific literature on climate change and its economic impacts." Standards at 28,115, JA__; *see also* RTC at 1521, JA__. It instead doubles down on flaws in the social cost of carbon metric to reach an inflated figure.

One source of inflation is EPA's chosen discount rate. Prior measures used discount rates between three and seven percent— consistent with federal guidance. *See* OMB, *Circular A-4*, 32–34 (Sept. 17, 2003), https://perma.cc/G9MX-GWES (instructing agencies to use two discount rates—seven percent, to "approximate the opportunity cost of capital" and three percent to approximate societal preferences). But in

4

the Standards, EPA used a two-percent discount rate, relying on a late-2023 update to Circular A-4. Standards at 28,106 n.1361, JA__, which by its terms is "not effective" for the Standards, *id.* at 27,985 n.723, JA__; *see also* OMB, *Circular A-4* at 93 (Nov. 9, 2023), https://perma.cc/FH8V-KPSH. Despite that acknowledgment, EPA claims that "to discount damages" by seven percent "would inappropriately underestimate the impacts of climate change[.]" Standards at 28,106, JA__. This decision allowed for inflated benefits.

EPA also refused to limit its calculations to the domestic costs. *See* RIA, 9-13–9-15, JA__–__. It instead "centers attention on a global measure of climate benefits from GHG reductions." *Id.* at 9-13, JA__. That, too, ignored instructions to "focus on benefits and costs that accrue to citizens and residents of the United States," not foreigners. *Circular A-4* at 15.

A final source of inflation is EPA's reliance on damage calculations based on an emissions scenario known as RCP8.5, described as "a high emissions scenario in the absence of climate change policies." *2023 Report* at 31–32. It projects a high level of warming but, as EPA admits, its "emissions projections [are] outside the 1st to 99th percentile range." *Id.* Yet despite that problem, EPA's damage module relies on damage functions that themselves rely on RCP8.5. *Id.* at 2; *see also* R. Pielke Jr., *Secret Sauce*, The Honest Broker (Dec. 4, 2023), https://perma.cc/RCK2-MCNR.

**B.    The resulting estimated "climate benefits" are significantly higher than those in the Proposed Rule.**

These flaws allow the Standards to dwarf the "climate benefits" estimated in the Proposed Rule. There, EPA predicted that its mandate would generate $330 billion in "climate benefits." *See* 88 Fed. Reg. 29,184, 29,200 (May 5, 2023), JA__. But in the Standards, due to the problems outlined above, EPA's estimated "climate benefits" balloon to $1.6 trillion. Standards at 28,118, JA__.

## STANDARD OF REVIEW

42 U.S.C. § 7607(b)(1) governs these challenges. It requires the Court to reverse the Standards "if [they are] 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations.'" *Wisconsin v. EPA*, 938 F.3d 303, 312 (D.C. Cir. 2019) (quoting 42 U.S.C. § 7607(d)(9)).

## SUMMARY OF ARGUMENT

Applying 42 U.S.C. § 7607 here requires vacating the Standards. State Petitioners offer two reasons why:

**First**, EPA lacked authority to promulgate them. An agency may not "assert[] highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. But that's just what EPA did here: the Standards aim to restructure the automobile industry around PEVs and send unprecedented demand

to an electric grid needing updates. Section 202 of the Act does not provide that authority.

**Second**, even if EPA had the authority to act, it was arbitrary and capricious in weighing costs against benefits. For one, EPA relied on a greenhouse-gas-emissions cost calculation plagued by internal inconsistencies and impermissible considerations. Doing so allowed it to inflate the Standards' benefits. For another, EPA also failed to address significant costs associated with its aggressive electrification timeline.

The Standards are unlawful, so the Court should vacate them.[1]

## STANDING

State Petitioners have standing to challenge the Standards. Standing requires "a 'substantial probability' that" State Petitioners have "been injured," that EPA caused the injury, and that vacating the Standards "could redress that injury." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citation omitted). Standing exists here for at least three reasons:

First, the Standards increase costs to State Petitioners. They thus impose a "'pocketbook' injury incurred by the state itself." *Air All.*

---

[1] State Petitioners agree with and adopt private Petitioners' additional bases for vacatur.

*Houston v. EPA*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) (citation omitted). To name just a few of those costs:

- State Petitioners manage fleets of state-owned vehicles to perform state functions. *See, e.g.*, Glass Decl. 5a, ¶¶3–4; Oliver Decl. 142a, ¶¶3–4; Randall Decl. 137a, ¶3; Moerer Decl. 135a–136a, ¶¶3–4; Johnston Decl. 128a–129a, ¶¶3–4; Goehring Decl. 45a. ¶54; Espy Decl. 160a, ¶4; Bylsma Decl. 164a, ¶3; Kuhlmann Decl. 169a, ¶3; Miller Decl. 178a, ¶7. The Standards "will result in a rise in the average purchase price" of vehicles—PEVs are more expensive for consumers, *see* Standards at 28,108, JA__, and the cost of internal-combustion-engine vehicles (what many State Petitioners currently need and prefer) will also increase with greater PEV supply, *see id.*; Zycher Decl., 187a–188a, ¶5 ("[V]ehicle manufacturers forced to adhere to the regulated fleet GHG emissions requirements can achieve them only by raising prices of conventional vehicles.").

