# In the United States Court of Appeals for the District of Columbia Circuit

---

COMMONWEALTH OF KENTUCKY, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ENVIRONMENTAL LAW & POLICY CENTER, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2022-0829)

---

## INITIAL BRIEF FOR PRIVATE PETITIONERS

---

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Petitioners in
No. 24-1196*

*Supervised by principals of the firm who are
members of the Virginia bar

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners Diamond
Alternative Energy, LLC and
Valero Renewable Fuels Company,
LLC*

*(Additional counsel listed on next page)*

MICHAEL B. BUSCHBACHER
JAMES R. CONDE
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for Petitioners in
No. 24-1197*

D. JOHN SAUER
JUSTIN D. SMITH
JAMES OTIS LAW GROUP, LLC
13321 North Outer Forty Road,
Suite 300
St. Louis, Missouri 63017
(816) 678-2103
justin.smith@james-otis.com

*Counsel for Petitioners in
No. 24-1132*

ROBERT HENNEKE
THEODORE HADZI-ANTICH
CONNOR MIGHELL
TEXAS PUBLIC POLICY
FOUNDATION
901 Congress Avenue
Austin, Texas 78701
(512) 472-2700
tha@texaspolicy.com

*Counsel for Petitioners in
No. 24-1158*

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Trade Association
Petitioners in No. 24-1195*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC  20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Petitioners in
No. 24-1206*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Petitioners
International
Association of Machinists and
Aerospace Workers Lodge No.
823, Diamond Alternative Energy,
LLC, and Valero Renewable Fuels
Company, LLC*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, petitioners respectfully submit this Certificate as to Parties, Rulings, and Related Cases.

## A.     Parties

Petitioners in Case No. 24-1087 are the Commonwealth of Kentucky; State of West Virginia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of New Hampshire; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Utah; Commonwealth of Virginia; and State of Wyoming.

Petitioner in Case No. 24-1100 is the State of Texas.

Petitioners in Case No. 24-1132 are Warren Petersen, President of the Arizona State Senate; Ben Toma, Speaker of the Arizona House of Representatives; and Arizona Trucking Association.

Petitioners in Case No. 24-1158 are Western States Trucking Association, Inc.; and Construction Industry Air Quality Coalition, Inc.

Petitioners in Case No. 24-1195 are American Fuel & Petrochemical Manufacturers; California Asphalt Pavement Association; California Manufacturers & Technology Association; Consumer Energy Alliance; Domestic Energy Producers Alliance; Energy Marketers of America; International Association of Machinists and Aerospace Workers Lodge No. 823; Louisiana Mid-Continent Oil & Gas Association; National Association of Convenience Stores; The Petroleum Alliance of Oklahoma; Texas Oil & Gas Association; and Western States Petroleum Association.

Petitioners in Case No. 24-1196 are American Petroleum Institute; American Farm Bureau Federation; National Corn Growers Association; Baxter Ford, Inc.; Celebrity Motor Cars, LLC; Celebrity Motors of Toms River, LLC; Celebrity of Springfield, LLC; Celebrity of Westchester, LLC; Gates Nissan LLC; AML Automotive Peoria, LLC; Loquercio Automotive, Inc.; Loquercio Automotive GOE, LLC; Loquercio Automotive Goshen, LLC; Loquercio Automotive MCH, LLC; Loquercio Automotive MCK, LLC; Loquercio Automotive South, Inc.; Loquercio Automotive West, LLC; Raecom Holdings, LLC; and Tarver Motor Company, Inc.

Petitioners in Case No. 24-1197 are American Free Enterprise Chamber of Commerce; Clean Fuels Development Coalition; ICM, Inc.; Illinois Corn

Growers Association; Indiana Corn Growers Association; Iowa Corn Growers Association; Kansas Corn Growers Association; Kentucky Corn Growers Association; Michigan Corn Growers Association; Minnesota Corn Growers Association; Missouri Corn Growers Association; Nebraska Corn Growers Association; Ohio Corn and Wheat Growers Association; South Dakota Corn Growers Association; Tennessee Corn Growers Association; Wisconsin Corn Growers Association; Diamond Alternative Energy, LLC; and Valero Renewable Fuels Company, LLC.

Petitioners in Case No. 24-1206 are Renewable Fuels Association and National Farmers Union.

Respondents are the U.S. Environmental Protection Agency and Michael S. Regan in his official capacity as Administrator of the U.S. Environmental Protection Agency.

Intervenors on behalf of respondents are Environmental Law & Policy Center; Ford Motor Company; National Parks Conservation Association; Natural Resources Defense Council, Inc.; Public Citizen, Inc.; Sierra Club; State of Arizona; State of California; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; State of Michigan; State of Minnesota; State of New Jersey; State

of New Mexico; State of New York; State of North Carolina; State of Oregon; State of Rhode Island; State of Vermont; State of Washington; State of Wisconsin; Alliance for Automotive Innovation; Alliance of Nurses for Healthy Environments; American Lung Association; American Public Health Association; Appalachian Mountain Club; Center for Biological Diversity; City of Chicago; City of Denver; City of Los Angeles; City of New York; Clean Air Council; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; Conservation Law Foundation; County of Denver; District of Columbia; Environmental Defense Fund; and Zero Emission Transportation Association.

## B.    Rulings Under Review

Under review is the final action of the Administrator of the United States Environmental Protection Agency, entitled *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, published in the Federal Register at 89 Fed. Reg. 27,842 (Apr. 18, 2024).

## C.    Related Cases

Eight consolidated cases in the U.S. Court of Appeals for the District of Columbia Circuit involve challenges to the agency action challenged here:

*Kentucky* v. *EPA*, No. 24-1087; *Texas* v. *EPA*, No. 24-1100; *Petersen* v. *EPA*, No. 24-1132; *Western States Trucking Ass'n, Inc.* v. *EPA*, No. 24-1158; *American Fuel & Petrochemical Manufacturers* v. *EPA*, No. 24-1195; *American Petroleum Institute* v. *EPA*, No. 24-1196; *American Free Enterprise Chamber of Commerce* v. *EPA*, No. 24-1197; and *Renewable Fuels Association* v. *EPA*, No. 24-1206.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioners hereby make the following disclosures:

**American Farm Bureau Federation** (AFBF) is the largest nonprofit general farm organization in the United States. Representing about six million member families in all 50 States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States. AFBF's mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. AFBF has no parent entity, and no publicly held corporation has a 10% or greater ownership stake in AFBF.

**American Free Enterprise Chamber of Commerce** (AmFree) is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in AmFree.

**American Fuel & Petrochemical Manufacturers** (AFPM) is a national trade association that represents American refining and petrochemical companies. AFPM has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in AFPM.

**American Petroleum Institute** (API) is a national trade association that represents all segments of America's natural gas and oil industry. API's nearly 600 members produce, process, and distribute most of the Nation's energy, and participate in API Energy Excellence, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting. API has no parent entity, and no publicly held corporation has a 10% or greater ownership stake in API.

**AML Automotive Peoria, LLC** d/b/a Peoria Ford, is an Illinois-based Ford dealership that sells light-duty vehicles to consumers and businesses. AML Automotive Peoria, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in AML Automotive Peoria, LLC.

**Arizona Trucking Association** is a trade association that represents its members before legislative, regulatory, and enforcement agencies as the trucking industry's primary voice in Arizona on transportation and other public policy and legal issues. The Arizona Trucking Association has no parent companies, and no publicly held company has a 10% or greater ownership interest in the Arizona Trucking Association.

**Baxter Ford, Inc.** is a Nebraska corporation that operates a Ford dealership in Nebraska that sells cars, trucks, and SUVs to consumers and businesses. Baxter Ford, Inc. has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Baxter Ford, Inc.

**Ben Toma, Speaker of the Arizona House of Representatives** is an elected official acting in his official capacity on behalf of the Arizona House of Representatives. Neither Speaker Toma nor the Arizona House of Representatives is a corporate entity, and thus a corporate disclosure statement is not required.

**California Asphalt Pavement Association** (CalAPA) is a nonprofit trade association established in 1953 that represents the asphalt pavement industry in California, including asphalt producers, refiners, paving contractors, consultants, equipment manufacturers, and other companies that comprise the industry. CalAPA has no parent corporation, and no publicly held company owns ten percent or more of its stock.

**California Manufacturers & Technology Association** (CMTA) is a nonprofit statewide trade association. Its members are companies engaged in the manufacturing and technology sectors in California who focus on improving and enhancing a strong business climate for California's

manufacturing, processing, and technology-based companies.  CMTA has no parent company, and no publicly held company owns ten percent or more of its stock.

**Celebrity Motor Cars, LLC** d/b/a Lexus of Route 10, is a New Jersey-based Lexus dealership that sells light-duty vehicles and trucks.  Celebrity Motor Cars, LLC has no parent corporation and no publicly held corporation has a 10% or greater ownership stake in Celebrity Motor Cars, LLC.

**Celebrity Motors of Toms River, LLC** d/b/a Celebrity Ford of Toms River, is a New Jersey-based Ford dealership that sells light-duty vehicles and trucks.  Celebrity Motors of Toms River, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Celebrity Motors of Toms River, LLC.

**Celebrity of Springfield, LLC** d/b/a BMW of Springfield, is a New Jersey-based BMW dealership that sells light-duty vehicles and trucks.  Celebrity of Springfield, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Celebrity of Springfield, LLC.

**Celebrity of Westchester, LLC** d/b/a Mercedes Benz of Goldens Bridge, is a New York-based Mercedes Benz dealership that sells light-duty

vehicles and trucks. Celebrity of Westchester, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Celebrity of Westchester, LLC.

**Clean Fuels Development Coalition** (CFDC) is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code. Established in 1988, CFDC works with auto, agriculture, and biofuel interests in support of a broad range of energy and environmental programs. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in CFDC.

**Construction Industry Air Quality Coalition, Inc.** (CIAQC) is a nonprofit California trade association representing the interests of other California nonprofit trade associations and their members whose air emissions are regulated by California state, regional, and local regulations, as well as federal regulations. CIAQC has no parent companies, and no publicly held company has 10% or greater ownership in CIAQC.

**Consumer Energy Alliance** (CEA) is a nonpartisan, nonprofit organization advocating for balanced energy and environmental policies and responsible access to resources. CEA has no parent corporation, and no publicly held corporation has a 10% or greater ownership in CEA.

**Diamond Alternative Energy, LLC** is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

**Domestic Energy Producers Alliance** (DEPA) is a nonprofit, nonstock corporation organized under the laws of the state of Oklahoma. DEPA has no parent corporation, and no publicly held company owns 10% or more of its stock.

**Energy Marketers of America** (EMA) is a federation of 47 state and regional trade associations representing energy marketers throughout the United States. EMA, which is incorporated under the laws of the Commonwealth of Virginia, has no parent corporation, and no publicly held corporation has a 10% or greater ownership in EMA.

**Gates Nissan LLC** d/b/a Gates Nissan, operates an automobile dealership in Richmond, Kentucky. Gates Nissan LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Gates Nissan LLC.

**ICM, Inc.** is a Kansas corporation that is a global leader in developing bio-refining capabilities, especially for the production of ethanol. It is a wholly

owned subsidiary of ICM Holdings, Inc., and no publicly held company has a 10% or greater ownership interest in ICM Holdings, Inc.

**Illinois Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Indiana Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**International Association of Machinists and Aerospace Workers Lodge No. 823** (IAMAW) is an unincorporated association and is a labor organization. IAMAW has no parent corporation, and no publicly held corporation has a 10% or greater ownership in IAMAW.

**Iowa Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Kansas Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Kentucky Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Loquercio Automotive GOE, LLC** d/b/a Genesis of Elgin, is an Illinois-based Genesis dealership that sells light-duty motor vehicles to consumers and businesses. Loquercio Automotive GOE, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive GOE, LLC.

**Loquercio Automotive Goshen, LLC** d/b/a Buick GMC of Goshen, is an Indiana-based Buick and GMC dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive Goshen, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive Goshen, LLC.

**Loquercio Automotive MCH, LLC** d/b/a Michigan City Hyundai, is an Indiana-based Hyundai dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive MCH, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive MCH, LLC.

**Loquercio Automotive MCK, LLC** d/b/a Michigan City Kia, is an Indiana-based Kia dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive MCK, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive MCK, LLC.

**Loquercio Automotive South, Inc.** d/b/a Honda City, is an Illinois-based Honda dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive South, Inc. has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive South, Inc.

**Loquercio Automotive West, LLC** d/b/a Elgin Chrysler, is an Illinois-based Chrysler dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive West, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership stake in Loquercio Automotive West, LLC.

**Loquercio Automotive, Inc.** d/b/a Elgin Hyundai, is an Illinois-based Hyundai dealership that sells light-duty vehicles to consumers and businesses. Loquercio Automotive, Inc. has no parent corporation, and no publicly held

corporation has a 10% or greater ownership stake in Loquercio Automotive, Inc.

**Louisiana Mid-Continent Oil & Gas Association** (LMOGA) is a business association representing the interests of the oil and gas industry of the second largest oil producing and fourth largest gas producing state in the nation, Louisiana. The state ranks second in the nation in crude oil refining capacity. LMOGA has no parent corporation, and no publicly held company has a 10% or greater ownership in it.

**Michigan Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Minnesota Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Missouri Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**National Association of Convenience Stores** (NACS) is an international trade association that represents both the convenience and fuel

retailing industries with more than 1,300 retail and 1,600 supplier company members.  The United States convenience industry has more than 152,000 stores across the country, employs 2.74 million people, and had more than $859 billion in sales in 2023, of which more than $532 billion were fuel sales.  NACS has no parent corporation, and no publicly held corporation has a 10% or greater ownership in NACS.

