# In the United States Court of Appeals for the District of Columbia Circuit

COMMONWEALTH OF KENTUCKY, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ENVIRONMENTAL LAW & POLICY CENTER, ET AL.,
*Intervenors.*

———————————

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2022-0829)

———————————

## PRIVATE PETITIONERS' ADDENDUM OF STATUTES AND STANDING DECLARATIONS

———————————

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Petitioners in
No. 24-1196*

*Supervised by principals of the firm who are
members of the Virginia bar

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners
Diamond Alternative Energy,
LLC and Valero Renewable
Fuels Company, LLC*

*(Additional counsel listed on next page)*

MICHAEL B. BUSCHBACHER
JAMES R. CONDE
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for Petitioners in
No. 24-1197*

D. JOHN SAUER
JUSTIN D. SMITH
JAMES OTIS LAW GROUP, LLC
13321 North Outer Forty Road,
Suite 300
St. Louis, Missouri 63017
(816) 678-2103
justin.smith@james-otis.com

*Counsel for Petitioners in
No. 24-1132*

ROBERT HENNEKE
THEODORE HADZI-ANTICH
CONNOR MIGHELL
TEXAS PUBLIC POLICY
FOUNDATION
901 Congress Avenue
Austin, Texas 78701
(512) 472-2700
tha@texaspolicy.com

*Counsel for Petitioners in
No. 24-1158*

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Trade Association
Petitioners in No. 24-1195*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Petitioners in No. 24-1206*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Petitioners International
Association of Machinists and
Aerospace Workers Lodge No.
823, Diamond Alternative Energy,
LLC, and Valero Renewable Fuels
Company, LLC*

# TABLE OF CONTENTS

Page

PRIMARY STATUTES ...................................................................1a

    A.    42 U.S.C. § 7521 (excerpt) .................................................1a

    B.    42 U.S.C. § 7522 ...............................................................14a

    C.    42 U.S.C. § 7524 ...............................................................18a

    D.    42 U.S.C. § 7525 (excerpt) .................................................22a

    E.    42 U.S.C. § 7541 (excerpt) .................................................28a

    F.    49 U.S.C. § 32902 (excerpt) ...............................................35a

STANDING DECLARATIONS ...................................................37a

    A.    Mark Brugioni, Director of the Optimization Planning and Economics Division for Valero Renewable Fuels Company, LLC ...............................................................................37a

    B.    Jennifer Jawalka, Manager of the Fuels Compliance Division for Valero Renewable Fuels Company, LLC and Diamond Alternative Energy, LLC.............................................45a

    C.    Dustin Meyer, Senior Vice President of Policy, Economics and Regulatory Affairs for the American Petroleum Institute ........................................................................55a

    D.    Susan W. Grissom, Chief Industry Analyst for the American Fuel & Petrochemical Manufacturers ......................63a

    E.    Joe Gilson, Director of Government Affairs for the American Farm Bureau Federation ...........................................70a

    F.    Mickey Anderson, President of Baxter Ford, Inc......................76a

G. Thomas Maoli, Member of Celebrity Motor Cars, LLC, Celebrity Motors of Toms River, LLC, Celebrity of Springfield, LLC, and Celebrity of Westchester, LLC .............79a

H. Stephen Gates, Managing Member of Gates Nissan LLC ........84a

I. Robert P. Loquercio, President and CEO of AML Automotive Perioia, LLC...............................................................88a

J. Roger A. Elswick, Manager of Raecom Holdings, LLC............93a

K. Philip Tarver, Chief Executive of Tarver Motor Company, Inc ....................................................................................97a

L. Neil Caskey, Chief Executive Officer of the National Corn Growers Association ...................................................101a

M. John Martini, Manager of Corporate Policy for Chevron Corporation.......................................................................107a

N. Lee Brown, Executive Director of the Western States Trucking Association ...................................................114a

O. Michael Lewis, Executive Director of the Construction Industry Air Quality Coalition.......................................132a

P. Anthony Bradley, President and Chief Executive of the Arizona Trucking Association.......................................142a

Q. Josh Roe, Chief Executive Officer of the Kansas Corn Growers Association ...................................................145a

R. Dave Loos, Director of Biofuels and Research of the Illinois Corn Growers Association .............................149a

S. Lane Howard, Director of Market Development of the Missouri Corn Growers Association .........................153a

T. Ryan Sauer, Vice President of Market Development of the Iowa Corn Growers Association.................................157a

U.    Geoff Cooper, President and Chief Executive Officer of the Renewable Fuels Asssociation ....................................................161a

V.    Thomas Santoro, Member of the Western States Trucking Association ..................................................................................166a

W.   Reginald Modlin ............................................................170a

X.    Walter Kreucher ...........................................................183a

# PRIMARY STATUTES

A.    42 U.S.C. § 7521 provides in pertinent part:

**Emission standards for new motor vehicles or new motor vehicle engines**

**(a) Authority of Administrator to prescribe by regulation**

Except as otherwise provided in subsection (b)—

(1) The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare. Such standards shall be applicable to such vehicles and engines for their useful life (as determined under subsection (d), relating to useful life of vehicles for purposes of certification), whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution.

(2) Any regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.

(3)(A) In general.—

(i) Unless the standard is changed as provided in subparagraph (B), regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy-duty vehicles or engines manufactured during or after model year 1983 shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology.

(ii)  In establishing classes or categories of vehicles or engines for purposes of regulations under this paragraph, the Administrator may base such classes or categories on gross vehicle weight, horsepower, type of fuel used, or other appropriate factors.

(B)  Revised standards for heavy duty trucks.—

(i) On the basis of information available to the Administrator concerning the effects of air pollutants emitted from heavy-duty vehicles or engines and from other sources of mobile source related pollutants on the public health and welfare, and taking costs into account, the Administrator may promulgate regulations under paragraph (1) of this subsection revising any standard promulgated under, or before the date of, the enactment of the Clean Air Act Amendments of 1990 (or previously revised under this subparagraph) and applicable to classes or categories of heavy-duty vehicles or engines.

(ii) Effective for the model year 1998 and thereafter, the regulations under paragraph (1) of this subsection applicable to emissions of oxides of nitrogen ($NO_x$) from gasoline and diesel-fueled heavy duty trucks shall contain standards which provide that such emissions may not exceed 4.0 grams per brake horsepower hour (gbh).

(C) Lead time and stability.—Any standard promulgated or revised under this paragraph and applicable to classes or categories of heavy-duty vehicles or engines shall apply for a period of no less than 3 model years beginning no earlier than the model year commencing 4 years after such revised standard is promulgated.

(D) Rebuilding practices.—The Administrator shall study the practice of rebuilding heavy-duty engines and the impact rebuilding has on engine emissions.  On the basis of that study and other information available to the Administrator, the Administrator may prescribe requirements to control rebuilding practices, including standards applicable to emissions from any rebuilt heavy-duty engines (whether or not the engine is past its statutory useful life), which in the Administrator's judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare taking costs into account.  Any regulation shall take effect after a period the Administrator finds necessary to permit the development and

application of the requisite control measures, giving appropriate consideration to the cost of compliance within the period and energy and safety factors.

(E) Motorcycles.—For purposes of this paragraph, motorcycles and motorcycle engines shall be treated in the same manner as heavy-duty vehicles and engines (except as otherwise permitted under section 7525(f)(1)[1] of this title) unless the Administrator promulgates a rule reclassifying motorcycles as light-duty vehicles within the meaning of this section or unless the Administrator promulgates regulations under subsection (a) applying standards applicable to the emission of air pollutants from motorcycles as a separate class or category. In any case in which such standards are promulgated for such emissions from motorcycles as a separate class or category, the Administrator, in promulgating such standards, shall consider the need to achieve equivalency of emission reductions between motorcycles and other motor vehicles to the maximum extent practicable.

(4)(A) Effective with respect to vehicles and engines manufactured after model year 1978, no emission control device, system, or element of design shall be used in a new motor vehicle or new motor vehicle engine for purposes of complying with requirements prescribed under this subchapter if such device, system, or element of design will cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function.

(B) In determining whether an unreasonable risk exists under subparagraph (A), the Administrator shall consider, among other factors, (i) whether and to what extent the use of any device, system, or element of design causes, increases, reduces, or eliminates emissions of any unregulated pollutants; (ii) available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such device, system, or element of design, and (iii) the availability of other devices, systems, or elements of design which may be used to

---

[1] Section 7525(f)(1) of this title, referred to in subsec. (a)(3)(E), was redesignated section 7525(f) of this title by Pub. L. 101–549, title II, §230(8), Nov. 15, 1990, 104 Stat. 2529.

conform to requirements prescribed under this subchapter without causing or contributing to such unreasonable risk. The Administrator shall include in the consideration required by this paragraph all relevant information developed pursuant to section 7548 of this title.

(5)(A) If the Administrator promulgates final regulations which define the degree of control required and the test procedures by which compliance could be determined for gasoline vapor recovery of uncontrolled emissions from the fueling of motor vehicles, the Administrator shall, after consultation with the Secretary of Transportation with respect to motor vehicle safety, prescribe, by regulation, fill pipe standards for new motor vehicles in order to insure effective connection between such fill pipe and any vapor recovery system which the Administrator determines may be required to comply with such vapor recovery regulations. In promulgating such standards the Administrator shall take into consideration limits on fill pipe diameter, minimum design criteria for nozzle retainer lips, limits on the location of the unleaded fuel restrictors, a minimum access zone surrounding a fill pipe, a minimum pipe or nozzle insertion angle, and such other factors as he deems pertinent.

(B) Regulations prescribing standards under subparagraph (A) shall not become effective until the introduction of the model year for which it would be feasible to implement such standards, taking into consideration the restraints of an adequate leadtime for design and production.

(C) Nothing in subparagraph (A) shall (i) prevent the Administrator from specifying different nozzle and fill neck sizes for gasoline with additives and gasoline without additives or (ii) permit the Administrator to require a specific location, configuration, modeling, or styling of the motor vehicle body with respect to the fuel tank fill neck or fill nozzle clearance envelope.

(D) For the purpose of this paragraph, the term "fill pipe" shall include the fuel tank fill pipe, fill neck, fill inlet, and closure.

(6) Onboard vapor recovery.—Within 1 year after November 15, 1990, the Administrator shall, after consultation with the Secretary of Transportation regarding the safety of vehicle-based ("onboard") systems for the control of vehicle refueling emissions, promulgate standards under

this section requiring that new light-duty vehicles manufactured beginning in the fourth model year after the model year in which the standards are promulgated and thereafter shall be equipped with such systems. The standards required under this paragraph shall apply to a percentage of each manufacturer's fleet of new light-duty vehicles beginning with the fourth model year after the model year in which the standards are promulgated. The percentage shall be as specified in the following table:

Implementation Schedule for Onboard Vapor Recovery Requirements

| Model year commencing after standards promulgated | Percentage* |
| --- | --- |
| Fourth | 40 |
| Fifth | 80 |
| After Fifth | 100 |

*Percentages in the table refer to a percentage of the manufacturer's sales volume.

The standards shall require that such systems provide a minimum evaporative emission capture efficiency of 95 percent. The requirements of section 7511a(b)(3) of this title (relating to stage II gasoline vapor recovery) for areas classified under section 7511 of this title as moderate for ozone shall not apply after promulgation of such standards and the Administrator may, by rule, revise or waive the application of the requirements of such section 7511a(b)(3) of this title for areas classified under section 7511 of this title as Serious, Severe, or Extreme for ozone, as appropriate, after such time as the Administrator determines that onboard emissions control systems required under this paragraph are in widespread use throughout the motor vehicle fleet.

\*    \*    \*

**(b) Emissions of carbon monoxide, hydrocarbons, and oxides of nitrogen; annual report to Congress; waiver of emission standards; research objectives**

(1)(A) The regulations under subsection (a) applicable to emissions of carbon monoxide and hydrocarbons from light-duty vehicles and engines manufactured during model years 1977 through 1979 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide. The regulations under subsection (a) applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during the model year 1980 shall contain standards which provide that such emissions may not exceed 7.0 grams per vehicle mile. The regulations under subsection (a) applicable to emissions of hydrocarbons from light-duty vehicles and engines manufactured during or after model year 1980 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970. Unless waived as provided in paragraph (5),[2] regulations under subsection (a) applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during or after the model year 1981 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970.

(B) The regulations under subsection (a) applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during model years 1977 through 1980 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 2.0 grams per vehicle mile. The regulations under subsection (a) applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during the model year 1981 and thereafter shall contain

[2] Paragraph (5) of subsec. (b), referred to in subsec. (b)(1)(A), related to waivers for model years 1981 and 1982, and was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

standards which provide that such emissions from such vehicles and engines may not exceed 1.0 gram per vehicle mile. The Administrator shall prescribe standards in lieu of those required by the preceding sentence, which provide that emissions of oxides of nitrogen may not exceed 2.0 grams per vehicle mile for any light-duty vehicle manufactured during model years 1981 and 1982 by any manufacturer whose production, by corporate identity, for calendar year 1976 was less than three hundred thousand light-duty motor vehicles worldwide if the Administrator determines that—

(i) the ability of such manufacturer to meet emission standards in the 1975 and subsequent model years was, and is, primarily dependent upon technology developed by other manufacturers and purchased from such manufacturers; and

(ii) such manufacturer lacks the financial resources and technological ability to develop such technology.

(C) The Administrator may promulgate regulations under subsection (a)(1) revising any standard prescribed or previously revised under this subsection, as needed to protect public health or welfare, taking costs, energy, and safety into account. Any revised standard shall require a reduction of emissions from the standard that was previously applicable. Any such revision under this subchapter may provide for a phase-in of the standard. It is the intent of Congress that the numerical emission standards specified in subsections (a)(3)(B)(ii), (g), (h), and (i) shall not be modified by the Administrator after November 15, 1990, for any model year before the model year 2004.

(2) Emission standards under paragraph (1), and measurement techniques on which such standards are based (if not promulgated prior to November 15, 1990), shall be promulgated by regulation within 180 days after November 15, 1990.

(3) For purposes of this part—

(A)(i) The term "model year" with reference to any specific calendar year means the manufacturer's annual production period (as determined by the Administrator) which includes January 1 of such calendar year.

If the manufacturer has no annual production period, the term "model year" shall mean the calendar year.

(ii) For the purpose of assuring that vehicles and engines manufactured before the beginning of a model year were not manufactured for purposes of circumventing the effective date of a standard required to be prescribed by subsection (b), the Administrator may prescribe regulations defining "model year" otherwise than as provided in clause (i).

(B) Repealed. Pub. L. 101–549, title II, §230(1), Nov. 15, 1990, 104 Stat. 2529.

(C) The term "heavy duty vehicle" means a truck, bus, or other vehicle manufactured primarily for use on the public streets, roads, and highways (not including any vehicle operated exclusively on a rail or rails) which has a gross vehicle weight (as determined under regulations promulgated by the Administrator) in excess of six thousand pounds. Such term includes any such vehicle which has special features enabling off-street or off-highway operation and use.

(3)[3] Upon the petition of any manufacturer, the Administrator, after notice and opportunity for public hearing, may waive the standard required under subparagraph (B) of paragraph (1) to not exceed 1.5 grams of oxides of nitrogen per vehicle mile for any class or category of light-duty vehicles or engines manufactured by such manufacturer during any period of up to four model years beginning after the model year 1980 if the manufacturer demonstrates that such waiver is necessary to permit the use of an innovative power train technology, or innovative emission control device or system, in such class or category of vehicles or engines and that such technology or system was not utilized by more than 1 percent of the light-duty vehicles sold in the United States in the 1975 model year. Such waiver may be granted only if the Administrator determines—

(A) that such waiver would not endanger public health,

---

[3] So in original. Probably should be "(4)".

(B) that there is a substantial likelihood that the vehicles or engines will be able to comply with the applicable standard under this section at the expiration of the waiver, and

(C) that the technology or system has a potential for long-term air quality benefit and has the potential to meet or exceed the average fuel economy standard applicable under the Energy Policy and Conservation Act [42 U.S.C. 6201 et seq.] upon the expiration of the waiver.

No waiver under this subparagraph[4] granted to any manufacturer shall apply to more than 5 percent of such manufacturer's production or more than fifty thousand vehicles or engines, whichever is greater.

\*　　\*　　\*

**(g) Light-duty trucks up to 6,000 lbs. GVWR and light-duty vehicles; standards for model years after 1993**

(1) NMHC, CO, and $NO_x$

Effective with respect to the model year 1994 and thereafter, the regulations under subsection (a) applicable to emissions of nonmethane hydrocarbons (NMHC), carbon monoxide (CO), and oxides of nitrogen ($NO_x$) from light-duty trucks (LDTs) of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles (LDVs) shall contain standards which provide that emissions from a percentage of each manufacturer's sales volume of such vehicles and trucks shall comply with the levels specified in table G. The percentage shall be as specified in the implementation schedule below:

---

[4] So in original. Probably should be "paragraph".

Table G—Emission Standards for NMHC, CO, and $NO_x$ from Light-Duty Trucks of up to 6,000 Lbs. GVWR And Light-Duty Vehicles

| Vehicle type | Column A (5 yrs/50,000 mi) | | | Column B (10 yrs/100,000 mi) | | |
| --- | --- | --- | --- | --- | --- | --- |
| | NMHC | CO | $NO_x$ | NMHC | CO | $NO_x$ |
| LDTs (0–3,750 lbs. LVW) and light-duty vehicles | 0.25 | 3.4 | 0.4* | 0.31 | 4.2 | 0.6* |
| LDTs (3,751–5,750 lbs. LVW) | 0.32 | 4.4 | 0.7** | 0.40 | 5.5 | 0.97 |

Standards are expressed in grams per mile (gpm).

For standards under column A, for purposes of certification under section 7525 of this title, the applicable useful life shall be 5 years or 50,000 miles (or the equivalent), whichever first occurs.

For standards under column B, for purposes of certification under section 7525 of this title, the applicable useful life shall be 10 years or 100,000 miles (or the equivalent), whichever first occurs.

*In the case of diesel-fueled LDTs (0–3,750 lvw) and light-duty vehicles, before the model year 2004, in lieu of the 0.4 and 0.6 standards for $NO_x$, the applicable standards for $NO_x$ shall be 1.0 gpm for a useful life of 5 years or 50,000 miles (or the equivalent), whichever first occurs, and 1.25 gpm for a useful life of 10 years or 100,000 miles (or the equivalent) whichever first occurs.

**This standard does not apply to diesel-fueled LDTs (3,751–5,750 lbs. LVW).

Implementation Schedule for Table G Standards

| Model year | Percentage* |
|---|---|
| 1994 | 40 |
| 1995 | 80 |
| after 1995 | 100 |

*Percentages in the table refer to a percentage of each manufacturer's sales volume.

  (2) PM Standard

  Effective with respect to model year 1994 and thereafter in the case of light-duty vehicles, and effective with respect to the model year 1995 and thereafter in the case of light-duty trucks (LDTs) of up to 6,000 lbs. gross vehicle weight rating (GVWR), the regulations under subsection (a) applicable to emissions of particulate matter (PM) from such vehicles and trucks shall contain standards which provide that such emissions from a percentage of each manufacturer's sales volume of such vehicles and trucks shall not exceed the levels specified in the table below. The percentage shall be as specified in the Implementation Schedule below.

PM Standard for LDTs of up to 6,000 lbs. GVWR

| Useful life period | Standard |
|---|---|
| 5/50,000 | 0.08 gpm |
| 10/100,000 | 0.10 gpm |

  The applicable useful life, for purposes of certification under section 7525 of this title and for purposes of in-use compliance under section 7541 of this title, shall be 5 years or 50,000 miles (or the equivalent), whichever first occurs, in the case of the 5/50,000 standard.

The applicable useful life, for purposes of certification under section 7525 of this title and for purposes of in-use compliance under section 7541 of this title, shall be 10 years or 100,000 miles (or the equivalent), whichever first occurs in the case of the 10/100,000 standard.

Implementation Schedule for PM Standards

| Model year | Light-duty vehicles | LDTs |
|---|---|---|
| 1994 | 40%* | |
| 1995 | 80%* | 40%* |
| 1996 | 100%* | 80%* |
| after 1996 | 100%* | 100%* |

*Percentages in the table refer to a percentage of each manufacturer's sales volume.

\* \* \*

**(m) Emissions control diagnostics**

(1) Regulations

Within 18 months after November 15, 1990, the Administrator shall promulgate regulations under subsection (a) requiring manufacturers to install on all new light duty vehicles and light duty trucks diagnostics systems capable of—

(A) accurately identifying for the vehicle's useful life as established under this section, emission-related systems deterioration or malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could cause or result in failure of the vehicles to comply with emission standards established under this section,

(B) alerting the vehicle's owner or operator to the likely need for emission-related components or systems maintenance or repair,

(C) storing and retrieving fault codes specified by the Administrator, and

(D) providing access to stored information in a manner specified by the Administrator.

The Administrator may, in the Administrator's discretion, promulgate regulations requiring manufacturers to install such onboard diagnostic systems on heavy-duty vehicles and engines.

(2) Effective date

The regulations required under paragraph (1) of this subsection shall take effect in model year 1994, except that the Administrator may waive the application of such regulations for model year 1994 or 1995 (or both) with respect to any class or category of motor vehicles if the Administrator determines that it would be infeasible to apply the regulations to that class or category in such model year or years, consistent with corresponding regulations or policies adopted by the California Air Resources Board for such systems.

(3) State inspection

The Administrator shall by regulation require States that have implementation plans containing motor vehicle inspection and maintenance programs to amend their plans within 2 years after promulgation of such regulations to provide for inspection of onboard diagnostics systems (as prescribed by regulations under paragraph (1) of this subsection) and for the maintenance or repair of malfunctions or system deterioration identified by or affecting such diagnostics systems. Such regulations shall not be inconsistent with the provisions for warranties promulgated under section 7541(a) and (b) of this title.

(4) Specific requirements

In promulgating regulations under this subsection, the Administrator shall require—

(A) that any connectors through which the emission control diagnostics system is accessed for inspection, diagnosis, service, or

repair shall be standard and uniform on all motor vehicles and motor vehicle engines;

(B) that access to the emission control diagnostics system through such connectors shall be unrestricted and shall not require any access code or any device which is only available from a vehicle manufacturer; and

(C) that the output of the data from the emission control diagnostics system through such connectors shall be usable without the need for any unique decoding information or device.

(5) Information availability

The Administrator, by regulation, shall require (subject to the provisions of section 7542(c) of this title regarding the protection of methods or processes entitled to protection as trade secrets) manufacturers to provide promptly to any person engaged in the repairing or servicing of motor vehicles or motor vehicle engines, and the Administrator for use by any such persons, with any and all information needed to make use of the emission control diagnostics system prescribed under this subsection and such other information including instructions for making emission related diagnosis and repairs. No such information may be withheld under section 7542(c) of this title if that information is provided (directly or indirectly) by the manufacturer to franchised dealers or other persons engaged in the repair, diagnosing, or servicing of motor vehicles or motor vehicle engines. Such information shall also be available to the Administrator, subject to section 7542(c) of this title, in carrying out the Administrator's responsibilities under this section.

