ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1087 (and consolidated cases)

————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————————

COMMONWEALTH OF KENTUCKY, *et al.*,
*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S.
REGAN, in his official capacity as Administrator of the U.S.
Environmental Protection Agency,
*Respondents*,

and

ENVIRONMENTAL LAW & POLICY CENTER, *et al.*,
*Intervenors*.

————————————————

On Petition for Review from the United States
Environmental Protection Agency (No. EPA-HQ-OAR-2022-0829)

————————————————

**PACIFIC LEGAL FOUNDATION'S AMICUS BRIEF
IN SUPPORT OF PETITIONERS AND VACATUR**

————————————————

Frank D. Garrison
William M. Yeatman
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
FGarrison@pacificlegal.org
WYeatman@pacificlegal.org

*Attorneys for Amicus Curiae Pacific Legal Foundation*

## RULE 28 CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties and intervenors appearing in this Court are listed in Petitioners' opening briefs.

### B. Rulings Under Review

References to the rulings under review appear in Petitioners' opening briefs.

### C. Related Cases

References to related cases appear in Petitioners' opening briefs.

## RULE 29 STATEMENT ON SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS[1]

Pacific Legal Foundation files this separate amicus brief in compliance with this Court's July 17, 2024 Order (#2065237), including the word limit set in that Order. A joint brief is not practicable because other amici will not address Pacific Legal Foundation's unique perspective on the Constitution's Separation of Powers. *See* D.C. Circuit Rule 29(d).

---

[1] In compliance with D.C. Circuit Rule 29(b), all parties have consented to the filing of this amicus brief. This brief was not authored in whole or in part by counsel for any party. No party or counsel for a party, and no person other than Amici or their counsel, contributed money to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

# RULE 26 CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the undersigned counsel for Amicus certifies that Pacific Legal Foundation is not a corporation that has issued stock and does not have a parent company whose ownership interest is 10 percent or greater.

DATED: September 13, 2024.

Respectfully submitted,

s/ Frank D. Garrison
Frank D. Garrison
William M. Yeatman
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
FGarrison@pacificlegal.org
WYeatman@pacificlegal.org

*Attorneys for Amicus Curiae Pacific Legal Foundation*

# TABLE OF CONTENTS

RULE 28 CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..................................................................i

RULE 29 STATEMENT ON SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS.................................i

RULE 26 CORPORATE DISCLOSURE STATEMENT...........................ii

TABLE OF AUTHORITIES.................................................................iv

GLOSSARY .........................................................................................vii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................2

ARGUMENT .........................................................................................3

I.    The Clean Air Act does not authorize the Executive Branch to remake America's automobile market .........................................3

    A.    After *Loper Bright*, the major questions doctrine helps courts fix the upper boundary of an agency's authority ......3

    B.    Under any version of the major questions doctrine, the EPA's Tailpipe Rule is unlawful.........................................6

    C.    This Court has a constitutional responsibility to check the EPA's executive lawmaking.................................................9

II.   If the EPA's interpretation is correct, the Clean Air Act violates Article I of the Constitution .......................................................12

CONCLUSION ....................................................................................14

CERTIFICATE OF COMPLIANCE.......................................................15

CERTIFICATE OF SERVICE..............................................................16

# TABLE OF AUTHORITIES

## Cases

*Am. Lung Ass'n v. Env't Prot. Agency*,
   985 F.3d 914 (D.C. Cir. 2021),
   *rev'd and remanded sub nom.*
   *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ...................... 6

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) ................................................................. 4, 8

*Dep't of Transp. v. Ass'n of Am. Railroads*,
   575 U.S. 43 (2015) ........................................................................ 11

*FCC v. AT & T Inc.*,
   562 U.S. 397 (2011) ........................................................................ 5

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................ 2–3, 5

*Gundy v. United States*,
   588 U.S. 128 (2019) ........................................................................ 1

*Heating, Air Conditioning & Refrigeration Distributors Int'l v.*
   *Env't Prot. Agency*,
   71 F.4th 59 (D.C. Cir. 2023) ........................................................... 8

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ....................................................... 2–4, 6, 13

*Merck & Co. v. United States Dep't of Health & Hum. Servs.*,
   962 F.3d 531 (D.C. Cir. 2020) ......................................................... 7

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*
   *Occupational Safety & Health Admin.*,
   595 U.S. 109 (2022) ................................................................ 12–14

---

*Authorities on which Amicus chiefly relies are marked with asterisks.

