# In the United States Court of Appeals
# for the District of Columbia Circuit

---

COMMONWEALTH OF KENTUCKY, ET AL.,
*Petitioners*,

AMERICAN FARM BUREAU FEDERATION, ET AL.,
*Private Petitioners*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ENVIRONMENTAL LAW AND POLICY CENTER, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency

---

**BRIEF OF AMICUS CURIAE CENTER FOR ENVIRONMENTAL
ACCOUNTABILITY IN SUPPORT OF PETITIONERS AND REVERSAL
OF EPA RULES**

---

Michael J. Nasi
Travis Wussow
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas  78701
[Tel.] (512) 236-2216
[Fax] (512) 391-2194
mnasi@jw.com
twussow@jw.com

Joseph A. Magliolo
JACKSON WALKER L.L.P.
2323 Ross Ave., Suite 600
Dallas, Texas 75201
[Tel.] (214) 953-6007
[Fax] (214) 661-6839
jmagliolo@jw.com

COUNSEL FOR AMICUS CURIAE

**DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1**

The Center for Environmental Accountability (CEA) is a non-profit organization whose mission is to promote transparency, excellence, and accountability in environmental policy and fidelity to the rule of law. Its commitment to a clean environment includes commitment to a healthy human environment, such that people from all walks of life can thrive. To date, it has submitted sixteen distinct sets of comments to agencies at the federal and state level in ten different areas of environmental law and policy. CEA respectfully submits that its broad familiarity with environmental law and policy, together with its specific insights on the regulations at issue in this case, enable it to be of considerable help to the Court.

The CEA has no parent corporation; no publicly held company has a 10% or greater ownership interest in the CEA; and CEA does not have any members who have issued shares or debt securities to the public.

/s/ Michael J. Nasi
Michael J. Nasi

## CERTIFICATE OF PARTIES, RULINGS, AND
## RELATED CASES PURSUANT TO CIRCUIT RULE 28(A)(1)

**A. Parties and Amici.** Except for amicus Center for Environmental Accountability, and amici The Buckeye Institute and Pacific Legal Foundation, all parties and intervenors appearing in this Court are listed in the Brief for Private Petitioners, filed September 6, 2024.

**B. Ruling Under Review.** An accurate reference to the ruling at issue appears in Private Petitioners' Brief, filed September 6, 2024.

**C. Related Cases.** The only related cases of which counsel are aware are identified in Private Petitioners' Brief, filed September 6, 2024.

*/s/ Michael J. Nasi*
Michael J. Nasi

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

All Private Petitioners have consented to the filing of this amicus brief. Counsel for amicus contacted all other known counsel on September 11, 2024 to determine whether they were opposed or unopposed to the CEA filing this brief. Counsel for the Commonwealth of Kentucky, the State of Mississippi, and the Association for Automotive Innovation, have indicated they consent to the filing of this brief. Counsel for amicus CEA has not heard the position on this brief from remaining counsel.

Pursuant to Circuit Rule 29(d), Amicus certifies that a separate brief is necessary to provide the CEA's unique perspective on and broad familiarity with environmental law and policy.

*/s/ Michael J. Nasi*
Michael J. Nasi

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

No party's counsel authored this brief in whole or in part. Nor did any party or party's counsel, or any other person other than amicus, contribute money that was intended to fund preparing or submitting this brief.

*/s/ Michael J. Nasi*
Michael J. Nasi

# TABLE OF CONTENTS

DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1 ............... ii

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) ......................................................... iiii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ................................................................................................ iv

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS .........v

TABLE OF CONTENTS ......................................................................... vi

TABLE OF AUTHORITIES ................................................................... vii

GLOSSARY ........................................................................................ viii

INTEREST OF AMICUS CURIAE .......................................................... 1

INTRODUCTION .................................................................................. 1

SUMMARY OF ARGUMENT ................................................................. 2

STATUTES AND REGULATIONS ........................................................... 3

BACKGROUND .................................................................................. 3

ARGUMENT ...................................................................................... 5

    EPA Failed to Reasonably Consider Who Will Bear the Full Cost of the Rule. ....................................................................................... 5

CONCLUSION ................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Petroleum Inst. v. EPA*,
216 F.3d 50 (D.C. Cir. 2000) ................................................................5