  State Petitioners regularly replace those vehicles. *See* Glass Decl. 6a–7a, ¶7 (Kentucky's Agriculture Department replaces 13 light-duty vehicles annually); Oliver Decl. 142a, ¶5 (Indiana replaces 50 light-duty vehicles annually); Moerer Decl. 136a, ¶6 (Nebraska replaces 190 light-duty vehicles annually); Johnston Decl. 129a, ¶7 (Arkansas replaces 20 light-duty vehicles annually); Espy Decl. 160a–161a, ¶6 (Alabama's Department of Environmental Management replaces 10.2 light-duty vehicles annually); Bylsma Decl. 165a, ¶7 (Alaska replaces 200-500 vehicles annually); Kuhlmann Decl. 170a, ¶7 (Wyoming replaces 90 light-duty vehicles annually). *See also* Goehring Decl. 47a, ¶60; Watts Decl. 52a, ¶12. The Standards make replacement more expensive for State Petitioners. Texas alone will need to purchase 4,465 PEVs between 2027 and 2032, at an estimated cost of $85,539,273. Miller Decl. 181a–182a, ¶¶15–21.

- Fleet management costs will also increase. State Petitioners are equipped for maintaining and refueling internal-combustion-engine vehicles. PEVs present new costs, including upgrading

8

maintenance systems for PEVs and installing vehicle-charging infrastructure. Glass Decl. 6a–7a, ¶7 (installation of PEV chargers at agency offices and employee homes); Moerer Decl. 136a, ¶9 (installation of PEV chargers at six agency offices); Oliver Decl. 146a, ¶¶13–14 ($500,000 to update maintenance and body shop to accommodate PEVs, $15,000 per technician to update tool sets). Those costs are even higher for agencies serving rural communities. *See, e.g.*, Glass Decl. 7a–10a, ¶¶9–12 (describing lack of charging infrastructure in rural communities served by agriculture inspectors); Johnston Decl. 130a–131a, ¶¶9–13 (same). *See also* Oliver Decl. 145a, ¶¶11–12 (explaining how severe and cold weather poses a problem with PEV use by state agencies in rural areas); Goehring Decl. 48a, ¶64 (same); Zycher Decl. 196a, ¶23 (same).

- Road- and infrastructure-maintenance costs will increase. The average PEV is substantially heavier than the average internal combustion engine vehicle, so State Petitioners must account for those consequences, particularly in rural communities where roads are designed for lighter traffic. Watts Decl. 52a, ¶10 (the Standards will "more than double" repair costs); Syslo Decl. 4a, ¶26 (increased weight reduce pavement life by 7.5 percent and require $6-10.3 million annual investment); Goehring Decl. 42a–44a, ¶¶47–51.

- States will also be tasked with updating electric grids and distribution systems to accommodate the Standards. The biggest victim of the "tangible and permanent costs" of upgrading infrastructure are citizens paying higher rates. Lane Decl. 18a, ¶9; Christmann Decl. 126a–127a, ¶28. But State Petitioners are ratepayers, too. *See* Watts Decl. 54a, ¶19 ("When electricity rates increase as a result of the increased demand from [PEVs], the cost to Florida of obtaining electric service for these will increase, as well."). They are also responsible for reliability, which will be taxed with the sudden influx of higher numbers of EVs. Lane Decl. 16a, ¶5 ("[PEVs] will take up a great deal of generation and grid capacity."); *id.* 21a, ¶19 (West Virginia "will be forced to make

9

significant expenditures of human and fiscal resources to keep up with the Rule's effects."); Christmann Decl. 126a–127a, ¶28. These costs created by the Standards will injure State Petitioners, so vacating the Standards will redress those injuries.

What is more, the costs rest "on the predictable effect of Government action on the decisions of third parties." *Dept. of Commerce v. New York*, 588 U.S. 752, 768 (2019). As emphasized above, State Petitioners are injured because (1) an increase in PEVs will mean (2) higher purchase prices for statewide fleets and (3) more need to invest in charging infrastructure. *See generally* Zycher Decl. 187a–188a, ¶5. That line of reasoning is uncontroversial: it comes straight from the Standards. *See* Standards at 27,861, JA__ (projecting "that the MY 2032 fleet will be made up of a larger share of BEVs relative to ICE vehicles"); *id.* at 28,066, JA__ (estimating an average cost increase of $2,100 for light-duty vehicles and $3,300 for medium-duty vehicles); *id.* at 28,013, JA__ (agreeing that "between $31 billion and $55 billion would be needed by 2030 for public charging infrastructure"). The attached declarations only bolster the Standards' conclusions.

Second, as the Standards increase State Petitioners' costs, they will simultaneously reduce their fuel-tax revenues. Indeed, "any rule that limits tailpipe [greenhouse gas] emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015)  (citation omitted). EPA agrees: it projects "a

10

reduction of U.S. gasoline consumption by 780 billion gallons through 2055." Standards at 28,092, JA__; *see also* RIA at 4-40, JA__. That massive reduction will correspond to decreased fuel-tax revenues. *See* Miller Decl. 183a–184a, ¶28; Tolman Decl. 156a–157a, ¶¶8–12; McCray Decl. 152a, ¶8; Cook Decl. 149a, ¶7; Goehring Decl. 35a, ¶30. And that revenue decrease will affect the funds available to State Petitioners. *Id.* That injures State Petitioners. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448–49 (1992).