**National Corn Growers Association** (NCGA) is a national trade association that represents nearly 40,000 dues-paying corn growers and the interests of more than 300,000 farmers who contribute through corn checkoff programs in their states.  NCGA and its 50 affiliated state associations and checkoff organizations work together to sustainably feed and fuel a growing world by creating and increasing opportunities for corn growers.  NCGA has no parent entity, and no publicly held corporation has a 10% or greater ownership stake in NCGA.

**National Farmers Union.**  The Farmers Educational & Cooperative Union of America (d/b/a National Farmers Union) (NFU) is a non-profit trade association within the meaning of Circuit Rule 26.1(b).  Its members include farmers who are producers of biofuel feedstocks and consumers of large quantities of fuel.  It operates for the purpose of promoting the general

commercial, legislative, and other common interests of its members. It does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Nebraska Corn Growers Association** is an agricultural organization. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Ohio Corn and Wheat Growers Association** is an agricultural organization. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Raecom Holdings, LLC** is a Delaware limited liability company that operates seven automobile dealerships in Texas and Louisiana selling light- and medium-duty vehicles to consumers and businesses. Raecom Holdings, LLC has no parent entity, and no publicly held corporation has a 10% or greater ownership stake in Raecom Holdings, LLC.

**Renewable Fuels Association.** The Renewable Fuels Association (RFA) is a non-profit trade association within the meaning of Circuit Rule 26.1(b). Its members are ethanol producers and supporters of the ethanol industry. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Renewable Fuels

Association does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

**South Dakota Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Tarver Motor Company, Inc.** d/b/a Lake Charles Toyota, is a Louisiana-based corporation that operates a sales and service franchised dealership, facility, and related operations. Tarver Motor Company, Inc. has no parent corporation and no publicly held corporation has a 10% or greater ownership stake in Tarver Motor Company, Inc.

**Tennessee Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Texas Oil & Gas Association** (TXOGA) is a statewide trade association representing every facet of the Texas oil and gas industry including small independents and major producers. Collectively, the membership of TXOGA produces approximately 90% of Texas' crude oil and natural gas and operates the vast majority of the state's refineries and pipelines. In fiscal year 2023, the Texas oil and natural gas industry supported over 480,000 direct jobs and

paid $26.3 billion in state and local taxes and state royalties, funding our state's schools, roads and first responders.  TXOGA has no parent corporation, and no publicly held company owns 10% or more of its stock.

**The Petroleum Alliance of Oklahoma** is a not-for-profit trade organization representing more than 1,600 individuals and member companies and their tens of thousands of employees in the upstream, midstream, and downstream sectors and ventures ranging from small, family-owned businesses to large, publicly traded corporations working in the MidContinent and other oil and gas producing regions nationwide.  Members of The Petroleum Alliance produce, transport, process, and refine the bulk of Oklahoma's crude oil and natural gas.  In 2023, the industry was responsible for almost $56 billion in state economic activity, 22% of the total statewide. The Petroleum Alliance of Oklahoma has no parent corporation, and no company has a 10% or greater ownership in the organization.

**Valero Renewable Fuels Company, LLC** is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

**Warren Petersen, President of the Arizona State Senate** is an elected official acting in his official capacity on behalf of the Arizona State Senate. Neither President Petersen nor the Arizona State Senate is a corporate entity, and thus a corporate disclosure statement is not required.

**Western States Petroleum Association** (WSPA) is a nonprofit trade association that represents companies engaged in petroleum exploration, production, refining, transportation and marketing in Arizona, California, Nevada, Oregon, and Washington. The association has no parent company, and no publicly held company has a 10% or greater ownership in it.

**Western States Trucking Association, Inc.** (WSTA) is a nonprofit California trade association representing the interests of thousands of members in a variety of businesses which own and operate on-road and non-road vehicles, engines, and equipment. WSTA has no parent company, and no publicly held company has a 10% or greater ownership in WSTA.

**Wisconsin Corn Growers Association** is an agricultural organization. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**TABLE OF CONTENTS**

Page

Glossary ...................................................................................xxix

Introduction......................................................................................1

Jurisdictional Statement........................................................4

Statement of the Issues...........................................................4

Statutes and Regulations.........................................................5

Statement of the Case ..............................................................5

I.    Statutory Background ...........................................................5

    A.    EPA's Standard-Setting Authority.......................................5

    B.    Compliance, Enforcement, and Remediation ...................6

II.    Regulatory Background ......................................................8

    A.    Greenhouse-Gas Standards ..............................................8

    B.    The Rule At Issue ..........................................................10

        1.    Fleetwide averaging ...............................................11

        2.    Mandating electric vehicles ...................................14

Summary of Argument ........................................................16

Standard of Review ..............................................................22

Argument...............................................................................22

I.    UNDER THE MAJOR-QUESTIONS DOCTRINE, EPA LACKS STATUTORY AUTHORITY TO EFFECTIVELY MANDATE ELECTRIC VEHICLES...............................................22

    A.    The Shift To Electric Vehicles Is A Major Question ...................23

        1.    EPA claims a power of vast economic significance.............24

2. EPA claims a power of vast political significance ............... 29

3. EPA claims an unheralded and transformative power. ................................................................ 33

B. EPA Has No Clear Congressional Authorization Here ............... 37

II. EPA LACKS STATUTORY AUTHORITY TO SET FLEETWIDE-AVERAGE STANDARDS THAT INCORPORATE ELECTRIC VEHICLES. ......................................... 38

A. EPA May Not Set Fleetwide-Average Standards ........................ 39

1. Title II's compliance and enforcement provisions demonstrate that EPA cannot use fleetwide averaging ............................................................... 40

2. Other provisions in Section 202 confirm that emission standards may not be based on averaging ........................... 44

3. The broader text and history of Title II confirm that the rule exceeds EPA's authority ......................................... 47

B. At A Minimum, EPA May Not Incorporate Electric Vehicles Into Its Fleetwide-Average Standards ........................... 49

1. The statutory text focuses on vehicles that emit the relevant pollutant ................................................................. 50

2. The statutory structure and history confirm Congress's focus on technologically achievable emission controls ................................................................ 54

3. Related statutes underscore that Section 202(a) does not authorize averaging of non-emitting electric vehicles. ................................................................ 56

4. EPA's counterarguments lack merit ................................... 58

III. EPA'S RULE IS ARBITRARY AND CAPRICIOUS ........................... 62

A. EPA Unreasonably Ignores Electric-Vehicle Emissions ............ 62

B.    EPA Failed To Consider The Obvious, Viable Alternative Of High-Octane And Renewable Fuels. ..........................................66

C.    EPA's Cost-Benefit Analysis Is Unsound.....................................67

Conclusion..............................................................................................70

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alabama Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)..................................................23, 24

*Am. Pub. Gas Association v. Dep't of Energy,*
22 F.4th 1018 (D.C. Cir. 2022) ....................................69

*American Fuel & Petrochemical Mfrs. v. EPA,*
3 F.4th 373 (D.C. Cir. 2021) .......................................20

*Barnhart v. Thomas,*
540 U.S. 20 (2003)..................................................51, 53

*Bartenwerfer v. Buckley,*
598 U.S. 69 (2023)........................................................59

*Biden v. Nebraska,*
143 S. Ct. (2023) .............................................24, 25, 30

*Delta Const. Co. v. EPA,*
783 F.3d 1291 (D.C. Cir. 2015).......................................9

*Energy Future Coal. v. EPA,*
793 F.3d 141 (D.C. Cir. 2015)..................................21, 59

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018)......................................................48

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021)......................................................68

*GPA Midstream Association v. U.S. Dep't of Transp.,*
67 F.4th 1188 (D.C. Cir. 2023) ....................................65

*Hunt v. Washington State Apple Advert. Comm'n,*
432 U.S. 333 (1977)......................................................21

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024)..................................................34

*Massachusetts v. EPA,*
549 U.S. 497 (2007)..........................................8, 57, 58

*Nat'l Ass'n of Home Builders* v. *EPA*,
    682 F.3d 1032 (D.C. Cir. 2012)................................................67, 68

*Nat'l Shooting Sports Found., Inc.* v. *Jones*,
    716 F.3d 200 (D.C. Cir. 2013)......................................................66

*National Petrochemical & Refiner Ass'n* v. *EPA*,
    287 F.3d 1130 (D.C. Cir. 2002).....................................................23

*NRDC* v. *Thomas*,
    805 F.2d 410 (D.C. Cir. 1986)..................................................51, 52

*NRDC* v. *EPA*,
    655 F.2d 318 (D.C. Cir. 1981).......................................................57

*NRDC* v. *EPA*,
    954 F.3d 150 (2d Cir. 2020) .........................................................55

*Ohio* v. *EPA*,
    144 S. Ct. 2040 (2024).................................................................72

*Paroline* v. *United States*,
    572 U.S. 434 (2014).....................................................................47

*Robinson* v. *Shell Oil Co.*,
    519 U.S. 337 (1997).....................................................................39

*Rotkiske* v. *Klemm*,
    589 U.S. 8 (2019).........................................................................44

*SAS Inst., Inc.* v. *Iancu*,
    584 U.S. 357 (2018).....................................................................48

*Texas* v. *EPA*,
    No. 22-1031 (D.C. Cir.)...........................................2, 10, 34, 47, 69

*Truck Trailer Mfrs. Ass'n* v. *EPA*,
    17 F.4th 1198 (D.C. Cir. 2021) .......................................52, 60, 61

*Utility Air Regul. Grp.* v. *EPA*,
    573 U.S. 302 (2014)...........................................24, 34, 37, 40, 42

*West Virginia* v. *EPA*,
    597 U.S. 679 (2022) .............................2, 3, 4, 16, 22, 23, 24,  29, 30, 32, 33,
    ......................................................................35, 37, 38, 61

**Statutes**

42 U.S.C.
    § 7521 ....................................... 5, 6, 17, 44, 45, 46, 47, 50, 51, 52, 54, 55, 60
    § 7602 ............................................................................................. 5, 57
    § 7607 .................................................................................................. 62

49 U.S.C.
    § 32901 *et seq.* ...................................................................................... 8
    § 32902 .................................................................................... 9, 34, 48, 57

Clean Air Act Amendments of 1970,
    Pub. L. No. 91-604, 84 Stat. 1676 ............................................................ 48

Clean Air Act Amendments of 1990,
    Pub. L. No. 101-549, 104 Stat. 2399 ........................................................ 56

Energy Policy Act of 1992,
    Pub. L. No. 102-486, 106 Stat. 2776 ........................................................ 57

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 818 .......................................................... 31

Infrastructure Investment and Jobs Act of 2021,
    Pub. L. No. 117-58, 136 Stat. 1818 .......................................................... 30

**Regulations**

40 C.F.R.
    § 86.1803-01 ...................................................................................... 9, 50
    § 86.1811-27 .................................................................................... 13, 58
    § 86.1818-12 .................................................................................... 11, 12
    § 86.1865-12 .......................................................................................... 42
    § 86.1866-12 ................................................................................ 9, 13, 50
    § 86.1819-14 .................................................................................... 11, 12

45 Fed. Reg. 14,496 (Mar. 5, 1980) ............................................................ 39, 42

65 Fed. Reg. 36,986 (June 12, 2000) ................................................................ 64

71 Fed. Reg. 2,810 (Jan. 17, 2006) .................................................................. 41

74 Fed. Reg 66,496 (Dec. 15, 2009) .............................................................. 8, 68

75 Fed. Reg. 25,324 (May 7, 2010) ............................................................... 8, 63

77 Fed. Reg. 62,624 (Oct. 15, 2012) .......................................................... 9, 34, 64

85 Fed. Reg. 24,174 (Apr. 30, 2020) ....................................................9

86 Fed. Reg. 43,583 (Aug. 5, 2021) ...............................................1, 9

86 Fed. Reg. 49,602 (Sept. 3, 2021)................................................33

86 Fed. Reg. 74,434 (Dec. 30, 2021) ..........................................1, 10

89 Fed. Reg. 27,842 (April 18, 2024)............ ....2, 4, 10, 11, 13, 14, 15, 16, 21,
............................. 22, 25, 27, 29, 35, 38, 52, 58, 59, 61, 62, 63, 64, 66, 67, 68,
................................................................................69, 70, 71, 73

Cal. Code Regs. tit. 13, §1962.4 (2022) ..........................................30

**Congressional Materials**

116 Cong. Rec. 19238 (1970).........................................................30

H.R. Rep. No. 1146, 91st Cong., 2d Sess. 6 (1970).........................................49

Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong.
(2019) ..............................................................................30

Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018)..............30

**Other Authorities**

EPA Press Office, *Biden-Harris Administration Proposes
Strongest-Ever Pollution Standards for Cars and Trucks to
Accelerate Transition to a Clean-Transportation Future*
(Apr. 12, 2023) .................................................................26

Fed. Highway Admin., *Charging and Fueling Infrastructure
Discretionary Grant Program* (Aug. 26, 2024)........................................31

Fed. Highway Admin., *National Electric Vehicle
Infrastructure (NEVI) Program* (June 13, 2024) .........................31

Neil E. Boudette, *More Gas Cars and Trucks, Fewer E.V.s as
Automakers Change Plans,* N.Y. Times (July 18, 2024)........................15

U.S. Energy Info. Admin., *Use of Electricity* (Dec. 18, 2023) ..............28

*American Heritage Dictionary of the English Language* 1038
(1st ed. 1969).....................................................................61

*Webster's New International Dictionary*
1910 (2d ed. 1949).................................................................58

*Overriding Consumer Preferences with Energy Regulations,*
43. J. of Regul. Econs. 248 (2013)................................................69

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy Conservation Act |
| NHTSA | National Highway Traffic Safety Administration |

**INTRODUCTION**

The current Presidential Administration is on a mission to phase out the internal-combustion engine and electrify the Nation's vehicle fleet. In his first year in office, President Biden announced his Administration's "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." Executive Order 14,037, 86 Fed. Reg. 43,583, 43,583 (Aug. 5, 2021). Neither market forces nor government incentives alone would produce this massive shift in manufacturer and consumer behavior. That left government mandates.