B.    42 U.S.C. § 7522 provides:

**Prohibited Acts**

**(a) Enumerated prohibitions**

The following acts and the causing thereof are prohibited—

(1) in the case of a manufacturer of new motor vehicles or new motor vehicle engines for distribution in commerce, the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person, except as provided by regulation of the Administrator), the importation into the United States, of any new motor vehicle or new motor vehicle engine, manufactured after the effective date of regulations under this part which are applicable to such vehicle or engine unless such vehicle or engine is covered by a certificate of conformity issued (and in effect) under regulations prescribed under this part or part C in the case of clean-fuel vehicles (except as provided in subsection (b));

(2)(A) for any person to fail or refuse to permit access to or copying of records or to fail to make reports or provide information required under section 7542 of this title;

(B) for any person to fail or refuse to permit entry, testing or inspection authorized under section 7525(c) of this title or section 7542 of this title;

(C) for any person to fail or refuse to perform tests, or have tests performed as required under section 7542 of this title;

(D) for any manufacturer to fail to make information available as provided by regulation under section 7521(m)(5) of this title;

(3)(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use; or

(4) for any manufacturer of a new motor vehicle or new motor vehicle engine subject to standards prescribed under section 7521 of this title or part C—

(A) to sell or lease any such vehicle or engine unless such manufacturer has complied with (i) the requirements of section 7541(a) and (b) of this title with respect to such vehicle or engine, and unless a label or tag is affixed to such vehicle or engine in accordance with section 7541(c)(3) of this title, or (ii) the corresponding requirements of part C in the case of clean fuel vehicles unless the manufacturer has complied with the corresponding requirements of part C

(B) to fail or refuse to comply with the requirements of section 7541(c) or (e) of this title, or the corresponding requirements of part C in the case of clean fuel vehicles

(C) except as provided in subsection (c)(3) of section 7541 of this title and the corresponding requirements of part C in the case of clean fuel vehicles, to provide directly or indirectly in any communication to the ultimate purchaser or any subsequent purchaser that the coverage of any warranty under this chapter is conditioned upon use of any part, component, or system manufactured by such manufacturer or any person acting for such manufacturer or under his control, or conditioned upon service performed by any such person, or

(D) to fail or refuse to comply with the terms and conditions of the warranty under section 7541(a) or (b) of this title or the corresponding requirements of part C in the case of clean fuel vehicles with respect to any vehicle; or

(5) for any person to violate section 7553 of this title, 7554 of this title, or part C of this subchapter or any regulations under section 7553 of this title, 7554 of this title, or part C.

No action with respect to any element of design referred to in paragraph (3) (including any adjustment or alteration of such element) shall be treated as a prohibited act under such paragraph (3) if such action is in accordance with section 7549 of this title. Nothing in paragraph (3) shall be construed to require the use of manufacturer parts in maintaining or repairing any motor vehicle or motor vehicle engine. For the purposes of the preceding

sentence, the term "manufacturer parts" means, with respect to a motor vehicle engine, parts produced or sold by the manufacturer of the motor vehicle or motor vehicle engine. No action with respect to any device or element of design referred to in paragraph (3) shall be treated as a prohibited act under that paragraph if (i) the action is for the purpose of repair or replacement of the device or element, or is a necessary and temporary procedure to repair or replace any other item and the device or element is replaced upon completion of the procedure, and (ii) such action thereafter results in the proper functioning of the device or element referred to in paragraph (3). No action with respect to any device or element of design referred to in paragraph (3) shall be treated as a prohibited act under that paragraph if the action is for the purpose of a conversion of a motor vehicle for use of a clean alternative fuel (as defined in this subchapter) and if such vehicle complies with the applicable standard under section 7521 of this title when operating on such fuel, and if in the case of a clean alternative fuel vehicle (as defined by rule by the Administrator), the device or element is replaced upon completion of the conversion procedure and such action results in proper functioning of the device or element when the motor vehicle operates on conventional fuel.

**(b) Exemptions; refusal to admit vehicle or engine into United States; vehicles or engines intended for export**

(1) The Administrator may exempt any new motor vehicle or new motor vehicle engine, from subsection (a), upon such terms and conditions as he may find necessary for the purpose of research, investigations, studies, demonstrations, or training, or for reasons of national security.

(2) A new motor vehicle or new motor vehicle engine offered for importation or imported by any person in violation of subsection (a) shall be refused admission into the United States, but the Secretary of the Treasury and the Administrator may, by joint regulation, provide for deferring final determination as to admission and authorizing the delivery of such a motor vehicle or engine offered for import to the owner or consignee thereof upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to insure that any such motor vehicle or engine will be brought into conformity with the standards, requirements, and limitations applicable to it under this part. The Secretary of the Treasury shall, if a motor vehicle or engine is finally

refused admission under this paragraph, cause disposition thereof in accordance with the customs laws unless it is exported, under regulations prescribed by such Secretary, within ninety days of the date of notice of such refusal or such additional time as may be permitted pursuant to such regulations, except that disposition in accordance with the customs laws may not be made in such manner as may result, directly or indirectly, in the sale, to the ultimate consumer, of a new motor vehicle or new motor vehicle engine that fails to comply with applicable standards of the Administrator under this part.

(3) A new motor vehicle or new motor vehicle engine intended solely for export, and so labeled or tagged on the outside of the container and on the vehicle or engine itself, shall be subject to the provisions of subsection (a), except that if the country which is to receive such vehicle or engine has emission standards which differ from the standards prescribed under section 7521 of this title, then such vehicle or engine shall comply with the standards of such country which is to receive such vehicle or engine.

C.    42 U.S.C. § 7524 provides:

**Civil penalties**

**(a) Violations**

Any person who violates sections[1] 7522(a)(1), 7522(a)(4), or 7522(a)(5) of this title or any manufacturer or dealer who violates section 7522(a)(3)(A) of this title shall be subject to a civil penalty of not more than $25,000.  Any person other than a manufacturer or dealer who violates section 7522(a)(3)(A) of this title or any person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500.  Any such violation with respect to paragraph (1), (3)(A), or (4) of section 7522(a) of this title shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine.  Any such violation with respect to section 7522(a)(3)(B) of this title shall constitute a separate offense with respect to each part or component.

---

[1] So in original.  Probably should be "section".

Any person who violates section 7522(a)(2) of this title shall be subject to a civil penalty of not more than $25,000 per day of violation.

**(b) Civil actions**

The Administrator may commence a civil action to assess and recover any civil penalty under subsection (a) of this section, section 7545(d) of this title, or section 7547(d) of this title. Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred or in which the defendant resides or has the Administrator's principal place of business, and the court shall have jurisdiction to assess a civil penalty. In determining the amount of any civil penalty to be assessed under this subsection, the court shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require. In any such action, subpoenas for witnesses who are required to attend a district court in any district may run into any other district.

**(c) Administrative assessment of certain penalties**

(1) Administrative penalty authority

In lieu of commencing a civil action under subsection (b), the Administrator may assess any civil penalty prescribed in subsection (a) of this section, section 7545(d) of this title, or section 7547(d) of this title, except that the maximum amount of penalty sought against each violator in a penalty assessment proceeding shall not exceed $200,000, unless the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment. Any such determination by the Administrator and the Attorney General shall not be subject to judicial review. Assessment of a civil penalty under this subsection shall be by an order made on the record after opportunity for a hearing in accordance with sections 554 and 556 of title 5. The Administrator shall issue reasonable rules for discovery and other procedures for hearings under this paragraph. Before issuing such an order, the Administrator shall give written notice to the person to be

assessed an administrative penalty of the Administrator's proposal to issue such order and provide such person an opportunity to request such a hearing on the order, within 30 days of the date the notice is received by such person. The Administrator may compromise, or remit, with or without conditions, any administrative penalty which may be imposed under this section.

(2) Determining amount

In determining the amount of any civil penalty assessed under this subsection, the Administrator shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.

(3) Effect of Administrator's action

(A) Action by the Administrator under this subsection shall not affect or limit the Administrator's authority to enforce any provision of this chapter; except that any violation,

(i) with respect to which the Administrator has commenced and is diligently prosecuting an action under this subsection, or

(ii) for which the Administrator has issued a final order not subject to further judicial review and the violator has paid a penalty assessment under this subsection,

shall not be the subject of civil penalty action under subsection (b).

(B) No action by the Administrator under this subsection shall affect any person's obligation to comply with any section of this chapter.

(4) Finality of order

An order issued under this subsection shall become final 30 days after its issuance unless a petition for judicial review is filed under paragraph (5).

(5) Judicial review

Any person against whom a civil penalty is assessed in accordance with this subsection may seek review of the assessment in the United States District Court for the District of Columbia, or for the district in which the violation is alleged to have occurred, in which such person resides, or where such person's principal place of business is located, within the 30-day period beginning on the date a civil penalty order is issued. Such person shall simultaneously send a copy of the filing by certified mail to the Administrator and the Attorney General. The Administrator shall file in the court a certified copy, or certified index, as appropriate, of the record on which the order was issued within 30 days. The court shall not set aside or remand any order issued in accordance with the requirements of this subsection unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's assessment of the penalty constitutes an abuse of discretion, and the court shall not impose additional civil penalties unless the Administrator's assessment of the penalty constitutes an abuse of discretion. In any proceedings, the United States may seek to recover civil penalties assessed under this section.

(6) Collection

If any person fails to pay an assessment of a civil penalty imposed by the Administrator as provided in this subsection—

 (A) after the order making the assessment has become final, or

 (B) after a court in an action brought under paragraph (5) has entered a final judgment in favor of the Administrator,

the Administrator shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount assessed (plus interest at rates established pursuant to section 6621(a)(2) of title 26 from the date of the final order or the date of the final judgment, as the case may be). In such an action, the validity, amount, and appropriateness of the penalty shall not be subject to review. Any person who fails to pay on a timely basis the amount of an assessment of a civil penalty as described in the first sentence of this paragraph shall be required to pay, in addition to that amount and interest, the United States' enforcement expenses, including attorneys fees and costs for collection proceedings, and a

quarterly nonpayment penalty for each quarter during which such failure to pay persists.  The nonpayment penalty shall be in an amount equal to 10 percent of the aggregate amount of that person's penalties and nonpayment penalties which are unpaid as of the beginning of such quarter.


D.    42 U.S.C. § 7525 provides in pertinent part:

**Motor vehicle and motor vehicle engine compliance testing and certification**

**(a)  Testing and issuance of certificate of conformity**

(1)  The Administrator shall test, or require to be tested in such manner as he deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether such vehicle or engine conforms with the regulations prescribed under section 7521 of this title.  If such vehicle or engine conforms to such regulations, the Administrator shall issue a certificate of conformity upon such terms, and for such period (not in excess of one year), as he may prescribe.  In the case of any original equipment manufacturer (as defined by the Administrator in regulations promulgated before November 15, 1990) of vehicles or vehicle engines whose projected sales in the United States for any model year (as determined by the Administrator) will not exceed 300, the Administrator shall not require, for purposes of determining compliance with regulations under section 7521 of this title for the useful life of the vehicle or engine, operation of any vehicle or engine manufactured during such model year for more than 5,000 miles or 160 hours, respectively, unless the Administrator, by regulation, prescribes otherwise. The Administrator shall apply any adjustment factors that the Administrator deems appropriate to assure that each vehicle or engine will comply during its useful life (as determined under section 7521(d) of this title) with the regulations prescribed under section 7521 of this title.

(2)    The Administrator shall test any emission control system incorporated in a motor vehicle or motor vehicle engine submitted to him by any person, in order to determine whether such system enables such vehicle or engine to conform to the standards required to be prescribed under section 7521(b) of this title.  If the Administrator finds on the basis

of such tests that such vehicle or engine conforms to such standards, the Administrator shall issue a verification of compliance with emission standards for such system when incorporated in vehicles of a class of which the tested vehicle is representative. He shall inform manufacturers and the National Academy of Sciences, and make available to the public, the results of such tests. Tests under this paragraph shall be conducted under such terms and conditions (including requirements for preliminary testing by qualified independent laboratories) as the Administrator may prescribe by regulations.

(3)(A) A certificate of conformity may be issued under this section only if the Administrator determines that the manufacturer (or in the case of a vehicle or engine for import, any person) has established to the satisfaction of the Administrator that any emission control device, system, or element of design installed on, or incorporated in, such vehicle or engine conforms to applicable requirements of section 7521(a)(4) of this title.

(B) The Administrator may conduct such tests and may require the manufacturer (or any such person) to conduct such tests and provide such information as is necessary to carry out subparagraph (A) of this paragraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system, device, or element of design if such pollutant was not emitted, or was emitted in significantly lesser amounts, from the vehicle or engine without use of the system, device, or element of design.

(4)(A) Not later than 12 months after November 15, 1990, the Administrator shall revise the regulations promulgated under this subsection to add test procedures capable of determining whether model year 1994 and later model year light-duty vehicles and light-duty trucks, when properly maintained and used, will pass the inspection methods and procedures established under section 7541(b) of this title for that model year, under conditions reasonably likely to be encountered in the conduct of inspection and maintenance programs, but which those programs cannot reasonably influence or control. The conditions shall include fuel characteristics, ambient temperature, and short (30 minutes or less) waiting periods before tests are conducted. The Administrator shall not grant a certificate of conformity under this subsection for any 1994 or later

model year vehicle or engine that the Administrator concludes cannot pass the test procedures established under this paragraph.

(B) From time to time, the Administrator may revise the regulations promulgated under subparagraph (A), as the Administrator deems appropriate.

(5)(A) A motor vehicle engine (including all engine emission controls) may be installed in an exempted specially produced motor vehicle if the motor vehicle engine is from a motor vehicle that is covered by a certificate of conformity issued by the Administrator for the model year in which the exempted specially produced motor vehicle is produced, or the motor vehicle engine is covered by an Executive order subject to regulations promulgated by the California Air Resources Board for the model year in which the exempted specially produced motor vehicle is produced, and—

(i) the manufacturer of the engine supplies written instructions to the Administrator and the manufacturer of the exempted specially produced motor vehicle explaining how to install the engine and maintain functionality of the engine's emission control system and the on-board diagnostic system (commonly known as "OBD"), except with respect to evaporative emissions;

(ii) the manufacturer of the exempted specially produced motor vehicle installs the engine in accordance with such instructions and certifies such installation in accordance with subparagraph (E);

(iii) the installation instructions include emission control warranty information from the engine manufacturer in compliance with section 7541 of this title, including where warranty repairs can be made, emission control labels to be affixed to the vehicle, and the certificate of conformity number for the applicable vehicle in which the engine was originally intended or the applicable Executive order number for the engine; and

(iv) the manufacturer of the exempted specially produced motor vehicle does not produce more than 325 such vehicles in the calendar year in which the vehicle is produced.

(B) A motor vehicle containing an engine compliant with the requirements of subparagraph (A) shall be treated as meeting the requirements of section 7521 of this title applicable to new vehicles produced or imported in the model year in which the exempted specially produced motor vehicle is produced or imported.

(C) Engine installations that are not performed in accordance with installation instructions provided by the manufacturer and alterations to the engine not in accordance with the installation instructions shall—

(i) be treated as prohibited acts by the installer under section 7522 of this title and any applicable regulations; and

(ii) subject to civil penalties under section 7524(a) of this title, civil actions under section 7524(b) of this title, and administrative assessment of penalties under section 7524(c) of this title.

(D) The manufacturer of an exempted specially produced motor vehicle that has an engine compliant with the requirements of subparagraph (A) shall provide to the purchaser of such vehicle all information received by the manufacturer from the engine manufacturer, including information regarding emissions warranties from the engine manufacturer and all emissions-related recalls by the engine manufacturer.

(E) To qualify to install an engine under this paragraph, and sell, offer for sale, introduce into commerce, deliver for introduction into commerce or import an exempted specially produced motor vehicle, a manufacturer of exempted specially produced motor vehicles shall register with the Administrator at such time and in such manner as the Administrator determines appropriate. The manufacturer shall submit an annual report to the Administrator that includes—

(i) a description of the exempted specially produced motor vehicles and engines installed in such vehicles;

(ii) the certificate of conformity number issued to the motor vehicle in which the engine was originally intended or the applicable Executive order number for the engine; and

(iii) a certification that it produced all exempted specially produced motor vehicles according to the written instructions from the engine manufacturer, and otherwise that the engine conforms in all material respects to the description in the application for the applicable certificate of conformity or Executive order.

(F) Exempted specially produced motor vehicles compliant with this paragraph shall be exempted from—

(i) motor vehicle certification testing under this section; and

(ii) vehicle emission control inspection and maintenance programs required under section 7410 of this title.

(G)(i) Except as provided in subparagraphs (A) through (F), a person engaged in the manufacturing or assembling of exempted specially produced motor vehicles shall be considered a manufacturer for purposes of this chapter.

(ii) Nothing in this paragraph shall be construed to exempt any person from the prohibitions in section 7522(a)(3) of this title or the requirements in sections 7542, 7525(c), or 7521(m)(5) of this title.

(H) In this paragraph:

(i) The term "exempted specially produced motor vehicle" means a light-duty vehicle or light-duty truck produced by a low-volume manufacturer and that-

(I) is intended to resemble the body of another motor vehicle that was manufactured not less than 25 years before the manufacture of the exempted specially produced motor vehicle; and

(II) is manufactured under a license for the product configuration, trade dress, trademark, or patent, for the motor vehicle that is intended to be replicated from the original manufacturer, its successors or assignees, or current owner of such product configuration, trade dress, trademark, or patent rights.

(ii) The term "low-volume manufacturer" means a motor vehicle manufacturer, other than a person who is registered as an importer

under section 30141 of title 49, whose annual worldwide production, including by a parent or subsidiary of the manufacturer, if applicable, is not more than 5,000 motor vehicles.

**(b) Testing procedures; hearing; judicial review; additional evidence**

(1) In order to determine whether new motor vehicles or new motor vehicle engines being manufactured by a manufacturer do in fact conform with the regulations with respect to which the certificate of conformity was issued, the Administrator is authorized to test such vehicles or engines. Such tests may be conducted by the Administrator directly or, in accordance with conditions specified by the Administrator, by the manufacturer.

(2)(A)(i) If, based on tests conducted under paragraph (1) on a sample of new vehicles or engines covered by a certificate of conformity, the Administrator determines that all or part of the vehicles or engines so covered do not conform with the regulations with respect to which the certificate of conformity was issued and with the requirements of section 7521(a)(4) of this title, he may suspend or revoke such certificate in whole or in part, and shall so notify the manufacturer. Such suspension or revocation shall apply in the case of any new motor vehicles or new motor vehicle engines manufactured after the date of such notification (or manufactured before such date if still in the hands of the manufacturer), and shall apply until such time as the Administrator finds that vehicles and engines manufactured by the manufacturer do conform to such regulations and requirements. If, during any period of suspension or revocation, the Administrator finds that a vehicle or engine actually conforms to such regulations and requirements, he shall issue a certificate of conformity applicable to such vehicle or engine.

(ii) If, based on tests conducted under paragraph (1) on any new vehicle or engine, the Administrator determines that such vehicle or engine does not conform with such regulations and requirements, he may suspend or revoke such certificate insofar as it applies to such vehicle or engine until such time as he finds such vehicle or engine actually so conforms with such regulations and requirements, and he shall so notify the manufacturer.

(B)(i) At the request of any manufacturer the Administrator shall grant such manufacturer a hearing as to whether the tests have been properly conducted or any sampling methods have been properly applied, and make a determination on the record with respect to any suspension or revocation under subparagraph (A); but suspension or revocation under subparagraph (A) shall not be stayed by reason of such hearing.

(ii) In any case of actual controversy as to the validity of any determination under clause (i), the manufacturer may at any time prior to the 60th day after such determination is made file a petition with the United States court of appeals for the circuit wherein such manufacturer resides or has his principal place of business for a judicial review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or other officer designated by him for that purpose. The Administrator thereupon shall file in the court the record of the proceedings on which the Administrator based his determination, as provided in section 2112 of title 28.

(iii) If the petitioner applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(iv) Upon the filing of the petition referred to in clause (ii), the court shall have jurisdiction to review the order in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter.

\*     \*     \*

E.     42 U.S.C. § 7541 provides in pertinent part:

**Compliance by vehicles and engines in actual use**

**(a) Warranty; certification; payment of replacement costs of parts, devices, or components designed for emission control**

(1) Effective with respect to vehicles and engines manufactured in model years beginning more than 60 days after December 31, 1970, the manufacturer of each new motor vehicle and new motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that such vehicle or engine is (A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title). In the case of vehicles and engines manufactured in the model year 1995 and thereafter such warranty shall require that the vehicle or engine is free from any such defects for the warranty period provided under subsection (i).

(2) In the case of a motor vehicle part or motor vehicle engine part, the manufacturer or rebuilder of such part may certify that use of such part will not result in a failure of the vehicle or engine to comply with emission standards promulgated under section 7521 of this title. Such certification shall be made only under such regulations as may be promulgated by the Administrator to carry out the purposes of subsection (b). The Administrator shall promulgate such regulations no later than two years following August 7, 1977.

(3) The cost of any part, device, or component of any light-duty vehicle that is designed for emission control and which in the instructions issued pursuant to subsection (c)(3) of this section is scheduled for replacement during the useful life of the vehicle in order to maintain compliance with regulations under section 7521 of this title, the failure of which shall not interfere with the normal performance of the vehicle, and the expected retail price of which, including installation costs, is greater than 2 percent of the suggested retail price of such vehicle, shall be borne or reimbursed at the time of replacement by the vehicle manufacturer and such replacement shall be provided without cost to the ultimate purchaser, subsequent purchaser, or dealer. The term "designed for emission control" as used in the preceding sentence means a catalytic converter, thermal

reactor, or other component installed on or in a vehicle for the sole or primary purpose of reducing vehicle emissions (not including those vehicle components which were in general use prior to model year 1968 and the primary function of which is not related to emission control).

\*       \*       \*

**(c) Nonconforming vehicles; plan for remedying nonconformity; instructions for maintenance and use; label or tag**

Effective with respect to vehicles and engines manufactured during model years beginning more than 60 days after December 31, 1970—

(1) If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given.  The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer.  If the manufacturer disagrees with such determination of nonconformity and so advises the Administrator, the Administrator shall afford the manufacturer and other interested persons an opportunity to present their views and evidence in support thereof at a public hearing. Unless, as a result of such hearing the Administrator withdraws such determination of nonconformity, he shall, within 60 days after the completion of such hearing, order the manufacturer to provide prompt notification of such nonconformity in accordance with paragraph (2).

(2) Any notification required by paragraph (1) with respect to any class or category of vehicles or engines shall be given to dealers, ultimate purchasers, and subsequent purchasers (if known) in such manner and containing such information as the Administrator may by regulations require.