*Sackett v. EPA*,
566 U.S. 120 (2012) ................................................................ 1

*Sackett v. EPA*,
598 U.S. 651 (2023) ................................................................ 1

*Save Jobs USA v. United States Dep't of
Homeland Sec., Off. of Gen. Couns.*,
111 F.4th 76 (D.C. Cir. 2024) ........................................... 6–7

*Touby v. United States*,
500 U.S. 160 (1991) ............................................................. 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .............................................................. 1

*United States v. Navarro*,
No. 23-5062, 2024 WL 1364354 (D.C. Cir. Apr. 1, 2024) .................... 8

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........................................................ 5, 7

*W. Virginia v. Env't Prot. Agency*,
597 U.S. 697 (2022) ............................................. 3, 5–6, 10–11

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .............................................. 4

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ................................................................ 1

## Statute

42 U.S.C. § 7521(a)(1) ............................................................ 5

## Other Authorities

Executive Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017) .............. 11

Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) ................ 11

Executive Order 14,037, 86 Fed. Reg. 43,583 (Aug. 5, 2021) ............... 10

The Federalist No. 51 (James Madison) ..................................................9

The Federalist No. 78 (Alexander Hamilton) ..........................................9

Kagan, Elena, *Presidential Administration*,
    114 Harv. L. Rev. 2245 (2001) ...........................................10

Lawson, Gary, *Delegation and Original Meaning*,
    88 Va. L. Rev. 327 (2002) ...................................................12

Levin, Ronald M., *The Major Questions Doctrine:*
    *Unfounded, Unbounded, and Confounded*,
    112 Calif. L. Rev. 899 (2024) ...........................................7–8

*Multi-Pollutant Emissions Standards for Model Years 2027*
    *and Later Light-Duty and Medium-Duty Vehicles*,
    89 Fed. Reg. 27,842 (Apr. 18, 2024) ............................ 1, 4–5

Smith, Steven S. & Deering, Christopher J.,
    *Committees in Congress* (3d ed. 1997) ..............................10

Sohoni, Mila, Comment, *The Major Questions Quartet*,
    136 Harv. L. Rev. 262 (2022) ...............................................6

Sunstein, Cass R., *There Are Two "Major Questions"*
    *Doctrines*, 73 Admin. L. Rev. 475 (2021) ...........................6

# GLOSSARY

EPA – Environmental Protection Agency

Private Pet'rs' Br. – Initial Brief for Private Petitioners (filed Sept. 6, 2024)

## IDENTITY AND INTEREST OF AMICUS CURIAE

Founded in 1973, Pacific Legal Foundation is a nonprofit, tax-exempt California corporation established to litigate matters affecting the public interest. Pacific Legal Foundation defends Americans' liberties when threatened by government overreach. It is the most experienced public-interest legal nonprofit, both as lead counsel and amicus curiae, in cases involving the Constitution's Separation of Powers and the freedom it provides. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651 (2023); *Gundy v. United States*, 588 U.S. 128 (2019); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Sackett v. EPA*, 566 U.S. 120 (2012).

This amicus brief supports but does not duplicate Petitioners' argument that the *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024) ("Tailpipe Rule") violates the major questions doctrine. Amicus has an interest in these issues because EPA is attempting, through the Tailpipe Rule, to expand its power under the Clean Air Act, requiring automobile manufacturers to shift their fleets to electric vehicles and thus phasing out the internal combustion engine. In

doing so, EPA seeks to legislate through rulemaking and reshape the American automobile market without clear congressional authorization. This brief brings a unique perspective to these issues by giving fuller context to the critical role the Constitution's structure plays in our system of checks and balances to protect individual liberty.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

*Loper Bright Enterprises v. Raimondo* directs lower courts to exhaust the judicial toolkit to ensure agencies stay within the "boundaries" of their enabling statutes. *See* 144 S. Ct. 2244, 2247 (2024). This case should begin and end with one such tool: the major questions doctrine.

Even among the small subset of genuinely "major" rules, the EPA's attempt to remake the automobile sector stands out. With conceded costs of $870 billion, EPA's Tailpipe Rule is the poster child for the doctrine. And while the rule's eye-popping price tag, by itself, requires—but lacks—clear congressional authorization, the rule's forced electrification of the automobile industry also meets every other criterion to make this Court "hesitate before concluding that Congress has intended such an implicit delegation." *See Food & Drug Admin. v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 159–60 (2000); Private Pet'rs' Br. at 23–40 (applying doctrine).