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) ............................................................11

*Nat'l Ass'n of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012) ..........................................................11

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ......................................................10, 11

**Statutes**

42 U.S.C. § 7521 ...............................................................................3, 5, 10

**Other Authorities**

American Free Enterprise Chamber of Commerce, Comments on the
Rule, 24-30 (July 5, 2023), https://tinyurl.com/y9znbvhw ............................6, 8

American Fuel and Petrochemical Manufacturers, Comments on the
Rule (July 5, 2023), https://tinyurl.com/57nejrev .................................6

Brent, PhD & Isaac, Jason, *Overcharged Expectations: Unmasking
the True Costs of Electric Vehicles* ........................................................4

Chris Isidore, "Ford just reported a massive loss on every electric
vehicle it sold", CNN.com (April 25, 2024),
https://tinyurl.com/42mpseb7 (last visited September 12, 2024) ........................9

Clean Fuels Development Coalition et al., Comments on the Rule
(July 5, 2023), https://tinyurl.com/yc8ncjnj .........................................3

EPA Notes ..................................................................................................8

EPA, Response to Comments for the Rule, 963-65, 1391-92 ...................6

Executive Order 12,866 ........................................................5

Executive Order 14,094 ........................................................5

89 Fed. Reg. 27,842, 27,857 ................................................3

89 Fed. Reg. 27,856, 27,857, 28,198 ....................................3

89 Fed. Reg. 27,861, 27,987, 28,057 ..................................10

89 Fed. Reg. 27,889 ..........................................................10

89 Fed. Reg. 27,983 ........................................................8, 9

89 Fed. Reg. 28,058 ..........................................................10

# GLOSSARY

EPA          United States Environmental Protection Agency

EV           Electric Vehicle

GHG         Greenhouse Gasses

ICEV        Internal Combustion Engine Vehicle

TPPF        Texas Public Policy Foundation

## INTEREST OF AMICUS CURIAE

The Center for Environmental Accountability (CEA) is a non-profit organization whose mission is to promote transparency, excellence, and accountability in environmental policy and fidelity to the rule of law. Its commitment to a clean environment includes commitment to a healthy human environment, such that people from all walks of life can thrive. To date, it has submitted sixteen distinct sets of comments to agencies at the federal and state level in ten different areas of environmental law and policy. As a result, the CEA has a significant interest in the outcome of this case.

CEA respectfully submits that its broad familiarity with environmental law and policy, together with its specific insights on the regulations at issue in this case, enable it to be of considerable help to the Court.

## INTRODUCTION

EPA's cost-benefit analysis purportedly supporting the Rule at issue here, as shown in the Petitioners' briefs, is so fundamentally flawed to render it arbitrary and capricious. Additionally, a pioneering study described below demonstrates that, in addition to the many salient points in the Petitioners' briefs, the cost-benefit analysis is further undermined by the EPA's failure to consider tens of thousands of dollars in hidden costs that apply to every single electric vehicle sold in the

United States and are transferred to purchasers of internal combustion engine vehicles in the form of higher prices.

EPA forces this regulatory cross-subsidy through the issuance of credits earned and traded under the emissions standards, which forces auto manufacturers to build more electric vehicles than consumers want. To induce consumers to purchase electric vehicles in the requisite numbers, retailers have no choice but to mark down electric vehicles considerably below manufacturing cost. In turn, to earn a profit on their overall fleet, manufacturers raise the prices for internal combustion engine vehicles. Because the EPA failed to reasonably consider these costs, which are largely borne by the many American car buyers who do not want or have electric vehicles, EPA's rule is arbitrary and capricious and should be reversed.

## SUMMARY OF ARGUMENT

Despite propping up the electric vehicle industry for many years, EPA still acknowledges that these vehicles cost far more to purchase and maintain over the life of an internal combustion engine vehicle. EPA has drastically undersold the true cost of electric vehicles to manufacturers, obscured the extent to which manufacturers and retailers must raise prices for internal combustion engine vehicles in order to achieve compliance with the emissions standards, and hidden this cost-shifting from the many consumers who, while having no desire to

purchase an EV, unwittingly foot the bill for the small segment of Americans who do. EPA has not adequately conducted a cost-benefit analysis of these regulatory cross-subsidies or disclosed them to consumers, rendering this regime arbitrary and capricious.