Finally, State Petitioners are challenging the Standards in part to protect their electric grids and accompanying infrastructure. "EPA acknowledges that there may be additional infrastructure needs and costs beyond those associated with charging equipment itself," including "generation, transmission, and distribution system upgrades and additions." Standards at 28,017, JA__. Although private parties will be largely responsible for *building* such infrastructure, regulating, managing, and overseeing those grids is one of State Petitioners' most important police powers. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). Increasing that capacity is not cost free. *See* Lane Decl. 21a, ¶19. It also undermines the States' sovereign and quasi-sovereign interests—injuries that entitle States to "special solicitude" in this standing analysis. *See*

11

*Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601–02 (1982). As this Court likely recognized in allowing California and its coalition to intervene to support Respondents, sovereign States have "important and substantial interests" in how EPA exercises its authority. State of California, et al., Mot. for Leave to Intervene, Case No. 24-1087, Doc. #2050867 at 18 (D.C. Cir. Apr. 22, 2024).

This Court's decision in *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), *cert. petitions pending* Nos. 24-7 (U.S. July 2, 2024) and 24-13 (U.S. July 9, 2024), does not change this analysis. That case involved EPA's decision to reinstate a federal-preemption waiver issued to California under 42 U.S.C. § 7543(a). The Court concluded that the petitioners' injuries "would be redressed only if automobile manufacturers responded to vacatur of the waiver by producing and selling fewer non-conventional vehicles or by altering the prices of their vehicles." *Ohio*, 98 F.4th at 302. But the Court concluded on that record it was unclear whether the waiver *would* lead to an increase in electric vehicle production at all, given existing market forces, the "relatively short" duration of the waiver, and the lead time manufacturers would need to make changes to their fleets. *Id.* at 304–05.

No such concern is present here. To start, the record here is clear that manufacturers are not unable "to alter their product plans" for the

relevant MYs. *See id.* at 302–03. Those plans are still changing; indeed, the Rule is specifically intended to affect them. *See, e.g.*, M. Colias, *Ford Shrinks its EV Rollout Plans as Demand Lags*, Wall St. J. (Aug. 21, 2024), https://perma.cc/YBP6-KZLW. And there is no question that the standards themselves will have an effect. Unlike the waiver in *Ohio*, EPA itself projects that compliance with the Standards *will* lead to substantially more PEVs on the market nationwide. *See* Standards at 27,861, JA__ (projecting "that the MY 2032 fleet will be made up of a larger share of BEVs relative to ICE vehicles"). The harms related to that increase, identified above, "would be reduced to some extent" by vacatur. *Massachusetts*, 549 U.S. at 526.

## ARGUMENT

The American automobile industry has been organized around the internal combustion engine for as long as it has existed. EPA seeks to change that with its Standards. EPA projects that, because of the Rule, 68 percent of new vehicles will be PEVs by 2032, *see* Standards at 28,067, tbl.108, JA__—a stunning remaking of the automobile market in under a decade. But EPA lacked authority to issue that mandate. And even if it had it, its cost-benefit analysis was arbitrary and capricious.

## I.     EPA lacked authority to promulgate the Standards.

The fundamental question for this Court is whether the Clean Air Act's Section 202 authorizes EPA to restructure the automobile industry

around PEVs by substantially tightening tailpipe emissions standards. The answer is no. Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). That clear-statement rule—the major-questions doctrine—applies here and bars EPA from asserting the extraordinary power it claims. In the Standards, EPA asserts broad new authority to address significant economic and political issues left within Congress' bailiwick. Congress never clearly authorized EPA to do so.

### A.    The Standards address major questions.

The Court must first determine whether the Standards implicate major questions. Such questions involve deciding "'the basic and consequential tradeoffs' inherent" in a government program "'that Congress would likely have intended for itself.'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (cleaned up) (quoting *West Virginia*, 597 U.S. at 730). Those tradeoffs are often described in economic or political terms. Whatever descriptor the Court uses, the Standards qualify.

**1.**    Start with economic significance. It can be measured several ways—"the amount of money involved for regulated and affected parties, the overall impact on the economy, [or] the number of people affected . . . ." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 422–23 (D.C. Cir.

14

2017) (Kavanaugh, J., dissenting from reh'g denial). And because the major-questions doctrine applies in "all corners of the administrative state," costs associated with "the conferral of benefits" are also considered. *Nebraska*, 143 S. Ct. at 2375.

The Supreme Court's recent major-questions decisions offer the simplest guide for the Court. In *Alabama Association of Realtors*, it found that $50 billion in economic impact "triggered analysis under the major questions doctrine." *Nebraska*, 143 S. Ct. at 2373 (citing *Ala. Ass'n*, 594 U.S. at 764). *UARG* dealt with "permitting costs of $147 billion" for "newly covered sources." 572 U.S. at 322. And in *Nebraska*, a debt-relief program costing taxpayers "between $469 billion and $519 billion" was "staggering by any measure." 143 S. Ct. at 2373 (citation omitted).