No law authorizes the federal government to mandate the sale of electric vehicles. So in 2021, EPA began reverse-engineering a *de facto* electric-vehicle mandate. It did so by setting greenhouse-gas emission standards for light-duty vehicles that were so stringent that automakers could meet them only by decreasing production of internal-combustion-engine vehicles and dedicating an increasing percentage of their fleets to electric vehicles (or subsidizing the electric-vehicle production of their competitors through credit purchases). 86 Fed. Reg. 74,434 (Dec. 30, 2021). EPA projected that under those standards, automakers would have to produce 17% electric vehicles by

2026, versus the 7% that they would have produced under the previous standards. A challenge to that rule is still pending in this Court. *See Texas* v. *EPA*, No. 22-1031 (argued Sept. 14, 2023).

Notably, EPA's defense of its 2021 rule was that it had taken just a modest, incremental step over its earlier emission standards. But EPA can no longer pretend that it has taken only a baby step. Although electric vehicles made up only 7.5% of sales in 2022, 89 Fed. Reg. at 27,986, EPA's new standards for light-duty and medium-duty vehicles are so stringent that EPA projects that, by 2032, at least *68%* of America's new vehicles will need to be electric to comply. *Id.* at 28,057. It took a decade for the market share of electric vehicles to grow from virtually nothing to a mere 7.5%. If electric vehicles are going to overtake the internal-combustion-engine vehicle over the next decade, that will be because of EPA's rules, not market forces.

If this play seems familiar, it should. In *West Virginia* v. *EPA*, 597 U.S. 679, 731 n.4 (2022), EPA "announc[ed] what the market share of coal, natural gas, wind, and solar must be, and then require[d] plants to reduce operations or subsidize their competitors to get there." Here, EPA has similarly "announc[ed] what the market share of" electric vehicles "must be, and then require[d]" automakers to meet that target for their fleets "or subsidize their

competitors to get there." *Id.* In both cases, EPA reached its desired result by setting standards beyond what could be achieved with a disfavored power source (there, coal-fired power generation; here, the internal-combustion engine). And in both cases, EPA pushed regulated parties to phase out disfavored technology.

As in *West Virginia*, EPA cannot unilaterally reshape the energy and transportation sectors without clear statutory authority. The question of whether internal-combustion-engine vehicles should be phased out in favor of electric vehicles is hugely consequential: it involves millions of jobs, the restructuring of entire industries, and the Nation's energy independence and relationship with hostile powers. If the federal government is going to effectively require that two-thirds of the Nation's new vehicles be electric by 2032, then a Congress accountable to the American public must say so. It has not.

Indeed, Congress has not authorized any of the steps that EPA has taken to get here. The Clean Air Act does not allow EPA to set emission standards for motor vehicles based on fleetwide averaging. And even if EPA could set average emission targets, it cannot manipulate the averages by treating electric vehicles as having zero emissions and "averaging" in all those

zeros to reach the share of electric vehicles that EPA wants to see. EPA is once again straining statutory text to force a seismic shift in the Nation's energy policy, only this time for automobiles rather than power plants. Here, as in *West Virginia*, EPA's rule is unlawful.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review EPA's *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024), under 42 U.S.C. § 7607(b)(1). The rule is a "standard under section 7521," and petitioners timely sought review "within sixty days from the date notice of such promulgation … appear[ed] in the Federal Register." 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES

1. Whether, under the major-questions doctrine, EPA lacks statutory authority to effectively mandate a nationwide transition from internal-combustion-engine vehicles to electric ones.

2. Whether Section 202 of the Clean Air Act prohibits EPA from (a) setting fleetwide average standards, and (b) including electric vehicles in calculating those averages.

3. Whether the rule is arbitrary and capricious because EPA failed to (a) adequately consider electric vehicles' lifecycle greenhouse-gas

emissions, (b) consider reasonable alternatives to electrification, and (c) perform an evenhanded cost-benefit analysis.

4. Whether EPA's rule exceeds its authority to regulate an "air pollution agent or combination of such agents." 42 U.S.C. § 7602(g).

## STATUTES AND REGULATIONS

Pertinent statutes are set forth in the Addendum.

## STATEMENT OF THE CASE

### I. Statutory Background

#### A. EPA's Standard-Setting Authority

Title II of the Clean Air Act sets forth a comprehensive scheme for regulating motor-vehicle emissions. At the center of the scheme is Section 202, which directs the EPA Administrator to

> by regulation prescribe (and from time to time revise) … standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. § 7521(a)(1).[1] "Such standards shall be applicable to such vehicles or engines for their useful life." § 7521(a)(1). The standards may not take

---

[1] Unless otherwise noted, all statutory citations are to Title 42 of the United States Code.

effect until "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." § 7521(a)(2).

Congress specified numerous emission standards for specific pollutants that EPA had to promulgate under Section 202(a). *See, e.g.*, §§ 7521(a)(3)(B)(ii), 7521(b)(1)(A)-(B). Some of those statutorily specified standards provided for phase-in periods during which the standards applied to an increasing percentage of manufacturers' fleets. *See, e.g.*, §§ 7521(g)(1), 7541(c)(4)(A), 7541(c)(5)(A), 7521(g)(2), 7521(j). And to support emission-control technologies like "the catalytic converter and oxygen sensor," Congress required EPA to mandate diagnostic systems that could determine if those technologies were deteriorating or malfunctioning in a way that "could cause or result in failure of the vehicles to comply with emission standards" under Section 202(a). § 7521(m)(1)(A).

## B.    Compliance, Enforcement, and Remediation

To determine compliance with these standards, EPA "shall test, or require to be tested in such manner as [it] deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer."

§ 7525(a)(1). "If such vehicle or engine" submitted by the manufacturer complies with the standards, EPA "shall issue a certificate of conformity," *id.*, which the manufacturer must "permanently affix[] to such vehicle or engine," § 7541(c)(3)(C).

In addition to this testing, EPA may test or require that the manufacturer test "new motor vehicles" to determine if such vehicles "do in fact conform with the regulations." § 7525(b)(1). If EPA determines that "such vehicle or engine" is not in compliance, EPA "may suspend or revoke" a certificate of conformity. § 7525(b)(2)(A)(ii).

Manufacturers "shall warrant" that "each new motor vehicle and new motor vehicle engine" is "designed, built, and equipped so as to conform at the time of sale with applicable regulations under" Section 202. § 7541(a)(1). Title II gives EPA several remedies when vehicles fail to conform. One is to seek civil penalties from automakers for each individual vehicle they distribute, sell, or offer in commerce without an effective certificate of conformity. §§ 7522(a)(1), 7524(a)-(b). In addition, where "a substantial number of any class or category of vehicles or engines" fail to conform, EPA must "require the manufacturer to submit a plan for remedying the nonconformity of the

vehicles or engines with respect to which such notification is given."
§ 7541(c)(1).

## II.    Regulatory Background

### A.    Greenhouse-Gas Standards

EPA did not regulate motor-vehicle greenhouse-gas emissions until 2010. Following the Supreme Court's decision in *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), EPA first issued an endangerment finding under Section 202(a) for "well-mixed greenhouse gases"—*i.e.*, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. 74 Fed. Reg. 66,496 (Dec. 15, 2009).

EPA then promulgated its initial light-duty vehicle greenhouse-gas emission standards in a joint rulemaking with the National Highway Traffic Safety Administration (NHTSA), which sets corporate average fuel-economy standards under the Energy Policy and Conservation Act. *See* 49 U.S.C. § 32901 *et seq.* As the agencies explained, carbon-dioxide emissions—EPA's central focus in the greenhouse-gas rules—are "essentially constant per gallon combusted of a given type of fuel," so carbon-dioxide emission standards and fuel-economy standards are two sides of the same coin. 75 Fed. Reg. 25,324, 25,327 (May 7, 2010); *see Delta Const. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C.

Cir. 2015) ("[A]ny rule that limits tailpipe [greenhouse-gas] emissions is effectively identical to a rule that limits fuel consumption.").

After that initial rulemaking, EPA continued to jointly promulgate its Title II greenhouse-gas emission standards for cars and light-duty trucks with NHTSA. *See* 85 Fed. Reg. 24,174 (Apr. 30, 2020); 77 Fed. Reg. 62,624 (Oct. 15, 2012). Because Congress prohibited NHTSA from considering the fuel economy of electric vehicles in setting fuel-economy standards, *see* 49 U.S.C. § 32902(h)(1), (2), the agencies' jointly promulgated standards could not be so stringent that they effectively required automakers to include electric vehicles in their fleets.[2]

To evade that limitation, EPA recently began issuing standards without NHTSA. In 2021, shortly after President Biden set "a goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles," 86 Fed. Reg. at 43,583, EPA issued its first-ever solo greenhouse-gas emission

---

[2]For simplicity's sake, petitioners use the phrase "electric vehicles" to encompass battery-electric vehicles, fuel-cell vehicles, and plug-in hybrids using electricity derived "from sources that are not onboard the vehicle." 40 C.F.R. § 86.1866-12(a); *id.* § 86.1803-01 (defining terms). While plug-in hybrid electric vehicles have a gas engine, EPA attributes zero carbon-dioxide emissions to plug-in hybrids operating in "charge-depleting mode"—*i.e.*, using electricity derived from an outside source. *See id.* §§ 86.1866-12(a), 600.116-12(c)(1),(2).

standards for cars and light-duty trucks.  *See* 86 Fed. Reg. at 74,437.  Those standards, applicable to model years 2023 to 2026, were at the time "the most stringent … ever set for the light-duty vehicle sector."  *Id.* at 74,435.  A challenge to those standards is pending before this Court.  *Texas* v. *EPA*, No. 22-1031.

## B.    The Rule At Issue

The rule at issue escalates EPA's campaign to force electrification of the Nation's vehicle fleet.  Again acting without NHTSA, on April 18, 2024, EPA finalized greenhouse-gas standards for light- and medium-duty vehicles for model years 2027 through 2032.  89 Fed. Reg. at 27,842.  The rule also sets correspondingly "more stringent emissions standards for criteria pollutants," including non-methane organic gases and nitrogen oxides.  *Id.* at 27,857.  As with the 2021 rule, EPA acknowledged that its standards would likely drive automakers to "deploy an increasing number" of electric vehicles.  *Id.* at 27,898.

Two aspects of EPA's emission standards are key to their operation.  First, EPA promulgated standards that automakers can meet on a fleetwide-average basis, rather than an individual-vehicle basis.  89 Fed. Reg. at 27,856, 27,857, 28,198.  Second, EPA stipulated that for purposes of determining an

automaker's compliance with the standards, electric vehicles counted and will be treated as producing zero emissions. *Id.*

## 1. Fleetwide averaging

Instead of issuing emission thresholds that any given *vehicle* must meet, EPA's standards prescribe a formula setting average emission levels for manufacturers' *fleets*. Each manufacturer is held to fleetwide-average standards derived from its annual production—one standard for its fleet of cars, another for its fleet of light-duty trucks, and a third for medium-duty vehicles (*i.e.*, larger pickup trucks and vans). *See* 40 C.F.R. §§ 86.1818-12(c)(1), 86.1819-14(a).

Manufacturers' fleets include multiple vehicle models, each of which is given a carbon-dioxide emission target. For light-duty vehicles, EPA bases these targets on the vehicle's size (or "footprint"). 40 C.F.R. § 86.1818-12(c)(2). A car with the smallest footprint (42 square feet or less) will have a target of 135.9 grams of carbon dioxide emitted per mile traveled (g/mile) in 2027, which drops to 71.8 g/mile by 2032, while a car with the largest footprint (56 square feet or more) will have a target of 145.2 g/mile in 2027 and 75.6 g/mile in 2032. *Id.* § 86.1818-12(c)(2),(h). For medium-duty vehicles, EPA similarly bases

emissions targets on a vehicle's "work factor," which is a function of its towing capability, payload, and drive train. *Id.* § 86.1819-14(a)(1), (k)(4).

EPA does not require individual vehicles to achieve these targets. The targets are instead used as inputs to determine a unique fleetwide-average standard for each manufacturer. That fleetwide average is "production-weighted," meaning it accounts for each vehicle's share of the manufacturer's fleet. 40 C.F.R. §§ 86.1818-12(c)(1), 86.1819-14(a)(3), 86.1865-12(i)(1).

Compliance with the fleetwide average depends on production for the entire year and thus can be determined only once the year ends. At the end of each year, a manufacturer must compare its actual production-weighted fleetwide-average carbon-dioxide emission level to its production-weighted fleetwide standard. 40 C.F.R. § 86.1865-12(j). If the actual average emission level is higher than the standard, the manufacturer will be assessed a deficit in proportion to the disparity between the actual level and the standard. If the actual average emission level is below the standard, the manufacturer will be given a proportional number of "credits," *id.* § 86.1865-12(k)(1), (4), which the manufacturer can "bank" to offset deficits accrued in future years or "trade" to competitors. *Id.* § 86.1865-12(k)(7)(i), (9).