(3)(A) The manufacturer shall furnish with each new motor vehicle or motor vehicle engine written instructions for the proper maintenance and

use of the vehicle or engine by the ultimate purchaser and such instructions shall correspond to regulations which the Administrator shall promulgate. The manufacturer shall provide in boldface type on the first page of the written maintenance instructions notice that maintenance, replacement, or repair of the emission control devices and systems may be performed by any automotive repair establishment or individual using any automotive part which has been certified as provided in subsection (a)(2).

(B) The instruction under subparagraph (A) of this paragraph shall not include any condition on the ultimate purchaser's using, in connection with such vehicle or engine, any component or service (other than a component or service provided without charge under the terms of the purchase agreement) which is identified by brand, trade, or corporate name; or directly or indirectly distinguishing between service performed by the franchised dealers of such manufacturer or any other service establishments with which such manufacturer has a commercial relationship, and service performed by independent automotive repair facilities with which such manufacturer has no commercial relationship; except that the prohibition of this subsection may be waived by the Administrator if—

(i) the manufacturer satisfies the Administrator that the vehicle or engine will function properly only if the component or service so identified is used in connection with such vehicle or engine, and

(ii) the Administrator finds that such a waiver is in the public interest.

(C) In addition, the manufacturer shall indicate by means of a label or tag permanently affixed to such vehicle or engine that such vehicle or engine is covered by a certificate of conformity issued for the purpose of assuring achievement of emissions standards prescribed under section 7521 of this title. Such label or tag shall contain such other information relating to control of motor vehicle emissions as the Administrator shall prescribe by regulation.

(4) Intermediate in-use standards.—

(A) Model years 1994 and 1995.—For light-duty trucks of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles which are subject to standards under table G of section 7521(g)(1) of this title in

model years 1994 and 1995 (40 percent of the manufacturer's sales volume in model year 1994 and 80 percent in model year 1995), the standards applicable to NMHC, CO, and NO$_x$ for purposes of this subsection shall be those set forth in table A below in lieu of the standards for such air pollutants otherwise applicable under this subchapter.

Table A—Intermediate In-Use Standards LDTS up to 6,000 lbs. GVWR and Light-Duty Vehicles

| Vehicle type | NMHC | CO | NO$_x$ |
| --- | --- | --- | --- |
| Light-duty vehicles | 0.32 | 3.4 | 0.4* |
| LDT's (0–3,750 LVW) | 0.32 | 5.2 | 0.4* |
| LDT's (3,751–5,750 LVW) | 0.41 | 6.7 | 0.7* |

*Not applicable to diesel-fueled vehicles.

(B) Model years 1996 and thereafter.—

(i) In the model years 1996 and 1997, light-duty trucks (LDTs) up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles which are not subject to final in-use standards under paragraph (5) (60 percent of the manufacturer's sales volume in model year 1996 and 20 percent in model year 1997) shall be subject to the standards set forth in table A of subparagraph (A) for NMHC, CO, and NO$_x$ for purposes of this subsection in lieu of those set forth in paragraph (5).

(ii) For LDTs of more than 6,000 lbs. GVWR—

(I) in model year 1996 which are subject to the standards set forth in Table H of section 7521(h) of this title (50%);

(II) in model year 1997 (100%); and

(III) in model year 1998 which are not subject to final in-use standards under paragraph (5) (50%);

the standards for NMHC, CO, and NO$_x$ for purposes of this subsection shall be those set forth in Table B below in lieu of the standards for such air pollutants otherwise applicable under this subchapter.

Table B—Intermediate In-Use Standards LDTs More Than 6,000 Lbs. GVWR

| Vehicle type | NMHC | CO | NO$_x$ |
|---|---|---|---|
| LDTs (3,751–5,750 lbs. TW) | 0.40 | 5.5 | 0.88* |
| LDTs (over 5,750 lbs. TW) | 0.49 | 6.2 | 1.38* |

*Not applicable to diesel-fueled vehicles.

(C) Useful life.—In the case of the in-use standards applicable under this paragraph, for purposes of applying this subsection, the applicable useful life shall be 5 years or 50,000 miles or the equivalent (whichever first occurs).

(5) Final in-use standards.—(A) After the model year 1995, for purposes of applying this subsection, in the case of the percentage specified in the implementation schedule below of each manufacturer's sales volume of light-duty trucks of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light duty[1] vehicles, the standards for NMHC, CO, and NO$_x$ shall be as provided in Table G in section 7521(g) of this title, except that in applying the standards set forth in Table G for purposes of determining compliance with this subsection, the applicable useful life shall be (i) 5 years or 50,000 miles (or the equivalent) whichever first occurs in the case of standards applicable for purposes of certification at 50,000 miles; and (ii) 10 years or 100,000 miles (or the equivalent), whichever first occurs in the case of standards applicable for purposes of certification at 100,000 miles, except that no testing shall be done beyond 7 years or 75,000 miles, or the equivalent whichever first occurs.

---

[1] So in original. Probably should be "light-duty".

LDTs up to 6,000 Lbs. GVWR and Light-Duty Vehicle Schedule for Implementation of Final In-Use Standards

| Model year | Percent |
| --- | --- |
| 1996 | 40 |
| 1997 | 80 |
| 1998 | 100 |

(B) After the model year 1997, for purposes of applying this subsection, in the case of the percentage specified in the implementation schedule below of each manufacturer's sales volume of light-duty trucks of more than 6,000 lbs. gross vehicle weight rating (GVWR), the standards for NMHC, CO, and $NO_x$ shall be as provided in Table H in section 7521(h) of this title, except that in applying the standards set forth in Table H for purposes of determining compliance with this subsection, the applicable useful life shall be (i) 5 years or 50,000 miles (or the equivalent) whichever first occurs in the case of standards applicable for purposes of certification at 50,000 miles; and (ii) 11 years or 120,000 miles (or the equivalent), whichever first occurs in the case of standards applicable for purposes of certification at 120,000 miles, except that no testing shall be done beyond 7 years or 90,000 miles (or the equivalent) whichever first occurs.

LDTs of More Than 6,000 Lbs. GVWR Implementation Schedule for Implementation of Final In-Use Standards

| Model year | Percent |
| --- | --- |
| 1998 | 50 |
| 1999 | 100 |

(6) Diesel vehicles; in-use useful life and testing.—(A) In the case of diesel-fueled light-duty trucks up to 6,000 lbs. GVWR and light-duty

vehicles, the useful life for purposes of determining in-use compliance with the standards under section 7521(g) of this title for NO$_x$ shall be a period of 10 years or 100,000 miles (or the equivalent), whichever first occurs, in the case of standards applicable for purposes of certification at 100,000 miles, except that testing shall not be done for a period beyond 7 years or 75,000 miles (or the equivalent) whichever first occurs.

(B) In the case of diesel-fueled light-duty trucks of 6,000 lbs. GVWR or more, the useful life for purposes of determining in-use compliance with the standards under section 7521(h) of this title for NO$_x$ shall be a period of 11 years or 120,000 miles (or the equivalent), whichever first occurs, in the case of standards applicable for purposes of certification at 120,000 miles, except that testing shall not be done for a period beyond 7 years or 90,000 miles (or the equivalent) whichever first occurs.

\* \* \*

**(h) Dealer certification**

(1) If at any time during the period for which the warranty applies under subsection (b), a motor vehicle fails to conform to the applicable regulations under section 7521 of this title as determined under subsection (b) of this section such nonconformity shall be remedied by the manufacturer at the cost of the manufacturer pursuant to such warranty as provided in subsection (b)(2)(without regard to subparagraph (C) thereof).

(2) Nothing in section 7543(a) of this title shall be construed to prohibit a State from testing, or requiring testing of, a motor vehicle after the date of sale of such vehicle to the ultimate purchaser (except that no new motor vehicle manufacturer or dealer may be required to conduct testing under this paragraph).

F.      49 U.S.C. § 32902 provides in pertinent part:

**Average fuel economy standards**

(a) Prescription of Standards by Regulation.—At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles

manufactured by a manufacturer in that model year. Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

* * *

(h) Limitations.—In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation—

(1) may not consider the fuel economy of dedicated automobiles;

(2) shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

(3) may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

## IN THE UNITED STATES COURT OF APPEALS FOR THE
## DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF KENTUCKY,
et al.,

*Petitioner,*

v.

Nos. 24-1087 (and consolidated cases)

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondent.*

## DECLARATION OF MARK BRUGIONI

I, Mark Brugioni, declare under penalty of perjury that the following is true

and correct to the best of my knowledge:

1.  I am the Director of Optimization & Planning in the Optimization Plan-

ning and Economics division for Valero. In this role, I am responsible for a wide

range of planning and economic business matters regarding Valero's operating strat-

egies for its West Coast, Mid-Continent, and North Atlantic refinery assets. My re-

sponsibilities include management oversight of the planning and economics teams

for these Valero assets, and through my background, I also have significant tech-

nical and operational experience from Valero's refineries. I am also generally fa-

miliar with the planning, economics, and operations of Valero's Gulf Coast refinery

1

assets.

2.    I am generally aware of the United States Environmental Protection Agency's ("EPA's") issuance of a final rule titled, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles." 89 Fed. Reg. 27,842 (Apr. 18, 2024). It is my understanding that, according to EPA, the rule will have significant impacts on liquid fuel consumption: EPA expects the rule to "result in a reduction of 780 billion gallons of retail gasoline consumption," including both gasoline and diesel fuels, through 2055 as gasoline- and diesel-powered vehicles are replaced with electric vehicles. 89 Fed. Reg. at 28,141, 28,111.

3.    As a result of the projected displacement of liquid fuels, EPA's rulemaking will cause financial injury to Valero's refining business segment, which would otherwise not occur in the absence of the rule.

**A. Valero's Overall Business Strategy**

4.    Valero has twelve U.S. domestic refineries: two on the West Coast in California, three in the Mid-Continent region, and seven in the Gulf Coast region. Unlike some other oil and gas companies, Valero does not explore for or produce crude, i.e., it does not drill for oil. Instead, it purchases crude from third parties.

5.    Valero also does not operate any retail motor fuel stations. It sells motor

2

fuel (i.e., gasoline and diesel) at the wholesale and bulk sale levels. Valero sells motor fuels at the wholesale level under several different channels of trade, including unbranded contract, unbranded "spot," and branded motor fuel sales. Bulk sales are made to clear the remaining refined product length from Valero's refineries to manage inventories.

**B. Reduction in Nationwide Fuel Demand**

6.    A significant reduction in nationwide gasoline demand, as contemplated by EPA's rule, will negatively impact Valero's business and operations. More specifically, the reduction in demand for gasoline and diesel attributable to the projected market share increase of so-called "zero-emission vehicles" will result in the need for refineries to operate at lower capacities and/or to move additional gasoline and/or gasoline components to other markets. The former option naturally has a direct impact on the profitability and long-term viability of such refineries, while the latter is limited to logistical constraints and economic margins.

7.    Moreover, because Valero's refineries must maintain a relatively high operating rate to remain stable, a significant reduction in domestic market demand risks potential refinery shutdowns and even permanent closures. In this regard, one need only consider the impact of the COVID-19 pandemic on the refining sector, which experienced negative financial margins and multiple third-party refinery closures due to the reduction in gasoline demand. However, even if operating capacity

3

is maintained at or above the minimum operating threshold, any reduction in market demand would negatively impact the profitability of Valero's refineries, which are currently operating at close to maximum capacity (outside of required maintenance events).

8.    In theory, the impacts of EPA's expected reduction in domestic demand can be mitigated to some extent through exports to Latin America and other foreign markets, but such mitigation efforts come with increased costs, logistical complications, and capacity limitations. In this regard, gasoline sales from Valero's refineries to foreign markets may be possible primarily via the shipping industry, which as an initial matter, requires the incurrence of additional transportation costs. Additionally, not all of Valero's refineries have access to marine docks. Two of Valero's Mid-Continent refineries are entirely landlocked, with limited and/or no access to export markets via pipeline, rail, or trucking. The third Mid-Continent refinery can only be accessed by barge, as opposed to large ocean-going vessels, which limits its export capacity as well. Valero's West Coast operations face similar logistical limitations due to limited dock space, vessel, and permitting constraints.

9.    To the extent capital investment might improve such constraints and allow for increased gasoline movements, that would nevertheless require significant expenditures by both Valero and third parties over whom Valero has no control, and would depend on business analyses and forecasts to justify said investment. And

4

even if, for example, existing third-party pipelines to Valero's Mid-Continent refineries were reverse-engineered so as to allow for product to be transported to the Gulf Coast, there are nevertheless additional costs associated with such pipeline use, as well as scheduling and forecasting complications, including competition with other Mid-Continent refiners for limited transportation throughput capacity.

10.    Such exports would also require Valero's West Coast refineries to compete with barrels from the Gulf Coast, the Far East, and Europe, which have lower operating and feedstock costs, and are therefore better equipped to compete in such markets. Additionally, California is one of the most expensive operating environments for refineries, and it is not at all clear these refineries would be competitive in the markets for conventional gasoline blends, as opposed to specialty blends such as CARBOB (California) and AZRBOB (Arizona).

11.    Even for Valero's Gulf Coast refineries, which are better equipped and geographically advantaged for exporting product, a large increase in foreign sales to offset domestic demand reduction would still result in logistical and permitting complications, and possibly the incurrence of additional transportation costs depending on the terms of sale. In this regard, it is unclear what the supply of and demand for gasoline and diesel in such foreign markets would look like in the scenario presented by EPA's rule—i.e., a scenario in which the domestic refining industry as a whole is forced to quickly and significantly increase exports. Valero

5

currently exports, on average, less than ten percent of its domestic gasoline production.

12.    Even EPA concluded that the possibility of increased exports would not fully compensate for the "reduced domestic refining" that results from the "reduced domestic liquid fuel demand" caused by its rule. 89 Fed. Reg. at 28,098. In its proposal, EPA estimated that almost all of the reduced liquid fuel demand would result in reduced domestic refining. 89 Fed. Reg. at 28,097 (estimating that "93 percent of the reduced liquid fuel demand resulted in reduced domestic refining"). In its final analysis, EPA speculates that increased exports may offset some of the reduced production that would otherwise result from the reduced demand. Regulatory Impact Analysis at 8-39–8-44. EPA, however, still estimates that "50 percent of reduced domestic liquid fuel demand" from its rule will result in reduced production by domestic refineries, like those owned by Valero. 89 Fed. Reg. at 28,098.

13.    In short, EPA projects that the subject rule will force a rapid expansion of the new vehicle market share for electric vehicles and a corresponding reduction in nationwide liquid fuel demand. Such a reduction in demand will negatively impact Valero's business operations and profitability as described herein.

14.    These economic impacts are not speculative. Indeed, as stated above, EPA itself projects that "through 2055" the rule "will result in a reduction of 780 billion gallons" of liquid fuel consumption and "reduced domestic refining." 89 Fed.

6

Reg. at 28,142, 28,098, 28,111.

15.  All of these injuries would be substantially ameliorated if EPA's rule were set aside. As EPA's analysis shows, without the rule, manufacturers would produce—and consumers would purchase—a greater share of gasoline- and diesel-powered light- and medium-duty vehicles, mitigating any reduction in liquid fuels demand. 89 Fed. Reg. at 28,057–61.

Dated: September 5, 2024

Mark Brugioni

Mark Brugioni

7

**IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., <br><br> *Petitioner,* <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, et al., <br> *Respondent.* | Nos. 24-1087 (and consolidated cases) |

### DECLARATION OF JESSICA JAWALKA

I, Jessica Jawalka, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.  I am a Manager of the Fuels Compliance division servicing Valero Renewable Fuels Company, LLC ("Valero Renewables") and Diamond Alternative Energy, LLC ("Diamond Alternative"). I am responsible for a wide range of compliance and business matters relating to Valero Renewables and Diamond Alternative's production and sale of renewable fuels such as ethanol and renewable diesel. My responsibilities include analyzing impacts of regulatory and statutory changes on the liquid fuels production industry, including the impacts on renewable fuels.

2.  I have extensive experience in ensuring the Valero family of companies'

1

compliance with the requirements of the federal Renewable Fuel Standard ("RFS"), which requires so-called "obligated parties" to blend certain percentages of renewable fuels into transportation fuels or to purchase an equivalent number of "Renewable Identification Numbers" credits, or RINs, to meet an EPA-specified Renewable Volume Obligation. I am likewise familiar with the requirements of the RFS on renewable fuel producers, such as Valero Renewables and Diamond Green Diesel, who are engaged in the program as RIN generators.

3.    In addition, I have extensive experience with California's Low Carbon Fuel Standard ("LCFS") program. The LCFS is designed to reduce greenhouse gas emissions by setting a carbon intensity ("CI") benchmark for transportation fuels consumed in the State, which decreases over time. Under this program, each fuel is assigned a CI value based on a model produced by the California Air Resources Board ("CARB"). The CI value is intended to represent the GHG emissions associated with the feedstocks from which the fuel was produced, the fuel production and distribution activities, and the use of the finished fuel. Fuels below the benchmark generate LCFS credits, while fuels above the benchmark generate deficits. The lower the fuel's CI score compared to the benchmark, the greater number of credits generated. Each producer or importer of fuel must demonstrate that the overall mix of fuels it supplies for use in California meets the CI benchmarks for each compliance period. A producer or importer with a fuel mix that is above the CI benchmark

2

must purchase LCFS credits sufficient to meet the CI benchmark.

4.      Valero Renewables is an independent ethanol producer owning and operating 12 ethanol plants with a combined production capacity of around 1.6 billion gallons per year. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage and net greenhouse gas emissions. Across the United States, refiners add ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles—with the result that approximately 10% of the final product consists of ethanol—and to meet federal renewable mandates. According to the U.S. Department of Energy, "[t]he U.S. ethanol industry has sufficient capacity to produce more than 17 billion gallons of ethanol and reduce GHG emissions by an estimated 42.7 million metric tons (CO2-eq) per year, which is approximately 2% of total U.S. transportation emissions." Valeri Sarisky-Reed, *Ethanol vs. Petroleum-Based Fuel Carbon Emissions*, DOE Bioenergy Technologies Office (June 23, 2022), https://perma.cc/X564-AX5F. "The United States has more than 200 ethanol plants supporting nearly 70,000 jobs, many in rural areas." *Id.* On average, Valero Renewables sells more than 70 percent of its total ethanol production domestically.

5.      Diamond Alternative is a part owner of the Diamond Green Diesel renewable diesel production facilities in St. Charles Parish, Louisiana and Port Arthur,

3

Texas. Between these two production facilities, Diamond Green Diesel currently produces approximately 1.2 billion gallons of renewable diesel per year, making it the largest renewable diesel producer in North America and the second-largest renewable diesel producer in the world. On average, Diamond Green Diesel sells approximately 65 percent of its total renewable diesel production domestically. Any harm to Diamond Green Diesel is also borne, at least in part, by Diamond Alternative as one of two owners of Diamond Green Diesel.

6. Renewable diesel is made from sustainable low-carbon feedstocks, such as used cooking oil, inedible animal fats derived from processing meat fats, soy bean oil, and inedible corn oil. Its chemical composition is nearly identical to that of petroleum-based diesel, making it a "drop-in" fuel that can be stored, distributed, and used interchangeably with petroleum-derived diesel, but its production results in up to 80% fewer greenhouse gas emissions for the finished fuel.

7. I am generally aware of the United States Environmental Protection Agency's ("EPA's") issuance of a final rule titled, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27,842 (Apr. 18, 2024). It is my understanding that, according to EPA, the rule will have significant impacts on liquid fuel consumption: EPA expects the rule to "result in a reduction of 780 billion gallons of retail gasoline consumption" through 2055. 89 Fed. Reg. at 28,141. Because nearly all retail gasoline

4

in the United States contains 10% ethanol, the decrease in demand for gasoline caused by the rule necessarily leads to a corresponding reduction in demand for the ethanol that Valero Renewables produces, as well as valuable LCFS credits.

8. The rule also will reduce demand for the renewable diesel produced by Diamond Alternative. Indeed, EPA acknowledges that the rule will "reduce the demand for gasoline and diesel for light-duty and medium-duty vehicles domestically and affect the petroleum refining industry." 89 Fed. Reg. at 27,900. Although diesel vehicles make up a relatively small part of the light-duty vehicle market, many medium-duty vehicles subject to the rule are powered by diesel fuels. EPA estimates that between 13 and 15 percent of on-road diesel fuel is consumed by medium-duty vehicles. *See* EPA, Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis at 8-44, tbl. 8-21, EPA-420-R-24-004, https://www.regulations.gov/document/EPA-HQ-OAR-2022-0829-5738/attachment_2.pdf.

9. EPA's rule also impacts revenues Valero Renewables and Diamond Alternative obtain through their participation in the LCFS and RFS programs.

10. Ethanol produced by Valero Renewables and renewable diesel produced by Diamond Alternative have CI scores that are lower than traditional petroleum-based transportation fuels. Therefore, these fuels generate LCFS credits that have significant monetary value and are an important part of the business planning and

5

49a

economics for the renewable fuels facilities, as they generate hundreds of millions of dollars in revenue annually. Both Valero Renewables and Diamond Alternative rely on credit revenue to provide a return on investment, and decreased demand for renewable fuels in the United States would undermine these expectations. By way of example, the economics underlying the significant investment in Diamond Alternative's newest Port Arthur renewable diesel facility were driven, in large part, by the expectation of LCFS credit values.

11.    Likewise, Valero Renewables and Diamond Alternative rely on revenue from RIN sales. As demand for liquid transportation fuels decreases domestically, so do the RIN revenues these businesses generate.

12.    In theory, the impacts of such reduction in demand can be mitigated to some extent through exports to foreign markets, but such mitigation efforts come with increased costs and capacity limitations, as well as other market complications. As an initial matter, foreign markets are not currently positioned to take on the significant and sudden influx of product from the United States' renewable fuels industry, as a whole, that would be necessary to offset EPA's expected reduction in domestic liquid fuel demand resulting from its rule, which would result in non-economical margins beyond a certain threshold. However, even if foreign markets could take on such increased product supply in its entirety, the movement of such product would nevertheless require companies to incur additional transportation

6

costs and would also be limited by dock, vessel, rail, and permitting constraints. To the extent that capital investment might improve such constraints and allow for increased product movements, that would require significant expenditures by Valero Renewables, Diamond Alternative, and third parties over whom they have no control, and would further depend on business analyses and forecasts to justify said investment. And the European Renewable Energy Directive requires that renewable fuels be produced from certified feedstocks under an approved, third-party certification scheme, over which Valero Renewables and Diamond Alternative have no control. This restriction, in turn, limits access to the European market for a majority of renewable fuels produced from U.S. feedstocks, including much of the ethanol and renewable diesel produced by Valero Renewables and Diamond Green Diesel, respectively. Moreover, such sales would be ineligible for domestic credits under the RFS and LCFS programs, which as stated above are an integral part of the business planning and economics for these renewable fuels facilities.