It is telling that EPA would promulgate such a problematic rule on the heels of *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022); Private Pet'rs' Br. at 23 ("This case follows *a fortiori* from *West Virginia*."). The agency's refusal to heed the Supreme Court's decision speaks to the source of the major questions doctrine: ever-bolder executive lawmaking. Indeed, the Tailpipe Rule is the latest of "a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Virginia*, 597 U.S. at 724. Amicus urges the Court to grant the petition for review.

## ARGUMENT

### I. The Clean Air Act does not authorize the Executive Branch to remake America's automobile market.

#### A. After *Loper Bright*, the major questions doctrine helps courts fix the upper boundary of an agency's authority.

*Loper Bright* directs lower courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. at 2273; *see also id.* at 2267–68 ("The view that interpretation of ambiguous statutory provisions amounts to policymaking suited for political actors rather than courts is especially

mistaken[.]"). After the end of deference, interpretive aids, such as the major questions doctrine, take on a premium.

As recognized in *Loper Bright*, Congress may expressly empower agencies "'to fill up the details' of a statutory scheme"; however, courts must "fix the boundaries" of that delegation. *See id.* at 2263 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). In such cases, the major questions doctrine assists courts in "fixing" the upper "boundaries" of an agency's interstitial authority. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring) (explaining the major questions doctrine's relevance to "interpreting the scope of a delegation").

The major questions principle is instrumental where, as here, the statute is susceptible to "literalism—the antithesis of context-driven interpretation." *Id.* Along these lines, the preamble to the final rule puts on a masterclass in how to cloak implausibility by reading statutory terms in isolation:

> [T]he Act directs EPA to prescribe emission standards for "motor vehicles," which are defined broadly … and do not exclude any forms of vehicle propulsion. The Act then directs EPA to promulgate emission standards for such vehicles, "whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such

pollution," based on the "development and application of the requisite technology." There is no question that electrified technologies … meet all of these specific statutory criteria. They apply to "motor vehicles," are ["]systems[,"] and incorporate devices that "prevent" and "control" emissions, and qualify as "technology."

*See* 89 Fed. Reg. at 27,891 (Apr. 18, 2024) (parsing 42 U.S.C. § 7521(a)(1)) (footnote omitted).

It is hard to imagine a standard that could not pass muster under the agency's word-by-word dissection of its own authority. By interpreting each phrase in a vacuum, the agency makes a hash of the statute and frees itself from any constraints on its delegated discretion. Whenever an agency grounds a major regulation in "definitional possibilities," *see W. Virginia v. Env't Prot. Agency*, 597 U.S. at 732 (quoting *FCC v. AT & T Inc.*, 562 U.S. 397, 407 (2011)), this Court has "reason to hesitate," *id.* at 723–24 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159). Instead, the agency "must point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

**B. Under any version of the major questions doctrine, the EPA's Tailpipe Rule is unlawful.**

Ultimately, "the question that matters" is whether "the statute authorize[s] the challenged agency action?" *Loper Bright*, 144 S. Ct. at 2269. Under the major questions doctrine, the answer here is no.

Although commentators have set forth multiple conceptions of the major questions doctrine, this parsing is mainly academic. *See, e.g.*, Cass R. Sunstein, *There Are Two "Major Questions" Doctrines*, 73 Admin. L. Rev. 475 (2021). In practice, all the theories converge on the same common-sense result: "Either a statute clearly endorses a major rule, or there can be no major rule." *Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914, 1002 (D.C. Cir. 2021), *rev'd and remanded sub nom. W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) (Walker, J., dissenting in part).[2] Indeed, despite "whether you think it's a linguistic canon, or a

---

[2] For example, many critics labor under the misapprehension that the major questions doctrine originally operated as an exception to *Chevron* deference. And, under that theory, it was "replaced" by a "tougher-to-satisfy" clear statement rule. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. at 766 (2022) (Kagan, J., dissenting); *see also* Mila Sohoni, Comment, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 272–90 (2022) (criticizing "new" major questions doctrine). But this putative evolution is illusory. As a *Chevron* carveout, the major questions doctrine served primarily as a presumption against implied delegations of major

substantive canon … , or both," the major questions doctrine is, in practice, a "tool of statutory interpretation"—"to help courts figure out what a statute means." *Save Jobs USA v. United States Dep't of Homeland Sec., Off. of Gen. Couns.*, 111 F.4th 76, 80 (D.C. Cir. 2024) (citations omitted). And that is precisely how this Court has employed the major questions doctrine before and after *West Virginia v. EPA.* Compare *id.*, *with Merck & Co. v. United States Dep't of Health & Hum. Servs.*, 962 F.3d 531, 540 (D.C. Cir. 2020) (reasoning that "the sweeping nature and scope of the authority being claimed" by the agency "underscores the unreasonableness of" its interpretation) (citations and quotations omitted).