## STATUTES AND REGULATIONS

All pertinent materials are contained in State and Private Petitioners' Petitions for Review and Initial Briefs and related addenda.

## BACKGROUND

As set forth in the Private Petitioners' brief, on April 18, 2024, the EPA issued standards for light- and medium-duty vehicles for model years 2027 through 2032 that set "more stringent emissions standards for criteria pollutants," including non-methane organic gases and nitrogen oxides. 89 Fed. Reg. at 27,842, 27,857; *see also* 89 Fed. Reg. at 27,856, 27,857, 28,198 (hereafter, the Rule).

Congress directs EPA to consider the "costs of compliance" with any new emission standards issued under Section 202 of the Clean Air Act. 42 U.S.C. § 7521(a)(2). EPA has failed to do so here, even though several commenters raised these issues to the Agency during notice and comment. *See, e.g.*, Clean Fuels Development Coalition et al., Comments on the Rule (July 5, 2023), https://tinyurl.com/yc8ncjnj ("CFDC Comments"). Not only has EPA failed to consider these comments, it has made the problem worse, as discussed below.

Research on the cost of vehicle electrification continues to unfold, and the Texas Public Policy Foundation released a groundbreaking study[1] demonstrating the hidden costs of electric vehicles, and how those costs are actually borne by consumers who choose not to purchase electric vehicles. The TPPF Study notes the EV proponents' claim that, notwithstanding an approximately $22,000 higher purchase price for an EV as compared to an ICEV, that an EV's lifetime cost over fifteen years would only exceed an ICEV's by approximately $8,000 when accounting for claimed fuel, insurance, and maintenance savings. TPPF Study at 1. This claimed $8,000 margin, however, does not account for the huge hidden costs borne by state and federal taxpayers in the form of subsidies, credits, and other cost-shifting measures which balloon the actual cost of owning a model year (MY) 2021 EV over ten years. The TPPF Study demonstrates that complex and opaque regulatory credits drive the largest share of hidden EV costs, adding an estimated $27,881 to the actual cost of each EV. *See* TPPF Study at 6-7. Commenters pointed out another type of cost-shifting—cross-subsidies—discussed further below, which represents **between $10,500 and $60,000** in hidden costs. (CFDC Comments, at 19.) EPA hides and minimizes these costs, hopelessly skewing its cost-benefit analysis.

---

[1] *See Be*nnett, Brent, PhD & Isaac, Jason, *Overcharged Expectations: Unmasking the True Costs of Electric Vehicles*, TEXAS PUBLIC POLICY FOUNDATION (Oct. 25, 2023) (attached to this filing as **Exhibit A**) (hereinafter, the "TPPF Study").

**ARGUMENT**

**EPA Failed to Reasonably Consider Who Will Bear the Full Cost of the Rule.**

Congress commanded that the EPA must consider "the cost of compliance" when developing emission standards for mobile sources under Section 202(a) of the Clean Air Act. 42 U.S.C. § 7521(a)(2). EPA must conduct this analysis before new emission standards may take effect. *Id.* Balancing the costs and benefits of a rule is a factor in the determination that a regulation may be arbitrary and capricious. *See Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 57 (D.C. Cir. 2000) (rejecting rule because EPA made no attempt to "balance the costs and benefits"). The leading Executive Order on this subject directs that it is "essential to consider" the "qualitative measures of costs and benefits that are difficult to quantify" (as defined by Executive Order 12,866 and modified by Executive Order 14,094). Exec. Order No. 12,866 §§ 3(f), 6(a)(3)(C), 58 Fed. Reg. 51,735, 51,738, 51,741 (Oct. 4, 1993).