The Standards exceed those numbers. EPA itself estimates that costs associated with the Standards will be $590 billion. Standards at 28,108 tbl.212, JA__. That includes $870 billion in vehicle technology costs for manufacturers, minus purported repair and maintenance savings. *Id.* For "public charging infrastructure" alone, an EPA-cited study "estimated that between $31 billion and $55 billion would be needed by 2030." *Id.* at 28,013, JA__. Taken with other costs faced by State Petitioners, *see supra* 8–10 (citing State cost calculations), there can be no question of the Standards' economic significance.

15

These costs extend to a huge number of Americans. In *West Virginia*, the Court focused on EPA's claimed authority to decide "how Americans will get their energy," including what transitions can occur "before the grid collapses, and how high energy prices can go as a result before they become unreasonably 'exorbitant.'" 597 U.S. at 729. And long ago, the Supreme Court rejected an agency's claim of authority to set railroad rates. *See ICC v. Cincinnati, N.O. & Tex. Pac. R. Co.*, 167 U.S. 479, 511 (1897). In doing so, it noted that "[t]he importance of the question cannot be overestimated" because "[b]illions of dollars are invested in railroad properties" and "[m]illions of passengers, as well as millions of tons of freight, are moved each year by the railroad companies." *Id.* at 494.

By this metric, too, the Standards are significant. The Census Bureau estimates that between 2018 and 2022, almost 92 percent of American households had access to at least one vehicle. *See* U.S. Census Bureau, *American Community Survey 2022 5-Year Estimates, Physical Housing Characteristics for Occupied Housing Units*, https://perma.cc/UA49-JB6S. Put simply, most Americans drive. And EPA acknowledges increased per-vehicle costs under the Standards. *See* Standards at 28,066, JA__ ($2,100 per light-duty vehicle and $3,300 per medium-duty vehicle in MY 2032).

16

But Americans will not only experience the Standards' effects in purchasing their vehicles. New infrastructure will also be needed to accommodate more PEVs. EPA admits as much, saying increases in charging caused by the Standards "are likely to require additional distribution infrastructure." Standards at 28,022, JA__. Those improvements will raise costs for consumers. Lane Decl. 18a, ¶9; Christmann Decl. 126a–127a, ¶28. Especially so given supply-chain problems affecting "the electric grid component market, resulting in an ongoing shortage of transformers and other grid components." *See* Dept. of Energy, *The Supply Chain Crisis Facing the Nation's Electric Grid* (Feb. 12, 2022), https://perma.cc/5PMF-7CB4.

If allowed to run their course, the Standards will altogether remake "a significant portion of the American economy," and "require billions of dollars in spending by private persons or entities." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (citations omitted).

2.      The politics surrounding the Standards likewise illustrate their significance. Whether governments should be putting a thumb on the scale for electrification nationwide is "the subject of an earnest and profound debate across the country." *Id.* at 732 (citation omitted). Recent attempts to force electrification have been challenged in this Court.[2] And

---

[2] *See Ohio v. EPA*, No. 22-1081 (D.C. Cir.) (challenging federal preemption waiver of California emissions mandates); *Texas v. EPA*, No.

17

Congress has twice declined to enact electrification mandates much like the Standards, *see, e.g.*, Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. (2019); Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018), instead choosing to study the "barriers and opportunities to scaling up" EV adoption, Bipartisan Infrastructure Law § 25006(c)(1)(A), Pub. L. 117-58 (Nov 15, 2021), as well as the "cradle to grave environmental impact of electric vehicles," *id.* § 40435, and the "impact on forced labor in China on the [EV] supply chain," *id.* § 40436. That Congress has "considered and rejected" these policies is evidence of political significance. *See West Virginia*, 597 U.S. at 731 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000)).

True, EPA pushes back on characterizing the Standards "as a ban on gasoline engines or a zero-emission vehicle mandate[,]" claiming that various technologies could meet the Standards. Standards at 27,898, JA__. It claims that the Standards "are complementary to what the manufacturers are already doing regardless of this rule." *Id.* But EPA's own models say otherwise: In its no-action case, PEV penetrations reach 47 percent in 2032. Standards at 28,067, tbl.108, JA__. That number is 68 percent under the Standards. *Id.* Indeed, EPA projects that the gap

---

22-1031 (D.C. Cir.) (challenging revised light-duty emissions standards for MYs 2023–2026); *NRDC v. NHTSA*, No. 22-1080 (D.C. Cir.) (challenging revised passenger car and light duty truck fuel economy standards for MYs 2024–2026); *Nebraska v. EPA*, No. 24-1129 (D.C. Cir.) (challenging revised heavy-duty emission standards).

18

between PEV penetration numbers in its no-action case and under the Standards will grow each year the Standards are in place. *Id.* And recent events confirm that while EPA is "pressuring [manufacturers] to invest in [PEV] technology[,]" "consumer interest in EVs has waned after a burst of enthusiasm." M. Colias, *supra* (citing Ford's claim that it "lost about $44,000 on every electric vehicle that it sold"). So while EPA denies forcing electrification in its major-questions-doctrine prebuttal, the Court should take EPA at its word when it "project[s] that the MY 2032 fleet will be made up of a larger share of BEVs relative to ICE vehicles." Standards at 27,861, JA__.