EPA has created other ways to generate credits. The most significant additional credits are offered for the production of electric vehicles. EPA regulations stipulate that, for purposes of calculating fleetwide targets and fleetwide performance, electric vehicles are to be treated as if they emit zero g/mi of carbon dioxide—even when they run on electricity generated by carbon-emitting sources, and despite the higher carbon intensity in manufacturing electric-vehicles. *Id.* § 86.1866-12(a); *see* 89 Fed. Reg. at 27,858 ("We project that … pollutant emissions from [electricity generation] will increase as a result of the increased demand for electricity associated with the final rule … .").

Credits and credit-trading play an important role in EPA's compliance regime. Manufacturers can carry forward a deficit for up to three years before being subject to penalties. 40 C.F.R. §§ 86.1865-12(j), (k)(8); *see id.* § 86.1865-12(k)(8)(ii)-(iii). After that, the only way a manufacturer can avoid penalties for noncompliance is by purchasing credits.

As with carbon-dioxide emissions, EPA has also established fleetwide-average standards for nonmethane-organic gases and nitrogen oxides. *See* 40 C.F.R. §§ 86.1811-27(b)(2), (6), 86.1860-17. For purposes of these standards,

battery-electric vehicles (but not plug-in hybrids) are also assumed to have zero emissions. *See* 89 Fed. Reg. 27,932 n.635, 27,935-27,936.

### 2. Mandating electric vehicles

The rule's stringent standards are designed to drive manufacturers to produce electric vehicles. To begin, EPA's feasibility determinations all assume a baseline electric-vehicle penetration rate of 5%, corresponding to the percentage of vehicles already present in the 2022 fleet. 89 Fed. Reg. at 28,082. EPA thus has found the rule's standards to be feasible only if manufacturers lock in at least that percentage of electric vehicles in their fleets, despite the fact that market forces could cause manufacturers to lower that percentage if left to their own devices.

More dramatically, no gasoline vehicle—not even a hybrid—meets EPA's emission targets for model year 2032. *See* Valero Energy Corp. Supplemental Comment 4-8, 9-11 (Mar. 11, 2024). The only path forward is thus to sell more and more electric vehicles. EPA predicts that the portion of electric vehicles in a manufacturer's light-duty fleet will more than double over the life of the standards, from 32% of vehicles in 2027 to 68% by 2032. 89 Fed.

Reg. at 28,057.[3] The change is even more drastic for medium-duty vehicles, where EPA predicts a *14-fold* increase in electric-vehicle production—jumping from just 3% in 2027 to 43% by 2032. *Id.* at 28,060.

EPA understood that to comply with its rule while "remain[ing] economically competitive," manufacturers must produce far more electric vehicles than they otherwise would. 89 Fed. Reg. at 28,058. Even accounting for recent federal legislation incentivizing electric-vehicle adoption, EPA estimated that by 2032 its greenhouse-gas standards would increase the light-duty electric-vehicle market share from 47% without EPA's standards to 68% with them. *Id.* at 28,057-28,058. But the disparity will likely be even larger than EPA projects, as automakers have recently reported that they are slowing electric-vehicle production. *See* Neil E. Boudette, *More Gas Cars and Trucks, Fewer E.V.s as Automakers Change Plans,* N.Y. Times (July 18, 2024), https://tinyurl.com/4av42sn4. The disparity for medium-duty vehicles is even more dramatic. Without EPA's standards, EPA projects that electric vehicles would make up just 8% of the medium-duty market by 2032. But to comply with EPA's standards, that market share jumps to *43%*. 89 Fed. Reg.

---

[3] All projections of future market penetration of electric vehicles are derived from EPA's "central case," in which manufacturers "seek the lowest cost compliance path." 89 Fed. Reg. at 27,844.

at 28,060.  EPA's new rule is thus clearly designed to bring about the electrification of the Nation's vehicle fleet.

## SUMMARY OF ARGUMENT

I.    EPA's unprecedented attempt to phase out the internal-combustion engine addresses a major question and thus requires clear congressional authorization.  Because EPA can point to no such authorization in Section 202 of the Clean Air Act, its rule should be reversed.

A.    There is no doubt that in forcing the electrification of the Nation's vehicle market, EPA has claimed an authority of "vast economic and political significance."  *West Virginia*, 597 U.S. at 716.  By the agency's own estimates, the rule will cost manufacturers *$870 billion* by 2055—orders of magnitude more than the Supreme Court has found to be economically significant in other major-question cases.  Moreover, the rule's effects will reverberate across industries, threatening millions of jobs both inside and outside the automobile industry, along with the vitality of the entire fuel industry and the American electric grid.

EPA's rule also short-circuits a vibrant and evolving political debate.  As in *West Virginia*, the rule preempts active deliberation in Congress and among the States about the future of conventional vehicles.  *See* 597 U.S. at

731-732.  In this domain EPA is not merely replacing but *overruling* Congress, which has considered and rejected legislation that would achieve EPA's desired electrification ends.  EPA cannot go its own way.

EPA's approach is as novel as it is transformative.  Just as in *West Virginia*, EPA claims to have " 'discover[ed] in a long-extant statute an unheralded power' representing a 'transformative expansion in its regulatory authority.' "  *West Virginia*, 597 U.S. at 724 (quotation omitted).  This Court should view this sudden discovery of unprecedented power with skepticism.

B.      Given the novelty and vast significance of EPA's rule, the agency "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723.  It cannot.  EPA relies on its Clean Air Act authorization to prescribe "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles."  § 7521(a)(1).  That decades-old, general standard-setting provision does not qualify as "clear congressional authorization" to force a market-wide transition from internal-combustion-engine vehicles to electric vehicles.

II.      Even if there were not a thumb on the scale against EPA's reading, its interpretation of the Clean Air Act is wrong.  Section 202(a) does not permit EPA to phase out internal-combustion-engine vehicles.  EPA

achieves that result only by setting emission standards on a fleetwide-average basis. But the Clean Air Act requires that emission standards under Section 202(a) apply to all vehicles *individually*, not manufacturers' fleets on *average*. For a given pollutant, EPA must therefore set emission standards that are achievable by individual vehicles on their own.

Even if fleetwide averaging were generally permissible under Section 202(a), the statute forecloses EPA from using fleetwide averaging to effectively mandate electrification. Section 202(a) authorizes EPA to set "standards" for "emission[s]" from "any class or classes of new motor vehicles or new motor vehicle engines, which … cause, or contribute to," potentially harmful air pollution. § 7521(a). But according to EPA, electric vehicles do not actually "emi[t]" carbon dioxide, or nitrogen oxides, or organic gases—the relevant pollutants—or "cause, or contribute to" air pollution. Thus, EPA may set standards for internal-combustion-engine vehicles, but it may not include electric vehicles in the class.

III.   Alternatively, EPA's rule must be reversed because it is arbitrary and capricious. In three ways, EPA irrationally and single-mindedly pursued its preferred technology.

A.      EPA treats electric vehicles as a pure environmental good that contribute zero emissions.  It does so by putting on blinders:  focusing arbitrarily only on tailpipe emissions and ignoring other lifecycle emissions.  EPA claims to just be treating like vehicles alike, but conventional vehicles are not like electric vehicles because electric vehicles shift emissions upstream to power sources.  EPA also says that electric vehicles' lifecycle emissions are supposed to decline in the future, but that does not explain why those emissions should not be taken into account now.  Finally, EPA throws up its hands and says that considering non-tailpipe emissions would be "unfair" to manufacturers, when what is unfair is fudging the numbers to reach a preferred outcome.

B.      EPA irrationally refused to consider better alternatives:  higher-octane gasoline and biofuels.  Numerous commenters advanced these superior means of achieving EPA's goals, which could reduce greenhouse-gas emissions as much as 80% compared to gasoline.  But EPA arbitrarily ignored this option too, on its drive toward electrification.

C.      Finally, EPA's cost-benefit analysis was flawed.  EPA estimated implausibly low costs for developing and implementing expensive and novel electric-vehicle technology.  And EPA assumed that consumers will realize

trillions of dollars in savings that they are apparently irrationally forgoing without any explanation for the supposed market failure in this area. Consumers are not stupid; they simply do not value fuel economy alone over other benefits currently offered by conventional vehicles.

## STANDING

Petitioners include entities that produce or sell liquid fuels and the raw materials used to produce them, along with associations whose members include such entities. By design, EPA's emission standards reduce the demand for liquid fuels and their raw materials by displacing an increasing number of internal-combustion-engine vehicles with electric vehicles. EPA thus projects that this rule will "result in a reduction of U.S. gasoline consumption by 780 billion gallons through 2055." 89 Fed. Reg. at 28,092. As shown in the accompanying declarations, depressing the demand for liquid fuels injures petitioners and petitioners' members financially. This economic injury constitutes injury-in-fact under Article III that is caused by the challenged regulatory action. *See, e.g.*, *American Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379-380 (D.C. Cir. 2021). Because vacatur of the rule would "remove a regulatory hurdle" to the sale of petitioners' products and predictably result in at least one vehicle that consumes more liquid fuel,

redressability is also satisfied. *Energy Future Coal.* v. *EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015).

Petitioners also include vehicle dealers. By artificially increasing the supply of electric vehicles beyond market demand, *see, e.g.*, 89 Fed. Reg. at 28,087, the rule will injure dealers by forcing them to either keep unwanted electric vehicles on their lots or sell them at cost or at a loss. And petitioners include trucking and construction contracting associations whose members own and operate a variety of light-duty and medium-duty vehicles that operate on diesel fuels. As explained in those petitioners' declarations, the new standards will limit the vehicles available to conduct their members' businesses, increasing the cost of diesel fuel and decreasing the prevalence of diesel refueling stations.

Petitioners also include the Arizona Legislature's leaders. EPA's emission standards will reduce state road maintenance funds and increase road maintenance costs, thus harming Arizona's Legislature by forcing it to adjust taxes and/or fees. *See* Dkt. 2060179 (Docketing Statement).

The petitioners that are membership associations have associational standing to challenge EPA's decision. *See Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977). Their members have standing

to sue in their own right, for the reasons described. The interests petitioners seek to protect are germane to their organizational purposes, which include safeguarding the viability of their members' businesses. And neither the claims asserted nor the relief requested requires the participation of individual members.

## STANDARD OF REVIEW

Under the Clean Air Act, this Court shall "reverse" a final rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." § 7607(d)(9)(A), (C). This standard is "indistinguishable from the Administrative Procedure Act equivalent." *National Petrochemical & Refiner Ass'n* v. *EPA*, 287 F.3d 1130, 1135 (D.C. Cir. 2002).

## ARGUMENT

## I. UNDER THE MAJOR-QUESTIONS DOCTRINE, EPA LACKS STATUTORY AUTHORITY TO EFFECTIVELY MANDATE ELECTRIC VEHICLES.

EPA seeks to radically transform the Nation's vehicle fleet by effectively mandating a nationwide transition from internal-combustion-engine vehicles to electric vehicles. That bold assertion of regulatory power vastly exceeds EPA's statutory authority. The Supreme Court has recently

and repeatedly emphasized that courts may not construe a statute to "authoriz[e] an agency to exercise powers of 'vast economic and political significance'" unless the statute does so "clearly." *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021) (citation omitted). The Clean Air Act does not clearly authorize EPA to force Americans to buy electric vehicles.

## A. The Shift To Electric Vehicles Is A Major Question.

This case follows *a fortiori* from *West Virginia*. In *West Virginia*, EPA asserted the "highly consequential power" to "announc[e] what the market share of coal, natural gas, wind, and solar must be, and then requir[e] plants to reduce operations or subsidize their competitors" to shift generation from coal to other energy sources. 597 U.S. at 724, 731 n.4. That claim of "unprecedented power over American industry" required "clear congressional authorization." *Id.* at 728 (quotation omitted).

So too here. Once again, EPA claims a sweeping authority to transform national energy policy—this time not by shifting power plants from coal to renewables, but by shifting vehicles from internal combustion to electricity. And once again, the authority that EPA asserts is indisputably a power of vast economic and political significance, as all the considerations that the Supreme Court found relevant in *West Virginia* confirm. This is no mere incremental

shift.  EPA is embracing the full scope of its claimed authority and pushing the country from a 7.5% electric-vehicle market share in 2022 to 68%—more than *two-thirds* of new vehicles—by 2032.  EPA needs "clear congressional authorization" before it can assert that sweeping power, 597 U.S. at 732 (quoting *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)).  It has nothing of the sort.

### 1.    EPA claims a power of vast economic significance.

The economic significance of EPA's rule "is staggering by any measure." *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023).  Given the projected costs and broader impacts of the rule, there can be "no serious dispute" that EPA is claiming "authority to exercise control over 'a significant portion of the American economy.'"  *Id.* (quoting *Utility Air*, 573 U.S. at 324).

***Direct compliance costs.***   EPA itself projects that its rule will cost manufacturers *$870 billion* through 2055 (though it tries to claw back $280 billion in supposed "negative costs"), 89 Fed. Reg. at 28,105, 28,108, likely making it the most expensive agency action in the Nation's history.  That is more than 17 times the projected $50 billion cost of the eviction moratorium in *Alabama Ass'n of Realtors*, 594 U.S. at 764; more than four times the projected $200 billion cost of the Clean Power Plan in *West Virginia*, 597 U.S.

at 746 (Gorsuch, J., concurring); and nearly double the projected $469 billion to $519 billion cost of the student-debt program in *Nebraska*, 143 S. Ct. at 2373—all of which the Supreme Court concluded would have significant economic impact.

***Restructuring of the market.*** The authority that EPA claims will also fundamentally restructure the vehicle market. EPA believes that the Clean Air Act gives it the power to ban new internal-combustion-engine vehicles in the name of "completely preventing motor vehicle tailpipe pollution." Response to Comments (RTC) 298.