13. Even EPA concluded that the possibility of increased exports would not fully compensate for the "reduced domestic refining" that results from the "reduced domestic liquid fuel demand" caused by its rule. 89 Fed. Reg. at 28,098. In its proposal, EPA estimated that almost all of the reduced liquid fuel demand would result in reduced domestic refining. 89 Fed. Reg. at 28,097 (estimating that "93 percent of the reduced liquid fuel demand resulted in reduced domestic refining"). In its final

7

analysis, EPA speculates that increased exports may offset some of the reduced production that would otherwise result from the reduced demand. Regulatory Impact Analysis at 8-39–8-44. Even so, EPA still estimates that "50 percent of reduced domestic liquid fuel demand" from its rule will result in reduced production by domestic facilities, like those owned by Valero Renewables and Diamond Alternative. 89 Fed. Reg. at 28,098.

14. In short, the subject rulemaking is projected by EPA to force a rapid expansion of the new vehicle market share for electric vehicles and a corresponding reduction in domestic liquid fuel demand. Such a reduction in demand would negatively impact the business operations and profitability of Valero Renewables and Diamond Alternative as described herein.

15. These economic impacts are not speculative. Indeed, as stated above, EPA itself projects that "through 2055" the rule "will result in a reduction of 780 billion gallons" of liquid fuel consumption. 89 Fed. Reg. at 28,142.

16. All of these injuries would be substantially ameliorated if EPA's rule were set aside. As EPA's analysis shows, without the rule, manufacturers would produce—and consumers would purchase—a greater share of gasoline- and diesel-powered light- and medium-duty vehicles, mitigating any reduction in liquid fuels demand. 89 Fed. Reg. at 28,057–61.

8

Dated: September 5, 2024

Jessica Jawalka

9

COMMONWEALTH OF
KENTUCKY, et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondents*.

No. 24-1087

and consolidated cases

## DECLARATION OF DUSTIN MEYER ON BEHALF OF THE AMERICAN PETROLEUM INSTITUTE

I, Dustin Meyer, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.      I am the Senior Vice President of Policy, Economics and Regulatory Affairs for the American Petroleum Institute ("API").

2.      API is a national trade association that represents all segments of America's oil and natural gas industry, which supports more than 11 million jobs in the United States. API's nearly 600 members produce, process, and distribute most of the Nation's energy. API represents companies throughout the entire supply chain of the oil and natural gas industry, including companies that explore and produce crude oil and natural gas; own and operate refineries, pipelines, terminals, ships, barges, and railways that move crude and finished products; supply branded and

unbranded gasoline and diesel fuel; own the brands used to sell retail gasoline and diesel; and own and operate retail gasoline stations. As of 2017, the most recent year for which data is available, API members supplied 51% of all gasoline and 31% of all diesel sold in the United States.

3.     As part of my work for API and its members, I am responsible for executive-level management of policies relating to the exploration, production, and movement of crude oil and natural gas, and the refining, movement, and sale of finished products including gasoline, diesel, renewable diesel, natural gas, biodiesel, and renewable natural gas. I am also responsible for analyzing and understanding the impacts of regulatory changes on the industry. I have extensive experience analyzing the oil and gas markets and the impact of regulatory changes on those markets.

4.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

5.     Those new standards require automakers to produce vehicle fleets for sale in the United States that will use considerably less fuel on average than their existing vehicle fleets. EPA's new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854

("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of CO2 in MY 2032, representing a nearly 50 percent reduction in projected fleet average GHG emissions target levels from the existing MY 2026 standards."); *id.* at 27,855 (medium-duty standards "are projected to result in ... a reduction of 44 percent [in fleet average GHG emissions] by MY 2032, which represents a reduction of 44 percent compared to the current MY 2026 standards."). And because "[t]he amount of [tailpipe] CO2 emissions is essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg 25,324, 25,327 (May 7, 2010), "any rule that limits tailpipe CO2 emissions is effectively identical to a rule that limits fuel consumption," *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015); *see also* 89 Fed. Reg. 28,141-42 ("This action reduces CO2 emissions for the light-duty and medium-duty vehicles under revised GHG standards, which will result in significant reductions of the consumption of petroleum ....").

6. To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles, which use significantly less or no liquid fuel at all. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 28,087 (noting that the "model" path of compliance anticipates "68%" electrification by MY 2032); *see also*

*id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]").

7.    API and its members are committed to accelerating safety and environmental progress across their operations while meeting the global demand for affordable, reliable, and cleaner energy.    Meeting those goals requires safe and responsible production, transportation, refining and exports managed by a skilled and diverse workforce, and continuous improvement in performance through diverse, new technologies and approaches informed by sound science and data. EPA's new standards will hinder the responsible progress and innovation required to build a strong and sustainable energy future.

8.    API and its members are invested in new technologies that reduce greenhouse gas emissions but that will be impeded by EPA's undue emphasis on electrification in its new standards that will manipulate and depress markets in a way that will make reducing emissions more expensive than a market-based, technology-neutral approach.    Those emission reduction projects include: 1) stand-alone production and co-processing of bio-feedstocks to make renewable fuels; 2) manufacturing of low-carbon ethanol; 3) manufacturing of renewable natural gas from wastewater, landfill gas, and bio-digesters at farms as fuel for compressed natural gas vehicles; 4) production of lower carbon intensity hydrogen for transportation and stationary applications including building infrastructure; 5) direct

air carbon capture; 6) carbon capture and sequestration of $CO_2$; 7) installation of electric vehicle charging stations; and 8) installation of hydrogen fueling stations.

9. EPA's new standards also fail to appropriately consider the full lifecycle emissions of electric vehicles, including but not limited to emissions from power plants that generate the electricity used to charge the electric vehicles and emissions from the raw material extraction, transport, and processing of minerals needed to manufacture electric vehicle motors and batteries, the manufacturing of the vehicles themselves, and the disposal of the batteries and related components. API and its members support a lifecycle approach to carbon accounting that facilitates informed decision-making throughout the value chain. Carbon data that is consistent, reliable and transparent across sectors, products, and firms of all sizes can be used to understand the carbon intensity associated with a good or service at each stage of the lifecycle, from production to manufacturing to transport to disposal. That is especially important when comparing, for example, emissions from internal-combustion-engine vehicles and electric vehicles.

10. By EPA's own admission, its new standards will significantly depress market demand for oil and gas in the United States. *See, e.g.*, 89 Fed. Reg. at 28,111 (recognizing that EPA's standards "are projected to reduce liquid fuel consumption"); *id.* at 28,129 (similar). Indeed, EPA's standards are *designed* to reduce demand for liquid fuel, by imposing stringent greenhouse gas emissions

standards that will require significantly "reduced fuel consumption." *Id.* at 28,092; *see also id.* at 27,858 (noting "lower demand for liquid fuel associated with the [greenhouse gas] standards."). According to EPA's own projections, the new standards will reduce gasoline consumption in the United States by "780 billion gallons through 2055." *Id.* at 28,092; *see id.* at 27,861 (projecting the rule will reduce consumer spending on fuel by "$57 billion" through 2055); EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis*, EPA-420-R-24-004, 8-43 (March 2024) (finding that final rule will "reduce gasoline and diesel fuel demand by about 40 billion gallons per year toward the end of the analysis period . . . [or] 2.6 million barrels per day").

11.    That market manipulation resulting in a massive reduction in sales of liquid fuel will cause API members significant financial injury and force the manufacture  of electric vehicles that will reduce consumer choice and still have lifecycle GHG emissions. The capital investments and the revenues of API members like Chevron Corporation ("Chevron"), Marathon Petroleum Corporation ("Marathon"), and others depend in substantial part on the market demand for liquid fuel and related products and services. By artificially reducing market demand for (and consumer spending on) liquid fuel, EPA's new standards will cause API members like Chevron, Marathon, and others direct financial injury by depriving

them of revenues that they would otherwise have obtained in meeting consumers' demand for their products and deprive consumers of products that the EPA predicts they would prefer. *See, e.g.*, 89 Fed. Reg. at 28,111 ("The final standards are projected to reduce liquid fuel consumption (gasoline and diesel) ...."); *id.* at 28,129 ("Reduced consumption of petroleum fuel represents ... a potential loss in value of output for the petroleum refining industry, fuel distributors, and gas stations, which may result in reduced employment in these sectors. These impacts may also pass up the supply chain to, for example, pipeline construction, operation and maintenance, and domestic oil production.").

12.     EPA's new rule will decrease market demand not only for petroleum gasoline and diesel, but also for renewable fuels, undermining programs like the federal Renewable Fuel Standard directed at promoting the increased use of renewable fuels. By reducing market demand for renewable fuels, the standards will cause additional adverse impacts on API members by reducing their sales of renewable fuels and revenue from those sales.

13.     All of those injuries will be redressed by a favorable decision from this Court, as market demand for liquid fuel (and thus for API members' products and services) will increase if EPA's new standards are invalidated, eliminating or at least reducing the financial injury that the standards would otherwise cause to API members. Indeed, EPA's own projections confirm that the injury to API members is

redressable if EPA's new standards are vacated, as they demonstrate that market demand for liquid fuel will be substantially higher if the standards, which are not technology neutral, are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,858, 27,861, 28,092, 28,111, 28,129; *Regulatory Impact Analysis*, *supra*, at 8-43.

Date: _____9/5/24_____          _____

Dustin Meyer

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF KENTUCKY, ET AL.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY
AND MICHAEL S. REGAN, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION
AGENCY,

Respondents,

ENVIRONMENTAL LAW & POLICY
CENTER, ET AL.,

Intervenors.

Case No. 24-1087
and consolidated
cases

## **DECLARATION OF SUSAN W. GRISSOM**

I, Susan W. Grissom, declare under penalty of perjury that the fol-
lowing is true and correct, to the best of my knowledge:

1. I am the Chief Industry Analyst for American Fuel & Petro-
chemical Manufacturers ("AFPM"), responsible for analyzing market and
economic impacts of regulatory and statutory changes on the refining and
petrochemical manufacturing industries. I have extensive experience an-
alyzing and directing the analysis of energy markets.

2.     AFPM is a national trade association representing nearly all American refining and petrochemical companies. Our 25 refining company members own and operate about 88% of U.S. domestic petroleum refining capacity. Many of them also produce biofuels. These companies provide jobs, contribute to economic and national security, and enable the production of products used by families and businesses throughout the United States.

3.     The refining industry supports nearly 3 million jobs in all 50 States, plus the District of Columbia. All told, the refining industry contributes $688 billion to the United States economy.

4.     EPA recently promulgated a rule establishing new light-duty vehicle (LDV) and medium-duty vehicle (MDV) greenhouse-gas and criteria-pollutant emission standards for model years 2027 and later. *See* 89 Fed. Reg. 27,842 (April 18, 2024). EPA's rule requires automobile manufacturers to produce vehicle fleets for sale in the United States that, on average, use considerably less gasoline and diesel fuel than they otherwise would.

5.     EPA's standards limit the amount of carbon dioxide that automakers' fleets may emit. *See id.* at 27,907 ("The projected MY 2032

2

combined fleet target of 85 g/mile is 49 percent lower than that of the MY 2026 standards."). And because "[t]he amount of [tailpipe] $CO_2$ emissions is essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg 25,324, 25,327 (May 7, 2010), "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption," *Delta Const. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015). Indeed, EPA explains that this rule, like previous rules that "achieved very significant reductions of GHGs," will have "significant anticipated impacts on liquid fuel consumption." 89 Fed. Reg. at 27,845.

6. Further, the rule will cause automakers to produce and sell more vehicles that use no liquid fuel at all than they otherwise would. According to EPA, for light-duty vehicles, "as the final standards become more stringent over MYs 2027 to 2032, the penetration of PEVs [*i.e.*, battery-powered electric vehicles (BEVs) and plug-in hybrid electric vehicles] increases by 36 percentage points over this 6-year period, from 32 percent in MY 2027 to 68 percent of overall vehicle production in MY 2032." *Id.* at 28,057.

7.    EPA compared those projections for light-duty vehicles to projections under a "No Action" scenario, in which it applied "the same technical, economic, and consumer inputs" but assumed that instead of the rule, "the MY 2026 standards would carry forward indefinitely into future years." *Id.* at 27,986. According to EPA, "the level of PEVs under the No Action case are projected to reach 47 percent in" MY 2032, which is 21 percentage points less than under EPA's rule. *Id.* at 28,057; *see also id.* at 28,079 (For MY 2032, BEVs would have 56 percent market penetration under the rule compared to only 35 percent in the No Action scenario). Similarly, for medium-duty vehicles, EPA projects that "the projected penetration of PEVs ... increases from 3 percent in MY 2027 to 43 percent of overall MDV production in MY 2032." *Id.* at 28,060. That contrasts with only 8 percent PEVs of overall MDV production in MY 2032 under the No Action scenario. *Id.*

8.    EPA also modeled the light-duty vehicle market penetration rate for PEVs under various sensitivities, including scenarios with higher or lower battery costs or more states' adoption of California's Advanced Clean Cars II policy. EPA found that under the range of variables, PEVs would constitute between 62 percent and 70 percent of light-duty fleets

4

in MY 2032 if the rule goes into effect. *Id.* at 28,057. By contrast, if the rule does not go into effect (the "No Action" scenario), the PEV penetration rate would range from just 18 percent of the market to 60 percent. *Id.*

9. For example, if battery costs are low, EPA projects a 70 percent PEV penetration rate under the final standards but only a 50 percent rate in the No Action scenario. *Id.* at 28,070 (Table 123); *see also id.* at 28,071 (rule would cause PEV penetration rate to increase by 29 points if battery costs are high); *id.* at 28,072 (rule would cause PEV penetration rate to increase by 6 points under optimistic assumptions about consumer demand for BEVs); *id.* at 28,073 (rule would cause PEV penetration rate to increase by 29 points if consumer acceptance of BEVs is "slower"). In other words, even accounting for a range of other variables that could increase EV market penetration, the rule would cause an independent increase in the market penetration of such vehicles.

10. EPA's rule depresses the demand for petroleum and renewable liquid fuels in the United States and thereby harms AFPM's member companies such as Cenovus Energy, Flint Hills Resources, Hunt Refin-

ing, Marathon Petroleum, PBF Energy, Placid Refining, and Valero Energy. A refining company's bottom line depends on the market's demand for transportation fuel. AFPM's members suffer economic injury, therefore, when EPA imposes emission standards that result in vehicles using less fuel per mile or force greater adoption of vehicles that do not operate on gasoline, diesel, or renewable liquid fuel at all.

11.    These economic harms are not speculative. EPA itself estimated that its rule "is projected to result in a reduction of U.S. gasoline consumption by 780 billion gallons through 2055." *Id.* at 28,092; *see also id.* at 28,111; EPA, Multi-Pollutant Emissions Standards for Model years 2027 and Late Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis (RIA) 4-40 (Mar. 2024). According to EPA's own projections, the rule "is estimated to reduce gasoline and diesel fuel demand by about 40 billion gallons per year toward the end of the analysis period, which equates to 2.6 million barrels per day." RIA 8-43.

12.    The reduced demand for transportation fuels caused by EPA's rule results in lost sales for AFPM member companies and requires them to expend resources changing feedstock and product slates, diverting fuel to other markets, and remedying supply-chain distortions.

6

13.  In 2020, for example, when demand for finished motor gasoline declined by 14% due to the COVID-19 pandemic, AFPM members suffered financial hardship. *See, e.g.*, Valero Energy, 2020 Fourth Quarter Earnings Release (losses of $1.4 billion in 2020).

14.  Similar harms will flow from EPA's rule. Indeed, EPA specifically projects that the reduced demand for transportation fuel caused by the rule will affect U.S. refinery production, estimating that "the reduction in crude oil refining would amount to 1.3 million [fewer] barrels per day" at U.S. refiners, most of which are members of AFPM. *Id.*

15.  For these reasons, EPA's rule financially injures AFPM's members that produce gasoline, diesel, and renewable liquid fuels that are blended into gasoline and diesel for sale in the U.S., and a judicial decision setting the rule aside would redress those injuries by allowing automakers to produce a fleet of vehicles that consume more liquid fuel.

Dated: 9/5/2024

Susan W. Grissom
Susan W. Grissom

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., *Petitioners*, v. ENVIRONMENTAL PROTECTION AGENCY, et al., *Respondents*. | No. 24-1087 and consolidated cases |

## DECLARATION OF JOE GILSON ON BEHALF OF THE AMERICAN FARM BUREAU FEDERATION

I, Joe Gilson, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.     I am a Director of Government Affairs for the American Farm Bureau Federation ("AFBF").

2.     AFBF was formed in 1919 and is the largest nonprofit general farm organization in the United States.  Representing about six million member families in all fifty States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States.  AFBF's mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers.

3.     As part of my work for AFBF and its members, I am responsible for the management of policies relating to various agricultural crop and commodity cultivation, production, transportation, and sale in the United States.  I am also responsible for and have experience analyzing and understanding the impacts of changes in the industry and in related industries, like the oil and gas market, that impact the livelihoods of American farmers and ranchers.

4.     AFBF members have for years supported America's energy market by growing crops necessary for alternative and renewable fuels.  One such renewable fuel is ethanol, which many AFBF member farmers and ranchers help produce through their growth and sale of corn all across the United States. Ethanol is the second largest component of the fuel that powers the Nation's vehicle fleet, as refiners across most of the United States add ethanol to gasoline in order to (among other things) raise its octane rating to a level suitable for use in most vehicles.

5.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032.  *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

6.     Those new standards require automakers to produce vehicle fleets for sale in the United States that will use considerably less fuel on average than their existing vehicle fleets.  EPA's new standards significantly limit the average amount

of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of $CO_2$ in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards."). And because "[t]he amount of [tailpipe] $CO_2$ emissions is essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg 25,324, 25,327 (May 7, 2010), "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption," *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015), *see also* 89 Fed. Reg. 28,141-42 ("This action reduces $CO_2$ emissions for the light-duty and medium-duty vehicles under revised [greenhouse gas] standards, which will result in significant reductions of the consumption of petroleum ….").

7. To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles, which use significantly less or no liquid fuel at all. *See, e.g.*, 89 Fed. Reg. at 28,087 (noting that the "model" path of compliance anticipates "68%" electrification by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]").

8. As EPA has recognized, its new standards will significantly depress the demand for liquid fuel in the United States. *See, e.g.*, 89 Fed. Reg. at 28,111

(recognizing that EPA's standards "are projected to reduce liquid fuel consumption"); *id.* at 28,129 (similar). Indeed, EPA's standards are *designed* to reduce demand for liquid fuel, by imposing stringent greenhouse gas emissions standards that will require significantly "reduced fuel consumption." *Id.* at 28,092; *see also id.* at 27,858 (noting "lower demand for liquid fuel associated with the [greenhouse gas] standards.").

9. According to EPA's own projections, the new standards will reduce gasoline consumption in the United States by "780 billion gallons through 2055." *Id.* at 28,092; *see id.* at 27,861 (projecting the rule will reduce consumer spending on fuel by "$57 billion" through 2055); EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis*, EPA-420-R-24-004, 8-43 (March 2024) (finding that final rule will "reduce gasoline and diesel fuel demand by about 40 billion gallons per year toward the end of the analysis period . . . [or] 2.6 million barrels per day"). And because ethanol is blended into nearly every gallon of gasoline sold in the United States, EPA's new rule will reduce ethanol consumption by tens of millions of gallons.

10. That massive reduction in demand for ethanol will cause AFBF members significant financial injury. The revenues of numerous AFBF members depend in substantial part on the market demand for corn, which in turn depends in substantial part on the market demand for ethanol for use in liquid fuel.

11.  For instance, AFBF member Cordt Holub of Iowa grows and sells approximately 220,000 bushels of corn each year for use in ethanol production. Depending on the year, approximately 75% to 100% of Mr. Holub's corn is sold for ethanol production, and corn represents approximately 45% of Mr. Holub's revenue. AFBF member Lance Atwater in Nebraska grows and sells approximately 25,000 to 30,000 bushels of corn each year for use in ethanol production; in addition, the ethanol market affects the futures price of corn, which then affects all other corn commodities Mr. Atwater sells, such as white corn and popcorn. Approximately 10% to 15% of Mr. Atwater's revenues come from corn sales for ethanol, and 60% of his overall revenues come from corn. By reducing demand for (and consumer spending on) liquid fuel, EPA's new standards will reduce demand for ethanol, and deprive AFBF members like Mr. Holub and Mr. Atwater of revenues that they would otherwise have obtained through sale of their corn for use in ethanol production.

12.  That injury will be redressed by a favorable decision from this Court, as the demand for liquid fuel (and thus the demand for corn to make ethanol) will increase if EPA's new standards are invalidated, eliminating or at least reducing the financial injury that the standards would otherwise cause to AFBF and its members. Indeed, EPA's own projections confirm that the injury to AFBF and its members is redressable if EPA's new standards are vacated, as they demonstrate that the demand for liquid fuel will be substantially higher if the standards are not in effect. *See, e.g.,*

89 Fed. Reg. at 27,858, 27,861, 28,092, 28,111, 28,129; *Regulatory Impact Analysis*, *supra*, at 8-43.

Date: _____09/03/2024_____     _Joe Gilson_____

                                                              Joe Gilson

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF
KENTUCKY, et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondents*.

No. 24-1087

and consolidated cases

## DECLARATION OF MICKEY ANDERSON ON BEHALF OF BAXTER FORD, INC.

I, Mickey Anderson, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.     I am the President of Baxter Ford, Inc., a Nebraska corporation that operates a Ford dealership in the State of Nebraska that sells light-duty and medium-duty cars, trucks, and SUVs to consumers and businesses.

2.     As the President of Baxter Ford, Inc., I am responsible for maintaining the company's operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032 that significantly limit the average amount of carbon dioxide that automakers' fleets may

emit. To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles.

4. That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm Baxter Ford, Inc. Consumer interest in electric vehicles remains limited, and has even shown recent signs of declining. By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including Baxter Ford, Inc.) to a skewed market in which the supply of electric vehicles exceeds demand.

5. That market distortion will impose concrete financial harms on Baxter Ford, Inc., forcing it to either keep unwanted electric vehicles on its lot or to sell those vehicles at cost (or at a loss) to make room for vehicles that its customers actually want, and potentially forcing it to increase its prices for other vehicles in order to cover the resulting additional costs. Baxter Ford, Inc. will accordingly suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

6. That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory

2

pressure to produce and sell more electric vehicles than consumer demand warrants, eliminating or at least reducing the financial injury to Baxter Ford, Inc. from that artificial oversupply. Indeed, EPA's own projections confirm that the injury to Baxter Ford, Inc. is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect.