Some observers fret that identifying a major rule is an impossibly indeterminate endeavor. *See* Ronald M. Levin, *The Major Questions Doctrine: Unfounded, Unbounded, and Confounded*, 112 Calif. L. Rev. 899, 930 (2024) ("[T]he boundaries of the doctrine are indeterminate at

_____

policymaking authority. *See, e.g.*, *Util. Air Regul. Grp.*, 573 U.S. at 323–24; *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–61. Yet a presumption against implied delegations is just another way of describing an expectation for an express delegation—also known as a clear statement rule. These two supposedly disparate versions of the major questions doctrine—deference carveout and clear statement rule—are flipsides of the same coin.

best, and the task of trying to pin them down is indeed confounding."). But the Federal Reporter reveals otherwise. This Court has had little difficulty separating the wheat from the chaff when deciding whether a rule rises to a level justifying review under the major questions doctrine. *See United States v. Navarro*, No. 23-5062, 2024 WL 1364354, at *3 (D.C. Cir. Apr. 1, 2024); *Heating, Air Conditioning & Refrigeration Distributors Int'l v. Env't Prot. Agency*, 71 F.4th 59, 67 (D.C. Cir. 2023) (explaining how controverted rule is "less important and expensive than other regulations to which the Supreme Court has applied" the major questions doctrine).

While this Court knows how to identify a major question when it sees one, doing so is easy here. As the petitioners explain, "no gasoline vehicle—not even a hybrid—meets EPA's emission targets for model year 2032." Private Pet'rs' Br. at 14. Undeniably, "a reasonably informed interpreter would expect Congress to legislate" a subject as "important" as the phasing out of the internal combustion engine. *See Biden v. Nebraska*, 143 S. Ct. at 2380–81 (Barrett, J., concurring) (citations and quotations omitted).

### C. This Court has a constitutional responsibility to check the EPA's executive lawmaking.

The founders designed the constitutional separation of powers to be dynamic. An accretion of authority in one branch of government is supposed to engender a response in the others. *See* The Federalist No. 51 (James Madison) (discussing constitutional checks and balances). Within this perpetual interplay, the courts' role is to "ascertain" the Constitution's meaning, "as well as the meaning of any particular act proceeding from the legislative body," and declare "void" any "act of a delegated authority, contrary to the tenor of the commission under which it is exercised." The Federalist No. 78 (Alexander Hamilton).

This constitutional dynamism underlies the rise of the major questions doctrine. It emerged as a judicial check on the worst excesses of a new regulatory paradigm involving a "major" expansion of executive power. The Tailpipe Rule is a quintessential example of the new mode of administrative policymaking.

For much of the Twentieth Century, powerful congressional committees vied with executive officers for control over administrative agencies; by the late 1990s, however, a diminished Congress essentially relinquished its co-management role over administrative policymaking.

*See* Steven S. Smith & Christopher J. Deering, *Committees in Congress* 30–33 (3d ed. 1997) (describing "committee government" and its demise). In the resultant vacuum, the Executive Branch acted ambitiously to consolidate control over the regulatory policymaking. And thus "[w]e live today in an era of presidential administration," Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2246 (2001), meaning that "regulatory activity ... [is] more and more an extension of the President's own policy and political agenda," *id.* at 2248.

It is no coincidence that the rise of the major questions doctrine dovetailed with the onset of "presidential administration." Behind each genuinely "major" case, one finds an executive order directing the agency to achieve a far-reaching policy based on existing statutory authority (rather than ask for new authority from Congress). *See, e.g.*, *id.* at 2282–83 (describing presidential directives behind the tobacco regulation in *Brown & Williamson Tobacco Corp*); *see also W. Virginia v. Env't Prot. Agency*, 597 U.S. at 779 (Kagan, J., dissenting) (describing *Brown & Williamson* as the "key" case for the major questions doctrine). The EPA's de facto electric vehicle mandate follows this made-to-order template. *See* Executive Order 14,037, 86 Fed. Reg. 43,583, 43,583 (Aug. 5, 2021)

(setting goal for 50 percent zero-emissions vehicles by 2030). The current president ordered a reversal from his predecessor, *see* Executive Order 13,990, 86 Fed. Reg. 7037, 7038 (Jan. 20, 2021), who had ordered a reversal of his predecessor's policy, *see* Executive Order 13,783, 82 Fed. Reg. 16,093, 16,095 (Mar. 28, 2017).