EPA has concealed a key component of the cost of compliance—cross subsidization. Auto manufacturers subsidize the cost of electric vehicles by increasing the price of conventional vehicles, maintaining overall profitability. The reason for this is that consumers are unwilling to pay a price that reflects the full cost of manufacturing an electric vehicle. As commenters pointed out to EPA, there is "overwhelming evidence that the manufacturing costs for electric vehicles

far exceed their current MSRPs and that current prices are the result of (large)
cross subsidization." CFDC Comments, at 16; *see also* American Fuel and
Petrochemical Manufacturers, Comments on the Rule (July 5, 2023),
https://tinyurl.com/57nejrev ("Ford lost approximately $58,000 for each [Zero
Emission Vehicle] it sold during [the first quarter of 2023,] more than an order of
magnitude greater than EPA's estimates."); American Free Enterprise Chamber of
Commerce, Comments on the Rule, 24-30 (July 5, 2023),
https://tinyurl.com/y9znbvhw. Indeed, commenters provided detailed analysis that
estimated these cross subsidies to be between $10,500 and $60,000 per vehicle,
depending on the manufacturer. CFDC Comments, at 19. Although commenters
notified the Agency of the importance of considering these costs before
promulgating the Rule, EPA brushed these comments aside. EPA, Response to
Comments for the Rule, 963-65, 1391-92 (Mar. 2024) (failing to address
comments related to missing costs in EPA's cost of compliance analysis).

The TPPF Study concludes that complex and opaque regulatory credits drive
the largest share of cross-subsidies between EVs and ICEVs, shouldering $27,881
of the actual cost of manufacturing each EV. *See* TPPF Study at 6-7. Current
CAFE standards require automakers to purchase credits if their fleet-wide miles-
per-gallon average is above EPA standards. TPPF Study at 8. The TPPF Study
added that the figure utilized likely under-calculates the actual penalties the EPA

currently impose.[2]  EV manufacturers, benefitting from an incorrect interpretation

of Department of Energy regulations that improperly credit EV manufacturers with

an extraordinary amount of claimed fuel-economy improvement per vehicle sold,

can sell these credits to ICEV makers who require them for compliance purposes.

TPPF Study at 7-8.  Because of this improper interpretation, however, EV

manufacturers earn approximately $19,678 worth of credits for *each* EV sold,

based on the requirement that ICEV manufacturers purchase credits to meet a fleet-

wide miles-per-gallon target.  TPPF Study at 8.

    EPA standards drive the costs further, based on the EPA's "banking system

for meeting its GHG [greenhouse gasses] emission standards."  TPPF Study at 9.

This additional credit system, despite EPA's lack of any authority to create it,

generates another market for EV manufacturers to earn approximately $3,322 per

EV in the form of credits it can sell to manufacturers who fall short of the GHG

emissions standard.  TPPF Study at 9-10.  Finally, state regulatory mandates,

principally in California but also elsewhere, result in a further hidden cost of

$4,881 per EV sold in the United States.  TPPF Study at 10.

    While EPA acknowledges the possibility of cross subsidization, the

Agency's estimates are neither reasonable nor reasonably explained.  Indeed, the

---

[2] The TPPF Study notes this $5.50 per 0.1 MPG penalty used in the study is very
conservative, as the penalty has risen to $16 per 0.1 MPG over the fleet-wide
average.  TPPF Study at 8.

EPA effectively blinds itself—and the public—to the significance of these costs by unreasonably capping them at 5% as a part of its regulatory cost model, "OMEGA." EPA, Regulatory Impact Analysis for the Rule, at 2-90; *see also* CFDC Comments, at 16-18.

The Agency justifies excluding the true degree of these costs from its analysis because, it says, it "cannot observe" them. *Id.* at 16. This is not a reasonable justification for EPA to throw up its hands. For one, the EPA could simply ask manufacturers for information on the value of these cross-subsidies as a part of the proposed rule or an information collection request, as it has done many times in the past. For another, the EPA goes to great lengths to estimate a broad range of *benefits* of the Rule, many of which are not observable or require modeling and assumptions to calculate. *See, e.g.*, EPA, Regulatory Impact Analysis for the Rule, at 6-6 (discussing the social cost of greenhouse gases). A reasonable cost-benefit analysis cannot be so selective in making a searching inquiry.