**3.**   A quick glance around the federal government also cuts against EPA. That's because EPA "has no comparative expertise" in deciding what percentage of American automobiles should be PEVs. *West Virginia*, 597 U.S. at 729 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)). The Department of Transportation, acting through NHTSA, has at least as strong a claim on emissions issues. (And in fact, EPA and NHTSA used to act together to regulate emissions. *See* State Petitioners' Comments (EPA-HQ-OAR-2022-0829-0649) at 2, JA__ (describing joint rulemakings).) NHTSA sets average fuel economy standards for automobiles. 49 U.S.C. § 32902(a). But it "may not consider" EV fuel economy in doing so. *Id.* § 32902(h)(1). EPA thus claims the authority to mandate PEVs at the expense of NHTSA's role in setting fuel standards.

19

That does little to "reconcile[]" these "two regulatory systems . . . applicable to a certain subject matter." *Pennsylvania v. ICC*, 561 F.2d 278, 292 (D.C. Cir. 1977).

Three other recent congressional programs merit mention. One is the Renewable Fuels Program. It "require[s] upstream market participants such as refiners and importers to introduce increasing volumes of renewable fuel into the transportation fuel supply" and, in so doing, acts as a "market forcing policy." *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 705 (D.C. Cir. 2017). Mandating PEVs here frustrates what Congress intended.

The other two are the Bipartisan Infrastructure Law of 2021 and the Inflation Reduction Act of 2022. Both are economic measures that, in part, fund or encourage PEVs and PEV infrastructure. EPA draws its own conclusion that the statutes "represent an important opportunity" to issue its mandate, purportedly consistent with "the public health goals of the Clean Air Act." Standards at 27,846, JA__. But it cannot point to any authorization (or even encouragement) to issue the Standards in either law. *See supra* 18 (citing congressional efforts to study, not mandate, PEV adoption). And in fact, these programs do more to suggest that Congress, in its own time and judgment, will decide the federal government's role in PEV penetration. Right now, Congress has chosen to encourage voluntary adoption of PEVs through economic incentives and otherwise,

20

rather than the top-down, compelled approach that EPA takes in the Standards.

4.    Finally, the Standards reflect a "transformative expansion in [EPA's] regulatory authority." *West Virginia*, 597 U.S. at 724 (cleaned up). When EPA began regulating GHG emissions in 2009 and 2010, 75 Fed. Reg. 25,324 (May 7, 2010), it chiefly resulted in current technologies being improved—smaller or more efficient engines, better transmissions, start-stop systems, better tires, reduced vehicles weights, for example, *see generally, e.g.*, EPA, *2022 EPA Automotive Trends Report* (2022), https://perma.cc/9BHV-8B3J. But the Standards force automobile manufacturers to start from the ground up, fundamentally changing the basic vehicle propulsion system and shifting the energy burden from the gas pump to the grid. In other words, EPA moved from a system of regulation that tries to build on existing technologies to one that works to *prohibit* them. Shifting from a process that merely tries to improve vehicles on the present-day market to one that tries to reshape the market itself is the kind of major question at issue in *West Virginia*. Like EPA then, EPA now believes it "can demand much greater reductions in emissions based on a very different kind of policy judgment: that it would be 'best' if [gas-powered vehicles] made up a much smaller share of [the] national" vehicle fleet. *West Virginia*, 597 U.S. at 728. *See* Standards at 28,059, tbl.81, JA__ (projecting 21 percent ICE penetration in 2032); *id.*

21

at 28,067, tbl.108, JA__ (projecting 68 percent PEV penetration in 2032); *id.* at 27,846, JA__ (citing E.O. 14,037's "goal for 50 percent of U.S. new vehicle sales to be zero-emission vehicles by 2030").

Until the current administration, EPA had never regulated this way before. *See Nebraska*, 143 S. Ct. at 2372 (asking whether an agency has "previously claimed powers of this magnitude under the [applicable] Act"). It claims otherwise. *See* Standards at 27,891–900, JA__–__ ("EPA is acting within the heartland of its statutory authority and faithfully implementing Congress's precise direction and intent."). But its reasons are unconvincing.

EPA's main resort is to examples of "basing standards on ever-evolving technologies that have allowed for enormous emissions reductions." Standards at 27,895–96, JA__–__. To be sure, EPA helped achieve those goals. But it cannot ignore who set them: Congress. That's why it cannot claim that the Standards are "directly analogous" to past measures. *Id.* at 27,895, JA__. Until recently, EPA only claimed the authority to upend the automobile industry when Congress provided it.

Start with EPA's prime example, the 1970 Clean Air Amendments. EPA cites *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C. Cir. 1973), for the proposition that "Congress expected the Clean Air Amendments to force the industry to broaden the scope of its research— to study new types of engines and new control systems." Standards at

22

27,894, JA__ (quoting *Ruckelshaus*, 478 F.2d at 635). But *Ruckelshaus* was not about the general provision of the Act (the current Section 202(a)) that EPA cites as authority here. It was about the decision by Congress "to set a statutory standard for required reductions in levels of hydrocarbons (HC) and carbon monoxide (CO) which must be achieved for 1975 models of light duty vehicles." *Ruckelshaus*, 478 F.2d at 623. In other words, Congress set a specific standard, designed to force industry innovation, and EPA implemented it.