*West Virginia* confirms that EPA's expansive claim of agency authority presents a major question. There, EPA sought to "substantially restructure the American energy market" by shifting power generation from coal to renewables through standards that it expected would decrease the coal market share from 38% to 27% coal by 2030. 597 U.S. at 724. Here, EPA seeks to restructure the American vehicle market by shifting powertrains from internal combustion to battery-electric, through standards that the agency expects will decrease the market share of non-electric vehicles from over 90% today to just 32% by 2032. *See* 89 Fed. Reg. at 28,057 (projecting that "as the

final standards become more stringent … the penetration of [electric vehicles] increases … to 68 percent of overall vehicle production in MY 2032").

That would transform the Nation's vehicle fleet not only as compared to today's reality, but even as compared to EPA's own (optimistic) assumptions about electric-vehicle sales without government intervention. EPA projects that without its rule, 47% of light-duty vehicles would be electric by 2032. 89 Fed. Reg. at 27,855-27,856, 28,058. That assumption is dubious. From 2012 to 2022, electric vehicles grew from near zero to 7.5% market share. *See* 89 Fed. Reg. at 27,896 n.504, 27,897 n.507. Even that paltry gain was made possible by significant regulatory incentives—which are being challenged elsewhere. It is extraordinarily unlikely that in the next ten-year period electric vehicles would organically balloon to a 47% market share. In fact, recent reports note that "the growth rate of electric vehicle sales has slowed sharply," and automakers are "slowing their investments in electric vehicles." Boudette, *supra*. But even if EPA's baseline projections were correct, EPA predicts a significant increase from the baseline to 68% electrification by 2032 under its rules. Its standards are thus designed to deliberately "accelerate the transition to electric vehicles," by requiring far higher levels of electrification than the market would otherwise demand. EPA Press Office, *Biden-Harris*

*Administration Proposes Strongest-Ever Pollution Standards for Cars and Trucks to Accelerate Transition to a Clean-Transportation Future* (Apr. 12, 2023), https://tinyurl.com/4cjkz5kr.

***Broader economic impacts.*** EPA's overhaul of the vehicle market would create cascading economic impacts. The domestic automobile industry "supports a total of 9.6 million American jobs and generates more than $1 trillion of economic activity each year." U.S. Chamber of Commerce Comment 2 (July 2023). EPA's rule threatens to destroy tens of thousands of those jobs, as electric-vehicle manufacturing is far more automated and so "requires 30% to 40% less labor." America First Policy Institute Comment 3 (June 30, 2023).

EPA's rule would have equally dramatic effects on the fuel and energy markets, massively "reduc[ing] liquid fuel consumption … while simultaneously increasing electricity consumption." 89 Fed. Reg. at 28,111. Again, the numbers are staggering: EPA projects that its standards "will result in a reduction of *780 billion gallons* of retail gasoline consumption … and an increase of *6,100 Terawatt hours* (TWh) of electricity consumption" through 2055. *Id.* at 28,141-28,142 (emphases added). That forced shift— which equates to trillions of dollars in lost fuel revenues—will wreak havoc on

the oil and gas industry, which "supports nearly 11 million U.S. jobs" and "accounts for approximately 8 percent of U.S. GDP." American Petroleum Institute Comment 1 (July 5, 2023).

The same is true for the biofuel industry and the farmers that support it. *See, e.g.*, Missouri Corn Growers Ass'n Comment 1 (July 5, 2023) (explaining that EPA's rule may cost corn growers "nearly one-billion bushels annually in lost demand"); Declaration of Geoff Cooper, President of the Renewable Fuels Association App. 164a. (predicting 1.7 to 2.5 billion gallon reduction in U.S. ethanol consumption as a result of EPA's rule). Likewise for gas stations, pipelines, asphalt and chemical manufacturers, and countless other industries. *See, e.g.*, 89 Fed. Reg. at 28,129; Valero Energy Corp. Comment 68 (July 5, 2023). The rule would also hugely and artificially increase demand for batteries and their component parts. And it would impose an enormous new strain on the electricity grid—the electricity that the rule demands is enough to power the entire United States for a year and a half. *See* U.S. Energy Info. Admin., *Use of Electricity* (Dec. 18, 2023), https://tinyurl.com/nhfzw97r. If those expansive impacts across multiple industries do not demonstrate economic significance, it is hard to say what would.

## 2. EPA claims a power of vast political significance.

The political significance of EPA's rule is just as staggering. Here as in *West Virginia*, all of the relevant considerations confirm that EPA cannot claim the sweeping power it asserts without clear congressional authorization.

***Ongoing policy debate.*** Whether to require greater electrification of the vehicle market by government mandate is "the subject of an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732 (quoting *Gonzales* v. *Oregon*, 546 U.S. 243, 267 (2006)). Some States have taken aggressive (and legally dubious) regulatory measures to accelerate electrification, *see, e.g.*, Cal. Code Regs. tit. 13, § 1962.4 (2022); others have opposed efforts to shift energy investment and generation away from traditional sources, *see, e.g.*, 2022 W. Va. Legis. C. 235. And Congress is still considering the matter, including by instructing various agencies—though not EPA—to study and report on the implications of electrifying the Nation's fleet. *See* Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, §§ 25006, 40435, 40436, 135 Stat. 429, 845-849, 1050 (2021). That makes EPA's "claimed delegation" to effectively mandate electrification "all the more suspect." *West Virginia*, 597 U.S. at 732 (quoting *Gonzales*, 546 U.S. at 267).

***Prior rejections by Congress.*** Congress not only is actively considering the issue, but has already "considered and rejected" legislation similar to EPA's latest rule. *West Virginia*, 597 U.S. at 731 (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000)); *see, e.g.*, Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. (2019) (rejected bill that would have mandated electric-vehicle penetration roughly equal to the 50%-by-2030 target in EPA's rule); Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018); *see also* 116 Cong. Rec. 19238-19240 (1970) (rejected amendment to Title II that would have banned internal-combustion-engine vehicles by 1978). A majority of the Senate recently voted to prohibit EPA from finalizing or enforcing the very rule at issue in this case. *See* S. 4072, 118th Cong. (2023-2024). The Clean Air Act cannot be read to authorize EPA to "enact a program that Congress has chosen not to enact itself." *Nebraska*, 143 S. Ct. at 2373 (quotation omitted).

***Conflict with Congress's broader design.*** EPA's rule is also inconsistent with Congress's broader statutory scheme for addressing vehicle emissions through increases in renewable fuels. Rather than mandate vehicle electrification, Congress has consistently focused on promoting the use of biofuels, which (unlike electric-vehicle components) are in abundant domestic

supply. *See, e.g.*, § 7545(o)(2); 49 U.S.C. § 32905(a) (encouraging "*liquid alternative fuel*") (emphasis added); Inflation Reduction Act of 2022, Pub. L. No. 117-169, §§ 13202, 13404, 22003, 136 Stat. 1818, 1932, 1966-1969, 2020 (2022). And to the extent Congress has sought to promote electrification, it has done so by investing in the needed infrastructure, not by requiring electrification of the vehicle fleet before that infrastructure exists. *See, e.g.*, Fed. Highway Admin., *Charging and Fueling Infrastructure Discretionary Grant Program* (Aug. 26, 2024), https://tinyurl.com/mr2ptnxt; Fed. Highway Admin., *National Electric Vehicle Infrastructure (NEVI) Program* (June 13, 2024), https://tinyurl.com/tsf926a2. This policy debate is thus larger than the (already enormous) issue of whether to shift away from the internal-combustion engine. It involves a fundamental strategic question about how to tackle emissions—by pushing vehicles to use electricity and attempting to lower emissions from power plants, or instead by lowering emissions from liquid fuels directly, such as through renewable-fuel standards.

**National policy implications.** The Clean Power Plan raised a major question in part because it required EPA to "balanc[e] the many vital considerations of national policy implicated in deciding how Americans will get their energy," including questions far outside the agency's expertise. *West*

*Virginia*, 597 U.S. at 729. Absent a clear congressional mandate, the Supreme Court refused to assume that Congress would authorize EPA to decide "how much of a switch from coal to natural gas" the power grid could tolerate, or "how high energy prices can go" before becoming "exorbitant"—decisions that "Congress presumably would not task" to an "agency [with] no comparative expertise." *Id.* (quotation omitted).

The same reasoning applies here. As State Petitioners (whose arguments petitioners incorporate) explain in further detail, EPA is again claiming the power to decide "how much of a switch" to electrification the Nation's power grid can be forced to tolerate, and how high vehicle and electricity prices can be forced to go as a result. *West Virginia*, 597 U.S. at 729; *see* State Petitioners' Br. 17-21. Once again, those questions are well outside the agency's "comparative expertise." *West Virginia*, 597 U.S. at 729. While Congress has permitted EPA to consider how its environmental regulations "indirectly impact" the energy market, RTC 320-323, it has not granted EPA the authority to radically transform that market. Instead, the "basic and consequential tradeoffs" involved in that choice "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U.S. at 730.

So too for the substantial national-security issues that EPA's rule implicates. As NHTSA has recognized, the United States "has very little capacity in mining and refining any of the key raw materials" needed for electric vehicles. 86 Fed. Reg. 49,602, 49,797 (Sept. 3, 2021). As a result, electrifying the vehicle fleet will make the American automotive industry dependent on foreign powers, including hostile ones—especially China, which controls "a large portion of processing capacity for mined battery minerals." 89 Fed. Reg. at 28,046; *see* Alliance for Automotive Innovation Comment 21 (July 5, 2023) (noting China's "history of leveraging supply chain[] influences in times of conflict"). EPA posits that domestic processing of battery minerals could be developed further to reduce the national-security impacts of its rule, *see* 89 Fed. Reg. at 28,046, but that unlikely suggestion only underscores how far outside its expertise the agency is reaching.

### 3. EPA claims an unheralded and transformative power.

In asserting the power to effectively mandate electrification of the Nation's vehicle fleet, EPA claims to have " 'discover[ed] in a long-extant statute an unheralded power' representing a 'transformative expansion in its regulatory authority.' " *West Virginia*, 597 U.S. at 724 (quoting *Utility Air*,

573 U.S. at 324). Both the novelty of EPA's approach and its massive expansion of EPA's reach undermine that claim.

***Novelty.*** When an agency relies on decades-old statutory text to assert newfound regulatory authority, courts "typically greet its announcement with a measure of skepticism." *Utility Air*, 573 U.S. at 324; *cf. Loper Bright Enters.* v. *Raimondo*, 144 S. Ct. 2244, 2258 (2024). That skepticism is fully warranted here. In the decades following the enactment of the Clean Air Act, EPA consistently treated electric vehicles as, at most, a compliance "option" or "flexibility," and never claimed the authority to use emission standards to phase out internal-combustion-engine vehicles. *See, e.g.*, 77 Fed. Reg. at 62,917 ("[E]lectrification is an option for compliance but is not required under this rule."). Indeed, using emission standards to push electrification was never on the table, as EPA's standards until 2021 were promulgated jointly with NHTSA—which is prohibited from considering the fuel economy of electric vehicles in setting its fuel-economy standards, *see* 49 U.S.C. § 32902(h)(1), (2).

That changed only three years ago, when EPA first sought to set emissions standards that would effectively require electrification, foreshadowing the even more dramatic shift it has sought to impose here. *See Texas* v. *EPA*, No. 22-1031 (pending challenge to prior standards). That

sudden assertion of newfound power—claiming the authority not just to "reduce pollution by causing the regulated source to operate more cleanly," but to "shift[]" the "polluting activity" from internal-combustion-engine vehicles to electric vehicles, *West Virginia*, 597 U.S. at 725—is a strong clue that EPA is going far beyond what Congress has authorized.

***Transformative power.*** EPA's novel approach also represents a transformative expansion of its asserted regulatory domain. By setting standards that effectively require increasing the market share of electric vehicles (and reducing the share of internal-combustion-engine vehicles), the agency has asserted the power to decide whether new internal-combustion-engine vehicles should be permitted on the roads at all. Indeed, EPA has openly claimed the authority to "completely prevent[] motor vehicle tailpipe pollution," even if that means a flat ban on "the production of vehicles that emit pollutants"—that is, prohibiting new internal-combustion-engine vehicles entirely. RTC 298. It is hard to imagine a more striking example of regulatory overreach. *See West Virginia*, 597 U.S. at 728 (rejecting EPA's apparent view that it could "forc[e] coal plants to 'shift' away virtually all of their generation—i.e., to cease making power altogether").

EPA attempts to downplay the transformative nature of its rule. It says that manufacturers "are not required to use particular technologies to meet [its] standards," and that it is technically possible to comply "without *additional* zero-emission vehicles beyond the volumes already sold today." 89 Fed. Reg. at 27,845, 27,855, 28,087 (emphasis added). Yet even EPA does not think that is how automakers will respond. EPA recognizes that manufacturers are "most likely to comply" with its standards "through increased [battery-powered electric vehicle] production." *Id.* at 27,855. And all of EPA's projected compliance pathways demand massive increases in the production and sale of battery-powered electric vehicles, plug-in hybrid vehicles, or both—depressing the production of other vehicles to *no more than 32% of the market* by 2032 under any of EPA's projections. *Id.* at 27,856. The truth is that *no* manufacturer can meet the 2032 targets without substantial numbers of electric vehicles. Valero Energy Corp. Supplemental Comment 4-8, 9-11 (Mar. 11, 2024) (documenting how EPA's "modeling approach and inputs reveal" that by Model Year 2023 electric vehicles are necessary for "all fleetwide compliance pathways"). There can be no doubt that EPA is attempting to force a shift in the Nation's vehicle fleet.