Date: _Sept. 3, 2024_                    _Mickey Anderson_

                                        Mickey Anderson

3

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., <br><br> *Petitioners*, <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondents*. | No. 24-1087 <br><br> and consolidated cases |

## DECLARATION OF THOMAS MAOLI ON BEHALF OF CELEBRITY MOTOR CARS, LLC, CELEBRITY MOTORS OF TOMS RIVER, LLC, CELEBRITY OF SPRINGFIELD, LLC, AND CELEBRITY OF WESTCHESTER, LLC

I, Thomas Maoli, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.     I am a Member of Celebrity Motor Cars, LLC, dba Lexus of Route 10, which is a New Jersey-based Lexus dealership that sells light-duty vehicles and trucks; Celebrity Motors of Toms River, LLC, dba Celebrity Ford of Toms River, which is a New Jersey-based Ford dealership that sells light-duty vehicles and trucks; Celebrity of Springfield, LLC, dba BMW of Springfield, which is a New Jersey-based BMW dealership that sells light-duty vehicles and trucks; and Celebrity of Westchester, LLC, dba Mercedes Benz of Goldens Bridge, which is a New York-

based Mercedes Benz dealership that sells light-duty vehicles and trucks (collectively, "the Celebrity Dealerships").

2.     In my role as Member, I am responsible for maintaining the Celebrity Dealerships' operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

4.     Those new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of $CO_2$ in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").

5.     To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 27,856 (noting that EPA's "central analysis case" anticipates 56% battery-powered

2

electric vehicles and 13% plug-in hybrid vehicles by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"); *see also id.* at 28,087 (projecting that manufacturers "could choose to meet the standards … by using 68 percent [plug-in electric vehicles] in MY 2032").

6. That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm the Celebrity Dealerships. Consumer interest in electric vehicles remains limited, and has even shown recent signs of declining. *See, e.g.*, Neal Bouddette, *Ford Plans More Gas Truck, Less EVs*, https://tinyurl.com/4av42sn4 (July 18, 2024) (noting the "shift in consumer sentiment" regarding electric vehicles and how "car buyers have balked at the high prices of electric cars and trucks and the hassles of charging them"); Lawrence Ulrich, *Corvette Bucked A Sports Cars Decline. Can It Thrive In An E.V. Era?* (July 21, 2024) (56% of surveyed drivers in 2024 were "'absolutely not interested' in an electric vehicle, up from 51% in 2023"); Jeff Arnold, *Nearly Half of US EV Owners Would Switch To Normal Cars*, https://tinyurl.com/yc9dahun (June 27, 2024) (46% of surveyed owners of electric vehicles would switch back to conventional vehicles); Kaya Ginsky, *Many Early-Adopting EV Owners Around the World Want To Gas Up Again*, https://tinyurl.com/yc46zwk6 (June 25, 2024) (describing additional polls and surveys showing a decline in "EV adoption").

3

7. By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including the Celebrity Dealerships) to a skewed market in which the supply of electric vehicles exceeds demand. That market distortion will impose concrete financial harms on the Celebrity Dealerships, forcing them to either keep unwanted electric vehicles on their lots or to sell those vehicles at cost (or at a loss) to make room for vehicles that their customers actually want, and potentially forcing them to increase their prices for other vehicles in order to cover the resulting additional costs. The Celebrity Dealerships will accordingly suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

8. That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory pressure to produce and sell more electric vehicles than consumer demand warrants, eliminating or at least reducing the financial injury to the Celebrity Dealerships from that artificial oversupply. Indeed, EPA's own projections confirm that the injury to the Celebrity Dealerships is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,854, 27,861, 28,087.

4

Date: <u>9/3/24</u>



_____
Thomas Maoli

5

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF
KENTUCKY, et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondents.*

No. 24-1087

and consolidated cases

## **DECLARATION OF STEPHEN GATES ON BEHALF OF GATES NISSAN LLC**

I, Stephen Gates, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.     I am the Managing Member of Gates Nissan LLC, dba Gates Nissan, which operates a Nissan dealership in Richmond, Kentucky that sells light-duty vehicles.

2.     As the Managing Member of Gates Nissan LLC, I am responsible for maintaining the company's operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See*

EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

4.  Those new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of $CO_2$ in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").

5.  To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 27,856 (noting that EPA's "central analysis case" anticipates 56% battery-powered electric vehicles and 13% plug-in hybrid vehicles by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"); *see also id.* at 28,087 (projecting that manufacturers "could choose to meet the standards ... by using 68 percent [plug-in electric vehicles] in MY 2032").

6.  That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm Gates Nissan LLC. Consumer interest in electric vehicles remains limited, and has even shown recent

2

signs of declining. *See, e.g.*, Neal Bouddette, *Ford Plans More Gas Truck, Less EVs*, https://tinyurl.com/4av42sn4 (July 18, 2024) (noting the "shift in consumer sentiment" regarding electric vehicles and how "car buyers have balked at the high prices of electric cars and trucks and the hassles of charging them"); Lawrence Ulrich, *Corvette Bucked A Sports Cars Decline. Can It Thrive In An E.V. Era?* (July 21, 2024) (56% of surveyed drivers in 2024 were "'absolutely not interested' in an electric vehicle, up from 51% in 2023"); Jeff Arnold, *Nearly Half of US EV Owners Would Switch To Normal Cars*, https://tinyurl.com/yc9dahun (June 27, 2024) (46% of surveyed owners of electric vehicles would switch back to conventional vehicles); Kaya Ginsky, *Many Early-Adopting EV Owners Around the World Want To Gas Up Again*, https://tinyurl.com/yc46zwk6 (June 25, 2024) (describing additional polls and surveys showing a decline in "EV adoption").

7.     By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including Gates Nissan LLC) to a skewed market in which the supply of electric vehicles exceeds demand. That market distortion will impose concrete financial harms on Gates Nissan LLC, forcing it to either keep unwanted electric vehicles on its lot or to sell those vehicles at cost (or at a loss) to make room for vehicles that its customers actually want, and potentially forcing it to increase its prices for other vehicles in order to cover the resulting additional costs. Gates Nissan LLC will accordingly

3

suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

8.    That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory pressure to produce and sell more electric vehicles than consumer demand warrants, eliminating or at least reducing the financial injury to Gates Nissan LLC from that artificial oversupply. Indeed, EPA's own projections confirm that the injury to Gates Nissan LLC is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,854, 27,861, 28,087.

Date: 9/3/24

Stephen Gates

4

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

<table>
<tr><td>

COMMONWEALTH OF
KENTUCKY, et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondents*.

</td><td>

No. 24-1087

and consolidated cases

</td></tr>
</table>

## <u>DECLARATION OF ROBERT P. LOQUERCIO ON BEHALF OF AML AUTOMOTIVE PEORIA, LLC, LOQUERCIO AUTOMOTIVE INC., LOQUERCIO AUTOMOTIVE GOE, LLC, LOQUERCIO AUTOMOTIVE GOSHEN, LLC, LOQUERCIO AUTOMOTIVE MCH, LLC, LOQUERCIO AUTOMOTIVE MCK, LLC, LOQUERCIO AUTOMOTIVE SOUTH, INC., AND LOQUERCIO AUTOMOTIVE WEST, LLC</u>

I, Robert P. Loquercio, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.    I am the President and CEO of AML Automotive Peoria, LLC, dba Peoria Ford, which is an Illinois-based Ford dealership that sells light-duty vehicles to consumers and businesses; Loquercio Automotive, Inc., dba Elgin Hyundai, which is an Illinois-based Hyundai dealership that sells light-duty vehicles to consumers and businesses; Loquercio Automotive GOE, LLC, dba Genesis of Elgin, which is an Illinois-based Genesis dealership that sells light-duty vehicles to

consumers and businesses; Loquercio Automotive Goshen, Inc., dba Buick GMC of Goshen, which is an Illinois-based Buick and GMC dealership that sells light-duty vehicles to consumers and businesses; Loquercio Automotive, MCH, LLC, dba Michigan City Hyundai, which is an Indiana-based Hyundai dealership that sells light-duty vehicles to consumers and businesses; Loquercio Automotive MCK, LLC, dba Michigan City Kia, which is an Indiana-based Kia dealership that sells light-duty vehicles to consumers and businesses; Loquercio Automotive South, Inc., dba Honda City, which is an Illinois-based Honda dealership that sells light-duty vehicles to consumers and businesses; and Loquercio Automotive West, LLC, dba Elgin Chrysler, which is an Illinois-based Chrysler dealership that sells light-duty vehicles to consumers and businesses (collectively, "the Loquercio Dealerships").

2. In my role as President and CEO, I am responsible for maintaining the Loquercio Dealerships' operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3. EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

4. Those new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The

2

standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of CO2 in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").

5. To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 27,856 (noting that EPA's "central analysis case" anticipates 56% battery-powered electric vehicles and 13% plug-in hybrid vehicles by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"); *see also id.* at 28,087 (projecting that manufacturers "could choose to meet the standards … by using 68 percent [plug-in electric vehicles] in MY 2032").

6. That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm the Loquercio Dealerships. Consumer interest in electric vehicles remains limited, and has even shown recent signs of declining. *See, e.g.*, Neal Bouddette, *Ford Plans More Gas Truck, Less EVs*, https://tinyurl.com/4av42sn4 (July 18, 2024) (noting the "shift in consumer sentiment" regarding electric vehicles and how "car buyers have balked at the high prices of electric cars and trucks and the hassles of charging them");

3

Lawrence Ulrich, *Corvette Bucked A Sports Cars Decline. Can It Thrive In An E.V. Era?* (July 21, 2024) (56% of surveyed drivers in 2024 were "'absolutely not interested' in an electric vehicle, up from 51% in 2023"); Jeff Arnold, *Nearly Half of US EV Owners Would Switch To Normal Cars*, https://tinyurl.com/yc9dahun (June 27, 2024) (46% of surveyed owners of electric vehicles would switch back to conventional vehicles); Kaya Ginsky, *Many Early-Adopting EV Owners Around the World Want To Gas Up Again*, https://tinyurl.com/yc46zwk6 (June 25, 2024) (describing additional polls and surveys showing a decline in "EV adoption").

7. By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including the Loquercio Dealerships) to a skewed market in which the supply of electric vehicles exceeds demand. That market distortion will impose concrete financial harms on the Loquercio Dealerships, forcing them to either keep unwanted electric vehicles on their lots or to sell those vehicles at cost (or at a loss) to make room for vehicles that their customers actually want, and potentially forcing them to increase their prices for other vehicles in order to cover the resulting additional costs. The Loquercio Dealerships will accordingly suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

4

8.     That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory pressure to produce and sell more electric vehicles than consumer demand  warrants, eliminating or at least reducing the financial injury to the Loquercio Dealerships from that artificial oversupply.   Indeed, EPA's own projections confirm that the injury to the Loquercio Dealerships is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect.  *See, e.g.*, 89 Fed. Reg. at 27,854, 27,861, 28,087.

Date: <u>September 3, 2024</u>

Robert P. Loquercio

5

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., *Petitioners*, v. ENVIRONMENTAL PROTECTION AGENCY, et al., *Respondents*. | No. 24-1087 and consolidated cases |

## DECLARATION OF ROGER A. ELSWICK ON BEHALF OF RAECOM HOLDINGS, LLC

I, Roger A. Elswick, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.    I am the Manager of Raecom Holdings, LLC, a Delaware limited liability company that operates seven automobile dealerships in Texas and Louisiana selling light- and medium-duty vehicles to consumers and businesses.

2.    As the Manager of Raecom Holdings, LLC, I am responsible for maintaining the company's operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3.    EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See*

EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

4. Those new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of CO2 in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").

5. To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 27,856 (noting that EPA's "central analysis case" anticipates 56% battery-powered electric vehicles and 13% plug-in hybrid vehicles by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"); *see also id.* at 28,087 (projecting that manufacturers "could choose to meet the standards … by using 68 percent [plug-in electric vehicles] in MY 2032").

6. That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm Raecom Holdings, LLC. Consumer interest in electric vehicles remains limited, and has even shown

2

recent signs of declining. *See, e.g.*, Neal Bouddette, *Ford Plans More Gas Truck, Less EVs*, https://tinyurl.com/4av42sn4 (July 18, 2024) (noting the "shift in consumer sentiment" regarding electric vehicles and how "car buyers have balked at the high prices of electric cars and trucks and the hassles of charging them"); Lawrence Ulrich, *Corvette Bucked A Sports Cars Decline. Can It Thrive In An E.V. Era?* (July 21, 2024) (56% of surveyed drivers in 2024 were "'absolutely not interested' in an electric vehicle, up from 51% in 2023"); Jeff Arnold, *Nearly Half of US EV Owners Would Switch To Normal Cars*, https://tinyurl.com/yc9dahun (June 27, 2024) (46% of surveyed owners of electric vehicles would switch back to conventional vehicles); Kaya Ginsky, *Many Early-Adopting EV Owners Around the World Want To Gas Up Again*, https://tinyurl.com/yc46zwk6 (June 25, 2024) (describing additional polls and surveys showing a decline in "EV adoption").

7. By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including Raecom Holdings, LLC) to a skewed market in which the supply of electric vehicles exceeds demand. That market distortion will impose concrete financial harms on Raecom Holdings LLC, forcing it to either keep unwanted electric vehicles on its lots or to sell those vehicles at cost (or at a loss) to make room for vehicles that its customers actually want, and potentially forcing it to increase its prices for other vehicles in order to cover the resulting additional costs. Raecom Holdings, LLC will

3

accordingly suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

8. That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory pressure to produce and sell more electric vehicles than consumer demand warrants, eliminating or at least reducing the financial injury to Raecom Holdings, LLC from that artificial oversupply. Indeed, EPA's own projections confirm that the injury to Raecom Holdings, LLC is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,854, 27,861, 28,087.

Date: ___9/3/24___                     _____

                                       Roger A. Elswick

COMMONWEALTH OF
KENTUCKY, et al.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

Respondents.

No. 24-1087

and consolidated cases

## DECLARATION OF PHILLIP TARVER ON BEHALF OF TARVER MOTOR COMPANY, INC.

I, Phillip Tarver, declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1. I am the owner and Chief Executive of Tarver Motor Company, Inc., dba Lake Charles Toyota, which is a Louisiana-based corporation that operates a sales and service franchised Toyota dealership, facility, and related operations.

2. As the owner and Chief Executive of Tarver Motor Company, Inc., I am responsible for maintaining the company's operations and have extensive experience dealing with matters of supply and demand in the automobile market.

3. EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See*

97a

EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

4.    Those new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit. *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of CO2 in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").

5.    To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles. Although EPA's rule claims to be technology neutral, its practical effect is to require a significant increase in the manufacturing and sale of electric vehicles. *See, e.g.*, 89 Fed. Reg. at 27,856 (noting that EPA's "central analysis case" anticipates 56% battery-powered electric vehicles and 13% plug-in hybrid vehicles by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"); *see also id.* at 28,087 (projecting that manufacturers "could choose to meet the standards … by using 68 percent [plug-in electric vehicles] in MY 2032").

6.    That artificial increase in the supply of electric vehicles—driven not by consumer demand, but by regulatory fiat—will directly harm Tarver Motor Company, Inc. Consumer interest in electric vehicles remains limited, and has even

2

shown recent signs of declining. *See, e.g.*, Neal Bouddette, *Ford Plans More Gas Truck, Less EVs*, https://tinyurl.com/4av42sn4 (July 18, 2024) (noting the "shift in consumer sentiment" regarding electric vehicles and how "car buyers have balked at the high prices of electric cars and trucks and the hassles of charging them"); Lawrence Ulrich, *Corvette Bucked A Sports Cars Decline. Can It Thrive In An E.V. Era?* (July 21, 2024) (56% of surveyed drivers in 2024 were "'absolutely not interested' in an electric vehicle, up from 51% in 2023"); Jeff Arnold, *Nearly Half of US EV Owners Would Switch To Normal Cars*, https://tinyurl.com/yc9dahun (June 27, 2024) (46% of surveyed owners of electric vehicles would switch back to conventional vehicles); Kaya Ginsky, *Many Early-Adopting EV Owners Around the World Want To Gas Up Again*, https://tinyurl.com/yc46zwk6 (June 25, 2024) (describing additional polls and surveys showing a decline in "EV adoption").

7. By forcing automakers to produce more electric vehicles than consumer demand warrants, EPA's new standards will subject automobile dealers (including Tarver Motor Company, Inc.) to a skewed market in which the supply of electric vehicles exceeds demand. That market distortion will impose concrete financial harms on Tarver Motor Company, Inc., forcing it to either keep unwanted electric vehicles on its lots or to sell those vehicles at cost (or at a loss) to make room for vehicles that its customers actually want, and potentially forcing it to increase its prices for other vehicles in order to cover the resulting additional costs. Tarver Motor

3

Company, Inc. will accordingly suffer direct economic injury from EPA's new standards and the resulting excess supply of electric vehicles as compared to consumer demand.

8.      That injury will be redressed by a favorable decision from this Court. If EPA's new standards are invalidated, it will eliminate the artificial regulatory pressure to produce and sell more electric vehicles than consumer demand warrants, eliminating or at least reducing the financial injury to Tarver Motor Company, Inc. from that artificial oversupply. Indeed, EPA's own projections confirm that the injury to Tarver Motor Company, Inc. is redressable if EPA's new standards are vacated, as they demonstrate that the expected market share of electric vehicles (the share warranted by consumer demand, without regulatory intervention) will be markedly lower if the standards are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,854, 27,861, 28,087.

Date: _9/3/74_

_Phillip Tarver_

Phillip Tarver

4

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF
KENTUCKY, et al.,

*Petitioners*,

v.

No. 24-1087

and consolidated cases

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

*Respondents*.

## DECLARATION OF NEIL CASKEY ON BEHALF OF THE NATIONAL CORN GROWERS ASSOCIATION

I declare under penalty of perjury that I am over 18 years of age and that the following is true and correct, to the best of my knowledge:

1.     I am the Chief Executive Officer for the National Corn Growers Association ("NCGA").

2.     NCGA is a national trade association that represents nearly 40,000 dues-paying corn growers and the interests of more than 300,000 farmers who contribute through corn checkoff programs in their states.  NCGA and its 50 affiliated state associations and checkoff organizations work together to sustainably feed and fuel the world by creating and increasing opportunities for corn growers.

3.     Because of my work for NCGA and its members, I am familiar with the domestic market for corn and products, such as ethanol, that are made using the corn

grown by our members.  I also have experience analyzing and understanding the impacts of changes in the industry and in related industries, like the oil and gas market, that impact the livelihoods of our many members.

4.      More than a third of the corn that NCGA members grow is sold to be used for ethanol production.  Ethanol is a renewable fuel that forms the second-largest component of the liquid fuel that powers the Nation's vehicle fleet.  Across most of the United States, refiners add ethanol to gasoline in order to (among other things) raise its octane rating to a level suitable for use in most vehicles.

5.      EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032.  *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

6.      Those new standards require automakers to produce vehicle fleets for sale in the United States that will use considerably less fuel on average than their existing vehicle fleets.  EPA's new standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit.  *See, e.g.*, 89 Fed. Reg. at 27,854 ("The standards are projected to result in an industry-wide average target for the light-duty fleet of 85 grams/mile (g/ mile) of $CO_2$ in MY 2032, representing a nearly 50 percent reduction in projected fleet average [greenhouse gas] emissions target levels from the existing MY 2026 standards.").  And because "[t]he amount of

[tailpipe] CO2 emissions is essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg 25,324, 25,327 (May 7, 2010), "any rule that limits tailpipe CO2 emissions is effectively identical to a rule that limits fuel consumption," *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015); *see also* 89 Fed. Reg. at 28,141-42 ("This action reduces CO2 emissions for the light-duty and medium-duty vehicles under revised [greenhouse gas] standards, which will result in significant reductions of the consumption of petroleum ....").

7.    To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles, which use significantly less or no liquid fuel at all. *See, e.g.*, 89 Fed. Reg. at 28,087 (noting that the "model" path of compliance anticipates "68%" electrification by MY 2032); *id.* at 27,861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]").

8.    As EPA has recognized, its new standards will significantly depress the demand for liquid fuel in the United States. *See, e.g.*, 89 Fed. Reg. at 28,111 (recognizing that EPA's standards "are projected to reduce liquid fuel consumption"); *id.* at 28,129 (similar).    Indeed, EPA's standards are *designed* to reduce demand for liquid fuel, by imposing stringent greenhouse gas emissions standards that will require significantly "reduced fuel consumption." *Id.* at 28,092;

*see also id.* at 27,858 (noting "lower demand for liquid fuel associated with the [greenhouse gas] standards.").

9.     According to EPA's own projections, the new standards will reduce gasoline consumption in the United States by "780 billion gallons through 2055." *Id.* at 28,092; *see id.* at 27,861 (projecting the rule will reduce consumer spending on fuel by "$57 billion" through 2055); EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis*, EPA-420-R-24-004, 8-43 (March 2024) (finding that final rule will "reduce gasoline and diesel fuel demand by about 40 billion gallons per year toward the end of the analysis period . . . [or] 2.6 million barrels per day"). And because ethanol is blended into nearly every gallon of gasoline sold in the United States, EPA's new rule will reduce ethanol consumption by tens of millions of gallons.

10.     That massive reduction in demand for ethanol will cause NCGA members significant financial injury. The revenues of NCGA members depend in substantial part on the market demand for corn, which in turn depends in substantial part on the market demand for ethanol for use in liquid fuel. The production of ethanol will use an estimated 36% of the corn produced in 2024, contributing over one-third of the value of corn revenues for U.S. farmers. *See* U.S. Dep't of Agric., *World Agricultural Supply and Demand Estimates*, at 12 (Aug. 12, 2024).

11. The EPA's projected reductions in gasoline use in its final rule will be translated into reductions in corn use. From 2027 to 2032, U.S. corn growers would lose more than 550 million bushels of demand as compared to the baseline, with annual demand loss exceeding 1 billion bushels per year by 2041. *See* Krista Swanson, *Corn Demand Takes a Hit in EPA's New Tailpipe Rule*, https://tinyurl.com/5n7dypz2 (Apr. 8, 2024). At today's corn prices, that is over $4 billion in lost revenue for U.S. corn growers—and losses could be several billion dollars higher in a higher-corn-price environment.

12. In short, by reducing demand for (and consumer spending on) liquid fuel, EPA's new standards will reduce demand for ethanol, and deprive corn growers of revenue that they would otherwise have obtained through sale of their corn for use in ethanol production. For instance, NCGA member Kelly Nieuwenhuis grows and sells 100% of his corn each year for use in ethanol production. By reducing demand for (and consumer spending on) liquid fuel, EPA's new standards will reduce demand for ethanol, and deprive NCGA members like Kelly Nieuwenhuis of revenues that they would otherwise have obtained through the sale of their corn for use in ethanol production.