The frequency of flip-flops speaks to the relative ease of executive lawmaking. Rather than persuading hundreds of lawmakers, a president needs only a pen and phone. But that's not how our constitutional system is supposed to work. "The framers believed that the power to make new laws regulating private conduct … if not properly checked, [could] pose a serious threat to individual liberty." *See W. Virginia v. Env't Prot. Agency*, 597 U.S. at 738 (Gorsuch, J., concurring). For this reason, "the framers deliberately sought to make lawmaking difficult[.]" *Id.*; *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) ("The Constitution's deliberative process was viewed by the Framers as a valuable feature, *see, e.g.*, Manning, Lawmaking Made Easy, 10 Green Bag 2d 202 (2007) ('[B]icameralism and presentment make lawmaking difficult *by design*'[).]").

In sum, the major questions doctrine evolved to "ensure" lawmaking "remains where Article I of the Constitution says it belongs—with the people's elected representatives." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring). It emerged as an important check against executive lawmaking running amok in our present era of presidential administration.

## II. If the EPA's interpretation is correct, the Clean Air Act violates Article I of the Constitution.

If the agency's interpretation is correct, then the Clean Air Act delegates limitless discretion to transform the automobile market. This is not "filling in the details" of a statutory scheme—it is a blank check. Such a "raw delegation of legislative authority" would contravene Article I of the Constitution. *See* Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 386 (2002).

The EPA's boundless reading of its own authority speaks to the constitutional basis for the major questions doctrine. *See Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 124 (Gorsuch, J., concurring) ("[T]he major questions doctrine is closely related to what is sometimes called the nondelegation doctrine."). At the heart of the doctrine is an assumption

that Congress did not seek to transgress the Constitution's limits through vague, open-ended statutory text. In this way, the major questions doctrine, like the nondelegation doctrine, "protect[s] the separation of powers and ensure[s] that any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands." *Id.*

What's more, *Loper Bright* affirms that to the extent there is an express delegation of rulemaking authority, the reviewing court still must ensure the delegation complies with "constitutional limits." *See Loper Bright Enters.*, 144 S. Ct. at 2268. The *Loper Bright* majority stressed this point three times. *See id.* at 2263, 2273. Justice Thomas' concurring opinion also warns that delegations allowing agencies to exercise a free hand in weighing competing policy priorities implicates the nondelegation doctrine. *See id.* at 2275 (Thomas, J., concurring) (explaining that deference to an agency's "'formulation of policy'. . . would mean that 'agencies are unconstitutionally exercising "legislative Powers" vested in Congress'"). *Loper Bright* thus signals this Court should consider the nondelegation doctrine as a background principle to inform the EPA's statutory interpretation.

Here, the agency's reading of the statute "would afford it almost unlimited discretion—and certainly, impose no 'specific restrictions' that 'meaningfully constrai[n]' the agency." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 126 (Gorsuch, J., concurring) (citing *Touby v. United States*, 500 U.S. 160, 166–67 (1991)). If EPA's view is right, such an unconstrained statute crosses constitutional lines. Congress cannot impliedly authorize EPA to remake the auto industry. If the federal government will force consumers to buy electric vehicles, then this intrusion must be clearly grounded in legislation, not regulation.

## CONCLUSION

Agencies like the EPA must have a clear statement from Congress to implement major policies and must do so under constitutional delegations. This Court should grant the petition for review vacate the Tailpipe Rule.

DATED: September 13, 2024.

Respectfully submitted,

s/ Frank D. Garrison

Frank D. Garrison
William M. Yeatman
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
FGarrison@pacificlegal.org
WYeatman@pacificlegal.org

*Attorneys for Amicus Curiae Pacific Legal Foundation*

**CERTIFICATE OF COMPLIANCE**

I certify this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5), and the Court's July 17, 2024 Order (#2065237), because this brief has 2,731 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32. This statement is based on the word count function of Microsoft Office Word.

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a 14-point Century Schoolbook, a proportionally spaced font.

s/ Frank D. Garrison
FRANK D. GARRISON

**CERTIFICATE OF SERVICE**

I certify that on September 13, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants are registered CM/ECF users and that I will serve this amicus brief through the appellate CM/ECF system.

s/ Frank D. Garrison
FRANK D. GARRISON