In its preamble to the Rule, EPA notes that it received a number of comments related to its modeling approach, and it made several significant adjustments to the OMEGA model's assumptions and functionality. 89 Fed. Reg. 27,983. However, the Agency made no changes to properly consider cross-subsidization as a part of the model. *Id.* tbl. 66. Indeed, the only change EPA

made to OMEGA's assessment of cross-subsidization was to make the problem worse, constraining cross-subsidies to be "within 5 percent of the marked up vehicle manufacturing cost." EPA, Regulatory Impact Analysis for the Rule, at 2-90. In its Regulatory Impact Analysis, EPA admits that this is "likely a conservative (i.e., low) limit of pricing flexibility" as more recent trends have shown these cross-subsidies may be higher—perhaps even as high as 100% of the cost of the vehicle. *Id.* EPA provides no further justification for this arbitrary assumption, which ignores and obscures the economic problem faced by automakers: consumers are not willing to purchase EVs at a price anywhere near their cost. These costs are moved elsewhere, and because EPA's analysis does not reasonably consider them, its entire cost-benefit analysis is hopelessly skewed.

One consequence of failing to consider and disclose these costs is that the EPA obscures an uncomfortable and inconvenient fact: These hidden cross-subsidies are borne by individuals who have chosen *not* to purchase an electric vehicle. As the TPPF Study notes, the Ford Motor Company lost over $70,000 for every EV it sold in the second quarter of 2023, *see* TPPF Study at 1, while the company's only profit came from ICEV vehicles.[3]  In other words, individuals

---

[3] *See* Chris Isidore, CNN.com, "Ford just reported a massive loss on every electric vehicle it sold" (April 25, 2024), https://tinyurl.com/42mpseb7 (last visited September 12, 2024).

buying ICEVs are subsidizing the automakers who are forced into making EVs in order to meet the EPA's extra-legal regulatory regime.

The EPA indicated that manufacturers will follow the "least-cost pathway," which in its view, requires manufacturing more EVs. *See* 89 Fed. Reg. at 28,058. This claim simply ignores the hidden costs detailed above, rendering this consideration arbitrary and capricious. *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating regulations because cost-benefit analysis was insufficiently explained).

Indeed, while the EPA claims the marginal cost of manufacturing all light-duty vehicles will increase by just $2,074 per vehicle made in 2032, this does not account in any way for the huge hidden costs identified by commenters and as noted in the TPPF Study. *See* 89 Fed. Reg. at 27,861, 27,987, 28,057. As listed above, the *actual* costs related to each EV sold far outstrip any claimed savings for these vehicles, with the costs borne by automakers—and, then, their customers—who are not beneficiaries of this EPA-created credits marketplace and various taxpayer-funded subsidies, and the taxpayers who pay for this scheme despite not purchasing EVs in great quantities.

EPA claims it need not evaluate these costs, citing this Court's precedent that EPA may exclude them from the "cost of compliance" under Section 202(a). 89 Fed. Reg. at 27,889. Your amicus may disagree as a matter of statutory

interpretation, but whether this is the correct interpretation of the Clean Air Act is beside the point, because these costs are also excluded from the EPA's cost-benefit analysis justifying the rule. Because the benefits portion of EPA's cost-benefit analysis is based on *global* benefits, the Agency must consider the at least the full cost of its action nationally when assessing its costs.

When, as the EPA did here, "an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *see also City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (noting that "we will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses"). And, while the Court provides some deference when analyzing such analyses, the EPA's failure to consider between $10,500 and $60,000 in hidden costs *per electric vehicle sold* renders the Rule arbitrary and capricious. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1040. In keeping with Circuit precedent, this Court should not tolerate EPA's final decision based on such an arbitrary and legally indefensible cost rationale. *See City of Portland*, 507 F.3d at 713; *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 206.

# CONCLUSION

For the foregoing reasons and the reasons set forth in Petitioners' briefs, the

Court should reverse the EPA's Rule.

DATED: SEPTEMBER 13, 2024

Respectfully submitted,

/s/ Michael J. Nasi

Joseph A. Magliolo
JACKSON WALKER L.L.P.
2323 Ross Ave., Suite 600
Dallas, Texas 75201
[Tel.] (214) 953-6007
[Fax] (214) 661-6839
jmagliolo@jw.com

Michael J. Nasi
Travis Wussow
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2216
[Fax] (512) 391-2194
mnasi@jw.com
twussow@jw.com

COUNSEL FOR AMICUS CURIAE CENTER FOR
ENVIRONMENTAL ACCOUNTABILITY

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 2,508 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

*/s/ Michael J. Nasi*
Michael J. Nasi

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(d) and Cir. R. 25, that on September 13, 2024, the foregoing brief was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

*/s/ Michael J. Nasi*
Michael J. Nasi

41780892v.12