It follows that EPA's point that the 90 percent emissions reduction required by the 1970 amendments "was to be achieved with less lead time than this rule provides for in its final standards" is irrelevant. Standards at 27,894, JA__. *Congress*—not EPA—set the reduction requirement and the lead time. The same was true for EPA's purported direct analogy, the 1990 amendments, which even EPA admits contained specific directions from Congress for EPA to implement. *Id.* at 27,894–95, JA__–__. EPA can only look to Section 202(a) by pointing to more recent rulemakings, *see* Standards at 27,895–96, JA__–__, but none forced such extreme technological change on manufacturers. The most accurate comparators to the Standards are the major emissions reduction targets set by Congress—not by EPA regulation—in 1970, 1977, and 1990.

All told, for these reasons, the Standards present major questions normally reserved for Congress.

**B.    EPA lacked clear authority to mandate electrification.**

"In such circumstances," EPA is required "to 'point to clear congressional authorization' to justify the" power exercised. *Nebraska*, 143 S. Ct. at 2375 (quoting *West Virginia*, 597 U.S. at 732). After all, "Congress" must "delegate such authority 'expressly' if at all." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2269 (2024) (citation omitted); *accord ICC*, 167 U.S. at 505 ("That [C]ongress has transferred such a power to any administrative body is not to be presumed or implied from any doubtful and uncertain language.").

Indeed, "modest words, vague terms, or subtle devices" cannot demonstrate an "extraordinary grant[] of regulatory authority." *West Virginia*, 597 U.S. at 723 (citation omitted) (cleaned up). Same for "oblique or elliptical language." *Id.* (citation omitted). Instead, if "Congress wishes to alter the fundamental details of a regulatory scheme," the Court must find "requisite clarity to place that intent beyond dispute." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621 (2020) (citation omitted).

The correct starting point is thus the text of EPA's claimed authority. EPA "shall by regulation prescribe (and from time to time revise) . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines" that "cause, or contribute to, air pollution which may reasonably be

24

anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). Those standards "shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." *Id.* § 7521(a)(2). Nothing in this incremental statutory text clearly authorizes market transformation. This is telling because Congress has been passing laws about EVs for at least 30 years. *Id.* § 13281; *supra* 18.

EPA claims that it is simply implementing Congress's "major policy decision to regulate air pollution from motor vehicles" in Section 202(a). Standards at 27,897, JA__. But that oversimplifies matters. Consider EPA's real point: Congress in 1970 regulated air pollution by (a) giving EPA general authority to set emissions standards and (b) tasking EPA with forcing industry to reduce certain emissions by 90 percent by MY 1975. So now, fifty-plus years later, EPA asserts its general standard-revising authority such that, taken to its logical conclusion, EPA can eliminate *all* tailpipe emissions. But purported similarities between the Standards' "indirect impacts" and the "impacts Congress itself recognized and accepted" when it set those specific emissions targets are not reason enough to sustain EPA's claim. Standards at 27,900, JA__. Reducing certain emissions by 90 percent and forcing almost 70 percent of new vehicles to be PEVs are both major policy choices, with "basic and

25

consequential tradeoffs" involved. *See Nebraska*, 143 S. Ct. at 2375. For the former, Congress made that choice; here, EPA acted alone.

The bottom line is that EPA has implemented major emissions reductions set by Congress. But when Congress has told EPA to "force the industry" to make significant technological changes, *Ruckelshaus*, 478 F.3d at 635, it has spoken clearly—not through Section 202(a). The general, incremental authority Congress gave EPA in Section 202(a)(1) is not the clear statement EPA needs to justify its authority to promulgate the Standards.

*    *    *

Without clear authorization from Congress, EPA could not answer the major questions the Standards raise. That makes them unlawful.

## II. EPA's cost-benefit analysis was arbitrary and capricious.

Even if EPA had the authority to promulgate the Standards, its action should be vacated. "One of the basic procedural requirements of administrative rulemaking" is that the agency must "give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). EPA did not meet its obligation "to engage in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up). To see why, the Court must consider "the relevant factors" and decide "whether there has been a clear error of judgment." *Id.* (cleaned up).

26

Because EPA "decide[d] to rely on a cost-benefit analysis" in adopting the Standards, "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Here, EPA missed the mark on both sides of the equation.

### A.    EPA's benefits calculation was flawed.

Three main errors related to the social cost of carbon led EPA to an inflated benefits calculation.