Even if EPA's rule did not actually force the dramatic shift to electrification that EPA projects, what matters under the major-questions doctrine is the full scope of the authority claimed by the agency. *See West Virginia*, 597 U.S. at 728-729. Here, EPA believes it can use its standard-setting authority to "require the complete elimination of tailpipe pollution from motor vehicles." RTC 298. The "'breadth of the authority that [EPA] has asserted'" thus provides all the more "'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159-160).

**B.    EPA Has No Clear Congressional Authorization Here.**

Because of the significance and novelty of EPA's claim of the authority to compel vehicle electrification, the major-questions doctrine requires EPA to "point to 'clear congressional authorization' to regulate in that manner." *West Virginia*, 597 U.S. at 732 (quoting *Utility Air*, 573 U.S. at 324). EPA cannot come close.

There is not one word in the Clean Air Act suggesting that Congress authorized EPA to phase out internal-combustion-engine vehicles in favor of electric vehicles. The statutory authority on which EPA relies merely authorizes the agency to prescribe "standards applicable to the emission of

any air pollutant from any class or classes of new motor vehicles." § 7521(a)(1). That standard-setting authority does not afford EPA "clear congressional authorization" to force a market-wide transition from internal-combustion-engines vehicles to electric vehicles, any more than EPA's parallel authority to set emission standards for power plants afforded it clear congressional authorization to force a transition from coal to renewable energy. *West Virginia*, 597 U.S. at 732.

That should be the end of the matter. As explained below, EPA does not have the best reading of the statutory text. But even if the Clean Air Act could be read to give EPA a "colorable textual basis" for the sweeping power it claims, the major-questions doctrine demands far more. *West Virginia*, 597 U.S. at 721-723. EPA's rule therefore exceeds its statutory authority and must be reversed.

## II. EPA LACKS STATUTORY AUTHORITY TO SET FLEETWIDE-AVERAGE STANDARDS THAT INCORPORATE ELECTRIC VEHICLES.

Even setting aside the major-questions doctrine, EPA's rule is unlawful under the plain statutory text. To achieve its goal of requiring electrification, EPA takes two statutory steps. First, it sets average emission standards for manufacturers' nationwide fleets, rather than standards for individual

vehicles.  Second, it artificially increases the stringency of those standards by "averaging" in more and more zeros to represent the electric vehicles it wants to see in future years.  The Clean Air Act does not authorize either step.[4]

## A.     EPA May Not Set Fleetwide-Average Standards.

To begin, EPA lacks authority to set vehicle-emission standards on a fleetwide-average basis.  On the contrary, the text and structure of Title II require that emission standards under Section 202(a) apply to vehicles individually, not manufacturers' fleets on average.  On its face, Section 202(a) says nothing about averaging across fleets.  And the "broader context of the statute as a whole," *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341 (1997), makes clear that Section 202(a) does not permit fleetwide averaging.  As the agency itself admitted when it first considered the issue, "the structure of Title II … assume[s] individual vehicle compliance with the applicable standards."  45 Fed. Reg. 14,496, 14,502 (Mar. 5, 1980).  Accordingly, EPA must set standards that are technologically feasible for individual internal-combustion-engine vehicles.

---

[4] EPA's greenhouse-gas and non-methane-organic gas and nitrogen oxide standards all rely on fleetwide averaging and include electric vehicles as part of those averages, and are thus equally unlawful under the Clean Air Act.

## 1. Title II's compliance and enforcement provisions demonstrate that EPA cannot use fleetwide averaging.

Fleetwide averaging clashes with "the design and structure of [Title II] as a whole." *Utility Air*, 573 U.S. at 321 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)). Title II sets forth a comprehensive, interlocking scheme for enforcing emission standards through testing, certification, warranties, remediation, and penalties. Fleetwide-average standards are incompatible with these provisions, which are "designed to apply to" individual vehicles and "cannot rationally be extended" to fleets. *Id.* at 322.

a. ***Testing and certification.*** Under Title II, EPA must "test, or require to be tested in such manner as [it] deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether such vehicle or engine conforms with the regulations prescribed under [Section 202]." § 7525(a)(1). If the "vehicle or engine conforms to such regulations," EPA must issue the manufacturer a "certificate of conformity." *Id.* EPA may also later test a manufacturer's vehicles and engines, and if "such vehicle or engine does not conform with such regulations and requirements, [EPA] may suspend or revoke such certificate insofar as it applies to such vehicle or engine." § 7525(b)(2)(A)(ii). A manufacturer may

not sell a vehicle or engine not "covered by a certificate of conformity." § 7522(a)(1).

Fleetwide averaging is incompatible with these requirements in at least two respects. First, by using the singular terms "vehicle" and "engine," along with "any" and "such," the statute contemplates that *individual* vehicles may be tested for conformity. If an individual vehicle is determined to "not conform" with the standards, the certificate of conformity may be suspended or revoked "as it applies to such vehicle." § 7525(b)(2)(A)(ii). In a fleetwide-averaging regime, testing an individual vehicle or engine does not enable EPA to determine whether it "conforms with the regulations prescribed under" Section 202, § 7525(a)(1), because conformity turns on the fleet's average performance overall.

Second, fleetwide averaging makes it impossible to determine compliance with applicable emission standards *before* a vehicle is sold, as required to obtain the certificate of conformity needed for such a sale. *See* § 7522(a)(1). As EPA has previously acknowledged, "[b]efore a manufacturer may introduce a new motor vehicle into commerce, the manufacturer must obtain an EPA certificate of conformity indicating compliance with all applicable emissions standards." 71 Fed. Reg. 2,810 (Jan. 17, 2006). Yet under

fleetwide-average standards, a vehicle's "conform[ity] with the regulations prescribed under [Section 202]" cannot be determined until the manufacturer calculates its production-weighted average at "the end of each model year," when the manufacturer knows the quantity and model of "vehicles produced and delivered for sale." § 7525(a)(1). So EPA has by regulation required certificates of conformity at the end of the model year. 40 C.F.R. § 86.1865-12(i)(1), (j)(3), (6). This "need to rewrite clear provisions of [Title II] should have alerted EPA that it had taken a wrong interpretive turn" in adopting averaging. *Utility Air*, 573 U.S. at 328.

b. ***Warranties and remediation.*** Fleetwide-average standards similarly clash with Title II's warranty provisions, which EPA has previously recognized "assume individual vehicle compliance with the applicable standards." 45 Fed. Reg. at 14,502. Under Section 207, a manufacturer must "warrant to the ultimate purchaser and each subsequent purchaser" "*at the time of sale*" that each new vehicle complies with "applicable regulations under [Section 202]." § 7541(a)(1) (emphasis added). Yet, as with certificates of conformity, manufacturers cannot warrant conformity with fleetwide-average emission standards at the time of sale, because compliance can be determined only at the end of the year. *See* 40 C.F.R. § 86.1865-12(i)(1) (requiring

manufacturers to compute their "production-weighted fleet average" by "using actual production" data for the year in question).

Fleetwide-average emission standards are also inconsistent with Title II's remediation and notification provisions. Those provisions state that if EPA "determines that a substantial number of any class or category of vehicles or engines … do not conform to the regulations prescribed under [Section 202]," the manufacturer must remedy "the nonconformity of any such vehicles or engines." § 7541(c)(1). If "a motor vehicle fails to conform," the manufacturer bears the cost. § 7541(h)(1). Further, "dealers, ultimate purchasers, and subsequent purchasers" must be given notice of any nonconformity, § 7541(c)(2), which requires identification of specific nonconforming vehicles. None of this is possible if the nonconformity is tied to a fleet on average.

c. ***Penalties.*** Finally, EPA's fleetwide-averaging regime is inconsistent with the statute's penalty provision. Under Section 205, any violation "shall constitute a separate offense with respect to *each* motor vehicle or motor vehicle engine," with each offense subject to its own civil penalty of up to $25,000. § 7524(a) (emphasis added). Under EPA's approach, however, no individual vehicle or engine violates the applicable standard; only the fleet

as a whole does. The statute provides no method for calculating penalties when a fleet fails to meet its fleetwide-average standard—because it does not authorize fleetwide-average standards.

> **2. Other provisions in Section 202 confirm that emission standards may not be based on averaging.**

a. Specific emission standards prescribed by Section 202 confirm that Section 202(a) does not permit averaging. In Section 202(b), the Act sets forth specific light-duty vehicle emission standards that EPA must promulgate in "regulations under" Section 202(a). § 7521(b). For example, for "light-duty vehicles and engines manufactured during model years 1977 through 1979," the standards must provide that "emissions from such vehicles and engines may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide." § 7521(b)(1)(A).

Those provisions require that the "regulations under [Section 202(a)]" apply to "vehicles and engines," not "vehicles and engines *on an average basis across a fleet*." Construing those provisions to allow averaging would impermissibly add words to the statute that change its meaning. *Cf. Rotkiske* v. *Klemm*, 589 U.S. 8, 13-14 (2019). And supplying the extra words "on average" would have a significant substantive effect: "roller coaster riders

must be 48 inches tall" means something very different from "roller coaster riders must be 48 inches tall *on average*."

The testing requirements accompanying the Section 202(b) standards confirm that those standards apply to all vehicles. EPA must "test any emission control system incorporated in a motor vehicle or motor vehicle engine … to determine whether such system enables such vehicle or engine to conform to the standards required to be prescribed under [Section 202(b)]." § 7525(a)(2). If the system complies, EPA must issue a "verification of compliance with emission standards for such system." *Id.* Those requirements plainly contemplate standards that apply to individual vehicles. Not only does the statutory text frame the inquiry as whether an individual "vehicle" or "engine" conforms to the emission standards, but the provision's foundational premise—that an emission-control system can enable a vehicle to meet emission standards—depends on individually applied standards.

b. Other parts of Section 202 further demonstrate that emission standards under Section 202(a) cannot rely on averaging. Section 202(b)(3), for example, authorizes EPA to grant waivers from certain nitrogen-oxide emission standards—which, again, are standards "under" Section 202(a), *see* § 7521(b)(1)(B)—for no "more than 5 percent of [a] manufacturer's production

or more than fifty thousand vehicles or engines, whichever is greater." § 7521(b)(3). This provision would be nonsensical under a fleetwide-averaging regime. Under fleetwide averaging, no waiver is needed. Instead, perhaps 50% or more of a manufacturer's fleet effectively has a "waiver" so long as a sufficient number of vehicles outperform the standard.

c. Similarly, under Section 202(m), EPA must require manufacturers to install on "all" new light-duty vehicles and trucks "diagnostic systems" capable of identifying malfunctions that "could cause or result in failure of the vehicles to comply with emission standards established under this section." § 7521(m)(1). In a fleetwide-averaging regime, this requirement would be pointless, as the deterioration or malfunction of an individual vehicle's emissions-related systems would provide virtually no information about whether the fleet as a whole is compliant.

d. EPA's principal response to these provisions is to assert that they have "no bearing on the section 202(a) authority beyond the specific circumstances to which [they] appl[y]." RTC 339. But EPA cannot wave away the significance of the fact that each time Congress directed EPA to issue specific emission standards, it mandated standards applicable to vehicles individually. Just as a general term must be understood in light of the specific

terms that accompany it, *see Paroline* v. *United States*, 572 U.S. 434, 447 (2014), the specific emission standards Congress required illuminate the scope of EPA's general Section 202(a) authority.

EPA has also previously suggested to this Court that because Section 202 directs EPA to regulate with respect to "class or classes," it necessarily permits EPA to "set standards for a group of vehicles—like a fleet." *Texas* v. *EPA*, No. 22-1031, EPA Opening Br. 63. That is circular and wrong. Of course EPA can "set standards for a group of vehicles," but the issue is whether the standards must apply *individually* to each vehicle in the group or collectively, *on average*. The term "class" does not answer that question, but Section 202 does.

### 3. The broader text and history of Title II confirm that the rule exceeds EPA's authority.

a.      Finally, other indicia of statutory meaning demonstrate that the rule exceeds EPA's statutory authority under Section 202(a). Elsewhere in Title II, Congress showed that it knew how to legislate with respect to "average annual aggregate emissions." § 7545(k)(1)(B)(v)(II) (directing EPA to take certain actions if "the reduction of the average annual aggregate emissions of toxic air pollutants in a [designated district] fails to meet" certain standards). Thus, "if Congress had wanted to adopt an [averaging] approach"

for motor-vehicle standards under Section 202(a), "it knew exactly how to do so." *SAS Inst., Inc.* v. *Iancu*, 584 U.S. 357, 365 (2018). It did not choose that approach in Section 202(a).

The Energy Policy Conservation Act (EPCA), enacted just two years before the 1977 Clean Air Act amendments, reinforces that conclusion. There, Congress directed the Secretary of Transportation to issue regulations setting "average fuel economy for passenger automobiles manufactured by any manufacturer" in a given model year—that is, fleetwide-average fuel economy. 49 U.S.C. § 32902(a). That Congress has not used similar language in Section 202(a) of the Clean Air Act is a "telling clue" that the Act does not permit fleetwide averaging. *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 517 (2018).

b. The Clean Air Act's history also reflects Congress's understanding that emission standards would apply to all vehicles individually. Before 1970, EPA relied on testing prototypes, rather than vehicles rolling off the assembly line. But in the 1970 amendments, Congress permitted EPA to test any individual vehicle as it comes off the assembly line. *See* Pub. L. No. 91-604, § 8, 84 Stat. 1676, 1694–1696 (1970). The House Report explained that while some testing of prototypes "will continue," "tests should require each prototype rather than the average of prototypes to comply with regulations

establishing emission standards." H.R. Rep. No. 1146, 91st Cong., 2d Sess. 6 (1970). If Congress forbade averaging across *prototypes*, it certainly did not permit averaging across entire *fleets*.