13. That injury will be redressed by a favorable decision from this Court, as the demand for liquid fuel (and thus the demand for corn to make ethanol) will increase if EPA's new standards are invalidated, eliminating or at least reducing the

financial injury that the standards would otherwise cause to NCGA and its members. Indeed, EPA's own projections confirm that the injury to NCGA and its members is redressable if EPA's new standards are vacated, as they demonstrate that the demand for liquid fuel will be substantially higher if the standards are not in effect. *See, e.g.*, 89 Fed. Reg. at 27,858, 27,861, 28,092, 28,111, 28,129; *Regulatory Impact Analysis*, *supra*, at 8-43.

Date: September 4, 2024

_____

Neil Caskey

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF
KENTUCKY, et al.,

     *Petitioners*,

     v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     *Respondents*.

No. 24-1087

and consolidated cases

## <u>DECLARATION OF JOHN MARTINI</u>

I, John Martini, declare under penalty of perjury that the following is true and correct, to the best of my knowledge:

1.    I am the Manager of Corporate Policy for Chevron Corporation ("Chevron"), which is an energy company specializing in oil and gas and renewable fuels exploration, production, refining, distribution, and marketing. Chevron's subsidiary Chevron U.S.A. Inc. is a major refiner of petroleum products in the U.S. Chevron's subsidiary Renewable Energy Group, Inc. produces renewable transportation fuels, and it is developing innovative renewable fuel technologies. Chevron's subsidiaries also market petroleum products and biofuels in the U.S., including liquid transportation fuels.

2.     As part of my work for Chevron, I am familiar with Chevron's analyses of the impacts of various policies and market scenarios on Chevron's subsidiaries, including regulatory changes, on the transportation fuels market.

3.     Chevron is a member of the American Petroleum Institute ("API"), and Chevron's subsidiary Chevron U.S.A. Inc. is a member of the American Fuel & Petrochemical Manufacturers ("AFPM").

4.     EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years 2027 through 2032. *See* Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles, 89 Fed. Reg. 27842 (April 18, 2024) ("Standards"). EPA's new Standards directly affect Chevron subsidiaries' transportation fuel businesses and customers.

5.     As stated in Chevron's 2023 Climate Change Resilience Report,[1] Chevron believes that the future of energy is lower carbon. Chevron continues to take actions that attempt to help lower the carbon intensity of its operations while meeting the world's demand for energy. Chevron believes that many of the potential pathways to achieving the goals of the Paris Agreement include the continued use of oil and gas.

---

[1]  Chevron, Advancing Energy Progress: 2023 Climate Change Resilience Report, https://www.chevron.com/-/media/chevron/sustainability/documents/climate-change-resilience-report.pdf.

6. Chevron also supports well-designed climate policy. As stated in Chevron's comment letter for the rulemaking on the Standards, it believes that broad, market-based mechanisms are the most efficient approach to addressing greenhouse gas (GHG) emission reductions, and any direct regulations should be narrowly and efficiently targeted to enable cost-effective lower carbon opportunities not addressed by carbon pricing or innovation policies. In the transportation sector, Chevron supports technology neutral policies that cost-effectively drive GHG emission reductions, rather than policies that artificially pick winners and losers among various technology options.

7. EPA's Standards significantly limit the average amount of carbon dioxide that automakers' fleets may emit, which necessarily require automobile manufacturers to produce vehicle fleets for sale in the United States that will use considerably less liquid fuel on average than their existing vehicle fleets.

8. To reach the new Standards, EPA itself has recognized that automobile manufacturers must dramatically increase the proportion of their fleets made up of electric vehicles which use significantly less liquid fuel or no liquid fuel at all. *See, e.g.*, 89 Fed. Reg. at 28087 (noting that "model" path of compliance anticipates "68%" electrification by MY 2032); *id.* at 27861 (projecting that "the MY 2032 fleet will be made up of a larger share of [electric vehicles]"). EPA projected that electric vehicles would constitute a much smaller percentage of the market in the "no action"

scenario without these Standards. *See id.* at 28,087 (predicting 47% electrification by MY 2032).

9.      By EPA's own admission, the Standards are designed to reduce demand for gasoline and diesel in light- and medium-duty vehicles, causing significantly "reduced fuel consumption." *See, e.g.*, 89 Fed. Reg. at 27900 ("[T]his rule may reduce the demand for gasoline and diesel for light-duty and medium-duty vehicles domestically and affect the petroleum refining industry . . . ."); *id.* at 28092. Reports cited in EPA's Regulatory Impact Analysis estimate that the Standards will "reduce gasoline and diesel fuel demand by about 40 billion gallons per year toward the end of the analysis period . . . [or] 2.6 million barrels per day." EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis*, EPA-420-R-24-004, 8-43 (March 2024). According to EPA's own projections, the rule will reduce U.S. gasoline consumption by "780 billion gallons through 2055." 89 Fed. Reg. at 28092; *see also id.* at 27861 (projecting the rule will reduce consumer spending on fuel by "$57 billion" through 2055). By artificially reducing demand for liquid transportation fuels, EPA's Standards will have a direct financial impact on Chevron by skewing the market and reducing the sales that Chevron, through its subsidiaries, would otherwise have made.

10.     Chevron's subsidiary Chevron U.S.A. Inc. operates five wholly owned refineries in the United States and has a total crude refining capacity in the U.S. of over one million barrels per day.[2] As EPA explains, its new Standards will directly impact domestic refining, as "93 percent of the reduced liquid fuel demand [will] result[] in reduced domestic refining." 89 Fed. Reg. at 28101.

11.     Chevron's subsidiary Renewable Energy Group, Inc. (CREG) also provides liquid transportation fuels, including bio-based renewable diesel and biodiesel, and operates multiple active biorefinieries in the U.S. These fuels can generally be used in a wide range of diesel engines. EPA's Standards would artificially reduce demand for these fuels.

12.     These harms will be redressed by a favorable decision from this Court, as the projected impacts on domestic marketing and refining of liquid fuels will not occur if the Standards are invalidated. *See, e.g.,* 89 Fed. Reg. at 28092 (estimating a reduction in gasoline consumption of "780 billion gallons through 2055"); *see also, e.g.*, *id.* at 28111.

13.     EPA's Standards also harm Chevron subsidiaries' efforts to develop creative and effective ways to meet the world's energy needs. By forcing the shift

---

[2] Chevron, Delivering Higher Returns: 2023 Supplement to the Annual Report 21, https://www.chevron.com/-/media/shared-media/documents/2023-chevron-annual-report-supplement.pdf (noting United States-Consolidated refinery capacities of 1,059,000 barrels per day at year-end 2023).

towards electric vehicles, EPA disincentivizes other lower-carbon innovations to fuel existing light-duty and medium-duty vehicles that could help achieve the policy goal of reduced GHG emissions. For example, Chevron's subsidiaries are developing and testing blends of lower carbon intensity renewable gasoline. With supportive policies, these renewable gasoline blends could be used to lower the lifecycle carbon emissions of existing cars on the road. Instead, EPA's new Standards disincentivize those innovations which, in Chevron's view, will be needed along with electric vehicles to achieve the policy goal of reduced GHG emissions.

14.     Chevron believes an approach that embraces all forms of technologies and solutions is critical to achieving climate and air quality policy goals with transportation options that are affordable and accessible to everyone. EPA's Standards are contrary to that approach and deeply flawed. Among other things, EPA's Standards fail to properly account for the true emissions of electric vehicles. As Chevron noted in its comment letter, a lifecycle approach to carbon accounting would have facilitated informed decision making throughout the value chain. Carbon data that is consistent, reliable, and transparent across sectors, products, and firms of all sizes can be used to understand the carbon performance associated with a good or service at each stage of the lifecycle, from production to manufacturing to transport.

15. Unfortunately, EPA declined to conduct this lifecycle emissions comparison, instead electing to force adoption of a single technology (electric vehicles) at a rate that would require wholesale transformation of electric energy generation and distribution infrastructure on an unprecedented, abbreviated time scale. On the other hand, a market-based approach allowing multiple technologies to compete would allow battery-powered and lower-carbon intensity fueled vehicles (including hybrids at rates beyond the Standards) to attempt to achieve GHG reduction targets in a cost-effective manner.

16. Finally, the EPA Standards force a single technology that does not appear to be adequately supported by consumer demand on pace with EPA's Standards or by sufficient nationwide charging infrastructure.[3]

Dated: 9/5/24

John Martini

---

[3] *See, e.g.,* Ellen R. Delisio, *Consumer Interest in EVs Is Declining*, AAA (June 25, 2024), https://ev.aaa.com/articles/consumer-interest-in-evs-is-declining-surveys-show/ (reporting that only 18% of U.S. adults indicated that they were likely to buy an EV); Am. Transp. Research Inst., *Charging Infrastructure Challenges for the U.S. Electric Vehicle Fleet* (Dec. 2022), https://truckingresearch.org/2022/12/charging-infrastructure-challenges-for-the-u-s-electric-vehicle-fleet-december-2022-full-report/.

No. 24-1158
(Consolidated with 24-1087, 24-1100, 24-1132, 24-1195, 24-1196, 24-1197,
and 24-1206)

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**WESTERN STATES TRUCKING ASSOCIATION, INC., ET AL.,**
*Petitioners,*

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.**
*Respondents.*

_____

On Appeal from the Environmental Protection Agency
EPA-HQ-OAR-2022-0829; FRL-8953-04-OAR

_____

**DECLARATION OF LEE BROWN**

_____

I, Lee Brown, hereby declare as follows:

1.    I am over the age of eighteen (18) and am competent to testify in this

matter.  I have personal knowledge of the following facts and if called upon to do so

could competently testify to them under oath.  As to those matters which reflect a

matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.    I am the executive director of Western States Trucking Association,

Inc. ("WSTA"), formerly known as California Dump Truck Owners Association, a

named petitioner in the above-captioned suit. Our organization's articles of incorporation, and subsequent amendments, are attached herein as Exhibits A–C.

3. WSTA is a nonprofit corporation formed for the general purpose of "protect[ing] the interests of the owners and operators of trucks using the highways of the State of California." Exhibit A at 1 (WSTA articles of incorporation). We additionally "conduct public educational campaigns for the purpose of preventing legislation adverse to the interests of the shipping public, and those engaged in the transportation business . . . ." *Id.* at 1–2. WSTA's purpose is also, in part, "to sue and be sued" in the interest of its members. *Id.* at 2. In short, we represent the interests of multiple member trucking companies that transport cargo and goods within the state of California and beyond.

4. WSTA's purpose is generally to support its trucking company members in all aspects of their businesses, including but not by way of limitation, the ability of their members to maintain their trucks for their full useful lives and to purchase replacement trucks at reasonable cost that will not adversely impact their businesses.

5. On April 18, 2024, the Environmental Protection Agency ("EPA") promulgated a final regulation entitled "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles" ("LD and MD Regulations"). *See* 89 Fed. Reg. 27842 *et seq.* (Apr. 18, 2024).

2

6. The LD and MD Regulations establish new, more stringent emission standards for criteria pollutants and greenhouse gases for light-duty and Class 2b and 3 medium-duty vehicles that will be phased in over model years 2027 through 2032. *Id.*

7. WSTA and its members have advocated against overly stringent EPA light-duty and medium-duty vehicle emissions regulations.

8. WSTA's members include Santoro Transportation, Inc. ("Santoro Transportation"), whose CEO is Thomas Santoro. The contents of Thomas Santoro's declaration are hereby incorporated herein in their entirety.

9. Members of WSTA, in addition to Santoro Transportation, are also injured by EPA's LD and MD Regulations, and WSTA has instituted this lawsuit on behalf of all of our members.

10. As detailed in the declaration of Thomas Santoro, WSTA members will be injured by the LD and MD Regulations, which will directly affect their profitability, market share, and overall economic stability.

11. The LD and MD Regulations will limit the types of vehicles available that are necessary to conduct WSTA members' business activities, making them choose between purchasing costly and unreliable vehicles and losing significant profits.

3

12. By unnecessarily increasing the stringency of emissions requirements for light-duty and medium-duty vehicles the LD and MD Regulations limit the vehicles that can be sold to and operated by WSTA's members. Because several of WSTA's members, including Santoro Transportation, own fleets of light-duty and medium-duty vehicles, they will be forced to purchase expensive vehicles that meet the requirements of the LD and MD Regulations to continue operating their businesses, thereby losing revenue.

13. The LD and MD Regulations limit the availability of vehicles needed for WSTA members to profitably conduct their businesses. The sales limitations that the LD and MD Regulations impose increase market scarcity of reliable and cost-effective diesel-powered light-duty and medium-duty vehicles, parts, and supplies necessary to maintaining a profitable fleet.

14. As fewer diesel-powered light-duty and medium-duty vehicles remain on the road thanks to the knock-on effects of the LD and MD Regulations, the cost of diesel fuel will increase and the prevalence of diesel refueling stations will decrease.

15. If WSTA's members wish to continue operating, these regulations will eventually force them to purchase unreliable electric vehicles that often break down or catch fire. There is no nationwide charging infrastructure yet available for such

4

vehicles. Their employees will lose valuable time and be made to risk their lives due to these regulations.

16.    EPA promulgated these regulations knowing full well that their approval would cause businesses like those represented by WSTA to purchase electric trucks or lose significant business. These regulations will increase WSTA member costs by a significant amount.

17.    In summary, due to existing externalities, including a lack of nationwide or statewide charging infrastructure, reliability problems with existing electric light-duty and medium-duty vehicles, and the higher cost of new light-duty and heavy-duty vehicles when compared to traditional diesel models, multiple WSTA members may not be able to continue running their businesses profitably now that the agency action under review has taken effect.

18.    But for EPA's decision to promulgate the LD and MD Regulations, the businesses of many WSTA members would not suffer economic injury. As WSTA's members are directly affected by EPA's decision in a manner that will negatively impact their businesses, WSTA may stand in the shoes of its members and "sue" on their behalf, as is its associational purpose. Exhibit A at 2.

19.    The Court can redress WSTA members' injuries by setting aside these EPA regulations, preventing these job-killing regulations from going into effect.

Pursuant to 28 U.S.C. § 1746, I, Lee Brown, declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd day of September, 2024, in Upland, in the State of California.

LEE BROWN
Executive Director
Western States Trucking Association, Inc.

# EXHIBIT A

# ARTICLES OF INCORPORATION

## of

## CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION

### (A California non-profit corporation)

Know all men by these presents that we, the persons whose names are signed hereto, have associated ourselves together, to become incorporated under the laws of the State of California, for the transaction of business in said state, and for such purpose we adopt the following articles of incorporation:

### ARTICLE I.

The name of this corporation is:

California Dump Truck Owners Association.

It is a corporation which does not contemplate pecuniary gain or profit to the members thereof.

### ARTICLE II.

The purposes for which this corporation is formed are:

(a) Generally to protect the interests of the owners and operators of trucks using the highways of the State of California.

(b) To conduct public educational campaigns for the purpose of preventing legislation adverse to the interests of

the shipping public, and those engaged in the transportation business, and particularly those engaged in the dump trucking business.

(c) To educate the producer and shipping business in general regarding the many advantages of using independent dump trucking operators.

(d) To promote general safety and to prove to the public that the truckmen are highly efficient, safe drivers, and gentlemen of the highways.

(e) To teach the public that the trucks owned and operated by the members of this association are reliable equipment, manned by competent, safe operators, and that the trucks are capable of carrying the loads that they are designed to carry anywhere, any time, and on time at reasonable prices.

(f) To sue and be sued.

(g) To contract and be contracted with.

(h) To receive property by devise or bequest, subject to the laws regulating the transfer of property by will, and to otherwise acquire and hold all property, real or personal, including shares of stock, bonds and securities of other corporations.

(i) To act as trustee under any trust incidental to the principal objects of the corporation, and to receive, hold, administer, and expend funds and property subject to such trust.

(j) To convey, exchange, lease, mortgage, encumber,

transfer upon trust or otherwise dispose of all property, real or personal.

(k)  To borrow money, contract debts, and issue bonds, notes and debentures, and secure the same.

(l)  To do all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of the corporation.

(m)  And incidental to the main purposes of this non-profit corporation to carry on any business whatsoever which this corporation may deem proper or convenient in connection with any of the foregoing purposes or otherwise, or which may be calculated directly or indirectly to promote the interests of this non-profit corporation or to enhance the value of its property; to conduct its business in this state, in other states, in the District of Columbia, in the territories and colonies of the United States, and in foreign countries.

The foregoing statement of purposes shall be construed as a statement of both purposes and powers, and the purposes and powers stated in each clause shall, except where otherwise expressed, be in nowise limited or restricted by reference to or inference from the terms or provisions of any other clause, but shall be regarded as independant purposes.

## ARTICLE III.

The existence of this corporation is to be perpetual.

## ARTICLE IV.

The county in this state where the principal office

for the transaction of the business of this non-profit
corporation is to be located is the county of Los Angeles.

ARTICLE V.

The names and addresses of the persons who are to
act in the capacity of directors until the selection of their
successors and who shall be known as directors, are:

| NAMES: | ADDRESSES: |
|---|---|
| Freasie Jones | 1718 E. Plymouth, Long Beach |
| Frank Heidlebaugh | 3125 E. 11th St. Long Beach |
| J. A. Frethiem | 800 Edgewood, Inglewood |
| Barney Bryce | 1111 Raymond Ave.. Long Beach |
| E. T. Seibert | Box 62. Route 3. Santa Ana |
| E. M. Balcom | 5632 Lankershim Blvd.. No. Hollywood |
| Leonard Schempp | 5128 S. Gramercy. L.A. |
| H. J. Bablin | 1002 Glickman Ave.. El Monte |
| H. L. Willingham | 2103 Pontius. West L.A. |
| T. E. Milligan | 645 E. 79th St.. L.A. |
| Edw. Davis | 6316 11th Ave.. L.A. |
| George Harrop | 1381 No. Catalina St., Burbank |

The number of directors shall remain at twelve until
changed by an amendment to the by-laws adopted pursuant to this
authority.

ARTICLE VI.

The authorized number and qualifications of the members
of this organization, the different classes of membership, the
property, voting and other rights, and privileges of each class
of membership, and the liability of each or all classes, to
dues or assessments and the method of collection thereof, may
be set forth in the by-laws of this corporation, except that

known to me to be the persons whose names are subscribed to the foregoing articles of incorporation and acknowledged to me that they executed the same.

WITNESS my hand and official seal.

Virginia F. Runyon
Notary Public in and for the
County of Los Angeles, State
of California

(Notarial Seal)

My Commission Expires Dec. 4, 1944

We, the undersigned, desiring to associate with the first directors for the purpose of forming California Dump Truck Owners Association , a California non-profit corporation, have subscribed our names to these articles of incorporation, have subscribed our names to these articles of incorporation.

## MEMBERS

| NAMES: | ADDRESSES: |
|---|---|
| Ed. W. Davis | , 6316 11th Ave. L.A. |
| Barney J. Bryce | , 1111 Raymond Ave. L.B. |
| Frank Heidlebaugh | , 3125 E. 11th St. L.B. |
| T. E. Milligan | , 645 79 St., L.A. |
| E. M. Balcom | , 5632 Lankershim Blvd. No.Ho. |
| George Harrop | , 1381 No. Catalina St. Burbank |
| E. T. Seibert | , Box 62 Route #3, Santa Ana |
| H. L. Wellingham | , 2103 Pontius West L.A. |
| H. J. Gebelin | , 1002 Glickman Ave. El Monte |
| A and W Trucking Service (By J. Abromson) | , 1180 So. Boyle Ave. L.A. |
| Leonard F. Schempp | , 5128 So. Gramercy Pl. L.A. |
| J. P. Gross | , 5821 Priory Bell |
| Rudolph Lenold | 6019 So. Whilton Pl. L.A |
| J. P. Intor | 127 E. ave. 39 L.a. |
| C.C. Verst | 271 R... ... M... L.a. |

voting rights or privileges shall be restricted to regular members as defined in the by-laws.

We, the persons who are to act in the capacity of first directors, hereby subscribe to the foregoing articles in the corporation of California Dump Truck Owners Association this 13th day of June, 1941.

Frank Heidlebaugh
Barney Bryce

E. T. Seibert

E. M. Balcom

Leonard F. Schempp

H. J. Gebelin

H. L. Willingham

T. E. Milligan

Ed. W. Davis

George Harrop

Freasie Jones
J. A. Frethiem

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

On this 13th day of June, in the year one thousand nine hundred and forty-one, before me Virginia F. Runyon a Notary Public in and for said county of Los Angeles, state of California, residing therein, duly commissioned and sworn, personally appeared the above twelve (12) incorporators,                              Frank Heidlebaugh

Barney Bryce                                   E. T. Seibert
,                                              ,
E. M. Balcom                                  Leonard F. Schempp
,                                              ,
H. J. Gebelin                                 H. L. Willingham
,                                              ,
T. E. Milligan                                Ed. W. Davis
,
Freasie Jones                                 George Harrop
,                                              ,
J. A. Frethiem
,

known to me to be the persons whose names are subscribed to the foregoing articles of incorporation, and acknowledged to me that they executed the same.

WITNESS my hand and official seal.

Virginia E. Runyon
Notary Public in and for the county of Los Angeles, State of California
My Commission expires Dec. 4, 1944

(Notarial Seal)

# EXHIBIT B

**CERTIFICATE OF AMENDMENT OF
ARTICLES OF INCORPORATION**

The undersigned certify that:

1. They are the president and the secretary, respectively, of California Dump Truck Owners Association, a California corporation.

2. Article I of the Articles of Incorporation of this corporation is amended to read as follows:

   The name of this corporation is:

   California Construction Trucking Association.

   It is a corporation which does not contemplate pecuniary gain or profit to the members thereof.

3. The foregoing amendment of the Articles of Incorporation has been duly approved by the board of directors.

4. The foregoing amendment of the Articles of Incorporation has been duly approved by the required vote of the members.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

DATE: _____01/05/12_____          _____

Fred Martin, President

DATE: _____01/05/12_____          _____

Mary Proctor, Secretary

# EXHIBIT C

NOTO

A0772453

0180202

FILED KEZ
Secretary of State DLX
State of California

CERTIFICATE OF AMENDMENT OF
ARTICLES OF INCORPORATION

IPC  JUL 0 7 2015

The undersigned certify that:

1. They are the president and the secretary, respectively, of California Construction Trucking Association, a California corporation.

2. Article I of the Articles of Incorporation of this corporation is amended to read as follows:

> The name of this corporation is:
> Western States Trucking Association.
> It is a corporation which does not contemplate pecuniary gain or profit to the members thereof.