1.    Between May 2023 and April 2024, the purported "climate benefits" of the Standards grew from $330 billion to $1.6 trillion. *Compare* 88 Fed. Reg. at 29,200, JA__, *with* Standards at 28,118, JA__. That massive shift was made possible by the social cost of carbon calculation's extreme sensitivity to damages models and EPA's decision to shift to a model relying on an implausible emissions scenario—RCP8.5. By embedding those RCP8.5 scenarios in its damages calculations, EPA was able to reach its inflated "climate benefits" calculation. Yet even EPA points out the problem with that RCP8.5 emissions projection. *See 2023 Report* at 31–32. Still, its damage modeling relies on studies that rely on it. *Id.* at 2; *see also* R. Pielke Jr., *supra*. Ignoring this problem was arbitrary and capricious: EPA's "reasoning cannot be internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

27

Equally troubling is EPA's move to change the metric supporting its "climate benefits" calculation without opportunity for comment. The earlier calculation had problems that State Petitioners flagged in their comment. *See* State Petitioners' Comments at 9–10, JA\_\_–\_\_. But as outlined above, the new metric drastically increased the "climate benefits" calculation, and it did so by relying on methods subject to serious debate. *See* Standards at 28,115, JA\_\_ (citing *2023 Report*). Put simply, its centrality here to the Standards' cost-benefit analysis was worthy of comment. EPA's failure to allow that opportunity was itself "a fundamental flaw." *NRDC v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

**2.**    Another error is EPA's chosen discount rate of two percent. The version of Circular A-4 applicable to the Standards requires a seven percent discount rate. OMB, *Circular A-4*, 33–34. But EPA claims applying that discount rate here "would inappropriately underestimate the impacts of climate change." Standards at 28,106 n.1361, JA\_\_. It does not explain that conclusion—or even how it is determining what is "appropriate." Of course, the lower discount rate means a higher value in today's dollars, so unreasonably ignoring Circular A-4's guidance here lets EPA inflate the alleged benefits of its Standards. OMB, *Circular A-4*, 32. That is not a detailed explanation of its decision to depart from longstanding guidance.

28

**3.**    The global scale of this measure is also unreasonable. EPA claims that "a global metric" is necessary to assess "the climate benefits of avoided [greenhouse gas] emissions" because "climate change" is "a true global challenge." RIA, 9-13–9-15, JA__–__. But the Act lets EPA regulate American air pollution, not solve global climate change. 42 U.S.C. § 7401(b)(1). EPA may only respond to foreign pollution in limited circumstances, none of which apply here. *See id.* §§ 7415(a), 7511b(h)(1)(A). This omission is particularly significant as statutes are presumed to have only domestic application. *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) ("When a statute gives no clear indication of an extraterritorial application, it has none." (citation omitted)). What's more, Circular A-4 directs agencies to "focus on benefits and costs that accrue to citizens and residents of the United States." OMB, *Circular A-4*, 15.

By leaning into these errors, EPA could calculate massive benefits—$72 billion in annualized value and $1.6 trillion in present value. Standards at 28,091, 28,118, JA__, __. That only stacked the deck in favor of EPA's preferred cost-benefit balance.

### B.    EPA downplays the Standards' unpredictable costs.

While it places undue weight on the Standards' benefits, EPA also fails to fully account for the costs they will impose on America's energy sector.

29

To start, the Standards will meaningfully affect America's power grid, despite EPA's prediction otherwise. *See, e.g.*, Standards at 27,900, JA__ ("EPA projects that this rulemaking will not cause significant adverse impacts on electric grid reliability or resource adequacy."). Current delivery systems require upgrades to deliver PEV-charging capacity to consumers. Lane Decl. 17a–18a, ¶¶7–10; Christmann Decl. 118a, ¶7. That cost is amplified by the significant supply-chain issues facing those infrastructure improvements. Christmann Decl. 124–125a, ¶25 (citing a four- to nine-times price increase from 2021 and a two-year lead time for distribution transformers). And for rural areas especially, the cost of catching infrastructure up with EPA's demands is high. *See infra* 8–10 (citing state declarations to explain the need for travel to areas without charging infrastructure); *see also* Christmann Decl. 125a–126a, ¶26–27 (describing distribution system problems faces by a California city and applying it to North Dakota). *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (holding EPA acted arbitrarily and capriciously where it did not adequately consider rule's effect on energy reliability).

On top of all that, EPA barely considers the effects of its simultaneous regulations on these problems. *See* Standards at 28,019–20, JA__–__ (discussing the "power Sector Rules"). Each of those rulemakings has been challenged in part because of harms to grid

30

reliability. Yet EPA simply determines they "are unlikely to affect the power sector's ability to maintain resource adequacy and grid reliability." Standards at 28,020, JA__. In weighing costs to electric providers and consumers, EPA cannot turn a blind eye to the effects of its government-wide approach to climate change. "Basing its decision on a premise" about grid reliability "the agency itself has already planned to disrupt is arbitrary and capricious." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011).

\*     \*     \*

The above flaws render EPA's cost-benefit analysis arbitrary and capricious. So even if the Court finds EPA had authority to promulgate the Standards, it should still set them aside as arbitrary and capricious.

## CONCLUSION

State Petitioners' petitions for review should be granted and the Standards should be vacated.