*    *    *

For many of these reasons, this Court has previously cast substantial doubt on EPA's authority to set fleetwide-average emission standards. As the Court explained in *Natural Resources Defense Council* v. *Thomas*, 805 F.2d 410 (D.C. Cir. 1986), the "engine specific thrust" of Title II's "testing and compliance provisions" is evident both in Congress's choice to "spea[k] of 'any,' 'a,' or 'such' motor vehicle or engine" in the statute and in the "troubling" legislative history recounted above. *Id.* at 425 n.24. The arguments were not dispositive in *Thomas* only because the parties there had failed to present them. *Id.* They are relevant—and dispositive—here.

**B.      At A Minimum, EPA May Not Incorporate Electric Vehicles Into Its Fleetwide-Average Standards.**

Even if the Clean Air Act permits fleetwide averaging in some circumstances, at a minimum it requires that the vehicles included in such averaging actually emit the relevant pollutant. Here, EPA treats electric vehicles as incapable of emitting greenhouse gases and battery-powered electric vehicles as incapable of emitting relevant criteria pollutants.

40 C.F.R. §§ 86.1803-01, 86.1866-12(a); 89 Fed. Reg. at 29,187; 89 Fed. Reg. at 27,966. Yet it includes those vehicles in its average-emission calculations, counting them as zeros. Averaging in a bunch of zeros allows the agency to set artificially low emission standards that effectively force manufacturers to incorporate an increasing percentage of electric vehicles into their fleets. *See supra*, pp. 13-15. Congress did not authorize EPA to manipulate averaging in that way. Section 202 focuses on vehicles that actually emit relevant pollutants, and the statutory structure, history, and context confirm the plain text.

### 1. The statutory text focuses on vehicles that emit the relevant pollutant.

Section 202(a)(1) provides that EPA shall prescribe "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." § 7521(a)(1). The statute, of course, does not expressly specify which vehicles are to be included in any average emission standard—because, as discussed above, it does not contemplate averaging in the first place. But to the extent averaging is permissible, the text makes clear

that the vehicles included in such averaging must actually emit the relevant pollutant.

To begin, the statute focuses on standards for the "*emission*" of an air pollutant, which immediately indicates Congress's focus on vehicles that actually "emi[t]" the relevant pollutant. § 7521(a)(1) (emphasis added). According to EPA, electric vehicles "have zero [greenhouse-gas] and criteria pollutant emissions from their tailpipes." 88 Fed. Reg. at 29,187. Given the textual focus on harmful emissions, it makes no sense for EPA to include vehicles it deems non-emitting in its calculation of emission standards.

Next, the statute is explicit that the things for which EPA sets standards must "in [EPA's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." § 7521(a)(1). The only textual question is *what* exactly EPA must "judg[e]" to "cause, or contribute to," potentially dangerous air pollution. There are only two plural options: the "new motor vehicles or new motor vehicle engines," or the "class or classes" of those vehicles or engines. And the rule of the last antecedent suggests the former. That rule provides that a "limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U.S. 20, 26 (2003). Here, the

relevant limiting phrase is: "which in [EPA's] judgment cause, or contribute, to air pollution." § 7521(a)(1). And the immediately antecedent phrase is "new motor vehicles or new motor vehicle engines." *Id.* Thus, it is the "*vehicles*" in the class that must "cause, or contribute to," the pollution, not the "class" as a whole.

This Court and others have adopted that natural reading. This Court has observed that Section 202(a) "requires the EPA to set emissions standards for new motor vehicles and their engines *if they emit harmful air pollutants*." *Truck Trailer Mfrs. Ass'n* v. *EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021) (emphasis added); *see NRDC* v. *EPA*, 954 F.3d 150, 152 (2d Cir. 2020) (Section 202(a) "requires EPA to regulate emissions from new motor vehicles if EPA determines that *the vehicles* 'cause, or contribute to,' [potentially dangerous] air pollution") (emphasis added) (quoting § 7521(a)(1)). On that correct view, the statute authorizes EPA to set standards *only* for "new motor vehicles or new motor vehicle engines" that the agency deems to cause or contribute to harmful pollution. But electric vehicles, in EPA's tailpipe-focused judgment, do not cause or contribute to greenhouse-gas or criteria pollution.

EPA resists on the theory that the "class or classes" of vehicles must "cause, or contribute to" air pollution. RTC 351. According to EPA, this

means that individual vehicles in that class need not "cause or contribute" to pollution on their own. That is both wrong and irrelevant. It is wrong because the rule of the last antecedent applies even without a "list of terms." RTC 351 n.307; *see Barnhart*, 540 U.S. at 26. EPA also argues that Congress's focus must have been the class because "while an individual vehicle could possibly 'contribute' to dangerous air pollution," one vehicle alone could not solely "cause" such pollution. RTC 351. But that proves too much. Even a class of vehicles does not solely "cause" greenhouse-gas or criteria pollution, which comes from many sources (including other classes of vehicles). Instead, the "cause" and "contribute" terms capture both vehicles that emit substances that themselves qualify as harmful pollution and vehicles that emit substances that are precursors to pollution (*e.g.*, emissions that combine to create smog).

Fundamentally, it does not matter whether it is the "class or classes" of vehicles that must "cause, or contribute to" air pollution. That still would not justify including electric vehicles in the class. When English speakers refer to a class of objects that does something, they ordinarily mean that *all* the members of the class do that thing. For example, when a doctor warns a patient about a "class of medications that cause drowsiness," the class does not include stimulants. And that is the best way to read the statute here: a class

that causes pollution is most naturally defined to include only those vehicles that cause pollution. EPA may have broad leeway to group those pollution-emitting vehicles into classes as it sees fit. *See NRDC* v. *EPA*, 655 F.2d 318, 338 (D.C. Cir. 1981). But it cannot sweep non-emitting vehicles into the class.

### 2. The statutory structure and history confirm Congress's focus on technologically achievable emission controls.

Several other portions of Section 202 confirm that Congress focused on technologically feasible standards for vehicles that actually emit pollutants that cause or contribute to pollution. Section 202(a)(2) requires EPA to provide manufacturers with lead time to comply with the standards, in order "to permit the development and application of the requisite technology." § 7521(a)(2). That language contemplates that technological feasibility will constrain the emission standards that EPA sets under Section 202(a). Congress's focus on technological feasibility, in turn, evinces a concern for incremental steps to improve vehicles that actually emit the relevant pollutants, rather than wholesale shifts to different types of vehicles.

Other provisions show the type of "technology" that Congress contemplated car manufacturers would develop to meet those standards. Section 202(m) requires EPA to command manufacturers to install on "all" new light-duty vehicles and trucks "diagnostic systems" that identify

"emission-related systems deterioration or malfunction … which could … result in failure of the vehicles to comply with emission standards established under this section." § 7521(m)(1). The required diagnostic systems must monitor, "at a minimum, the catalytic converter and oxygen sensor." *Id.* In other words, to ensure compliance with emission standards under Section 202(a), Congress required "emissions-related systems" and accompanying "diagnostic systems" on each vehicle—again underscoring Congress's view that the vehicles subject to an emission standard actually emit the relevant pollutant.

EPA disagrees, contending that the legislative history demonstrates Congress's commitment to aggressive pollution reduction using "unconventional" power sources, including electric vehicles. 89 Fed. Reg. at 27,893-27,894. Those examples, however, do not suggest that EPA has authority to *require* automakers to shift to novel technologies. Instead, EPA's examples show that Congress has taken a cautious approach to alternative technologies, holding "hearings," instituting pilot programs, and "encourag[ing] Federal purchases" of novel types of vehicles. *Id.* None of that means that Congress has authorized EPA to effectively mandate a wholesale, nationwide shift away from internal-combustion-engine vehicles.

### 3. Related statutes underscore that Section 202(a) does not authorize averaging of non-emitting electric vehicles.

Other environmental laws confirm the lack of statutory authorization to include electric vehicles in fleetwide-average standards and to use those standards to effectively force electrification.

a. In the Clean Air Act Amendments of 1990, Congress spoke directly to the phase-in of electric vehicles on America's roads. Congress instructed EPA to establish standards for "clean-fuel vehicles" operating on "clean alternative fuel," including "electricity." Pub. L. No. 101-549, § 229, 104 Stat. 2399, 2511-2513 (codified at 42 U.S.C. §§ 7581(2), (7), 7582(a)). Congress required that certain areas of the country with the worst pollution "phase-in" a "specified percentage" of "clean-fuel vehicles" using "clean alternative fuels"—defined to include "electricity"—in certain fleets. § 7586; *see* § 7581(a). The 1990 amendments highlight that Congress knows how to establish standards that apply to electric vehicles, and to directly require that such vehicles be phased into a particular fleet. But Congress chose to do so only on a targeted, regional basis.

b. Other related statutes suggest the same. In EPCA, Congress directed NHTSA to set fuel-economy standards based on averages, but *prohibited* NHTSA from setting fuel-economy standards that average in the

fuel economy of electric vehicles. *See* Pub. L. No. 102-486 §§ 302, 403, 106 Stat. 2776, 2868-2871, 2876-2879 (codified at 49 U.S.C. § 32902(h)).  That prohibition bars NHTSA from doing exactly what EPA is doing here.

The absence of a specific prohibition on EPA does not suggest that it has free rein to do what NHTSA cannot.  When Congress enacted Section 202(a)(1) in 1977, it had no need to explicitly block EPA from considering electric vehicles, because it did not contemplate that EPA would set emission standards using averaging in the first place.  The prohibition on NHTSA thus underscores just how far EPA is reaching here:  it is straining statutory language to seize a power that Congress expressly denied to a sister agency that actually *has* authority to promulgate fleetwide-average standards. Moreover, because EPA's reading creates an inconsistency between EPCA and the Clean Air Act, it conflicts with a key premise of *Massachusetts*—that NHTSA and EPA can "administer their obligations and yet avoid inconsistency."  549 U.S. at 532.

Further, petitioners in Case No. 24-1158 preserve the argument that *Massachusetts* should be overruled on the ground that carbon dioxide is not an "air pollution agent or combination of such agents." § 7602(g); *see Massachusetts*, 549 U.S. at 559 (Scalia, J., dissenting).  Carbon

dioxide does not "make or render impure or unclean" the air. *Webster's New International Dictionary* 1910 (2d ed. 1949). It is an abundant, naturally occurring gas that exists throughout the atmosphere and that is essential for life on Earth. Subsequent developments merely confirm that *Massachusetts* was wrong on both the facts and the law.

### 4. EPA's counterarguments lack merit.

EPA has offered several justifications for averaging electric-vehicle "zeros" into its fleetwide standards, but none has merit.

a. EPA argues in the rule's preamble that petitioners' argument is "factually flawed" because electric vehicles actually *do* cause or contribute to pollution. 89 Fed. Reg. at 27,902; *see* 74 Fed. Reg. at 66,496 (finding that air-conditioning emissions contribute to harmful air pollution). That is not the "gotcha" that the agency thinks. In setting these standards, the agency has chosen to deem electric vehicles all to have zero greenhouse-gas emissions and battery electric vehicles as having zero relevant criteria-pollutant emissions. *See supra* p. 9 n.2.[5] Accordingly, EPA's standards reflect the agency's "judgment" that these types of vehicles do not "cause, or contribute

---

[5] For compliance with the averaging standard for criteria pollutants, plug-in hybrids are run without relying on an outside power source, and are not assumed to emit zero. 40 C.F.R. § 86.1811-27(b)(v); 89 Fed. Reg. at 27,936.

to," the relevant pollution. § 7521(a). If EPA now recognizes that treating these vehicles as "zero-emission" is counterfactual, then its rule premised on that treatment is arbitrary and capricious. *See infra* pp. 62-66. But if EPA stands by its zero-emission designation, then it must abide by the statutory consequences.

b. EPA also contends that excluding electric vehicles from its averaging would be nonsensical. The agency questions why, "given Congress's directive to reduce air pollution," it would have "authorized EPA to consider technologies that achieve 99 percent pollution reduction" but "not 100 percent." 89 Fed. Reg. at 27,893. Setting aside that electric vehicles shift pollution to the power sector, the answer is simple: "[n]o statute pursues a single policy at all costs." *Bartenwerfer* v. *Buckley*, 598 U.S. 69, 81 (2023). In the Clean Air Act, Congress was concerned not only with emission reduction but also with technological feasibility and preserving "some productive economic activity." *Energy Future Coal.*, 793 F.3d at 145. There is nothing nonsensical about allowing EPA to use emission standards to combat pollution within meaningful limits.

EPA similarly contends that it would be "unworkable" to exclude electric vehicles from its averages because it does not know "ex ante" which

vehicles a manufacturer will choose to turn into a non-emitting vehicle. *See* 89 Fed. Reg. at 27,902. But the challenge here is to EPA's standard-setting, not to manufacturers' production of vehicles. There is nothing "unworkable" about telling EPA that when it calculates a technologically feasible emission standard achievable by an emitting class of vehicles, it cannot average in a bunch of zeros to represent non-emitting electric vehicles.

c.    Finally, EPA argues that the Clean Air Act affirmatively authorizes it to mandate the production of electric vehicles because it may prescribe pollution-emission controls for vehicles and engines, whether they "are designed as complete systems" or "incorporate devices to prevent or control such pollution." § 7521(a)(1); 89 Fed. Reg. at 27,889. It is worth pausing to note how extreme that argument is: under EPA's view of the statute, the agency has the authority to declare tomorrow that 100% of vehicles manufactured must be battery-powered—without any express word from Congress about electrification.