3. The foregoing amendment of the Articles of Incorporation has been duly approved by the board of directors.

4. The foregoing amendment of the Articles of Incorporation has been duly approved by the required vote of the members.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

DATE: 7-1-2015

Susan Jones, President

DATE: 6/30/2015

Mary Proctor, Secretary

No. 24-1158
(Consolidated with 24-1087, 24-1100, 24-1132, 24-1195, 24-1196, 24-1197,
and 24-1206)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**WESTERN STATES TRUCKING ASSOCIATION, INC., ET AL.,**
*Petitioners,*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.**
*Respondents.*

On Appeal from the Environmental Protection Agency
EPA-HQ-OAR-2022-0892; FRL-8953-04-OAR

**DECLARATION OF MICHAEL LEWIS**

I, Michael Lewis, hereby declare as follows:

1.　　I am over the age of eighteen (18) and am competent to testify in this matter. I have personal knowledge of the following facts and if called upon to do so could competently testify to them under oath. As to those matters which reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.　　I am the executive director of Construction Industry Air Quality Coalition ("CIAQC"). Our organization's articles of incorporation are attached hereto as Exhibit A.

3.     CIAQC is a nonprofit California trade association representing the interests of other California non-profit trade associations and their members whose air emissions are regulated by California state, regional, and local regulations, as well as federal regulations.

4.     CIAQC's specific purpose is "to obtain and provide information to its members concerning environmental regulatory issues affecting the members, assist in the development of environmental regulatory strategies and legislation that will balance the goals of a healthy environment and a healthy local economy, act as a conduit for information from members to regulatory agencies and legislators concerning the effect of proposed regulations and legislation on its members, and to cooperate with other persons and associations in the development of reasonable and effective environmental improvement strategies." Exhibit A at 1 (CIAQC articles of incorporation). To those ends, CIAQC may "engage in any lawful act or activity for which a corporation may be organized under [applicable California law]." *Id.* This includes bringing legal challenges on behalf of its members. We represent the interests of multiple member construction companies that transport cargo and goods within the state of California and beyond in connection with construction activities.

5.     On April 18, 2024, the Environmental Protection Agency ("EPA") promulgated a final regulation entitled "Multi-Pollutant Emissions Standards for

2

133a

Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles" ("LD and MD Regulations"). *See* 89 Fed. Reg. 27842 *et seq.* (Apr. 18, 2024).

6.  The LD and MD Regulations establish new, more stringent emission standards for criteria pollutants and greenhouse gases for light-duty and Class 2b and 3 medium-duty vehicles that will be phased in over model years 2027 through 2032. *Id.*

7.  CIAQC's members are injured by EPA's LD and MD Regulations, and CIAQC has instituted this lawsuit on behalf of its members.

8.  The LD and MD Regulations will limit the types of vehicles available that are necessary to conduct CIAQC members' business activities, making them choose between purchasing costly and unreliable vehicles required by the regulations and losing significant profits.

9.  By unnecessarily increasing the stringency of emissions requirements for light-duty and medium-duty vehicles the LD and MD Regulations limit the vehicles that can be sold to and operated by CIAQC's members., which will be forced to purchase expensive vehicles that meet the requirements of the LD and MD Regulations to continue operating their businesses, thereby losing revenue.

10.  The LD and MD Regulations limit the availability of vehicles needed for CIAQC members to profitably conduct their businesses. The sales limitations that the LD and MD Regulations impose increase market scarcity of reliable and

cost-effective diesel-powered light-duty and medium-duty vehicles, parts, and supplies necessary to maintaining a profitable fleet.

11.     As fewer diesel-powered light-duty and medium-duty vehicles remain on the road thanks to the knock-on effects of the LD and MD Regulations, the cost of diesel fuel will increase and the prevalence of diesel refueling stations will decrease.

12.     If CIAQC's members wish to continue operating, these regulations will eventually force them to purchase unreliable electric vehicles that often break down or catch fire. There is no nationwide charging infrastructure yet available for such vehicles. Their employees will lose valuable time and be made to risk their lives due to these regulations.

13.     But for EPA's decision to promulgate the LD and MD Regulations, the businesses of many CIAQC members would not suffer economic injury. As CIAQC's members are directly affected by EPA's decision in a manner that will negatively impact their businesses, CIAQC may stand in the shoes of its members for purposes of this litigation.

14.     CIAQC's members frequently operate in locations where there is no power because CIAQC members are installing power at that specific location, which only further complicates the use of all-electric vehicles.

4

15. The Court can redress CIAQC members' injuries by setting aside these EPA regulations, preventing these job-killing regulations from going into effect.

Pursuant to 28 U.S.C. § 1746, I, Michael Lewis, declare under penalty of perjury that the foregoing is true and correct.

Executed on the _2_ day of _September_____,
2024, in _Los Angeles County_____, in the State of
_California_____.

_[signature]_____
MICHAEL LEWIS
Executive Director
Construction Industry Air Quality Coalition, Inc.

5

# EXHIBIT A

**1954125**

F I L E D
...the office of the Secretary of State
of the State of California

NOV 1 7 1995

Bill Jones
PHIL JONES, Secretary of State

# ARTICLES OF INCORPORATION OF
# CONSTRUCTION INDUSTRY AIR QUALITY COALITION

## I.
## NAME

The name of the corporation is Construction Industry Air Quality Coalition.

## II.
## PURPOSES

2. (A) This corporation is a nonprofit mutual benefit corporation organized under the Nonprofit Mutual Benefit Corporation Law. The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under such law.

(B) The specific purpose of this corporation is to obtain and provide information to its members concerning environmental regulatory issues affecting the members, assist in the development of environmental regulatory strategies and legislation that will balance the goals of a healthy environment and a healthy local economy, act as a conduit for information from members to regulatory agencies and legislators concerning the effect of proposed regulations and legislation on its members, and to cooperate with other persons and associations in the development of reasonable and effective environmental improvement strategies.

## III.
## AGENT FOR SERVICE OF PROCESS

The name and address in the State of California of this corporation's initial agent for service of process is: Michael Lewis, 1330 South Valley Vista Drive, Diamond Bar, California 91765.

## IV.
## OTHER PROVISIONS

A. An existing unincorporated association, Construction Industry Air Quality Coalition, is being incorporated by the filing of these articles.

B. The Bylaws may provide for two classes of membership: general and associate.

C. Notwithstanding any of the above statements of purposes and powers, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the specific purpose of this corporation.

Dated: September 5, 1995

_____
Amy Glad

_____
John R. Kruse

138a

Amy Glad and Jon R. Kruse declare under penalty of perjury under the laws of the State of California that they are two of the Board Members of Construction Industry Air Quality Coalition, the subject of the Articles of Incorporation attached to this declaration, and further declare that Construction Industry Air Quality Coalition has duly authorized and approved its incorporation by means of the attached Articles in accordance with its rules and procedures.

Executed at Monterey Park, County of Los Angeles, California, on September 5, 1995

- 2 -

139a




STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**
P.O. BOX 1286
RANCHO CORDOVA, CA. 95741-1286

November 17, 1995

In reply refer to
340:G  :PTS

CONSTRUCTION INDUSTRY AIR QUALITY
COALITION
1330 SOUTH VALLEY
VISTA DRIVE
DIAMOND BAR CA   91765

Purpose                  :  BUSINESS LEAGUE
Code Section             :  23701e
Form of Organization     :  Corporation
Accounting Period Ending:  December 31
Organization Number      :

You are exempt from state franchise or income tax under the section of
the Revenue and Taxation Code indicated above.

This decision is based on information you submitted and assumes that
your present operations continue unchanged or conform to those proposed
in your application.  Any change in operation, character, or purpose of
the organization must be reported immediately to this office so that we
may determine the effect on your exempt status.  Any change of name or
address also must be reported.

In the event of a change in relevant statutory, administrative, judicial
case law, a change in federal interpretation of federal law in cases
where our opinion is based upon such an interpretation, or a change in
the material facts or circumstances relating to your application upon
which this opinion is based, this opinion may no longer be applicable.
It is your responsibility to be aware of these changes should they occur.
This paragraph constitutes written advice, other than a chief counsel
ruling, within the meaning of Revenue and Taxation Code Section
21012 (a)(2).

You may be required to file Form 199 (Exempt Organization Annual
Information Return) on or before the 15th day of the 5th month (4 1/2
months) after the close of your accounting period.  See annual
instructions with forms for requirements.

You are not required to file state franchise or income tax returns
unless you have income subject to the unrelated business income tax
under Section 23731 of the Code.  In this event, you are required to
file Form 109 (Exempt Organization Business Income Tax Return) by the
15th day of the 5th month (4 1/2 months) after the close of your
annual accounting period.

November 17, 1995
CONSTRUCTION INDUSTRY AIR QUALITY
Page 2

If the organization is incorporating, this approval will expire unless incorporation is completed with the Secretary of State within 60 days.

Exemption from federal income or other taxes and other state taxes requires separate applications.

A copy of this letter has been sent to the Office of the Secretary of State.

P SHEK
EXEMPT ORGANIZATION UNIT
CORPORATION AUDIT SECTION
Telephone (916) 845-4171

EO :
cc:  CURTIS L. COLEMAN

COPY

141a

---
**No. 24-1132**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

WARREN PETERSEN, President of the Arizona State Senate,

BEN TOMA, Speaker of the Arizona House of Representatives, and

ARIZONA TRUCKING ASSOCIATION,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, and

MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,

*Respondents*.

---

## DECLARATION OF ANTHONY BRADLEY

---

I, Anthony Bradley, declare as follows:

1.      I am President and Chief Executive Officer at the Arizona Trucking Association.  I have served in these positions for more than 10 years.  This experience has provided me with a deep understanding of the Arizona Trucking Association, its members, and the transportation industry.

2.      The Arizona Trucking Association was founded in 1937.

3.     It is the Arizona Trucking Association's mission to represent its members before legislative, regulatory and enforcement agencies, to serve as the trucking industry's primary voice on transportation and other public policy issues and to provide members with cost-effective services that can help them comply with all relevant laws and regulations.

4.     Based on my experience and knowledge of the Arizona Trucking Association and its members, as well as interactions with individual members, I am aware of how the Final Rule is expected to impact Arizona Trucking Association members.

5.     Arizona Trucking Association members purchase and use light- and medium-duty vehicles that are subject to the Final Rule, such as light trucks, large pickups, and vans.

6.     The Arizona Trucking Association projects that several of its members will be forced to purchase and use electric light- and medium-duty vehicles as a result of the Final Rule.

7.     Higher upfront costs to purchase electric vehicles and necessary equipment will impact Arizona Trucking Association members because of issues relating to cash flow, time-value of money, and other business considerations.

8.     Arizona Trucking Association members will suffer even greater financial harm if EPA's cost estimates are incorrect.

2

9.     The lack of sufficient public charging, the time spent waiting for a charger to become available, and the time spent waiting for a vehicle to be fully charged will disrupt business activities by Arizona Trucking Association members.

10.     The Arizona Trucking Association's mission is to represent its members and serve as their voice on public policy issues impacting the transportation industry, which is why the Arizona Trucking Association has brought this challenge.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 17, 2024                  */s/ Anthony Bradley*
                                        ANTHONY BRADLEY

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., | |
| *Petitioner,* | |
| v. | Nos. 24-1087 (and consolidated cases) |
| ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| *Respondent.* | |

**DECLARATION OF JOSH ROE OF KANSAS CORN GROWERS ASSOCIATION**

I, Josh Roe, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.  I am the Chief Executive Officer of the Kansas Corn Growers Association, a nonprofit trade association based in Kansas with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.  I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

145a

3.     Kansas is one of the nation's leading corn producing states, with a net production of more than 600 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.     The ethanol industry supports nearly 400,000 jobs in more than 24 states. Ethanol contributes more than $54 billion to the national GDP and profitably processed approximately 5.3 billion bushels of corn in 2023.

5.     Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 133 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Aug. 30, 2024), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.     The United States Environmental Protection Agency promulgated a final agency action entitled *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). The final rule sets increasingly stringent greenhouse-gas standards for light-

2

and medium-duty vehicles for model years beginning with 2027. *Id.* at 27,854–55. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 28,057–61.

7. By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See id.* at 28,141 ("through 2055 these standards will result in a reduction of 780 billion gallons of retail gasoline consumption"). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of billions of gallons.

8. While these standards are in effect, they will drive down demand for ethanol.

9. This demand destruction harms the Kansas Corn Growers Association and its members by decreasing demand for the corn they grow.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. All these injuries would be substantially ameliorated if EPA's decision

3

were set aside. As EPA's analysis shows, without the rule, automakers would produce more gasoline-powered light- and medium-duty vehicles, mitigating any reduction in gasoline and ethanol consumption. *Id.* at 28,057–61.

Dated: September 3, 2024

Josh Roe

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., <br><br> *Petitioner,* <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondent.* | Nos. 24-1087 (and consolidated cases) |

**DECLARATION OF DAVE LOOS OF ILLINOIS CORN GROWERS ASSOCIATION**

I, Dave Loos, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Director of Biofuels and Research of the Illinois Corn Growers Association, a nonprofit trade association based in Illinois with a membership of over 4,000 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2. I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Illinois is one of the nation's leading corn producing states, with a net production of more than 2 billion bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.    The ethanol industry supports nearly 400,000 jobs in more than 24 states. Ethanol contributes more than $54 billion to the national GDP and profitably processed approximately 5.3 billion bushels of corn in 2023.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 133 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Aug. 30, 2024), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final agency action entitled *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). The final rule sets increasingly stringent greenhouse-gas standards for light-

2

and medium-duty vehicles for model years beginning with 2027. *Id.* at 27,854–55. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 28,057–61.

7. By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See id.* at 28,141 ("through 2055 these standards will result in a reduction of 780 billion gallons of retail gasoline consumption"). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of billions of gallons.

8. While these standards are in effect, they will drive down demand for ethanol.

9. This demand destruction harms the Illinois Corn Growers Association and its members by decreasing demand for the corn they grow.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. All these injuries would be substantially ameliorated if EPA's decision

3

were set aside. As EPA's analysis shows, without the rule, automakers would produce more gasoline-powered light- and medium-duty vehicles, mitigating any reduction in gasoline and ethanol consumption. *Id*. at 28,057–61.

Dated: September 3, 2024

_____
Dave Loos

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., <br><br> *Petitioner,* <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondent.* | Nos. 24-1087 (and consolidated cases) |

**DECLARATION OF LANE HOWARD OF MISSOURI CORN GROWERS ASSOCIATION**

I, Lane Howard, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I am the Director of Market Development of the Missouri Corn Growers Association, a nonprofit trade association based in Missouri with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.     I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Missouri is one of the nation's leading corn producing states, with a net production of more than 560 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.    The ethanol industry supports nearly 400,000 jobs in more than 24 states. Ethanol contributes more than $54 billion to the national GDP and profitably processed approximately 5.3 billion bushels of corn in 2023.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 133 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Aug. 30, 2024), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final agency action entitled *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). The final rule sets increasingly stringent greenhouse-gas standards for light-

2

and medium-duty vehicles for model years beginning with 2027. *Id.* at 27,854–55. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 28,057–61.

7. By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See id.* at 28,141 ("through 2055 these standards will result in a reduction of 780 billion gallons of retail gasoline consumption"). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of billions of gallons.

8. While these standards are in effect, they will drive down demand for ethanol.

9. This demand destruction harms the Missouri Corn Growers Association and its members by decreasing demand for the corn they grow.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. All these injuries would be substantially ameliorated if EPA's decision

3

were set aside. As EPA's analysis shows, without the rule, automakers would produce more gasoline-powered light- and medium-duty vehicles, mitigating any reduction in gasoline and ethanol consumption. *Id*. at 28,057–61.

Dated: September 03, 2024

                                                            _____

                                                         Lane Howard

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF KENTUCKY, et al.,

*Petitioner,*

v.

Nos. 24-1087 (and consolidated cases)

ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

**DECLARATION OF RYAN SAUER OF IOWA CORN GROWERS ASSOCIATION**

I, Ryan Sauer, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.   I am Vice President of Market Development of the Iowa Corn Growers Association, a nonprofit trade association based in Iowa with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.   I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3. Iowa is the nation's leading producer of corn, with a net production of around 2.4 billion bushels. The majority of this corn is used as a feedstock for ethanol production.

4. The ethanol industry supports nearly 400,000 jobs in more than 24 states. Ethanol contributes more than $54 billion to the national GDP and profitably processed approximately 5.3 billion bushels of corn in 2023.

5. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 133 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Aug. 30, 2024), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6. The United States Environmental Protection Agency promulgated a final agency action entitled *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). The final rule sets increasingly stringent greenhouse-gas standards for light-

2

and medium-duty vehicles for model years beginning with 2027. *Id.* at 27,854–55. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 28,057–61.

7.   By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See id.* at 28,141 ("through 2055 these standards will result in a reduction of 780 billion gallons of retail gasoline consumption"). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of billions of gallons.

8.   While these standards are in effect, they will drive down demand for ethanol.

9.   This demand destruction harms the Iowa Corn Growers Association and its members by decreasing demand for the corn they grow.

10.   These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11.   All these injuries would be substantially ameliorated if EPA's decision

3

159a

were set aside. As EPA's analysis shows, without the rule, automakers would produce more gasoline-powered light- and medium-duty vehicles, mitigating any reduction in gasoline and ethanol consumption. *Id.* at 28,057–61.

Dated: September 6, 2024

Ryan Sauer

4

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, ET AL.<br><br>        Petitioners,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>        Respondent. | Case No. 24-1087 (and consolidated cases) |

## DECLARATION OF GEOFF COOPER

1. My name is Geoff Cooper. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge, published data, and studies and information developed by the Renewable Fuels Association ("RFA"). I am submitting this Declaration on behalf of the Petitioners' opening brief in the above-captioned matter.

2. Since 1981, RFA has served as a non-profit, national trade association and voice for the United States' ethanol industry both domestically and internationally. Ethanol is a renewable fuel produced from plant-based feedstocks, including grains like field corn and sorghum. The members of RFA include companies that manufacture ethanol fuel and market it to blenders and marketers of gasoline, as well as companies that provide goods

and services (such as process technologies and raw feedstocks) to ethanol producers. RFA's members operate facilities across the United States, from California to New York, and are responsible for a substantial share of the nation's ethanol production. Among RFA's purposes is representing its members in lawsuits affecting the ethanol industry.

3. I am currently the President and CEO of RFA and have served in that capacity since 2018. I have been employed with RFA since 2008, when I was hired as the organization's director of research and analysis. I have served in various capacities throughout my tenure, most recently as Executive Vice President. Prior to serving as CEO, I led RFA's regulatory activities, oversaw the group's research and technical initiatives, supported public and media relations efforts, assisted with legislative initiatives and managed the Renewable Fuels Foundation. Prior to RFA, I worked on ethanol issues for the National Corn Growers Association and served as a captain in the U.S. Army, where I specialized in bulk petroleum product logistics. Throughout my 16 years working for RFA and years of prior work experience, I have developed an in-depth understanding of the business and operations of the members of RFA, and the market for ethanol fuel in the United States.

4. RFA's members primarily produce corn-based ethanol, a type of renewable

2

fuel.  Some RFA members also produce small volumes of biomass-based diesel, renewable diesel, or cellulosic ethanol.

5. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating-the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage and net GHG emissions.  Refiners add ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles and to meet federal renewable mandates.

6. I submit this declaration in support of RFA's challenge to the U.S. Environmental Protection Agency's ("EPA's") final rule, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," published at 89 Fed. Reg. 27842 (Apr. 18, 2024).

7. The emissions standards for light-duty vehicles established in EPA's final rule can only be met by averaging emissions from internal combustion engine vehicles with the emissions from zero-emission vehicles that do not run on liquid fuels. Therefore, this rule will reduce the demand for all liquid fuels, including renewable fuels, which will in turn reduce the demand for the feedstocks used to produce renewable fuels, such as ethanol.

3

8. RFA's studies project that that the emissions standards will cause U.S. ethanol consumption to fall by 1.7-2.5 billion gallons between 2027-2032, an average reduction of 283-425 million gallons per year.



9. Reduced demand for ethanol would result in great economic harm to RFA's members, as it would undermine their ability to sell the ethanol they produce.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Date: September 6, 2024

Respectfully submitted,

_Geoff Cooper_

_____
Geoff Cooper

*President and CEO of the Renewable Fuels Association*

5

No. 24-1158
(Consolidated with 24-1087, 24-1100, 24-1132, 24-1195, 24-1196, 24-1197,
and 24-1206)

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**WESTERN STATES TRUCKING ASSOCIATION, INC., ET AL.,**
*Petitioners*,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.**
*Respondents*.

_____

On Appeal from the Environmental Protection Agency
EPA-HQ-OAR-2022-0829; FRL-8953-04-OAR

_____

**DECLARATION OF THOMAS SANTORO**

_____

I, Thomas Santoro, hereby declare as follows:

1.     I am over the age of eighteen (18) and am competent to testify in this

matter. I have personal knowledge of the following facts and if called upon to do so

could competently testify to them under oath. As to those matters which reflect a

matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.     I am the CEO of Santoro Transportation, Inc. ("Santoro

Transportation"), an interstate authorized trucking company that is a member of

Western States Trucking Association, Inc. ("WSTA"), a named petitioner in the

above-captioned suit. WSTA represents the interests of Santoro Transportation in this lawsuit.

3.   My company, which is based in Salinas, California, transports interstate domestic cargo using seventeen heavy-duty trucks.

4.   On April 18, 2024, the Environmental Protection Agency ("EPA") promulgated a final regulation entitled "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles" ("LD and MD Regulations"). *See* 89 Fed. Reg. 27842 *et seq.* (Apr. 18, 2023).

5.   The LD and MD Regulations establish new, more stringent emission standards for criteria pollutants and greenhouse gases for light-duty and Class 2b and 3 medium-duty vehicles that will be phased in over model years 2027 through 2032. *Id.*

6.   Santoro Transportation uses light- and medium-duty vehicles in its business operations. Specifically, Santoro Transportation owns and operates a red GMC 2500HD diesel-powered service truck (VIN #1GTHK23UX1F182764). Santoro Transportation uses this truck to assist its heavy-duty vehicles when they break down throughout California and neighboring states, sometimes in remote locations.

7.   The LD and MD Regulations will limit the types of vehicles available that are necessary to conduct Santoro Transportation's business activities, eventually

requiring it to purchase a costly and unreliable electric service truck required by the LD and MD Regulations. These regulations will force my company to purchase unreliable electric vehicles that often break down or catch fire. There is no nationwide charging infrastructure yet available for such vehicles. My employees will lose valuable time and be made to risk their lives due to these regulations.

8. Due to limited electric charging infrastructure in many locations where Santoro Transportation operates, as well as the limited range of electric vehicles, an electric service truck would be unable to reach heavy-duty vehicle drivers in need of critical assistance, leaving them stranded on the side of remote roads in unsafe conditions.

9. The sales limitations that the LD and MD Regulations impose will create market scarcity of reliable and cost-effective parts and supplies necessary to maintaining my service truck. As fewer diesel-powered light-duty and medium-duty vehicles remain on the road thanks to the knock-on effects of the LD and MD Regulations, the cost of diesel fuel will increase and the prevalence of diesel refueling stations will decrease. Additionally, the parts needed to repair an electric truck cost more than those needed to repair Santoro Transportation's current diesel-powered service truck. The higher costs associated with repairing and operating an electric service vehicle would impose a significant financial burden on Santoro Transportation.