31

Respectfully submitted,

**RUSSELL COLEMAN**
**Attorney General of**
**Kentucky**

/s/ Jacob M. Abrahamson
Matthew F. Kuhn
 *Solicitor General*
John H. Heyburn
 *Principal Deputy*
 *Solicitor General*
Victor B. Maddox
 *Counsel for Special Litigation*
Jacob M. Abrahamson
 *Assistant Solicitor General*
Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov
Victor.Maddox@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*


(Counsel for Additional Petitioners Below)

**PATRICK MORRISEY**
**Attorney General of**
**West Virginia**

/s/ Michael R. Williams
Michael R. Williams
 *Solicitor General*
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, West Virginia 25305
(304) 558-2021
Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

**STEVE MARSHALL**
**Attorney General of Alabama**

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Petitioner*
*State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**

/s/ Masha Kazakova
Masha Kazakova
  *Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
masha.kazakova@alaska.gov

*Counsel for Petitioner*
*State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/ Nicholas J. Bronni
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner*
*State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**

/s/ Henry C. Whitaker
Henry C. Whitaker
  *Solicitor General*
James H. Percival
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for Petitioner*
*State of Florida*

33

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

/s/ Stephen J. Petrany
Stephen J. Petrany
  *Solicitor General*
Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Petitioner*
*State of Georgia*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Joshua N. Turner
Joshua N. Turner
  *Chief of Constitutional Litigation*
  *and Policy*
Alan M. Hurst
  *Solicitor General*
Office of the Idaho
Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for Petitioner*
*State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
James A. Barta
  *Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for Petitioner*
*State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Eric H. Wessan
Eric H. Wessan
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa*

34

**KRIS KOBACH**
**Attorney General of Kansas**

/s/ Anthony J. Powell
Anthony J. Powell
  *Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for Petitioner*
*State of Kansas*

**LIZ MURRILL**
**Attorney General of Louisiana**

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
  *Solicitor General*
Office of the Louisiana
Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov

*Counsel for Petitioner*
*State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**

/s/ Justin L. Matheny
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi
Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner*
*State of Mississippi*

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
  *Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for Petitioner*
*State of Missouri*

35

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Petitioner*
*State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ Grant D. Strobl
Eric J. Hamilton
  *Solicitor General*
Grant D. Strobl
Zachary B. Pohlman
  *Assistant Solicitors General*
Office of the Attorney General
of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Eric.Hamilton@nebraska.gov
Grant.Strobl@nebraska.gov

*Counsel for Petitioner*
*State of Nebraska*

**JOHN FORMELLA**
**Attorney General of**
**New Hampshire**

/s/ Mark Dell'Orfano
Mark Dell'Orfano
  *Associate Attorney General*
New Hampshire
Department of Justice
33 Capitol Street
Concord, New Hampshire 03301
(603) 271-3643
Mark.W.Dellorfano@doj.nh.gov

*Counsel for Petitioner*
*State of New Hampshire*

**DREW WRIGLEY**
**Attorney General of**
**North Dakota**

/s/ Philip Axt
Philip Axt
  *Solicitor General*
North Dakota Attorney
General's Office
600 East Boulevard Avenue,
Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Petitioner*
*State of North Dakota*

36

**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
  *Solicitor General*
Mathura Sridharan
  *Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Oklahoma Office of the
Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov

*Counsel for Petitioner*
*State of Oklahoma*

**ALAN WILSON**
**Attorney General of**
**South Carolina**

/s/ James Emory Smith, Jr.
James Emory Smith, Jr.
  *South Carolina*
  *Deputy Solicitor General*
P.O. Box 11549
Columbia, South Carolina 29211
(803) 734-3642
esmith@scag.gov

*Counsel for Petitioner*
*State of South Carolina*

**MARTY J. JACKLEY**
**Attorney General of**
**South Dakota**

/s/ Steven Blair
Steven Blair
  *Deputy Attorney General*
South Dakota Attorney
General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for Petitioner*
*State of South Dakota*

37

**KEN PAXTON**
**Attorney General of Texas**

/s/ Lanora C. Pettit
Brent Webster
  *First Assistant Attorney General*
Aaron L. Nielson
  *Solicitor General*
Lanora C. Pettit
  *Principal Deputy Solicitor General*
Wesley S. Williams
  *Assistant Attorneys General*
Office of Texas Attorney General
P.O. Box 12548
Austin, Texas 78711
Tel: (512) 936-1700
Lanora.Pettit@oag.texas.gov

*Counsel for Petitioner*
*State of Texas*

**SEAN D. REYES**
**Attorney General of Utah**

/s/ Stanford E. Purser
Stanford E. Purser
  *Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov

*Counsel for Petitioner*
*State of Utah*

**JASON S. MIYARES**
**Attorney General of Virginia**

/s/ Kevin M. Gallagher
Kevin M. Gallagher
  *Principal Deputy Solicitor General*
Brendan T. Chestnut
  *Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Petitioner*
*Commonwealth of Virginia*

**BRIDGET HILL**
**Attorney General of Wyoming**

/s/ Ryan Schelhaas
Ryan Schelhaas
  *Chief Deputy Attorney General*
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-5786 phone
(307) 777-6869 fax
ryan.schelhaas@wyo.gov

*Counsel for Petitioner*
*State of Wyoming*

39

## CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(f) and (g), I certify that this brief complies with this Court's July 17, 2024 Scheduling Order, because it contains 6,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word.

*/s/* Jacob M. Abrahamson

40

**CERTIFICATE OF SERVICE**

I certify that on September 6, 2024, I electronically filed the above with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/* Jacob M. Abrahamson