The statute does not countenance that extraordinary result. Electric vehicles are not "designed as complete systems" to prevent or control air pollution because they do not have "built-in pollution control" or prevention. *Truck Trailer Manufacturers*, 17 F.4th at 1202. To "prevent" something

means to "keep [it] from happening" or "impede" it. *American Heritage Dictionary of the English Language* 1038 (1st ed. 1969). To "control" means to "hold in restraint" or "check." *Id.* at 290. Thus, a vehicle with "built-in pollution control" or prevention is one that has a self-contained mechanism to block or capture pollution that would otherwise be emitted. Electric vehicles, by contrast, are designed to run on an entirely different power system. To draw an analogy, it would not be natural to refer to an iPod as a system that prevents or controls record skips. An iPod is not a record player with some built-in method of reducing record skips; it is a different technology altogether. *Cf. West Virginia*, 597 U.S. at 734 (statutory grant to EPA to design a "system of emission reduction" did not encompass cap-and-trade "system," because a "system of emission reduction" exclusively refers to measures that "improve the pollution performance" of existing sources).

Nor do electric vehicles incorporate "add-in devices for pollution control" or prevention, *Truck Trailer Manufacturers*, 17 F.4th at 1202, as EPA contends. *See* RTC 356. The component parts of electric vehicles, such as their batteries, are not add-ins that block the emission of pollution or minimize pollution that would otherwise occur. They are integral to the basic

functioning of the vehicle, which does not emit the relevant pollutant in the first place.

## III. EPA'S RULE IS ARBITRARY AND CAPRICIOUS.

Alternatively, EPA's rule must be set aside because it is arbitrary and capricious in at least three respects. *See* § 7607(d)(9)(A). First, EPA irrationally treats electric vehicles as having "zero emissions," when they generate significant emissions upstream in the production of electric batteries and the electricity that powers them. Second, EPA failed to explain why it refused to consider the cost-effective alternative of encouraging the adoption of renewable fuel. Third, EPA's cost-benefit analysis is flawed on both sides of the ledger. All three defects flow from EPA's single-minded focus on electrifying the Nation's fleet, and each is independently fatal to EPA's rule.

### A. EPA Unreasonably Ignores Electric-Vehicle Emissions.

EPA's rule is arbitrary and capricious because it unreasonably treats electric vehicles as though they contribute zero emissions in some contexts, while acknowledging their emissions in other contexts.

For its emission standards, EPA focuses only on emissions from a vehicle's tailpipe. It thus treats electric vehicles as though they produce "zero" emissions, and it allows carmakers to "use 0 g/mile as [the] compliance value" for those vehicles. 89 Fed. Reg. at 27,923, 28,019-28,020. That treatment is

unsupportable. Electric vehicles generate emissions in several ways other than through a tailpipe. Significant emissions are associated with the mining, production, and disposal of the batteries and associated minerals that power the vehicle. *See* Renewable Fuels Association Comment 1-2 (July 5, 2023); America First Policy Institute Comment 1 (June 30, 2023). Generating electricity to charge and power the vehicle also produces significant emissions. *See* 75 Fed. Reg. at 25,435. Indeed, more than 60% of U.S. electricity is generated from fossil fuels that produce greenhouse-gas emissions. Renewable Fuels Association Comment 4 (July 5, 2023). Recent EPA estimates suggest that current electric vehicles generate about 79 grams/mile more upstream emissions than comparable gasoline vehicles, even ignoring their greater manufacturing emissions. The 2023 EPA Automotive Trends Report at E-6, Table E.4 (Dec. 2023) (average of "Tailpipe + Net Upstream $CO_2$ Avg" values for electric vehicles), https://www.epa.gov/system/files/documents/2023-12/420r23033.pdf. For context, that difference is comparable to the Rule's 2032 targets for tailpipe emissions from the fleet of light-duty vehicles. *See* 89 Fed. Reg. at 27,854 (73 g/mile for cars and 90 g/mile for trucks).

EPA does not dispute that electric vehicles cause emissions. The agency actually included some upstream emissions in its analysis of the rule's costs and benefits. *See* RTC 1063. In fact, EPA previously recognized that upstream emissions should be addressed in emission standards. *See* 77 Fed. Reg. at 62,817. But for its present emission standards, EPA put on blinders, focusing only on the emissions from a vehicle's tailpipe and thus treating electric vehicles as zero-emission.

EPA offers three reasons for its selective focus on tailpipe emissions, but none is reasonable. First, EPA asserts that counting only tailpipe emissions from electric vehicles is justified because it is "consistent with [its] treatment of all other vehicles." 89 Fed. Reg. at 27,923. But electric vehicles are *not* like "all other vehicles," because of the way in which they shift nearly all operational emissions upstream (to the power sector). Congress has recognized as much. It requires EPA to account for "generation and transmission" energy losses when including electric vehicles in a manufacturer's "average fuel economy," 49 U.S.C. § 32904(a)(2), precisely because "an electric vehicle burns its fuel … off-board the vehicle," at a power plant. 65 Fed. Reg. 36,986, 36,987 (June 12, 2000). By lumping together things that are not "similar in all important respects"—here, electric vehicles and

internal-combustion-engine vehicles—EPA acted arbitrarily. *GPA Midstream Ass'n* v. *U.S. Dep't of Transp.*, 67 F.4th 1188, 1199 (D.C. Cir. 2023).

Second, EPA contends that "power sector emissions are expected to decline significantly in the future," so they are apparently not worth considering. 89 Fed. Reg. at 27,923. But the supposed *future* decline of power-sector emissions does not justify ignoring those emissions *today*. Power-sector emissions will not be zero any time soon. In the meantime, as commenters demonstrated, EPA's decision to turn a blind eye to the total lifecycle emissions caused by electric vehicles will cause environmental harm. John German & John D. Graham Comment 37 (July 5, 2023).

Finally, EPA contends that taking into account total lifecycle emissions would be unfair to manufacturers because such emissions are supposedly out of manufacturers' control. 89 Fed. Reg. at 27,923. But EPA nowhere else requires automakers' control over emissions. For example, it makes manufacturers of internal-combustion-engine vehicles responsible for all the carbon-dioxide emissions that result from the carbon-intensity of liquid fuels, which they do not control. *See* 89 Fed. Reg. at 27,911 (dictating the test fuel). EPA's conclusion that it would be unfair to make manufacturers of electric vehicles responsible for the emissions from the fuel used to power their

vehicles, while imposing the same responsibility on manufacturers of internal-combustion-engine vehicles, is the definition of arbitrariness.

**B.    EPA Failed To Consider The Obvious, Viable Alternative Of High-Octane And Renewable Fuels.**

EPA's preference for electric vehicles also led it to arbitrarily refuse to consider "viable" and "obvious alternative[s]." *Nat'l Shooting Sports Found., Inc.* v. *Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).  Here, higher-octane fuels, biofuels, and flex-fuel vehicles are a documented solution to the issue of pollution from vehicle emissions.  Indeed, many commenters noted, higher-octane gasoline and renewable fuels could substantially reduce greenhouse-gas emissions as compared to conventional fuel.  *See* RTC 47; Renewable Fuels Association Comment 4, 7 (explaining that renewable fuels can reduce greenhouse-gas emissions by 40-80% compared to gasoline).  Commenters also noted that flex-fuel vehicles create significant opportunities for increased use of such lower emitting fuels.  Renewable Fuels Association Comment 4, 7 (July 5, 2023).  Yet EPA refused to even consider renewable fuels as an alternative to its push for electrification, unreasonably deeming those issues outside the scope of its rule.  *See, e.g.,* 89 Fed. Reg. at 27,911.

EPA likewise failed to consider how its rulemaking conflicts with Congress's Renewable Fuel Standard.  In that program, Congress mandated

that gasoline and diesel sold in the United States must contain a year-over-year increasing amount of renewable fuels, which then shifted to annual volume obligations set by EPA. § 7545(o)(2)(A)(i). EPA's rule thus conflicts with Congress's mandate to increase the Nation's use of renewable fuel. EPA ignored that tension, concluding without explanation that its rule was somehow "compl[e]mentary" with its renewable-fuel rules. 89 Fed. Reg. at 28,115. EPA's failure to grapple with renewable fuels as an alternative—and a congressionally mandated one at that—was thus arbitrary and capricious.

## C. EPA's Cost-Benefit Analysis Is Unsound.

EPA's cost-benefit analysis was independently arbitrary and capricious. *See also* State Petitioners' Br. 27-31. When an agency relies "on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders* v. *EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). EPA's cost-benefit analysis suffers from "serious flaw[s]" with respect to both costs and benefits. *See* 89 Fed. Reg. at 27,860.

On the cost side, EPA's estimate of the technology costs associated with producing electric vehicles is flawed. EPA estimated the cost of manufacturing using a model that analyzed powertrain and vehicle structure

costs. *See* RTC 1793-1794. But as commenters pointed out, EPA's inputs into the model, including the cost of electric-vehicle batteries and motors, were too low. *See, e.g.*, *id.* at 1923-1932. Although EPA responded with minor adjustments, its final results are still divorced from reality. EPA claims that its rule will increase vehicle technology costs by only $2,074 per vehicle in 2032, even though EPA projects the rule will force automakers to produce approximately 1.5 times as many electric vehicles by 2032 as they would absent the rule. 89 Fed. Reg. at 27,861, 27,987, 28,057. In the real world, producing more electric vehicles costs much more than that. For example, in the first quarter of 2023, Ford spent an average of $119,083 per electric vehicle it sold, compared to only $31,871 per conventional vehicle. Clean Fuels Development Coalition Comment 17 (July 5, 2023).

EPA's model bizarrely estimates that some manufacturers' technology costs, including Ford's, will *decline* as a result of the rule. RIA at 12-25, tbl. 12-42. EPA never explained why its cost calculations diverge so substantially from the on-the-ground experience of manufacturers. *Cf. Nat'l Ass'n of Home Builders*, 682 F.3d at 1040; *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Ohio* v. *EPA*, 144 S. Ct. 2040, 2054 (2024).

EPA also inflated the rule's benefits. EPA asserts that the rule will help consumers realize a *trillion* dollars in "pre-tax fuel savings." 89 Fed. Reg. at 27,860, tbl. 8. The agency recognized the tension between its assessment and rational consumer behavior, 89 Fed. Reg. at 28,136-28,137, but it blamed the mismatch on consumers' failure to understand their own best interests. EPA concedes it has no real explanation for the supposed market failure's "existence [or] its magnitude," 89 Fed. Reg. at 28,137, and says "it is not clear" why consumers and manufacturers act the way they do, Regulatory Impact Analysis 4-47. But EPA nevertheless assumed the existence of an enormous market failure, largely because it has done so "in many previous vehicle GHG standards' analyses." 89 Fed. Reg. at 28,136. Those standards, however, have been criticized on the same basis. *See* Brief of Private Petitioners 65-66, *Texas* v. *EPA*, No. 22-1031; *see also* W. Kip Viscusi & Ted Gayer, *Overriding Consumer Preferences with Energy Regulations*, 43. J. of Regul. Econs. 248 (2013). And years later, the agency still has not mustered an evidence-based response. EPA's "lackadaisical response" cannot "justify assuming a purchaser's decisions will not align with its economic interests." *Am. Pub. Gas Ass'n* v. *Dep't of Energy*, 22 F.4th 1018, 1027 (D.C. Cir. 2022).

Nor is there some great mystery behind consumer choice. As commenters noted, mandating greater fuel economy comes at a cost, resulting in cumbersome features like "idle stop-start" functions, 89 Fed. Reg. at 27,846, and fewer performance improvements in horsepower, towing capacity, and other attributes that consumers value, *see* National Automobile Dealers Association, Comment 7-8 (July 5, 2023). In short, consumers and manufacturers are not irrational; they just do not value fuel economy above all else, as EPA apparently thinks they should.

## CONCLUSION

For the foregoing reasons, the Court should reverse EPA's rule.

SEPTEMBER 6, 2024

Respectfully submitted,

s/ Jeffrey B. Wall

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Petitioners in
No. 24-1196*

*Supervised by principals of the firm who are
members of the Virginia bar

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners Diamond
Alternative Energy, LLC and Valero
Renewable Fuels Company, LLC*

MICHAEL B. BUSCHBACHER
JAMES R. CONDE
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for Petitioners in
No. 24-1197*

D. JOHN SAUER
JUSTIN D. SMITH
JAMES OTIS LAW GROUP, LLC
13321 North Outer Forty Road,
Suite 300
St. Louis, Missouri 63017
(816) 678-2103
justin.smith@james-otis.com

*Counsel for Petitioners in
No. 24-1132*

ROBERT HENNEKE
THEODORE HADZI-ANTICH
CONNOR MIGHELL
TEXAS PUBLIC POLICY
FOUNDATION
901 Congress Avenue
Austin, Texas 78701
(512) 472-2700
tha@texaspolicy.com

*Counsel for Petitioners in
No. 24-1158*

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Trade Association
Petitioners in No. 24-1195*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Petitioners in
No. 24-1206*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Petitioners
International
Association of Machinists and
Aerospace Workers Lodge No.
823, Diamond Alternative Energy,
LLC, and Valero Renewable Fuels
Company, LLC*

# CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's July 17, 2024 Order because it contains 13,955 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

SEPTEMBER 6, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 6th day of September, 2024, I electronically filed the foregoing Initial Brief for Petitioners with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

SEPTEMBER 6, 2024