3

10.    Santoro Transportation will likely be unable to recharge an electric service truck at its current place of business due to grid limitations. The costs necessary to install electric infrastructure to charge an electric service vehicle would likely force Santoro Transportation out of business.

11.    But for EPA's decision to promulgate the LD and MD Regulations, Santoro Transportation would not suffer economic injury. The Court can redress Santoro Transportation's injuries by setting aside these EPA regulations, preventing these job-killing regulations from going into effect.

Pursuant to 28 U.S.C. § 1746, I, Thomas Santoro, declare under penalty of perjury that the foregoing is true and correct.

Executed this ___1___ day of ___Sept_____, 2024, in Salinas, in the State of California.


_____
THOMAS SANTORO
CEO
P.O. Box 6166, Salinas, CA 93912

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, et al., | |
| *Petitioners,* | |
| v. | No. 24-1087 (and consolidated cases) |
| ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| *Respondents.* | |

## DECLARATION OF REGINALD MODLIN

I, Reginald Modlin, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I have over forty years of experience in the automobile industry. From 1972 through 2015 I served in various roles at FCA NA Corporation ("Chrysler"). From 1992 to 1998 in my role as a manager for vehicle environmental affairs I directed design and development of automobiles at Chrysler, focusing on the requirements of established emissions and fuel economy regulations. I also worked with national and state regulatory agencies on developing and understanding their emissions and fuel economy requirements.

2. From 1998 to 2015 I served as the Director of Regulatory Affairs at Chrysler. In that capacity, I ensured the compliance of Chrysler's North American

1

products with all applicable environmental and safety regulations, including the National Highway Traffic Safety Administration's Corporate Average Fuel Economy standards, the Environmental Protection Agency's ("EPA's") federal tailpipe emission standards, and California's regulations. I also worked with national, state, and local legislatures and agencies in developing legislation and regulations regarding transportation emissions, fuel economy and safety performance, including participating in the evolution of California's vehicle emission regulations such as Advanced Clean Cars I.

3.   During the course of my career I also actively engaged in numerous private and public partnerships seeking to identify and pursue alternative fuel options for automobiles, such as the California Fuel Cell Partnership (formed by the California Air Resources Board, the South Coast Air Quality Management District, and the California Energy Commission), the Michigan Governor's Alternative Fuel Advisory Council (under then-Governor Jennifer Granholm), the United States Council for Automotive Research, the Future Fuels Coalition, 25 X 25, and other regional and state organizations.

4.   I am aware of EPA's issuance of a final rule titled, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles." 89 Fed. Reg. 27,842 (Apr. 18, 2024). It is my understanding that according to EPA, the rule will significantly affect the technology mix of light- and

2

medium-duty vehicles that automobile manufacturers produce. For example, EPA projects that under the rule, 68% of light-duty vehicles will be plug-in electric vehicles in 2032, compared to 47% without the rule. 89 Fed. Reg. at 28,057. EPA also projects that under the rule, 43% of medium-duty vehicles will be plug-in electric vehicles in 2032, compared to 8% without the rule. *Id*. at 28,060. These projections were made based on EPA's estimates of future technology costs and consumer acceptance of different technologies, and without considering announced manufacturer plans or state policies meant to incentivize electric vehicles (e.g., California's Advanced Clean Cars II). *Id*. at 27,986.

5.    It is also my understanding that EPA projects that the rule will result in increased production of plug-in electric vehicles, even when different technology costs, consumer acceptance rates, and state incentives are considered. For example, EPA presented results from various "sensitivity analyses" that examined different scenarios, including lower or higher electric vehicle battery costs, faster or slower consumer acceptance of electric vehicles, and adoption of state-level electric vehicle mandates. *Id*. at 28,068–77. In all of the scenarios presented, EPA projects that the rule will increase the production of light-duty plug-in electric vehicles and decrease the production of conventional internal-combustion-engine vehicles in 2032, compared to a baseline without the rule. *Id*. Whether making optimistic or pessimistic projections, therefore, EPA's regulations will increase the market share of plug-in

3

electric vehicles, reduce the market share of conventional internal-combustion-engine vehicles, and also reduce consumer demand for liquid fuels. *See id.* at 28,111–12, Tbl. 216 (projecting consumer savings of gasoline and diesel through model year 2055).

6. EPA's regulation increases the market share of plug-in electric vehicles in the fleet primarily, but not only, through two regulatory mechanisms: (1) the carbon dioxide ($CO_2$) fleet-average standards, and (2) the non-methane organic gas and nitrogen oxide ($NMOG + NO_X$) fleet-average standards. Other regulations included in the Final Rule, such as the particulate matter standards for gasoline vehicles, will predictably increase the cost of gasoline vehicles and therefore also encourage electric vehicles, but the fleet-average $CO_2$ and $NMOG + NO_X$ standards encourage increased electrification by design.

7. The $CO_2$ standards work by setting attribute-based "targets" for vehicle carbon-dioxide emissions. For cars and light trucks, these targets depend on the vehicle's size as determined by its "footprint" (the area between the wheels). For medium-duty vans and pickups, the targets depend on a vehicle's "work factor," a measure that accounts for the vehicle's payload capacity, towing capacity, and four-wheel drive. *Id.* at 27,883–86. Manufacturers with a fleet of cars, light trucks, or medium-duty vans and pickups that exceeds the attribute-based targets for the fleet receive $CO_2$ credits, whereas manufacturers that fall below their targets incur a $CO_2$

4

deficit they must make up by depleting their credit bank or purchasing corresponding credits from rival manufacturers. Alternatively, they can pay significant civil penalties.

8.    An important consideration for manufacturers when complying with these fleet-average standards is that EPA attributes zero $CO_2$ emissions to plug-in battery-electric vehicles ("BEVs") and zero $CO_2$ emissions to plug-in hybrid electric vehicles ("PHEVs") when operating in charge-depleting mode, even though generating electricity to power the vehicles generates considerable $CO_2$ emissions. This means that plug-in electric vehicles can vastly exceed their attribute-based targets in the real-world, but still generate significant credits for fleets.

9.    EPA has designed its $CO_2$ standards so that manufacturers cannot meet them without producing a significant share of electric vehicles. EPA's $CO_2$ target for passenger cars is between 71.6 and 75.6 g/mile in model year 2032, depending on the footprint. *Id.* at 27,906, Tbl. 17 (MAX and MIN). EPA predicts the national fleet average target will be 73 g/mile. *Id.* at 27,908, Tbl. 19. EPA's $CO_2$ footprint target for light-duty trucks in model year 2032 is between 75.7 and 110.1 g/mile in model year 2032, depending on the footprint. *Id.* at 27,906, Tbl. 18 (MAX and MIN). EPA predicts that the national fleet average target will be 90 g/mile. *Id.* at 27,908, Tbl. 19. EPA predicts that the work-factor target for the fleet of medium-duty vans and pickups in model year 2032 is 274 g/mile. *Id*. at 27,915, Tbl. 26.

5

10.    Manufacturers cannot meet these targets unless they manufacturer plug-in electric vehicles assigned zero emissions. As shown in the figure below, EPA's OMEGA model, used during the rulemaking, shows that cars and light trucks with conventional internal-combustion engines ("ICEs"), strong hybrids ("SHEVs"), and mild hybrids ("MHEVs") will fall way below their targets and generate significant deficits, whereas plug-in electric vehicles (BEVs and PHEVs) will generate credits. Therefore, to comply, manufacturers must offset sales of conventional internal com-bustion engine, and strong and mild hybrid, vehicles with more and more sales of plug-in electric vehicles.[1]

 

[1] OMEGA, 2024_02_27_16_06_31_LDV_central_to2055_20240227_Final_vehicles.csv" available at: https://www3.epa.gov/otaq/ld/2024-02-27-16-06-31-LDV-central-to-2055-20240227.zip.

6

11.    Another way to demonstrate the need to comply by producing plug-in electric vehicles is to compare the targets to the performance of current non-plug-in vehicles in the fleet. Valero's analysis demonstrates that even a highly efficient hybrid vehicle, such as a Toyota Prius, would not meet the model year 2032 targets. Valero Energy Corp. Supplemental Comment 4–6, 9–11 (Mar. 11, 2024), *available at* https://downloads.regulations.gov/EPA-HQ-OAR-2022-0829-5125/attachment_1.pdf (no liquid fueled vehicles meet the target in "Alternative 3" finalized by EPA, which ends up in the same place as the proposed target). The same is true for medium-duty pickups and vans. *Id.* at 6–8.

12.    The $NMOG + NO_x$ fleet-average standard operates in a similar manner, with some differences. One important difference is that while BEVs are also assumed to have zero $NMOG + NO_x$ emissions, PHEV emissions are based only on the vehicle's emissions in "charge-sustaining mode." 89 Fed. Reg. at 27,936, 27,970. In that mode, the grid energy stored in the battery has been depleted, and the engine is operating. *Id.* at 27,970. Therefore, unlike under the $CO_2$ standards, PHEVs do not get $NMOG + NO_x$ credit for having a battery that can use electricity from the grid. For this reason, the $NMOG + NO_x$ standard biases compliance heavily in favor of BEVs. Manufacturers must design a fleet that can comply with all the standards simultaneously, so the bias in the $NMOG + NO_x$ standard predictably encourages manufacturers to comply by producing BEVs over PHEVs or other

7

technologies. That is why manufacturers, such as Stellantis, have called EPA's criteria pollution standards a "[d]e facto" plug-in electric vehicle "mandate" intended to attain specific BEV market shares. *Id.* at 27,935; Stellantis Comment 16 (July 5, 2023), *available at* https://downloads.regulations.gov/EPA-HQ-OAR-2022-0829-0678/attachment_1.pdf; *see also* Am. Petrol. Inst. Comment 8–9 (July 5, 2023), *available at* https://downloads.regulations.gov/EPA-HQ-OAR-2022-0829-0641/attachment_1.pdf ("EPA has not demonstrated a technologically feasible path for OEMs to meet NMOG + $NO_x$ standards with a mixed vehicle fleet comprised of large and small light-duty vehicles with ICE technologies. … EPA instead anticipates and sets the standard to require the use of BEVs").

13. In model year 2032, light-duty vehicles and medium-duty passenger vehicles regulated by the rule must meet a fleet average of 15 mg/mi of NMOG + $NO_x$, down from 30 mg/mi in model year 2026, a 50% reduction. *Id.* at 27,935, Tbl. 39. According to EPA, only 39 models with internal-combustion engines complied with the standard, and practically all of them are either strong or mild hybrids, or PHEVs. Regulatory Impact Analysis 3-53, 3-54, Tbl. 3-19, *available at* https://downloads.regulations.gov/EPA-HQ-OAR-2022-0829-5738/attachment_2.pdf. Most of these vehicles would barely meet the new standard. Manufacturers must ensure significant compliance headroom (30 to 40 percent) to avoid compliance risk, so they typically aim to overperform the standards. *Id.* at 3-55. EPA asserts that the standard

8

may be met "with BEV penetrations as low as 35 percent," *id.* at 3-53, an implicit admission that the NMOG + NO$_x$ standard will guarantee a market-share for—and predictable increases in—BEV production in all plausible scenarios modeled by the agency.

14. For medium-duty vans and pickups, the story is much the same. For model year 2032, the fleet average NMOG + NO$_x$ standard is 75 mg/mile. 89 Fed. Reg. at 27,937, Tbl. 42. That is far below the median for current medium-duty gasoline pickups (approximately 100 g/mile), and below the lowest value reported for current medium-duty diesel vans and pickups. Regulatory Impact Analysis 3-55, Fig. 3-17. To account for the "30 to 40 percent compliance headroom" that manufacturers aim for to avoid compliance risk, manufacturers will predictably meet the standards through "the introduction of an increasing number of [plug-in electric vehicles] into the fleet average." *Id.* at 3-55.

15. EPA's conclusion that automobile manufacturers can, and will, adapt their production to respond to changes in federal regulations is consistent with my experience in the automobile industry. In particular, based on my over forty years of experience at Chrysler and working with automobile trade groups, if EPA's greenhouse gas or NMOG + NO$_x$ standards were vacated or made less stringent automobile manufacturers could, and at least some likely would, change their production and/or pricing plans to increase sales of internal-combustion-engine

9

vehicles, or strong or mild hybrid vehicles, which yield greater profit per vehicle.

16. This is true even if the regulatory changes are made once a manufacturer has begun production for that model year. Automakers can, and often do, adapt their production plans for a particular model year, even well into the corresponding calendar year. Based on my experience, if EPA's greenhouse gas or NMOG + $NO_x$ standards were vacated or made less stringent automobile manufacturers could, and at least some likely would, change their production and/or pricing plans for a model year as late as December of that year, but at a minimum well into the corresponding calendar year. They have done so in the past in response to changing market and/or regulatory compliance conditions.

17. First, with regard to production decisions, automobile manufacturers do make automobile production plans years in advance, but those plans are adjustable. For example, if EPA's new greenhouse gas or NMOG + $NO_x$ emissions standards were altered during model year 2027 automobile manufacturers could adjust the production volumes of electric, internal-combustion-engine, or strong or mild hybrid vehicles to reflect market demand as opposed to government mandates. Automobile manufacturers could increase their production of internal combustion engine, or strong and mild hybrid, vehicles for model year 2027 up until the last month of the model year's production, which often runs through the summer of the subject year, but could run through December 31, 2027.

10

18.   Second, pricing in the automobile industry is updated on a continuous basis and price changes can be made up until the end of the applicable calendar year, e.g., the end of calendar year 2027 for model year 2027. For example, toward the end of a model year, manufacturers may lower prices on certain vehicles in over supply. Accordingly, if EPA's greenhouse gas or NMOG + $NO_x$ standards were altered automobile manufacturers could quickly change prices in response. Automobile manufacturers could lower the price of internal-combustion-engine vehicle, or strong or mild hybrid vehicles, in oversupply, or they could raise prices on electric vehicles to reflect the true cost of manufacturing those vehicles, resulting in greater internal-combustion-engine, or hybrid, vehicle sales.

19.   Automobile manufacturers also could, and at least some likely would, change their production and/or pricing plans in response to a change in EPA's rule even if those manufacturers have announced plans or committed resources to increase future plug-in electric vehicle production.

20.   First, production plans are adjustable. Automobile manufacturers can— and historically, do—change production targets and timing in response to market demand or other changed conditions, including changed regulations. For example, Ford and General Motors previously announced plans to transition a significant portion of their fleet to plug-in electric powertrains. However, both companies have more recently canceled or delayed plug-in electric vehicle production in response to

11

changed market conditions. *See, e.g.*, Mike Colias, *Ford Shrinks Its EV Rollout Plans as Demand Lags*, Wall St. J. (Aug. 21, 2024) (Ford cancels plans for large electric SUV); Christopher Otts, *GM Delays Indiana Battery Factory in Latest EV Pullback*, Wall St. J. (Aug. 27, 2024); Kalea Hall*, Barra: GM still planning to be all-electric by 2035*, The Detroit News (Dec. 4, 2023) (GM "still has a plan in place to be all electric by 2035, but will adapt based on customer demand, CEO Mary Barra said"). If EPA's greenhouse gas or NMOG + $NO_x$ standards were vacated or made less stringent automobile manufacturers could, and likely would, adjust production to increase production of internal-combustion-engine vehicles, or strong or mild hybrid vehicles, and/or adjust vehicle pricing to reflect market demand and maximize profit.

21. Second, even automobile manufacturers who have announced plans or committed resources to increase future plug-in electric vehicle production still have a substantial knowledge base and production capability in internal-combustion-engine technology. If EPA's greenhouse gas or NMOG + $NO_x$ standards were vacated or made less stringent automobile manufacturers could, and at least some likely would, leverage existing engineering teams to accelerate development and increase production of internal-combustion-engine vehicles, or strong or mild hybrid vehicles, to reflect market demand and maximize profit.

22. Any one of the foregoing changes would likely result in more internal-

combustion-engine vehicle sales, or more strong or mild hybrid vehicle sales, in the United States, thereby resulting in increased domestic demand for liquid fuels.

Dated: September 5, 2024

_Reginald Modlin_

Reginald Modlin

13

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| |
|---|
| COMMONWEALTH OF KENTUCKY, et al., |
| *Petitioners*, |
| v. |
| ENVIRONMENTAL PROTECTION AGENCY, et al., |
| *Respondents*. |

No. 24-1087

and consolidated cases

## <u>DECLARATION OF WALTER KREUCHER</u>

I, Walter Kreucher, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I have more than thirty years of experience overseeing vehicle regulatory and legislative issues in the automobile industry, including issues related to fuel economy, fuel quality, compliance, and alternative fuels.

2.     I began working for Ford in 1973 and helped Ford create its first Preliminary Corporate Average Fuel Economy Compliance program in the mid-1970s. Eventually, I took over as vehicle energy planning manager at Ford Motor Company in Dearborn, Michigan. In that capacity, I managed compliance with NHTSA's Corporate Average Fuel Economy (CAFE) standards and negotiated CAFE regulatory and legislative matters with the federal government. I also

monitored Ford's vehicle certification testing and helped develop Ford's CAFE reporting procedures. Furthermore, I provided technical support on all fuel economy and fuel quality matters for Ford, including serving as lead negotiator for fuel economy, fuel quality, and other related standards issued by California and the federal government.

3.     Since leaving Ford in 2004, I have served as an outside consultant on automobile regulatory matters, including for NHTSA, for the Department of Transportation's John A. Volpe National Transportation Systems Center (Volpe Center), which builds, maintains, and runs NHTSA's CAFE modeling program, for the Environmental Defense Fund, and for Ford. I have also done some pro-bono work on the CAFE program for the Government Accountability Office.

4.     I am aware that EPA recently promulgated a rule establishing new light-duty and medium-duty vehicle emission standards for model years ("MYs") 2027 through 2032. *See* EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium Duty Vehicles*, 89 Fed. Reg. 27,842 (April 18, 2024).

5.     Those new standards require automakers to produce vehicle fleets for sale in the United States that will use considerably less liquid fuel on average than their existing vehicle fleets. *See, e.g.*, *id.* at 28,092 (projecting that the new standards will reduce gasoline consumption in the United States by "780 billion gallons

through 2055"). To meet the new standards, automakers will have to dramatically increase the proportion of their fleets made up of electric vehicles, which use significantly less liquid fuel or no liquid fuel at all.

6. According to EPA, "as the final standards become more stringent over MYs 2027 to 2032, the penetration of PEVs [i.e., battery-powered electric vehicles ("BEVs") and plug-in hybrid electric vehicles] increases by 36 percentage points … from 32 percent in MY 2027 to 68 percent of overall vehicle production in MY 2032." *Id.* at 28,057. That is markedly higher than EPA's projection for a "no action" scenario in which "the MY 2026 standards would carry forward indefinitely into future years." *Id.* at 27,986. In that "no action" scenario, according to EPA, "the level of PEVs … [is] projected to reach 47 percent" in MY 2032, which is 21 percentage points less than under EPA's rule. *Id.* at 28,057; *see also id.* at 28,079 (projecting that BEVs would have 56% market penetration under EPA's rule, as compared to only 35% in the "no action" scenario). Similarly, for medium-duty vehicles, EPA projects that "the projected penetration of PEVs … increases from 3 percent in MY 2027 to 43 percent of overall [medium-duty vehicle] production in MY 2032," as contrasted with only 8% of overall medium-duty vehicle production in MY 2032 under the "no action" scenario. *Id.* at 28,060.

7. Based on my experience in the automobile industry and my review of EPA's projections, I agree with EPA that its standards will have at least some effect

on the Nation's vehicle fleet, and will cause at least some automobile manufacturers to produce fleets that include more electric vehicles and that on average consume less liquid fuel than they would absent the standards. While some automobile manufacturers have indicated that they intend to move toward electrification of their fleets in the future, that approach has not been uniform across the entire industry, and recent trends have shown slowing investment in electric vehicles. *See, e.g.*, Neal E. Boudette, *More Gas Cars and Trucks, Fewer E.V.s as Automakers Change Plans*, N.Y. Times (July 18, 2024), https://tinyurl.com/4av42sn4. Especially given those trends, it is overwhelmingly likely that absent EPA's new standards, at least some automobile manufacturers would produce fleets that would include fewer electric vehicles and that would consume more liquid fuel than they will with the new standards in effect, and that the overall impact of the new standards will be to substantially increase the market penetration of electric vehicles and decrease liquid fuel consumption. *See* 89 Fed. Reg. at 28,057, 28,079, 28,092.

8. It is also overwhelmingly likely that vacating the standards will cause at least some automobile manufacturers to shift their production and pricing strategies back toward a fleet that includes a lower percentage of electric vehicles and that consumes more liquid fuel on average. Based on my experience in the automotive industry and in particular my decades of compliance work for Ford and on compliance-related work for federal agencies, including NHTSA and the Volpe

Center, automobile manufacturers can and often do adapt their plans for a particular model year well into that model year. Indeed, automobile manufacturers have done so in the past to take advantage of a model year's less stringent vehicle emission standards before subjecting themselves to more stringent standards applicable to subsequent model years. And notably, it is generally easier for automobile manufacturers to immediately adapt their plans in response to the relaxing of vehicle emission standards, as opposed to when standards are made more stringent, which requires more lead time.

9.     As a result, if EPA's new standards were to be vacated now (or at any time before MY 2027), automobile manufacturers could and likely would respond by changing their production or pricing strategies as described above for the model years covered by those standards. Indeed, even if the new standards were vacated as late as December 2032, automobile manufacturers still could and likely would respond by changing their production or pricing plans for MY 2032. That is, vacating the standards at any time before December 2032 would likely have at least some real-world impact on the fleets that automobile manufacturers would produce and sell, and on the amount of liquid fuel that those fleets would consume.

10.     With regard to production decisions, automobile manufacturers discuss and amend their fleet production mix continually throughout a model year, adjusting to real world consumer demand and sales as opposed to sales forecasts. For example,

if the new standards here were to be vacated as late as December 2032, automobile manufacturers could decrease electric vehicle production or move some of their electric vehicle production for the rest of MY 2032 to a subsequent year, and could also increase their production of internal combustion engine vehicles or strong and mild hybrid vehicles for MY 2032.

11.  So too for pricing. Pricing decisions in the automobile industry are made dynamically, and price changes can be made until the end of a given calendar year—e.g., the end of 2032 for MY 2032. For example, toward the end of a model year, manufacturers may raise prices on certain vehicles in low supply. As such, if the new standards here were to be vacated, automobile manufacturers could quickly change prices in response. Automobile manufacturers could provide additional incentives to purchase internal combustion engine vehicles by lowering the prices for those vehicles, or they could raise prices on electric vehicles to reflect the true cost of manufacturing those vehicles. Any one of the foregoing changes would likely result in more sales of internal combustion engine vehicles, leading to increased liquid fuel consumption.

Date: _September 4, 2024_          _Walter Kreucher_
                                    Walter Kreucher