NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-1087 and consolidated cases

---

U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

Commonwealth of Kentucky, et al.,
Petitioners,

v.

U.S. Environmental Protection Agency and Michael S. Regan, in his official
capacity as Administrator, U.S. Environmental Protection Agency,
Respondents.

Petition for Review of a Rule of
the U.S. Environmental Protection Agency

**EPA's Proof Answering Brief**

Todd Kim
Assistant Attorney General

Sue Chen
*Of counsel*                    Alex J. Hardee
Ryland Shengzhi Li              Jin Hyung Lee
David P.W. Orlin                U.S. Department of Justice
Seth Nolbaum                    Environment & Natural Resources Div.
Kyle Durch                      Environmental Defense Section
U.S. Environmental Protection   P.O. Box 7611
Agency                          Washington, D.C. 20044
Office of General Counsel       202.305.0283
Washington, D.C.                sue.chen@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), EPA certifies:

## A.  Parties and amici

All petitioners, respondents, and intervenors appearing here are listed in the Brief for Private Petitioners.

Amici for petitioners are: Center for Environmental Accountability, Growth Energy, Pacific Legal Foundation, and The Buckeye Institute.

## B.  Rulings under review

Under review is the action, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27842 (Apr. 18, 2024).

## C.  Related cases

There are no related cases under Circuit Rule 28(a)(1)(C).

*/s/ Sue Chen*
Counsel for EPA

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Authorities ....................................................................v

Glossary.......................................................................... xvi

Introduction .......................................................................1

Statement of Jurisdiction.............................................................3

Issues Presented ...................................................................3

Statutes and Regulations ............................................................5

Statement of the Case...............................................................5

      I.      Legal framework. ..............................................................5

      II.      Structuring the standards. ....................................................7

              A.      Greenhouse gases.....................................................9

              B.      Ozone precursors.....................................................13

      III.     The most effective emission-control technology. ...............................16

      IV.     Charting EPA's vehicle-emission rules. ..........................................19

      V.      The 2024 rule.................................................................20

              A.      Basis for the standards under Section 7521(a). ......................20

              B.      Cost-benefit analysis.................................................23

Standard of Review...................................................................23

Summary of Argument ..............................................................25

Argument.........................................................................28

I.     Petitioners are outside Section 7521(a)'s zone of interests.................28

II.    Petitioners' statutory arguments are time-barred. ...............30

III.   EPA has authority to promulgate the 2024 rule. ................32

     A.    Section 7521(a) authorizes EPA to regulate electric vehicles...................................................................33

          1.    Electric vehicles are "motor vehicles" within EPA's regulatory ambit. .................................33

          2.    EPA's authority over motor vehicles does not turn on their emission levels. .................................38

          3.    Petitioners' remaining arguments are wrong.................48

     B.    The 2024 rule lawfully uses fleet averaging. ...........................51

          1.    Section 7521(a) authorizes fleet averaging. ..................51

          2.    Fleet averaging aligns with other statutory requirements. .................................................54

               a.    Greenhouse gases. .................................54

               b.    Ozone precursors.................................60

     C.    The major-questions doctrine offers no reason to depart from statutory text.................................61

          1.    Petitioners' "major question" is untethered to an interpretive question. ........................................62

          2.    EPA broke no legal ground by tightening earlier standards. ..........................................65

          3.    The rule hews to the regulatory approach blessed in *West Virginia*...................................68

          4.    Petitioners' other arguments are meritless. ...................75

        5.     Even under the major-questions doctrine, clear congressional authorization exists. ..............................81

IV.    The 2024 rule is reasonable. ..............................................82

    A.    EPA reasonably considered all vehicles' upstream emissions in setting standards. ..................................82

    B.    EPA reasonably rejected regulating fuels. ................................85

    C.    The cost-benefit analysis was not a basis for the rule and anyway, it is reasonable. ........................................86

        1.     EPA reasonably estimated costs. ...................................88

        2.     Evidence supports projected fuel savings......................90

        3.     EPA's climate-benefit estimate is sound........................92

Conclusion ..............................................................................96

Certificates of Compliance and Service..................................................97

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ................................................................ 67, 69

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez.*,
458 U.S. 592 (1982) .........................................................................28

*Alon Refin. Krotz Springs, Inc. v. EPA*,
936 F.3d 628 (D.C. Cir. 2019)........................................................31

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) .........................................................................75

*Barnhart v. Thomas*,
540 U.S. 20 (2003) ..........................................................................43

*Becerra v. Empire Health Found.*,
597 U.S. 424 (2022) .........................................................................75

*Biden v. Missouri*,
595 U.S. 87 (2022) ............................................................... 65, 66, 75

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)........................................................... 61, 67, 76

*Bostock v. Clayton Cnty*,
590 U.S. 644 (2020) .........................................................................36

*Chevron USA v. NRDC*,
467 U.S. 837 (1984) .........................................................................53

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007)........................................................92

*Authorities upon which we chiefly rely are marked with asterisks

*Coal. for Renewable Nat. Gas v. EPA,*
  108 F.4th 846 (D.C. Cir. 2024) ....................................................94

*Coal. for Responsible Regul., Inc. v. EPA,*
  684 F.3d 102 (D.C. Cir. 2012).....................................................30

\*CSL Plasma Inc. v. CBP,*
  33 F.4th 584 (D.C. Cir. 2022) .....................................................28

*Delta Constr. Co. v. EPA,*
  783 F.3d 1291 (D.C. Cir. 2015).....................................................29

*EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) .....................................................................75

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .....................................................................67

*Gonzalez v. Oregon,*
  546 U.S. 243 (2006) .....................................................................67

*Grocery Mfrs. Ass'n v. EPA,*
  693 F.3d 169 (D.C. Cir. 2012).....................................................29

\*Growth Energy v. EPA,*
  5 F.4th 1 (D.C. Cir. 2021) ..................................................... 31, 87

\*Int'l Harvester Co. v. Ruckelshaus,*
  478 F.2d 615 (D.C. Cir. 1973)......................................... 6, 29, 35, 74

*Lockhart v. United States,*
  577 U.S. 344 (2016) .....................................................................43

\*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024)................................... 23, 24, 35, 40, 53

\*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ....................... 8, 13, 41, 50, 67, 81, 84

vi

*Med. Waste Inst. v. EPA,
    645 F.3d 420 (D.C. Cir. 2011).................................................. 7, 30, 31

Michigan v. EPA,
    576 U.S. 743 (2015) ..............................................................53

Miss. Comm'n on Env't Quality v. EPA,
    790 F.3d 138 (D.C. Cir. 2015)...............................................24

Motor & Equip. Mfrs. Ass'n, Inc. v. EPA,
    627 F.2d 1095 (D.C. Cir. 1979)..............................................76

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,
    463 U.S. 29 (1983) .......................................................... 24, 37

Nat'l Ass'n of Home Builders v. EPA,
    682 F.3d 1032 (D.C. Cir. 2012)..............................................87

Nat'l Biodiesel Bd. v. EPA,
    843 F.3d 1010 (D.C. Cir. 2016)..............................................32

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
    545 U.S. 967 (2005) ..............................................................75

Nat'l Fed'n of Indep. Bus. v. OSHA,
    595 U.S. 109 (2022) ......................................................... 67, 69

Nat'l Shooting Sports Found., Inc. v. Jones,
    716 F.3d 200 (D.C. Cir. 2013)...............................................86

New York v. FERC,
    535 U.S. 1 (2002) ..................................................................75

NextEra Energy Res., LLC v. FERC,
    118 F.4th 361 (D.C. Cir. 2024) .............................................24

NRDC v. EPA,
    655 F.2d 318 (D.C. Cir. 1981).......................................... 35, 74

*NRDC v. Thomas,
    805 F.2d 410 (D.C. Cir. 1986) ........................................................ 15, 53

NRDC v. EPA,
    571 F.3d 1245 (D.C. Cir. 2009) .................................................................31

NRDC v. EPA,
    954 F.3d 150 (2d Cir. 2020) .....................................................................42

Pub. Emps. for Env't Resp. v. EPA,
    77 F.4th 899 (D.C. Cir. 2023) ...................................................................89

*Save Jobs USA v. DHS,
    111 F.4th 76 (D.C. Cir. 2024) ......................................................... 61, 62, 70

Skidmore v. Swift & Co.,
    323 U.S. 134 (1944) ...................................................................................24

TRW Inc. v. Andrews,
    534 U.S. 19 (2001) .....................................................................................43

Truck Trailer Mfr. Ass'n v. EPA,
    17 F.4th 1198 (D.C. Cir. 2021) .................................................................42

Twin Rivers Paper Co. LLC v. SEC,
    934 F.3d 607 (D.C. Cir. 2019) ...................................................................29

U.S. Sugar Corp. v. EPA,
    113 F.4th 984 (D.C. Cir. 2024) .................................................................32

Util. Air Regul. Grp. v. EPA,
    573 U.S. 302 (2014) ............................................................................ 30, 67

*West Virginia v. EPA,
    597 U.S. 697 (2022) .................................. 2, 61, 65, 66, 67, 68, 69, 74, 75, 76, 81

White Stallion Energy Ctr., LLC v. EPA,
    748 F.3d 1222 (D.C. Cir. 2014) ................................................................53

*Window Covering Mfrs Ass'n v. CPSC,*
  82 F.4th 1273 (D.C. Cir. 2023) ...........................................................94

**Statutes**

15 U.S.C. §§ 2501-14.........................................................................17

15 U.S.C. § 2501................................................................................35

15 U.S.C. § 2501(a)(1)........................................................................17

26 U.S.C. § 30B(b)(3)(B)....................................................................54

26 U.S.C. § 30D(f)(7)(A)....................................................................54

42 U.S.C. § 7401-15...........................................................................83

42 U.S.C. § 7401(a)(3)........................................................................40

42 U.S.C. § 7401(b)(1)........................................................................95

42 U.S.C. § 7404(a)(2)(B)...................................................................35

42 U.S.C. §§ 7521-90.......................................................................1, 83

42 U.S.C. § 7521(a) ........................................................................1, 59

42 U.S.C. § 7521(a)(1).............................................5, 6, 7, 28, 33, 34, 36, 39, 40,
  ............................................................ 42, 44, 46, 47, 51, 66, 81, 83

42 U.S.C. § 7521(a)(2)............................................. 6, 28, 34, 35, 36, 52, 74, 86

42 U.S.C. § 7521(b) ............................................................................56

42 U.S.C. § 7521(b)(1)(A)...................................................................58

42 U.S.C. § 7521(b)(1)(C)...................................................................66

42 U.S.C. § 7521(b)(3).........................................................................58

42 U.S.C. § 7521(g)(1)............................................................................58

42 U.S.C. § 7521(i)(1) ...........................................................................33

42 U.S.C. § 7521(i)(3)(B) .......................................................................66

42 U.S.C. § 7521(m) ...............................................................................56

42 U.S.C. § 7522 ....................................................................................56

42 U.S.C. § 7522(a)(1) ............................................................... 7, 12, 54, 56

42 U.S.C. § 7524(a) ...............................................................................56

42 U.S.C. § 7525 ....................................................................................57

42 U.S.C. § 7525(a) .................................................................... 12, 56

42 U.S.C. § 7525(a)(1) ...........................................................................7, 54

42 U.S.C. § 7541 ....................................................................................55

42 U.S.C. § 7541(a) ...............................................................................57

42 U.S.C. § 7541(c)(1) ...........................................................................56

42 U.S.C. § 7541(c)(2) ...........................................................................56

42 U.S.C. § 7541(h)(1) ...........................................................................56

42 U.S.C. § 7545(k)(1)(B)(v)(II) .............................................................59

42 U.S.C. § 7545(c)(2)(A) .......................................................................85

42 U.S.C. § 7545(o)(12) ............................................................... 49, 86

42 U.S.C. § 7550(2) ............................................... 5, 33, 36, 46, 70, 81

42 U.S.C. § 7550(7) ...................................................................7

42 U.S.C. § 7550(10)-(11) ........................................................33

42 U.S.C. § 7581 ......................................................................49

42 U.S.C. § 7581(2) ..................................................................33

42 U.S.C. § 7607(b)(1)........................................... 3, 7, 30, 31

42 U.S.C. § 7607(d)(7)(A) .............................. 25, 73, 80, 88

42 U.S.C. § 7607(d)(7)(B) .................................. 7, 90, 95

42 U.S.C. § 7607(d)(8)...............................................................94

42 U.S.C. § 7607(d)(9)(A) .......................................................24

42 U.S.C. § 13212(f)(3)(C)........................................................54

42 U.S.C. § 17013(a)(A)(i) .......................................................54

49 U.S.C. § 32902(a) .................................................................13

49 U.S.C. § 32904(a)(2)..............................................................84

**Code of Federal Regulations**

40 C.F.R. § pt. 1037, subpt. H ................................................14

40 C.F.R. §§ 50.4-50.19 .............................................................8

40 C.F.R. § 86.1803-01........................... 7, 8, 16, 31, 41, 46, 64

40 C.F.R. § 86.1811-27...............................................................51

40 C.F.R. § 86.1811-27(b)(4) ....................................................31

40 C.F.R. § 86.1818-12...............................................................51

40 C.F.R. § 86.1818-12(c)(1) .................................................................................10

40 C.F.R. § 86.1818-12(c)(2) .................................................................................31

40 C.F.R. § 86.1818-12(d) .....................................................................................12

40 C.F.R. § 86.1819-14 ...........................................................................................51

40 C.F.R. § 86.1829-15 ...........................................................................................55

40 C.F.R. § 86.1843-01 ...........................................................................................55

40 C.F.R. § 86.1844-01 ...........................................................................................55

40 C.F.R. § 86.1844-01(d)(7) .................................................................................55

40 C.F.R. § 86.1844-01(d)(13) ...............................................................................55

40 C.F.R. § 86.1848-10(c) ................................................................................ 55, 57

40 C.F.R. § 86.1848-10(c)(2) .................................................................................55

40 C.F.R. § 86.1848-10(c)(6) .................................................................................55

40 C.F.R. § 86.1848-10(c)(7) .................................................................................55

40 C.F.R. § 86.1848-10(c)(9) .................................................................................12

40 C.F.R. § 86.1860-17 ...........................................................................................14

40 C.F.R. § 86.1860-17(e) .......................................................................................14

40 C.F.R. § 86.1861-17 ..................................................................................... 14, 51

40 C.F.R. § 86.1864-10 ...........................................................................................51

40 C.F.R. § 86.1865-12 ...........................................................................................51

40 C.F.R. § 86.1865-12(j)(2) ...............................................................57

40 C.F.R. § 86.1865-12(k) ........................................................... 11, 31

40 C.F.R. § 86.1865-12(k)(7) ...................................................... 11, 12

40 C.F.R. § 86.1865-12(k)(8)(i) .........................................................56

40 C.F.R. § 86.1865-12(k)(8)(i)-(iii) .................................................56

40 C.F.R. § 86.1865-12(*l*)(2) .............................................................12

40 C.F.R. § 86.1866-12(a) ..................................................................47

40 C.F.R. § 86.1867-12 ......................................................................48

40 C.F.R. § 600.010(d) ......................................................................12

40 C.F.R. § 1037.115(e) .....................................................................48

49 C.F.R. § 523.2 .................................................................................9

**Federal Registers**

31 Fed. Reg. 5170 (Mar. 30, 1966) ....................................................8

36 Fed. Reg. 22369 (Nov. 25, 1971) ................................................7, 8

45 Fed. Reg. 14496 (Mar. 5, 1980) ...................................................57

48 Fed. Reg. 33456 (July 21, 1983) .............................................. 11, 19

50 Fed. Reg. 10606 (Mar. 15, 1985) .................................................11

55 Fed. Reg. 30584 (July 26, 1990) ..................................................12

58 Fed. Reg. 51735 (Oct. 4, 1993) ....................................................23

65 Fed. Reg. 6698 (Feb. 10, 2000) ............................................... 19, 30

65 Fed. Reg. 59896 (Oct. 6, 2000)...........................................................19

74 Fed. Reg. 66496 (Dec. 15, 2009) ...............................................8, 41

75 Fed. Reg. 25324 (May 7, 2010) ................................... 8, 12, 19, 30, 85

76 Fed. Reg. 57106 (Sept. 15, 2011) ...................................................19

77 Fed. Reg. 62624 (Oct. 15, 2012)......................................................19

79 Fed. Reg. 23414 (Apr. 28, 2014) ....................................................19

81 Fed. Reg. 73478 (Oct. 25, 2016).....................................................20

85 Fed. Reg. 24174 (Apr. 30, 2020) ....................................................20

86 Fed. Reg. 74434 (Dec. 30, 2021) ....................................................20

88 Fed. Reg. 11556 (Feb. 23, 2023) ....................................................84

88 Fed. Reg. 29184 (May 5, 2023) .......................................................94

89 Fed. Reg. 16820 (Mar. 8, 2024).......................................................84

89 Fed. Reg. 27842 (Apr. 18, 2024) ........................................ i, 8, 9, 10, 11, 12, 13,
........................................................... 14, 18, 19, 20, 21, 22, 23, 31, 34, 37, 39,
................................................. 47, 48, 49, 59, 60, 64, 66, 70, 71, 72, 73, 77, 78,
....................................... 79, 80, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 95

89 Fed. Reg. 39798 (May 9, 2024) .......................................................84

## Legislative Material

Pub. L. No. 89-272, 79 Stat. 992 (1965).................................................5

Pub. L. No. 95-95, 91 Stat. 686 (1977).................................................59

Pub. L. No. 101-549, 104 Stat. 2399 (1990).........................................7, 15

Pub. L. No. 110-343, 122 Stat. 3765 (2008)...........................................17

Pub. L. No. 111-5, 123 Stat. 115 (2009)................................................17

Pub. L. No. 117-58, 135 Stat. 429 (2021).......................................... 18, 36

Pub. L. No. 117-169, 136 Stat. 1818 (2022).................................... 18, 36

Executive Order 12866, § 6(a)(3)(B)-(C) ............................................23

H. Rep. No. 89-899 (1965) .................................................... 5, 16, 39, 43

H. Rep. No. 101-490 (1990) ..............................................................49

S. Rep. 89-192 (1965) .................................................................5, 52

S. Rep. 90-403 (1967) ................................................................ 16, 35

S. Rep. 91-1196 (1970) ....................................................................6

Staff of Special Subcomm. On Air & Water Pollution, 88th Cong., Rep. on Steps Toward Clean Air (Comm. Print. 1964)................................................38

Joint Hearings Before the Committees on Commerce and Public Works for S. 451 and S. 453, 90th Cong. 297 (1967) ............................................ 16

136 Cong. Rec. 35367 (1990) ............................................. 15, 16, 52, 54

136 Cong. Rec. 36713 (1990) ................................................. 15, 16, 54

# GLOSSARY

| | |
|---|---|
| 2023 Trends Report | 2023 EPA Automotive Trends Report |
| Draft Reg. Impact Analysis | Multi-Pollutant Emissions Standards For Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles—Draft Regulatory Impact Analysis (Apr. 2023) |
| EPA | U.S. Environmental Protection Agency |
| Fuel Br. | Brief for Private Petitioners |
| Greenhouse-gas Report | Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances (Nov. 2023) |
| JA | Joint Appendix |
| NHTSA | National Highway Traffic Safety Administration |
| Resp. to Comments | Multi-Pollutant Emissions Standards For Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles—Response to Comments (Mar. 2024) |
| Reg. Impact Analysis | Multi-Pollutant Emissions Standards For Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles—Regulatory Impact Analysis (Mar. 2024) |
| State Br. | Brief for State Petitioners |

## INTRODUCTION

The Clean Air Act regulates "motor vehicles." Motor vehicles—defined by the Act based on function rather than power source—can be powered by gasoline, electricity, or both.

Emissions from the nation's vast motor-vehicle fleet contribute to harmful air pollution. To regulate those emissions, Congress created a statutory scheme, 42 U.S.C. § 7521(a), that seeks to foster not just innovation in effective emission-control technologies, but their broad adoption.

Electric motors are one such technology. Since the 1960s, Congress has recognized that electric vehicles (which rely on electric motors) could become, as a Senate report put it, a "nonpolluting alternative[]" to gas vehicles. Today, electric motors are the most effective emission controls available: They allow electric vehicles to emit no tailpipe pollutants at all. And after years of industry investment and steady gains in market share, electric vehicles are going mainstream. Congress has spent billions of dollars to encourage this market transition.

Against this backdrop, in 2024 EPA tightened emission standards for light- and medium-duty motor vehicles like cars and trucks. EPA then left it to automakers to choose the technologies they will use in compliance. Those choices will likely include electric vehicles given their growing popularity and unmatched effectiveness.

Petitions for review of the 2024 rule soon followed. They were brought not by automakers—the regulated entities instead intervened to support EPA—but by a group of states, the fuel industry, and others who fall outside Section 7521(a)'s zone of interests.

Setting aside this and other threshold problems, Petitioners are wrong on the merits. They chiefly object to the shift from gas vehicles to electric vehicles, which they fear EPA's rule will accelerate. But Section 7521(a)'s plain text authorizes EPA to regulate "motor vehicles," electric or otherwise, that completely "prevent" pollution. Petitioners' arguments rest on a distinction between types of motor vehicles that appears nowhere in Section 7521(a).

Nor can the major-questions doctrine save Petitioners. The doctrine is a tool of—not a replacement for—statutory interpretation, and it applies only to "extraordinary" cases. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). That is not this case. Petitioners present no particular textual question anchored to their "major question." And far from doing something unexpected or novel, EPA merely tightened existing standards using the same statutory authority it has always used. The standards' impacts are the kind that Congress envisioned when it enacted Section 7521(a). The major-questions doctrine thus does not apply. And anyway, Congress authorized EPA's action with pristine clarity. The Court should reject Petitioners' challenges.

## STATEMENT OF JURISDICTION

The Court lacks jurisdiction over Petitioners' challenges to EPA's statutory authority to regulate electric vehicles and to use fleet averaging. 42 U.S.C. § 7607(b)(1). It has jurisdiction over Petitioners' remaining arguments. *Id.*

## ISSUES PRESENTED

The threshold issues are:

1. Section 7521(a) protects the public from harmful vehicle emissions and regulates automakers. Petitioners do not claim to represent either the public or automakers. Are they outside Section 7521(a)'s zone of interests?

2. With exceptions not relevant here, the Clean Air Act permits judicial review only if a challenge is filed within 60 days from an action's publication in the Federal Register. EPA adopted the structure of its greenhouse-gas standards in 2010 and the structure of its ozone-precursor standards in 2000. Are Petitioners' challenges to those structures time-barred?

If the Court were to go further, the merits issues are:

3. Section 7521(a) authorizes EPA to regulate emissions "from any class or classes" of "motor vehicles."

   a. "Motor vehicles," defined by the Act based on function and not power source, include electric vehicles. EPA has always classified motor vehicles based on load capacity. Classes thus include electric vehicles

meeting the load requirements. Section 7521(a) also specifies that emission standards apply to motor vehicles that, like electric vehicles, have emission controls that "prevent" pollution. Does Section 7521(a) authorize EPA to regulate electric vehicles within covered classes?

b. Given that Section 7521(a) authorizes standards for "classes" of motor vehicles, EPA has long used fleet averaging in setting standards and assessing compliance. Both this Court and Congress have approved EPA's averaging program, on which automakers have long relied. Does EPA have authority to use fleet averaging in the 2024 rule?

4. Did EPA act reasonably when:

a. Considering upstream emissions of all vehicles (electric or not) to assess the standards' environmental impact but not to assess compliance;

b. Declining to regulate fuel when acting under Section 7521(a), which authorizes EPA to set standards for vehicles, not fuels; and

c. Assessing the rule's costs and benefits in an analysis that EPA did not rely on to set the standards?

## STATUTES AND REGULATIONS

Pertinent statutes, regulations, and legislative history not in Petitioners' addenda are in the addendum to this brief.

## STATEMENT OF THE CASE

## I.    Legal framework.

Title II of the Clean Air Act directs EPA to regulate mobile sources.  42 U.S.C. §§ 7521-90.  Section 7521 governs "motor vehicles," defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway."  *Id.* § 7550(2); *see id.* § 7521(a)(1).  Cars, trucks, and most other vehicles on public roads are motor vehicles.

Enacted in 1965, Section 7521 was Congress's response to pollution from the country's growing motor-vehicle fleet.  Pub. L. No. 89-272, 79 Stat. 992 (1965).  The problem was a cumulative one:  The sheer number of motor vehicles created dangerous levels of air pollution.  *See* H. Rep. No. 89-899 at 3 (1965) (noting the "omnipresence" of automobiles, which were responsible for some 50% of the national air-pollution problem); *id.* at 4 ("automotive smog is occurring with increasing frequency and severity"); S. Rep. No. 89-192 at 3 (1965) (calling automotive exhaust a "major problem").

Section 7521(a) targets that problem.  It requires EPA to set and periodically revise standards applicable to the "emission of any air pollutant from any class or

classes of new motor vehicles" which "in [EPA Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). Those standards apply to motor vehicles "whether [they] are designed as complete systems or incorporate devices to prevent or control such pollution." *Id.*

The standards "shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." *Id.* § 7521(a)(2). Congress's aim here was twofold: First, Congress wanted the standards to be feasible for automakers. Hence its attention to compliance costs and lead time.

Second, Congress designed Section 7521(a) to drive the "development and application" of better emission-control technologies. *Id.*; *see* S. Rep. No. 91-1196 at 24 (1970) (stating that the standards should be a "function of the degree of [emission] control required, not the degree of technology available"). So in setting standards, EPA can, in its feasibility analysis, consider technology that has not yet been widely adopted or even developed. The idea is that the standards would "force" automakers "to study new types of engines and new control systems." *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 635 (D.C. Cir. 1973).

The statute also requires all new motor vehicles entering commerce to be covered by a certificate of conformity. 42 U.S.C. § 7522(a)(1). EPA issues certificates, "upon such terms" as "[the Administrator] may prescribe," to motor vehicles that conform with "the regulations prescribed under section 7521." *Id.* § 7525(a)(1).

Petitions challenging Section 7521 standards must be filed within 60 days of the action's Federal Register publication. *Id.* § 7607(b)(1). This time-bar is jurisdictional. *Med. Waste Inst. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). The Court can consider only objections raised with "reasonable specificity" during the comment period. 42 U.S.C. § 7607(d)(7)(B).

## II.     Structuring the standards.

Section 7521(a) directs EPA to regulate emissions from "classes" of motor vehicles but left it to the agency to define that term. *Id.* § 7521(a)(1). EPA has long classified motor vehicles functionally, based on load capacities. 36 Fed. Reg. 22369, 22449/3 (Nov. 25, 1971). For example, light-duty vehicles include passenger cars that can seat no more than 12 passengers. 40 C.F.R. § 86.1803-01 (defining light-duty vehicle and light-duty truck). Congress ratified this functional approach in 1990 by adopting the agency's definitions of "light-duty vehicle" and "light-duty truck." 42 U.S.C. § 7550(7); Pub. L. No. 101-549, § 223, 104 Stat. 2399 (1990).

In 2009, EPA found that an aggregate group of greenhouse gases from certain classes of motor vehicles contributes to harmful air pollution. 74 Fed. Reg. 66496, 66499/3 (Dec. 15, 2009); *see id*. at 66537/3 (making finding for "passenger cars, light- and heavy-duty trucks, buses, and motorcycles"). This endangerment finding triggered EPA's duty under Section 7521(a)(1) to set greenhouse-gas standards for the covered classes of motor vehicles. *See Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).[1] The first set of standards was promulgated in 2010. 75 Fed. Reg. 25324 (May 7, 2010); 40 C.F.R. § 86.1803-01. Since then, EPA has periodically revised the standards. *Infra* Table 1.

Regulation of "criteria" pollutants, like ozone precursors, goes back even earlier.[2] The first criteria-pollutant standards for vehicles date to 1966. 31 Fed. Reg. 5170 (Mar. 30, 1966); 36 Fed. Reg. at 22452/1-2.

---

[1] Light-duty vehicles account for 58% of greenhouse-gas emissions from the transportation sector, the nation's biggest source of emissions. 89 Fed. Reg. 27842, 28098/1-2 (Apr. 18, 2024).

[2] The six criteria pollutants are carbon monoxide, lead, oxides of nitrogen, oxides of sulfur, ozone, and particulate matter. *See* 40 C.F.R. §§ 50.4-50.19. In the 2024 rule, precursors for these pollutants are also referred to as criteria pollutants. *See* 89 Fed. Reg. at 27857/1 & n.154. Ozone precursors mean non-methane organic gases plus nitrogen oxides ("NMOG+NOx" in the record). *Id.* at 27865/3.

Relevant here are the standards for greenhouse gases and ozone precursors, which use different forms of fleet averaging.[3]

**A.      Greenhouse gases.**

Under greenhouse-gas regulations, each automaker has its own fleet-average standard.  Two things determine that standard for light-duty vehicles: (1) target emission levels based on vehicle size (called "footprint"), 49 C.F.R. § 523.2, and (2) number of vehicles with each footprint in the fleet.  For the medium-duty class, the same approach applies except the target emission level is based on "work factor," a metric that reflects vehicle payload and towing capacity.  *See* 89 Fed. Reg. at 27885/1.

To calculate an automaker's fleet-average standard, first determine each vehicle's target emission level.  Below are the footprint-based car targets EPA set for model years 2027-2032:

---

[3] The 2024 rule also sets standards for other pollutants like particulate matter.  89 Fed. Reg. at 27939/2-3, 27947/3.  Those standards are not at issue here.  *See* Fuel Br. 39-62 (focusing on averaging, which is used in greenhouse-gas and ozone-precursor standards).



*Id.* at 27906 (including model-year 2026 curve for reference); *see id.* at 27907 (truck targets). A model-year 2027 car with a footprint of 40 ft$^2$ thus has a target emission level of about 136 grams carbon dioxide per mile (g/mi), while a car with a footprint of 50 ft$^2$ has a target of about 141 g/mi.

Next, calculate the weighted average based on how many vehicles of each footprint are in a fleet. Suppose an automaker has a fleet of 5 cars: 2 compact cars each with a footprint of 40 ft$^2$, and 3 full-size cars each with a footprint of 50 ft$^2$. This automaker's model-year 2027 fleet-average standard is (2 × 136 g/mi + 3 × 141 g/mi) ÷ 5 = 139 g/mi. 40 C.F.R. § 86.1818-12(c)(1). A different automaker

with a different fleet (and thus a different set of footprints) would have a different fleet-average standard.  *See* 89 Fed. Reg. at 27883/2.

To comply with its fleet-average standard, the automaker can make each vehicle hit its own emission target.  But in practice, it is often easier and cheaper to reduce more emissions from some vehicles than from others.  *See id.* at 28088/2. EPA's averaging, banking, and trading program, which has existed in one form or another since the 1980s, allows automakers to reduce emissions where and when it is most efficient.  *See* 40 C.F.R. § 86.1865-12(k); 48 Fed. Reg. 33456, 33456/1-57/3 (July 21, 1983); 50 Fed. Reg. 10606, 10607/2-09/1 (Mar. 15, 1985).

*Averaging* allows vehicles that emit less than their targets to offset those that emit more.  40 C.F.R. § 86.1865-12(k)(7).  Imagine that our hypothetical automaker cuts the compact cars' emissions to 90 g/mi (46 g/mi below target), but leaves its full-size cars' emissions at 170 g/mi (29 g/mi above target).  The automaker's fleet-average emission is $(2 \times 90 \text{ g/mi} + 3 \times 170 \text{ g/mi}) \div 5 = 138 \text{ g/mi}$. Thanks to its "cleaner" compacts, the automaker complies with its fleet-average standard (139 g/mi) even though its full-size cars exceed their targets.  *See* 89 Fed. Reg. at 28088/2.

Notice that this fleet emits less than what its standard allows.  *Banking* allows automakers to get credits for "unused" emissions and save those credits for future compliance.  Automakers who exceed their standards can run deficits to be

made up by future credits. 40 C.F.R. § 1865-12(k)(7). Banking, in short, averages emissions over time. 55 Fed. Reg. 30584, 30585/3 (July 26, 1990). It recognizes that automakers do not redesign every model every year to add emission-control technologies. *See* 89 Fed. Reg. at 28088/2. And it offers flexibility in compliance timing.

EPA also allows credit *trading*, meaning automakers can sell their extra credits. 55 Fed. Reg. at 30584/1; 40 C.F.R. § 1865-12(k)(7). Trading, which in effect averages emissions across fleets, creates incentives for those who can reduce emissions most cheaply to do so beyond what their standards require.

Compliance with fleet-average standards is determined at the end of the model year based on testing data that automakers must submit. 40 C.F.R. §§ 86.1865-12(*l*)(2), 86.1848-10(c)(9), 600.010(d); 42 U.S.C. §§ 7522(a)(1), 7525(a).

In addition, individual vehicles must comply with EPA's in-use standards. These standards are set using the same test data used to determine compliance with the fleet-average standard, plus a 10% variability margin. 40 C.F.R. § 86.1818-12(d); 89 Fed. Reg. at 27978/1; *see* 75 Fed. Reg. at 25476/2-3 (explaining reason for margin).

When setting greenhouse-gas standards, EPA coordinates with the National Highway Traffic Safety Administration's fuel-economy program. 89 Fed. Reg. at

27930/1 n.632. Though EPA's obligation to regulate emissions under the Clean Air Act is "wholly independent" from NHTSA's obligation to set corporate average fuel-economy standards under the Energy Policy and Conservation Act, those obligations do potentially "overlap[]." *Massachusetts*, 549 U.S. at 532; 49 U.S.C. § 32902(a). To "avoid inconsistency," the agencies structured their different regulatory programs to harmonize where appropriate, and to ensure that automakers could meet both sets of standards. *Massachusetts*, 549 U.S. at 532; *see, e.g.*, 89 Fed. Reg. at 27982/1-2. NHTSA's use of fleet averaging was one reason EPA adopted the same approach when it began regulating greenhouse gases. 89 Fed. Reg. at 27930/1 n.632.

## B. Ozone precursors.

As with greenhouse-gas standards, EPA sets individual-vehicle standards and fleetwide standards for ozone precursors. But unlike greenhouse-gas standards, ozone-precursor standards use bins averaging.

Under this approach, individual-vehicle standards are set using "bins":

|  | Bin 30 | Bin 15 | Bin 0 |
|---|---|---|---|
| Standard, in milligrams per mile (mg/mi) | 30 | 15 | 0 |

*Id.* at 27932/3-33/1 (tbl. 36). Automakers choose a standard (or bin) at which to certify each vehicle. That vehicle must emit at or below its standard. *Id.* at 27886/1.

Fleetwide standards are the same for all automakers. Here are some of those standards under the 2024 rule:

|  | MY2027 | MY2028 | MY2029 |
|---|---|---|---|
| Standard (mg/mi) | 25 | 23 | 21 |

*Id.* at 27935 (tbl. 39). In the compliance analysis, the fleet's emission level is the sales-weighted average of the individual-vehicle standards. 40 C.F.R. § 86.1860-17. Imagine that an automaker has a fleet of 4 vehicles and needs to meet the model-year 2027 fleetwide standard of 25 mg/mi. One vehicle is certified to bin 30, two to bin 15, and one to bin 0. That automaker's fleet-average emission is $((1 \times 30) + (2 \times 15) + (1 \times 0)) \div 4 = 15$ mg/mi, well below the fleetwide standard. Again, the automaker can bank or sell its credits. *Id.* § 86.1861-17, 86.1860-17(e); *id.* pt. 1037, subpt. H.

\* \* \*

Averaging allows automakers to tailor compliance strategies to their business strategies. They can have a wide range of emission levels within their fleet, with extra "clean" cars offsetting extra "dirty" ones. Or they can run deficits while fine-tuning new emission-control technologies to be installed in later model years. Or they can have lots of "clean" cars and sell their credits. And so on. The

choice of how to comply—of what kind, how much, and the timing of technologies to use—lies with automakers.[4]

Both this Court and Congress have approved EPA's averaging program. Decades ago, environmental groups challenged averaging in certain heavy-duty standards. *See NRDC v. Thomas*, 805 F.2d 410 (D.C. Cir. 1986). They argued that averaging improperly allowed "dirty" trucks to be averaged into the fleet and thus escape a statutory penalty. *Id.* at 425. This Court disagreed, reasoning that "a manufacturer whose entire fleet does not—even on average—meet an emissions standard will still pay [those penalties]." *Id.* "[I]n the absence of any clear evidence that Congress meant to prohibit averaging," the Court rejected petitioners' argument. *Id.*

A few years later, when Congress amended the Clean Air Act, the House and Senate considered—and rejected—proposals to either extend or curtail EPA's authority to allow emission averaging for motor vehicles. 136 Cong. Rec. 35367 (1990); 136 Cong. Rec. 36713 (1990); *see generally* 104 Stat. 2399. Congress, noting *NRDC*, instead opted to let the existing law "remain in effect." 136 Cong.

---

[4] The greenhouse-gas program uses fleet averaging both to set standards (through sales-weighted averages) and to assess compliance (through averaging, banking, and trading). The ozone-precursor program uses fleet averaging only to assess compliance. Petitioners challenge fleet averaging in standard-setting and compliance-assessment. Fuel Br. 41-42. We use "fleet averaging," "averaging," and the "averaging program" to refer to averaging in both contexts.

Rec. 36713. "The intention was to retain the status quo." 136 Cong. Rec. 35367. The House report also noted that averaging has "very positive impacts on air quality," while also "reducing the costs of controlling emissions" and "encourag[ing] the development and early use of improved emission control technologies." *Id.*

## III. The most effective emission-control technology.

Though electric vehicles[5] have, until recently, elicited little public notice, they have commanded Congress's attention for almost 60 years. Since at least 1965, Congress has known that electric motors offer a promising way to cut emissions. H. Rep. No. 89-899 at 44-45 (report from Federal Power Commission). By 1967, Congress realized that electric vehicles, which rely on electric motors, could become a "nonpolluting alternative[]" to gas vehicles. S. Rep. No. 90-403 at 59 (1967); Joint Hearings Before the Committees on Commerce and Public Works for S. 451 and S. 453, 90th Cong. 297 (1967) (holding hearings on "electric vehicles and other alternatives to the internal combustion engine" (internal capitalization omitted)); *cf.* S. Rep. No. 90-403 at 60 (approvingly noting that

---

[5] We use "electric vehicles" to mean motor vehicles that run solely on electricity. 40 C.F.R. § 86.1803-01. *Contra* Fuel Br. 9 n.2 (using "electric vehicle" to refer to a broader set of vehicles). We use "gas vehicles" to mean motor vehicles that run only on petroleum-based fuel like gasoline or diesel. We use "hybrids" to mean motor vehicles that run on electricity and petroleum-based fuels. *See* 40 C.F.R. § 86.1803-01 (defining "mild," "strong," and "plug-in" hybrids).

16

electric vehicles could make up about a third of the market by 1985).  Congress

also saw gas vehicles as creating a "dependence on foreign sources of petroleum"

that "jeopardizes national security, inhibits foreign policy, and undermines

economic well-being."  15 U.S.C. § 2501(a)(1).

And so for decades, Congress has promoted electric vehicles.  Early on, it

supported research and development of electric-vehicle technologies.  *See id.*

§§ 2501-14 (Electric and Hybrid Vehicle Research, Development, and

Demonstration Act).  Once those technologies matured, Congress encouraged

adoption of electric vehicles through subsidies like tax credits.  *E.g.*, Energy

Improvement and Extension Act of 2008, Pub. L. No. 110-343, Div. B, Tit. II,

§ 205, 122 Stat. 3765, 3835; American Recovery and Reinvestment Act of 2009,

Pub. L. No. 111-5, § 1141, 123 Stat. 115, 326.

Thanks in part to Congress's longstanding support, electric vehicles are now

the lowest-emitting vehicles on the market:  They have zero tailpipe emissions

because they use electric motors.  Electric vehicles do not combust gasoline to

generate propulsion, a process that produces carbon dioxide (a greenhouse gas) and

assorted criteria pollutants.  2023 Trends Report 41-42, 59, JA_____-__, _____.  In

this way, electric motors control a vehicle's emissions by preventing pollutants

from forming rather than blocking emissions after the pollutant is created.  And

although other commercially available carbon-dioxide controls also prevent

pollutant-formation, electric motors are the most effective controls available.  *See*

Resp. to Comments 302, JA_____.

*　　*　　*

The vehicles sector is changing.  Hybrid vehicles are now commonplace.

*See* 2023 Trends Report 43, JA_____ (showing hybrids are over 20% of some

major automakers' model-year 2022 fleets).  And electric vehicles are becoming

more popular as they win over more consumers and their costs fall.  *See* 89 Fed.

Reg. at 28086/2-3 (noting that production of plug-in hybrids and electric vehicles

quadrupled in the last few years), 27847 (Figure 1).  Automakers plan to electrify

their fleets in short order.  *Id.* at 27848/1-50/1.  And Congress has spent many

billions of dollars on charging infrastructure and other electrification efforts.  *See*

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, Div. J., Tit. VIII,

Highway Infrastructure Program ¶ 2, 135 Stat. 429, 1421-23 (2021); Inflation

Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, 2044, 2063, 2086 (2022).  It

has also enacted tax credits to encourage sales of electric vehicles and development

of domestic supply chains for related components.  *See* 136 Stat. at 1954-69, 1971-

81.

Market forces and congressional spending are each expected to hasten the

ongoing transition to electric vehicles.  EPA conservatively estimates that even

without the 2024 rule, electric vehicles and plug-in hybrids are expected to surge

18

from 12% of light-duty sales in 2023 to 47% (or more) by 2032. Resp. to

Comments 314, JA_____; 89 Fed. Reg. at 28058 (tbl. 76); *see id.* at 27852/3,

27847/1-3 (reporting third-party mid-range estimates of 48 to 58% by 2030).

## IV. Charting EPA's vehicle-emission rules.

For four decades, EPA has used fleet averaging in its vehicle-emission

standards. 48 Fed. Reg. at 33456/1-57/3. And in the last 25 years, the agency has

explicitly applied those standards to any electric vehicles in the covered classes.

That consistency spans 10 sets of standards issued by 4 different presidential

administrations:

**Table 1**

| Rule | Uses fleet averaging | Applies to electric vehicles |
|---|---|---|
| Criteria-pollutant Tier 2 standards (model-year 2004 and later), 65 Fed. Reg. 6698 (Feb. 10, 2000) | 6743/3-44/2 | 6851/1 |
| Heavy-duty criteria-pollutant standards (model-year 2004 and later), 65 Fed. Reg. 59896 (Oct. 6, 2000) | 59921/1-3 | 59963/3 |
| Light-duty greenhouse-gas standards (model-year 2012 and later), 75 Fed. Reg. 25324 (May 7, 2010) | 25405/1, 25412/1-3 | 25375/1, 25682/1 |
| Heavy-duty greenhouse-gas standards (model-year 2014 and later), 76 Fed. Reg. 57106 (Sept. 15, 2011) | 57119/1, 57238/2-39/1 | 57196/2, 57376/2 |
| Light-duty greenhouse-gas standards (model-year 2017 and later), 77 Fed. Reg. 62624 (Oct. 15, 2012) | 62627/3-28/2 | 62706/1 |
| Criteria-pollutant Tier 3 standards (model-year 2017 and later), 79 Fed. Reg. 23414 (Apr. 28, 2014) | 23480/3-81/2, 23488/2-89/1 | 23725/2 |

| Heavy-duty greenhouse-gas standards (model-year 2021 and later), 81 Fed. Reg. 73478 (Oct. 25, 2016) | 73495/2-3, 73568/2-69/1, 73730/2-3, 73733/2-34/1 | 73500/3, 73985/3 |
|---|---|---|
| Light-duty greenhouse-gas standards (model-year 2021 and later), 85 Fed. Reg. 24174 (Apr. 30, 2020) | 24246/3-47/3, 25103/3-04/1 | 24469/1 |
| Light-duty greenhouse-gas standards (model-year 2023 and later), 86 Fed. Reg. 74434 (Dec. 30, 2021)[6] | 74446/3-51/1, 74453/1-56/1 | 74473/2, 74484/2-87/3 |
| Light- and medium-duty greenhouse-gas and criteria-pollutant standards (model-year 2027 and later), 89 Fed. Reg. 27842 (Apr. 18, 2024) | 27903/1-2, 27915/3-16/3 | 27882/1-3, 27933/1, 28168/2-3 |

## V.     The 2024 rule.

In 2024, after notice and comment, EPA finalized greenhouse-gas and criteria-pollutant standards for model-year 2027-2032 light- and medium-duty vehicles.  Relevant here, EPA revised greenhouse-gas standards by adopting stricter emission targets.  89 Fed. Reg. at 27853/1, 27854/3 & tbl. 1.  And it revised ozone-precursors standards by adopting stricter fleetwide standards and eliminating higher-level bins.  *Id.* at 27929/2.

### A.     Basis for the standards under Section 7521(a).

To set the standards, EPA first identified available emission-control technologies and related compliance costs and lead time.  *See id.* at 27987/1-2, 27983/2.  Then, using an updated version of the model it had used in earlier

---

[6] In September 2023, argument was held in the challenges to the 2021 rule.  *Texas v. EPA*, Case No. 22-1031 and consolidated cases (D.C. Cir.).

vehicle-emission rules, EPA evaluated potential standards. *Id.* at 27983/1. That analysis proceeded in two stages.

First, though automakers ultimately choose the mix of technologies in their fleets, EPA used the model to project how automakers might respond to a given set of standards. The model started with a host of user-provided inputs, such as each automaker's baseline fleet and the availability, capability, and costs of different control technologies. *Id.* at 27983/2-3. Using these inputs, the model brought each automaker into compliance with potential standards by applying technologies based on their relative cost-effectiveness. *Id.* at 27984/2. The model, in other words, simulates what rational, cost-conscious automakers *might* do to meet future standards. *Id.*; *cf. id.* at 27984/2-3 (noting that automakers "remain free to adopt very different compliance paths").

The output of this simulation is an illustrative fleet, including the prevalence of emission-control technologies in the fleet, that automakers might use to comply with the standards. *See id.* at 27856 (tbl. 3). That prevalence is the projected technology penetration rate. *See id.* at 28057/2-3. One potential compliance pathway shows that automakers can meet the model-year 2032 standards with a fleet that has 68% plug-in hybrids and electric vehicles. *Id.* at 28057 (tbl. 75). This estimate, however, applies only to the fleet of *new* motor vehicles in 2032,

while over 80% of the overall national fleet is still expected to use gasoline. *Id.* at 27898/2.

The second stage of EPA's analysis entailed modeling the effects of automakers' projected compliance strategies. Those effects—which capture many factors like emission levels, air quality, compliance costs, and fuel consumption—allow EPA to compare various stringency options. *Id.* at 28086/2-3; Reg. Impact Analysis 2-6 (tbl. 2-1), JA_____.

After examining modeling results and other information, EPA considered whether it was appropriate to tighten the model-year 2027-2032 standards. *See* 89 Fed. Reg. at 28093/2-3. In this analysis, EPA focused on the factors set forth in Section 7521(a): potential emission reductions and feasibility. *Id.* at 28085/1, 28093/2-96/3. The agency determined that the standards will reduce carbon-dioxide emissions by 37% and ozone-precursor emissions by 25 to 46% in 2055. *Id.* at 28097 (tbl. 204), 28101 (tbl. 208).

EPA also determined that the standards are feasible. Unlike some earlier vehicle-emission standards, here technologies that can help automakers comply—like electric vehicles—have already been deployed and proven effective. *Id.* at 28086/2. The per-vehicle compliance costs, moreover, were comparable to costs of earlier emission standards. *Id.* at 28089/3 & n.1327.

Weighing these factors, EPA concluded that the final standards were appropriate and justified under Section 7521(a). *Id.* at 27845/1.

## B.    Cost-benefit analysis.

Separate from Section 7521(a), Executive Order 12866 directs agencies to assess expected costs and benefits before proposing "significant" actions. E.O. 12866, § 6(a)(3)(B)-(C), 58 Fed. Reg. 51735, 51741, 51738 (Oct. 4, 1993). The Office of Management and Budget has issued Circular A-4, a guidance document to help agencies develop cost-benefit analyses. Circular A-4 (2003), JA_____-__.

The cost-benefit analysis under the Executive Order examines a broader set of factors than what Section 7521(a) requires. Here EPA considered things like impacts on the costs of fuel and charging infrastructure, and climate benefits from reducing greenhouse-gas emissions. 89 Fed. Reg. at 27860 (tbl. 8), 28017/1-26/1. EPA estimated that the standards would result in annualized net benefits of $99 billion. *Id.* at 27860 (tbl. 8). The existence of net benefits, though not a factor under Section 7521(a), "reinforce[d]" EPA's conclusion that its choice of standards is appropriate. *Id.* at 27857/3.

## STANDARD OF REVIEW

To resolve the meaning of disputed statutory language, a court adopts the interpretation that it, "after applying all relevant interpretive tools, concludes is best." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). "Careful

attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 2273.  In this analysis, "courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them."  *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024).

EPA's interpretation and opinions, "'made in pursuance of official duty' and 'based upon … specialized experience,' 'constitute a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions."  *Loper Bright*, 144 S. Ct. at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).  The weight of that judgment "'depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"  *Id.* (quoting *Skidmore*, 323 U.S. at 140).

The Clean Air Act applies the same arbitrary-and-capricious standard as the Administrative Procedure Act.  42 U.S.C. § 7607(d)(9)(A); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam).  This standard is narrow, and the Court cannot substitute its judgment for EPA's.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  EPA need only consider the relevant factors and articulate a rational connection between the facts found and the choices made.  *Id.*; *see Loper Bright*, 144 S. Ct. at 2261

(holding that judicial review of agency factfinding is deferential). Review is limited to the administrative record. 42 U.S.C. § 7607(d)(7)(A).

## SUMMARY OF ARGUMENT

The Court should dismiss or deny the petitions.

I. Petitioners fall outside Section 7521(a)'s zone of interests. Section 7521(a) protects the public from harmful motor-vehicle emissions while regulating automakers. Petitioners—states, the fuel industry, auto dealers, trucking associations, and others—are here to defend their alleged pecuniary and sovereign interests, as well as interest in specific vehicle preferences. They represent neither the public nor automakers and cannot be expected to police the interests safeguarded by Section 7521(a).

II. Petitioners' statutory arguments are time-barred. They attack decades-old elements of EPA's Section 7521(a) standards: use of averaging and application to electric vehicles. The Clean Air Act gives Petitioners 60 days from Federal Register publication to challenge agency actions. Petitioners missed that deadline by years. The Court thus lacks jurisdiction to consider their statutory arguments.

III. The rule lies within EPA's statutory authority.

First, Section 7521(a) authorizes EPA to regulate electric vehicles. Section 7521(a) governs "motor vehicles." The Act defines that term functionally. Any vehicle—whether powered by gasoline or electricity—with the requisite functions

is a motor vehicle. Petitioners' policy objection, to a shift from gas vehicles to electric ones, relies on a distinction that Section 7521(a) declined to draw.

Context confirms EPA's authority. Congress designed Section 7521(a) to foster broad adoption of effective emission controls. Electric motors are the most effective control available today. And Congress has long championed electric vehicles as a nonpolluting alternative to gas vehicles. Petitioners would in effect require EPA to ignore electric vehicles when setting standards. But doing so would be at odds with Section 7521(a)'s text and design. Indeed, it would be arbitrary and capricious.

Nor does the fact that electric vehicles have zero (tailpipe) emissions remove them from EPA's regulatory ambit. Congress enacted Section 7521(a) to tackle harmful pollution created by fleets of motor vehicles. This provision directs EPA to set standards that apply to emissions "from any class or classes" of motor vehicles. The standards thus cover any electric vehicle in the regulated classes, which EPA has long defined by load capacity, not emission level. Section 7521(a) dispels any doubt about the scope of EPA's authority: It specifies that the standards apply to motor vehicles that, like electric vehicles, have emission controls that "prevent" pollution. Petitioners' counter-textual reading of EPA's statutory authority is incoherent and not workable when applied to plug-in hybrids.

Second, Section 7521(a) authorizes EPA to use fleet averaging. Averaging reduces emissions using effective technologies, while ensuring that those reductions are feasible for automakers. And because Section 7521(a) targets emissions of groups—"classes"—of vehicles, it authorizes EPA to use fleet averaging in regulation. Both this Court and Congress have affirmed that authority. Averaging also aligns with other statutory provisions.

The major-questions doctrine is not the silver bullet that Petitioners imagine. That doctrine, a principle of statutory interpretation reserved for extraordinary cases, does not apply here for many reasons. Petitioners' asserted "major question" is unmoored from any interpretive question. The 2024 rule is an ordinary exercise of EPA's authority and sets the same sort of standards to regulate the same sources as earlier vehicle-emission rules. The standards focus on source-based emission control, a regulatory approach the Supreme Court endorsed in *West Virginia*. And the standards' impacts are the kind that Congress accepted when it directed EPA to set standards using all feasible technologies. So there is no reason to hesitate before applying the statute as it is written. Even if the major-questions doctrine were to apply, Congress authorized EPA's action with clarity.

IV. The 2024 rule is reasonable. In setting standards, EPA accounted for upstream emissions of all vehicles, electric or not. In assessing compliance with the standards, however, EPA measures only direct vehicle emissions—again, for

all vehicles.  EPA also followed the statute in declining to regulate fuel as an alternative to regulating emissions.  And Petitioners' sundry criticisms of EPA's cost-benefit analysis ignore the record and should be rejected.

## ARGUMENT

### I.  Petitioners are outside Section 7521(a)'s zone of interests.

Petitioners lack a cause of action because they fall outside Section 7521(a)'s zone of interests.  In this inquiry, the question is whether Petitioners "can be expected to police the interests that the statute protects."  *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022).  The answer is no.

Section 7521(a) protects the public from harmful vehicle pollution while ensuring that emission standards are reasonably feasible for automakers.  *See* 42 U.S.C. § 7521(a)(1)-(2).  Petitioners, however, do not claim to represent either the public or automakers.  They cannot be expected to police the interests of those two groups.

Start with State Petitioners.  They allege that the standards will cause them various pocketbook injuries, which have nothing to do with public health or compliance with the standards.  State Br. 8-11; *see also* Fuel Br. 21.  The same is true of their asserted sovereign interest in protecting "their electric grids."  State Br. 11; *cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592,

610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government.").

Fuel Petitioners include entities that "produce or sell liquid fuels and the raw materials used to produce them." Fuel Br. 20. But the Court has already held that this kind of interest—promoting fuel allegedly made "economically infeasible" by an EPA action—falls outside the relevant zone of interests. *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1299 (D.C. Cir. 2015).[7]

Other Fuel Petitioners claim that the standards will foist electric vehicles on them or "limit the vehicles available to conduct their members' businesses." Fuel Br. 21. Even if the standards forced anyone to buy electric vehicles (and they do not), consumer choice in motor vehicles is not an interest protected by Section 7521(a). *See Int'l Harvester*, 478 F.2d at 640 (noting that emission standards may limit choice of vehicle models).

Because none of Petitioners' claimed injuries falls within Section 7521(a)'s zone of interests, the petitions should be denied.

---

[7] *See also Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 617 (D.C. Cir. 2019) (holding that paper manufacturers fall outside zone of interests protected by securities laws); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (holding that higher corn prices did not allow food groups to challenge EPA's waiver allowing ethanol blend).

## II.  Petitioners' statutory arguments are time-barred.

Petitioners' statutory arguments are time-barred.  Those arguments challenge elements of EPA's standards that were established years ago and not reopened here.  But the Clean Air Act requires challenges to final actions to be filed within 60 days after their Federal Register publication.  42 U.S.C. § 7607(b)(1).  Because Petitioners missed that deadline, the Court lacks jurisdiction to consider their statutory arguments.  *See Med. Waste*, 645 F.3d at 427.

The elements of EPA's standards challenged here—fleet averaging and application to electric vehicles—were established long ago.  Petitioners should have challenged those elements in 2000, when EPA first used fleet-average standards to regulate ozone precursors and applied the standards to classes that include electric vehicles.  *See* 65 Fed. Reg. at 6743/3-46/3.  Or Petitioners should have raised their challenge in 2010, when EPA promulgated its first greenhouse-gas standards, which used fleet averaging and applied to electric vehicles in the light-duty class.  *See* 75 Fed. Reg. at 25405/1, 25412/1-3, 25375/1, 25682/1.  Many Petitioners in fact challenged the 2010 rule.  *See Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 126 (D.C. Cir. 2012), *aff'd in part and rev'd in part on other grounds*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).  But none made the statutory arguments now put forward.

Now, the 60-day window to challenge EPA's "longstanding practice" has "long since closed." *Med. Waste*, 645 F.3d at 427; *Growth Energy v. EPA*, 5 F.4th 1, 12-13 (D.C. Cir. 2021) (per curiam). The Court thus lacks jurisdiction over those challenges. *See* 42 U.S.C. § 7607(b)(1); *Med. Waste*, 645 F.3d at 427.[8]

EPA also did not reopen the disputed elements here. Reopening requires "a serious, substantive reconsideration" of the relevant determination. *Growth Energy*, 5 F.4th at 21. But EPA said it was *not* reopening the averaging issue or inclusion of electric vehicles in fleet averaging. *See* 89 Fed. Reg. at 27856/3-57/1. It continued to use its longstanding framework on fleet averaging and vehicle classification. *See id.* at 27856/3, 27901/1, 27958/1-2; 40 C.F.R. §§ 86.1818-12(c)(2), 86.1865-12(k), 86.1811-27(b)(4), 86.1803-01. Granted, EPA changed some compliance flexibilities, and tweaked certain class nomenclatures and definitions. 89 Fed. Reg. at 27958/1-3, 27853/1, 27855/2-3. But that is an *application* of EPA's longstanding regulatory framework, not a "serious, substantive reconsideration" of it. *Growth Energy*, 5 F.4th at 21; *see NRDC v. EPA*, 571 F.3d 1245, 1265-66 (D.C. Cir. 2009) (stating that amending one aspect of a regulation does not automatically reopen aspects "already decided"). EPA

---

[8] Petitioners do not assert that their claim is based "solely on grounds arising after" the 60-day deadline. 42 U.S.C. § 7607(b)(1). Nor do they challenge an EPA refusal to amend the structure established in 2000 or 2010. *See Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 646-47 (D.C. Cir. 2019). These arguments are forfeited. *Growth Energy*, 5 F. 4th at 15.

also offered no "new rationale" to suggest that it seriously reconsidered its approach to averaging or classes. *See U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 992 (D.C. Cir. 2024); Resp. to Comments 330, JA_____.

Nor was EPA's approach "constructively" reopened. The "basic regulatory scheme remains unchanged," and Petitioners could have reasonably anticipated the gradual tightening of the standards. *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016). Thus the Court should not reach Petitioners' arguments about EPA's statutory authority.

## III. EPA has authority to promulgate the 2024 rule.

Section 7521(a)(1), the keystone of Title II's motor-vehicle program, seeks to reduce emissions using feasible control technologies. The 2024 rule does exactly that.

The only two interpretive questions presented here are whether EPA can (1) regulate electric vehicles and (2) set fleet-average standards. Both are easily resolved by applying ordinary principles of statutory interpretation: Electric vehicles are "motor vehicles" and thus subject to EPA regulation under Section 7521(a). EPA can also set standards for "classes" of vehicles using averaging, which gives automakers compliance flexibility.

The major-questions doctrine offers no reason to depart from those conclusions. Though that doctrine is a canon of statutory interpretation, Petitioners

offer no textual question for the doctrine to resolve. Nor has EPA exercised any extraordinary authority that would trigger the doctrine. Even if the doctrine were to apply, Congress authorized EPA's action with clarity.

## A. Section 7521(a) authorizes EPA to regulate electric vehicles.

### 1. Electric vehicles are "motor vehicles" within EPA's regulatory ambit.

The Clean Air Act's plain text authorizes EPA to regulate "motor vehicles," a term that encompasses electric vehicles. Petitioners' objection, to a shift from gas vehicles to electric vehicles, rests on a distinction without a legal difference.

Section 7521(a) directs EPA to regulate "motor vehicles." 42 U.S.C. § 7521(a)(1). A motor vehicle is "any self-propelled vehicle designed for transporting persons or property on a street or highway." *Id.* § 7550(2). This definition turns on function, not power source. So EPA's regulatory ambit covers more than just vehicles powered by gasoline. It covers "any" vehicle having the requisite functions, *id.*, including vehicles powered in part or in whole by electricity.[9]

---

[9] When Congress wanted to specify gas vehicles, it did so. Thus it defined "nonroad vehicles" (like snowmobiles and tractors) to require "internal combustion engine[s]." 42 U.S.C. § 7550(10)-(11). Or Congress used the words "gasoline and diesel-fueled … vehicles," *id.* § 7521(i)(1), even though it knew that motor vehicles can be powered by other sources like electricity. *E.g.*, *id.* § 7581(2).

Section 7521(a) thus does not distinguish between gas vehicles and electric vehicles. Both are designed for the same function: transporting people or cargo on public roads. So both are equally "motor vehicles" under the Act. As a practical matter, both rely on electricity not only to control emissions but to operate. *See* 89 Fed. Reg. at 27892/1-3 (giving examples, such as starting internal-combustion engines). And except for tailpipes, gas and electric vehicles often look similar. Some vehicles are a hybrid of the two. Automakers even offer the same models in gas, electric, and hybrid versions. Resp. to Comments 353 & n. 317, JA_____.

Statutory context confirms EPA's authority. Section 7521(a) is a technology-based provision. It directs EPA to consider compliance costs and lead time for the "development and application of the requisite technology" when setting standards. 42 U.S.C. § 7521(a)(2). And Section 7521(a) excludes no technology from EPA's consideration. Just the opposite: It says that emission standards apply to vehicles whether they are "designed as complete systems or incorporate devices to prevent or control … pollution." *Id.* § 7521(a)(1).

Congress, in short, wanted EPA to consider all emission-control technologies—whether they are complete systems or discrete devices, whether they work by preventing pollution or controlling it—so long as they are feasible. Nor did it limit what is feasible to tried-and-true technologies that have already saturated the market. By allowing EPA to consider technologies that still require

"development" and "application," Congress sought to foster both innovation and adoption of better, more effective technologies. *Id.* § 7521(a)(2); *see Int'l Harvester*, 478 F.2d at 628-29, 635; *NRDC v. EPA*, 655 F.2d 318, 328 (D.C. Cir. 1981). Having made that policy decision, Congress delegated the technical task of accounting for technology developments and adoption to EPA. *See Loper Bright*, 144 S. Ct. at 2263 (recognizing that statutes can give agencies "a degree of discretion" by using terms that leave them with "flexibility").

Today, the most effective emission controls available are electric motors, for they eliminate all tailpipe emissions in electric vehicles. 2023 Trends Report 59, JA_____. Congress has long anticipated this outcome. Since the 1960s—before EPA even existed—Congress has known that electric vehicles could become a "nonpolluting alternative[]" to gas vehicles. S. Rep. No. 90-403 at 59. And Congress has supported efforts to make electric vehicles such an alternative. *See, e.g.*, 15 U.S.C. § 2501 (stating policy to use electric vehicles in lieu of gas vehicles); 42 U.S.C. § 7404(a)(2)(B) (encouraging "low emission alternatives" to the internal-combustion engine). Once electric vehicles became commercially viable, Congress spent many billions of dollars to encourage their broad adoption

and to build charging infrastructure. *See, e.g.*, 136 Stat. at 1954-64, 1971-81, 2044, 2086-87; 135 Stat. at 1421-23.[10]

All this plain statutory text and context dooms Petitioners' chief argument, that absent clear text, EPA cannot, in effect, even consider electric vehicles in setting standards. Fuel Br. 23, 26, 37, 55; State Br. 13-14. The text *is* clear: Congress directed EPA to set emission standards for "motor vehicles," which are defined by function, not power source. 42 U.S.C. §§ 7521(a)(1), 7550(2). In setting standards, EPA should consider all "requisite technolog[ies]," whether they are "designed as complete systems or incorporate devices to prevent or control … pollution." *Id.* § 7521(a)(1)-(2).

Under Section 7521(a), then, any shift from one technology to another is legally irrelevant to questions about EPA's authority. That authority hinges on the definition of "motor vehicles." Whether a given standard is too strict is a separate question for arbitrary-and-capricious review.

Petitioners' argument—which would limit EPA to regulating vehicles with internal-combustion engines—would undercut Congress's longstanding support for electric vehicles. Resp. to Comments 293, JA_____. Congress has promoted the

---

[10] Though Petitioners emphasize various failed bills, Fuel Br. 16-17, 30, State Br. 17-18, those failures "offer[] a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 670 (2020) (internal quotation marks omitted); *see* Resp. to Comments 326-27, JA_____-__.

very shift to electric vehicles that Petitioners object to: It crafted Section 7521(a) to encourage adoption of feasible and effective control technologies—like electric motors. And it devoted billions of dollars to expedite that shift. To that, Petitioners say, unconvincingly, that Congress somehow spent all that money on charging infrastructure without also embracing the vehicles for which that infrastructure is built. Fuel Br. 31; State Br. 20. And it defies common sense to think, as Petitioners do, that EPA must ignore electric vehicles *because* Congress supports them. Fuel Br. 31; State Br. 20; Resp. to Comments 366, JA_____. By considering electric vehicles in the feasibility analysis, EPA did what it was supposed to do under Section 7521(a). In fact, given that provision's technology-based framework and electric vehicles' effectiveness in preventing pollution, it would have been arbitrary and capricious for EPA to ignore those vehicles in setting standards. *See State Farm*, 463 U.S. at 43; 89 Fed. Reg. at 27893/3.

In the end, Petitioners, fixated on a "shift[] … from internal combustion to electricity," confuse the means with the ends of what Congress and EPA seek to achieve. Fuel Br. 23. What matters under Section 7521(a) is reducing harmful motor-vehicle emissions by setting feasible standards. Electric motors, used in electric vehicles, have proven to be superb emission controls, and electric vehicles are growing in popularity. So if meeting the standards means that automakers

choose to equip their motor vehicles with electric motors, that just means lower emissions and a step closer to the statute's goal.

### 2. EPA's authority over motor vehicles does not turn on their emission levels.

The fact that a given motor vehicle has zero emissions does not remove it from EPA's regulatory ambit.[11]  Section 7521(a)(1) directs EPA to set standards applicable to the emission from any class or classes of motor vehicles, including any zero-emission vehicles in the class.  That reading is the best one because it adheres to the statute's plain text and congressional intent.  Petitioners' contrary reading flouts both.  Fuel Br. 49-62.

In Section 7521(a), Congress addressed a specific problem: harmful emissions from the nation's motor-vehicle fleet.  What alarmed Congress was the enormous amount of pollutants emitted from an ever-growing number of motor vehicles on the roads, resulting in dangerous levels of pollution in the ambient air. *See* Staff of Special Subcomm. on Air & Water Pollution, 88th Cong., Rep. on Steps Toward Clean Air at 3 (Comm. Print. 1964) (noting the "omnipresence" of motor vehicles); *id.* at 7-9 (emphasizing the sheer number of vehicles on roads and the volume of pollutants they produce).  The problem, then, was the cumulative

---

[11] For simplicity, in this argument we use Petitioners' (incorrect) assumption that electric vehicles emit no pollutants. *E.g.*, Fuel Br. 49-50. *But see infra* Argument § III.A.3.

harm that the "motor vehicle population" inflicts on public health and welfare.  H. Rep. No. 89-899 at 4.

Section 7521(a)(1) tackles that problem.  Its first sentence directs EPA to regulate emissions from groups of vehicles.  Or, in Congress's words, the standards are "applicable to the emission of any air pollutant *from any class or classes* of new motor vehicles" that EPA finds to cause or contribute to harmful air pollution. 42 U.S.C. § 7521(a)(1) (emphasis added).  How classes are defined is left to EPA. The key here is that Congress wanted EPA to focus on reducing cumulative emissions from groups of motor vehicles.[12]

Section 7521(a)(1) goes on to say, in its second sentence, that standards apply to motor vehicles that emit no pollutants:  The emission standards "shall be applicable to such vehicles" whether they are "designed as complete systems or incorporate devices to prevent or control such pollution." *Id*.  As Congress saw it, the standards "appl[y]" to regulated vehicles that comply with the standards using a broad range of technologies, including those that "prevent" pollution.  *See* 89 Fed. Reg. at 27902/1.  This makes sense:  Without control technologies, motor vehicles can potentially emit pollutants.  In designing and manufacturing motor

---

[12] To borrow Petitioners' analogy, Fuel Br. 44-45, the problem that Congress targeted is not like riding roller coasters, where safety turns on each rider being tall enough, so the height requirement applies to individual riders.  The problem is more like riding elevators, where safety turns on riders' combined weight, so the weight limit applies to riders as a group.

vehicles, automakers must incorporate technologies—be they complete systems or devices—to prevent or control pollution.

Electric vehicles fit the bill. Because they generate no pollutants, they "prevent" pollution by, to use Petitioners' definition, "'keep[ing that pollution] from happening.'" Fuel Br. 61 (quoting dictionary); *see* 42 U.S.C. § 7401(a)(3) (stating that "air pollution prevention" includes the "elimination, through any measures, of the amount of pollutants produced or created at the source"). That is true whether electric vehicles are "designed as complete systems" or "incorporate devices" (electric motors) that prevent pollution. 42 U.S.C. § 7521(a)(1); *see* Resp. to Comments 351, JA_____. Either way, the standards "shall be applicable" to them. 42 U.S.C. § 7521(a)(1).

Now put Section 7521(a)(1)'s two sentences together: To regulate, EPA must first find that emissions "from any class or classes" of new motor vehicles cause or contribute to harmful air pollution. Then EPA must set standards to regulate those emissions. The standards apply to all motor vehicles in the regulated classes—including vehicles that, like electric vehicles, use controls to "prevent" pollution.

After creating this basic framework, Congress gave EPA a "degree of discretion" to "fill up the details." *Loper Bright*, 144 S. Ct. at 2263. Thus in Section 7521(a), Congress let EPA work out the technical issues, like how to group

40

vehicles into classes. *See Massachusetts*, 549 U.S. at 532 (recognizing that Section 7521(a)(1) reflects Congress's "intentional effort" to give EPA "regulatory flexibility"); Resp. to Comments 291-92, JA_____-__.

EPA followed Section 7521(a)(1) to the letter. It found that greenhouse-gas emissions from light- and medium-duty vehicles contribute to harmful air pollution. 74 Fed. Reg. at 66537/3. This endangerment finding was not limited to gas vehicles in light- and medium-duty classes; it covered all vehicles in those classes, whether powered by gas, natural gas, hydrogen, electricity, or something else. *See id.* And EPA has long defined classes functionally, based on load capacities. Resp. to Comments 350 & n.305, JA_____. So, for example, an electric car that can seat no more than 12 passengers is (like an otherwise-identical gas car) a light-duty vehicle. 40 C.F.R. § 86.1803-01.

Once EPA made the endangerment finding, it regulated greenhouse-gas emissions from light- and medium-duty vehicles. *Supra* Table 1. The 2024 rule is part of that effort. And because the light- and medium-duty classes include electric vehicles, the 2024 rule properly regulates electric vehicles in those classes.

Petitioners read Section 7521(a)(1) to bar EPA from regulating electric vehicles because they emit no pollutants. Fuel Br. 49-62. That reading conflicts with the plain text of both sentences in Section 7521(a)(1), not to mention its

context and common sense:  Why would Congress want to stop one molecule short of eliminating harmful emissions if doing so is reasonably feasible?

It would not, as the statute's text makes clear.  Section 7521(a)(1)'s first sentence directs EPA to prescribe "standards applicable to" the emission "from any class or classes of new motor vehicles."  42 U.S.C. § 7521(a)(1).  It does not say that standards apply only to motor vehicles that emit.  A standard can "appl[y]" to a class that includes zero-emission vehicles.  The Court should stick to the text.[13]

Petitioners latch onto the phrase "cause, or contribute to," which appears later in the same sentence.  Fuel Br. 51-53; *see* 42 U.S.C. § 7521(a)(1) ("the emission of any air pollutant from any class or classes of new motor vehicles …, which … *cause, or contribute to*" harmful air pollution (emphasis added)).  But "cause, or contribute to" simply refers to the emission "from any class or classes": The thing that causes or contributes to harmful pollution is the emission "from" a "class or classes" of motor vehicles, not the emission from each individual vehicle. 42 U.S.C. § 7521(a)(1).  That reading makes practical sense.  A single vehicle may "contribute" to harmful air pollution.  But ordinarily it could not "cause" such

---

[13] Petitioners wrongly claim that this and other courts have "adopted" their reading. Fuel Br. 52.  They spotlight shorthand descriptions of Section 7521(a)(1)'s first sentence. *See Truck Trailer Mfrs. Ass'n v. EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021); *NRDC v. EPA*, 954 F.3d 150, 152 (2d Cir. 2020).  But whether Section 7521(a) applies to zero-emission vehicles was not an issue in those cases.

pollution.  Resp. to Comments 351, JA_____.[14]  A group or groups of vehicles, by

contrast, could.  *See* Fuel Br. 53 (seemingly agreeing that multiple classes of

vehicles can cause harmful pollution); H. Rep. No. 89-899 at 3 (noting that

automobiles were responsible for some 50% of the nation's air-pollution problem).

Petitioners' reading would make some of the statutory text "superfluous" or

"insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  The Court should

adopt EPA's reading, which gives effect to every word in the statute and is the best

one.  *See id.*

    The rule of last antecedent cannot save Petitioners' contrary reading.  Fuel

Br. 51-53.  That rule is sometimes used to interpret "a list of terms or phrases

followed by a limiting clause."  *Lockhart v. United States*, 577 U.S. 347, 351

(2016); *see Barnhart v. Thomas*, 540 U.S. 20, 22, 26-27 (2003) (interpreting a list).

Section 7521(a)(1) has no such list.  More crucially, the rule of last antecedent "'is

not an absolute and can assuredly be overcome by other indicia of meaning.'"

*Lockhart*, 577 U.S. at 352 (quoting *Barnhart*, 540 U.S. at 26).

    That indicator is Section 7521(a)(1)'s second sentence, which specifies that

emission standards *do* apply to motor vehicles that use technologies to "prevent"

pollution—meaning zero-emission vehicles.  Section 7521(a)(1), in short, rejects

---

[14] In practice, EPA would not regulate an individual vehicle for causing harmful
pollution.

Petitioners' view that individual vehicles must cause or contribute to harmful air pollution and thus must emit.

Petitioners offer a cramped reading of the second sentence. They say it indicates that pollution-prevention controls are limited to "self-contained mechanism[s] to block or capture pollution that would otherwise be emitted"; controls that keep the pollutant from forming do not count. Fuel Br. 61. But this sentence says nothing of the sort. It discusses how standards should apply to vehicles for their useful life "whether [they] are designed as complete systems or incorporate devices to prevent or control [harmful] pollution." 42 U.S.C. § 7521(a)(1). This text thus underscores EPA's duty to look broadly at all available technologies. Had Congress instead meant to blacklist some technologies from EPA's consideration, it would have used different language in a different spot; it would not have limited EPA's authority in a sentence about the standards' applicability.

And Petitioners' reading implicitly concedes that emission standards *do* cover at least some zero-emission vehicles. *See* Fuel Br. 60-61. That concession maims Petitioners' argument, under Section 7521(a)(1)'s first sentence, that standards apply only to vehicles that emit. *See id.* at 50-55. In the end, their argument comes down to this: Emission standards apply to vehicles that capture all their pollution before it is emitted, but not to vehicles that, thanks to advanced

technologies, generate no pollution. This arbitrary distinction is found nowhere in Section 7521(a)(1), which directs EPA to consider all kinds of technologies, from complete systems to discrete devices.

More to the point, Section 7521(a)(1) aims to reduce overall fleet emissions. The statute does not care whether controls do that by preventing pollutants from forming or from emitting. And why should it? Favoring one kind of control over the other would defeat Congress's goal of reducing emissions using all feasible technologies.[15] EPA's standards can thus cover all zero-emission vehicles, however they prevent emissions.

Petitioners dismiss EPA's reading by analogizing zero-emission vehicles to iPods, contending that "it would not be natural to refer to an iPod as a system that prevents or controls record skips." Fuel Br. 61. An iPod, they say, "is not a record player with some built-in method of reducing record skips; it is a different technology altogether." *Id.*

That analogy betrays the chief flaw in Petitioners' statutory arguments. *See supra* Argument § III.A.1. The relevant classification is not record players (just as

---

[15] Petitioners' arbitrary distinction is especially nonsensical when it comes to carbon dioxide. *All* controls—including those used on gas vehicles, like stop-start technology and better aerodynamic design—work by preventing carbon dioxide from forming. There is no commercially available technology that reduces vehicle emissions by capturing carbon dioxide after it is produced. Resp. to Comments 302, JA_____.

under Section 7521(a), the relevant legal status is not gas vehicles). It is music

players (and motor vehicles). A record player is a music player, one that does not

reduce skips. An iPod is also a music player, but has a built-in mechanism that

reduces—indeed, prevents—skips. The ability to prevent skips, however, does not

alter an iPod's status as a music player. So too here: An electric vehicle's ability

to prevent emissions does not alter its legal status as a motor vehicle. 42 U.S.C.

§ 7550(2). Regardless, contrary to Petitioners' claim, it is natural to say that

electric vehicles are "designed as complete systems" of emission prevention. *Id.*

§ 7521(a)(1). In the design process, automakers add emission controls to motor

vehicles. Electric vehicles are motor vehicles designed to incorporate a system that

prevents emissions. And the plain text of Section 7521(a)(1)'s second sentence

confirms that emission standards apply to motor vehicles, whether they emit or not.

Petitioners' treatment of plug-in hybrids showcases the incoherence of their

position. Plug-in hybrids are essentially a cross between an electric vehicle and a

gas vehicle. 40 C.F.R. § 86.1803-01. They drive certain distances on electricity;

beyond that they use gas. There is no dispute that hybrids emit pollutants. *See*

Fuel Br. 9 n.2. So even under Petitioners' reading that Section 7521(a)(1)

regulates only vehicles that emit, EPA should be able to regulate plug-in hybrids.

Yet Petitioners think that EPA can regulate these vehicles only in gas mode.[16] Section 7521(a)(1), of course, draws no such distinction. Either a vehicle is a motor vehicle and thus comes under EPA's authority, or it is not and does not. Part-time regulation is not an option. *See* 42 U.S.C. § 7521(a)(1) ("such standard shall be applicable to such vehicles").

Ultimately, Petitioners confuse what the standards regulate with their effects. Under Section 7521(a)(1), standards are "applicable to" emissions from any class or classes of new motor vehicles. New motor vehicles, before they get emission controls, can potentially emit. The standards apply to those emissions. It is only once automakers comply with the standards by installing emission controls, like catalytic converters or electric motors, that emissions are reduced or even eliminated. *See* 89 Fed. Reg. at 27902/1-2; Resp. to Comments 351, JA_____; *cf.* Fuel Br. 59-60. But the standards' success in controlling emissions does not mean that the standards (or EPA's authority) are inapplicable in the first place.

---

[16] Petitioners challenge EPA's authority to regulate "electric vehicles." *See* Fuel Br. 4, 49-61. That term, as used by Petitioners, includes "plug-in hybrids using electricity derived 'from sources that are not onboard the vehicle.'" *Id.* at 9 n.2 (quoting 40 C.F.R. § 86.1866-12(a)). Although plug-in hybrids "have a gas engine," Petitioners say, "EPA attributes zero carbon-dioxide emissions to plug-in hybrids operating in 'charge-depleting mode'—*i.e.*, using electricity derived from an outside source." *Id.*; *see also id.* at 58 n.5. Simply stated, Petitioners challenge EPA's regulation of plug-in hybrids when they use electricity rather than gas.

### 3. Petitioners' remaining arguments are wrong.

None of Petitioners' remaining arguments shows that EPA lacks authority to regulate electric vehicles.

First, Petitioners are wrong that electric vehicles emit no pollutants. *E.g.*, Fuel Br. 50, 58-59. Although these vehicles have no tailpipe emissions, all existing electric vehicles could emit greenhouse gases through leaks in their air-conditioning systems. 89 Fed. Reg. at 27902/2. The rule accounts for this fact: Whether a light-duty vehicle is electric or not, automakers can earn credits for using lower-emitting air-conditioning systems. Those credits, in turn, are part of the fleet-average calculation. 40 C.F.R. § 86.1867-12; *see id.* § 1037.115(e) (setting air-conditioning-leakage standard for non-light-duty vehicles). Petitioners overlook this fact. Fuel Br. 58-59. So even if Section 7521(a)(1) were held to not apply to wholly zero-emission vehicles, EPA could keep regulating electric vehicles under that provision.

Second, Petitioners' reference to technological feasibility is misplaced. Fuel Br. 54, 59. No one here disputes the rule's feasibility; automakers—the regulated entities—have intervened to defend the rule. *See id.* at 4-5 (statement of issues); State Br. 3 (same). And neither Section 7521(a) nor EPA "pursues a single policy at all costs." Fuel Br. 59. That is why the statute limits the standards' stringency

to what is reasonably feasible, and why EPA considers feasibility in standard-setting.  The statute does not, however, bar EPA from regulating electric vehicles.

The 2024 rule also does not force automakers to "start from the ground up" or "*prohibit*" existing technologies.  State Br. 21.  It builds on existing technologies, like electric vehicles.  And automakers can use whatever technologies they want to comply.  *See* 89 Fed. Reg. at 28057-84 (giving examples of complying fleets with different mixes of gas, hybrid, and electric vehicles).  It is Petitioners, not EPA, who seek to prohibit existing technology by barring consideration of electric vehicles.

Third, the 1990 Clean Air Act amendments' clean-fuels program, 42 U.S.C. § 7581, did not amend Section 7521(a) or alter its meaning.  *Contra* Fuel Br. 56.  That was a pilot program directing EPA to set standards for vehicles running on "clean" fuels like ethanol, natural gas, and electricity.  *See* H. Rep. No. 101-490 at 283 (1990).  It did not cabin EPA's preexisting Section 7521(a) authority.  *See* Resp. to Comments 325, 346-47, JA_____, _____-__.  If anything, the clean-fuels program confirms that Congress saw electrification as an available control technology worth encouraging.[17]

_____

[17] EPA's Clean Air Act authority to regulate renewable fuels also does not exclude electrification from Section 7521(a).  *See* 42 U.S.C. § 7545(o)(12) (specifying that the renewable-fuels provisions do not limit EPA's other authority to regulate greenhouse gases); *cf.* Fuel Br. 30-31.

Finally, limits on NHTSA's authority to set fuel-economy standards under the Energy Policy and Conservation Act are irrelevant to what the Clean Air Act authorizes EPA to do. *See id.* at 359-60, JA_____-__; *contra* Fuel Br. 56-57. The two agencies have distinct sources of authority and distinct responsibilities. *Massachusetts*, 549 U.S. at 532; *see* Fuel Br. 57-58. Those differences are not "inconsistenc[ies]" that void EPA's authority. Fuel Br. 57. Though Petitioners accuse EPA of issuing standards on its own to "evade" NHTSA's statutory limitations, *id.* at 9, EPA has always set emission standards in line with its Clean Air Act authority, whether acting alongside NHTSA or not. *See* Resp. to Comments 359-60, JA_____-__.

In sum, Section 7521(a) authorizes EPA to regulate electric vehicles and to consider them in standard-setting. This is the best reading of the statute's plain text and it is supported by context and congressional intent. Petitioners' competing view reads words out of the statute and clashes with that intent. The Court should uphold EPA's reading.

## B.    The 2024 rule lawfully uses fleet averaging.

### 1.    Section 7521(a) authorizes fleet averaging.

For decades an integral part of EPA's vehicles program, fleet averaging embodies Section 7521(a)'s objectives.[18]  It reduces emissions using effective technologies while giving automakers flexibility in compliance.  Though Petitioners blame fleet averaging for allowing EPA to "requir[e] electrification," Fuel Br. 38, the averaging mechanism has nothing to do with electrification as such.  None of Petitioners' averaging arguments even speaks to electrification.  *Id.* at 38-49.  Nor does EPA's averaging authority implicate its authority to regulate electric vehicles or to consider them as control technologies.

EPA's authority to average is plain from the statute's text.  Section 7521(a) specifies that standards apply to emissions of pollutants "from any class or classes"—meaning groups—of motor vehicles.  42 U.S.C. § 7521(a)(1); Resp. to Comments 334, JA_____.  And nothing in that text supports Petitioners' view that standards can apply only to individual vehicles.  Fuel Br. 39.

EPA reasonably exercised its discretion in continuing the averaging program.  The program allows automakers to reduce emissions where and when it is cheapest to do so.  In this way, averaging achieves greater pollution reduction

---

[18] *See* 40 C.F.R. §§ 86.1818-12, 86.1819-14, 86.1865-12 (carbon dioxide); *id.* §§ 86.1811-27, 86.1861-17, 86.1864-10 (ozone precursors).

for the same cost while rewarding automakers for using the most effective controls. Resp. to Comments 335, JA_____; 136 Cong. Rec. 35367. And by creating a market that rewards effective controls, averaging encourages technological innovation. The averaging program thus advances Section 7521(a)'s goals of reducing emissions using innovative, effective controls while giving due consideration to automakers' lead time and compliance costs. 42 U.S.C. § 7521(a)(2); *see* Resp. to Comments 336, JA_____.

Fleet averaging also offers a tailored solution to the precise problem Congress wanted to fix. It focuses on reducing harmful emissions from fleets of motor vehicles—the emissions that concerned Congress. *Supra* Argument § III.A.2. But it lets automakers decide how to achieve those emissions given their business strategies. *See* S. Rep. No. 89-192 at 4 ("[T]he manner of meeting the standards … should be left to the manufacturer's determination."). That flexibility—offsetting high emitters with low emitters—allows automakers to offer a wide range of vehicle models to meet consumer demand. Fleet averaging, in short, allows EPA to zero in on the problem of overall motor-vehicle emissions without micromanaging matters in which Congress showed little interest.

On the flip side, were averaging banned as Petitioners urge, a more rigid regime would take its place. There would be no averaging of vehicles that exceed their emission targets with those that fall below their targets. Every vehicle would

have to meet its own target. That is a world of fewer vehicle models, less consumer choice, and lots of EPA micromanaging of automakers' fleets. *See* Statement of the Case § II. Fear of losing averaging is one reason that automakers intervened to defend a rule that regulates them.[19] If Petitioners are worried about the prospect of EPA "radically transform[ing] the Nation's vehicle fleet," Fuel Br. 22, they cannot do worse than to press their averaging argument.

And that argument is wrong. This Court upheld the averaging program soon after its creation. *See NRDC*, 805 F.2d at 425. Noting the absence of "any clear congressional prohibition of averaging," this Court held that EPA's argument— that averaging offers greater compliance flexibility—"makes sense." *Id.*;[20] *cf. White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1253 (D.C. Cir. 2014) (allowing averaging in regulation of stationary sources under 42 U.S.C. § 7412(d), which "neither expressly allows nor disallows emissions averaging"), *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

Congressional ratification of the averaging program dispels any doubts about its legality. When Congress amended the Clean Air Act in 1990, it acknowledged

---

[19] *See* Mot. of Alliance for Automotive Innovation for Leave to Intervene in Support of Respondents 4-5 (May 20, 2024).

[20] To the extent *NRDC*'s holding relied on *Chevron USA v. NRDC*, 467 U.S. 837 (1984), the Supreme Court has made clear that though it overruled *Chevron*, it did "not call into question prior cases that relied on the *Chevron* framework," which "are still subject to statutory *stare decisis*." *Loper Bright*, 144 S. Ct. at 2273.

*NRDC* and left the averaging program in place.  *See* 136 Cong. Rec. 35367; 136

Cong. Rec. 36713; Resp. to Comments 335-36, 345-46, JA_____-__, _____-__.

Elsewhere in the U.S. Code, Congress often recognizes EPA's authority to set

fleet-average standards.[21]  The Court should heed Section 7521(a)'s text and

Congress's intent.

### 2.     Fleet averaging aligns with other statutory requirements.

Petitioners disregard Section 7521(a)(1)'s direction that the standards apply

to "classes" of motor vehicles.  Fuel Br. 39.  Their chief case is that averaging is

incompatible with other statutory provisions.  *Id.* at 40-49.  That is wrong for both

EPA's greenhouse-gas and ozone-precursors regulations.

### a.     Greenhouse gases.

A new motor vehicle must be covered by a certificate of conformity before

entering commerce.  42 U.S.C. § 7522(a)(1).  To be certified, a vehicle must

"conform[] with the regulations prescribed under section 7521" and any other

terms specified by EPA.  *Id.* § 7525(a)(1).  Fleet-average standards are one such

regulation.  But so are a host of others.  Together, those regulations form EPA's

---

[21] *See, e.g.*, 26 U.S.C. §§ 30B(b)(3)(B), 30D(f)(7)(A) (providing tax credits to
certain vehicles certified to EPA's standards); 42 U.S.C. § 17013(a)(1)(A)(i)
(defining "advanced technology vehicle" by reference to compliance with bins
averaging); *id.* § 13212(f)(3)(C) (referencing "fleet average grams per mile of
carbon dioxide-equivalent emissions for that class of vehicle); Resp. to Comments
337, JA_____.

regulatory program. All new motor vehicles must comply with that program to be certified for conformity.

Here is how it works:

Well before a model year starts, automakers develop their compliance plans. Their applications for certification must include information about those plans. *See, e.g.*, 40 C.F.R. §§ 86.1829-15, 86.1843-01, 86.1844-01. That information includes testing data for vehicles that would be covered by the certificates and expected sales. *See id.* §§ 86.1829-15, 86.1844-01(d)(7), (13). EPA checks that the compliance plans make sense and meets with each automaker to discuss its plan. The submissions and meetings assure EPA that automakers have good-faith compliance strategies for the forthcoming model year.

With that assurance, EPA issues the certificates, which come with a host of conditions. One is that automakers must at all times comply with their fleet-average standards and in-use standards (which apply to individual vehicles). 40 C.F.R. § 86.1848-10(c)(2), (7). Another is that vehicles covered by the certificates must, in all material ways (including emission profile), match those described in the application for certification. *Id.* § 86.1848-10(c)(6); *see id.* § 86.1848-10(c) (listing other conditions). Automakers also warrant at time of sale that each new vehicle is designed to comply with all applicable emission standards and will be free from defects that may cause noncompliance. 42 U.S.C. § 7541.

At the end of the model year, if an automaker's fleet exceeds its fleet-average standard, the emission deficits can be banked (for up to three years) or offset using credits. 40 C.F.R. § 86.1865-12(k)(8)(i). If deficits are not offset in time, EPA voids the automaker's certificates *ab initio*, starting with the highest emitters, until the remaining fleet complies with the fleet-average standard. *Id.* § 86.1865-12(k)(8)(i)-(iii). Once voided, it is as if a certificate had never existed. That means that the automaker will have illegally put new motor vehicles into commerce without a certificate. 42 U.S.C. § 7522(a)(1). The penalty for that is severe: $57,617 per vehicle. Resp. to Comments 344-45, JA_____-__.

Whether a fleet is meeting its fleet-average standard depends on whether each vehicle within the fleet emits at the level contemplated in automakers' compliance plans. To ensure that each vehicle does, EPA enforces in-use standards that apply to individual vehicles. If enough vehicles fail their in-use standards, EPA can order a vehicle recall. 42 U.S.C. § 7541(c)(1).

Though Petitioners deem a litany of statutory provisions to be incompatible with fleet averaging, Fuel Br. 40-49, the reasons for that supposed incompatibility generally riff on two themes: (1) the statute contemplates that "*individual* vehicles may be tested for conformity," *id.* at 41 (citing 42 U.S.C. § 7522), 43-46 (citing 42 U.S.C. §§ 7541(c)(1)-(2), (h)(1), 7524(a), 7521(b), 7525(a), 7521(m)); *see id.* at 48-49 (citing 1970 Clean Air Act amendment allowing EPA to test individual

vehicles instead of prototypes); and (2) averaging makes it "impossible" to determine compliance with applicable emission standards before a vehicle enters commerce, *id.* at 41; *see id.* at 40-41 (citing 42 U.S.C. § 7525), 42 (citing 42 U.S.C. § 7541(a)); *see generally* Fuel Br. 40-49.

Neither objection works. First, EPA's regulatory program does test individual vehicles for conformity. *See* Resp. to Comments 345-46, JA_____-__ (explaining that testing of in-use vehicles addresses Congress's concern about testing on prototypes). That testing occurs when EPA enforces its in-use, vehicle-specific standards.[22]

Second, EPA does not certify, and automakers do not warrant, an unknown. Certificates and warranties are based on EPA-approved compliance plans and actual compliance with emission standards. *See* 40 C.F.R. §§ 86.1848-10(c), 86.1865-12(j)(2). If, after the model year ends, an automaker's fleet-average emission exceeds its fleet-average standard, that automaker must make up its deficits. Otherwise, EPA will void the automaker's certificates until the remaining fleet is in compliance. Averaging simply shifts some elements of the compliance

---

[22] In the 1980 notice that Petitioners spotlight, Fuel Br. 39, EPA considered whether to use fleet-average standards for the first time but noted that one issue to work out was that Section 7521 "assume[s] individual vehicle compliance with the applicable standards." 45 Fed. Reg. 14496, 14502/2 (Mar. 5, 1980). That is, a standard based on fleet averages should not exempt individual vehicles from compliance. EPA thus developed a regulatory program that allows averaging but also requires vehicle-by-vehicle compliance.

demonstration to after the model year ends. Nothing in the Clean Air Act precludes this compliance system, which EPA has successfully used for decades. To date, EPA has never had to void any certificate on account of failure to comply with fleet-average standards.

In fact, Congress itself has relied on delayed compliance demonstrations when it set standards under Section 7521. One provision requires an increasing percentage of certain model-year sales to meet specified criteria-pollutant standards. 42 U.S.C. § 7521(g)(1); *see* Fuel Br. 6. Another provision allows EPA to impose less stringent criteria-pollutant standards for up to 5% of certain model-year light-duty productions. 42 U.S.C. § 7521(b)(3); Fuel Br. 45-46. In both cases, model-year sales are a core element of the standards—just like they are in fleet averaging. And because those sales cannot be known until after the model year ends, Congress's own standards also delay compliance demonstration—just like fleet averaging does. *See* Resp. to Comments 343-44, JA_____-__. Congress thus confirmed that delayed compliance demonstration is compatible with other Clean Air Act provisions.

Petitioners' remaining arguments fare no better. One is that Section 7521(b) precludes averaging under Section 7521(a). *See* Fuel Br. 44-46; *e.g.*, 42 U.S.C. § 7521(b)(1)(A) (setting model-year 1977-1979 hydrocarbons and carbon-monoxide standards at certain numerical levels). Subsection (b) is an exception to

EPA's general standard-setting authority under Subsection (a).  *See* 42 U.S.C.

§ 7521(a) ("Except as otherwise provided in subsection (b)").  It does not limit

Subsection (a)'s scope.  Resp. to Comments 339, JA_____.  Anyway, Subsection

(b) predates Congress's express decision, in 1990, to let the averaging program

stand.  *See* Pub. L. No. 95-95, § 201, 91 Stat. 686, 751 (1977).  So it cannot be read

to restrict EPA's averaging authority.

Finally, Petitioners contend that because Congress expressly allowed

averaging in other contexts, Section 7521(a) must bar that approach.  Fuel Br. 47-

48.  That cannot be right when Congress affirmatively let EPA continue to use

averaging in 1990.  And Petitioners' two examples say little about what Section

7521(a) allows.  The first addresses reformulated gasoline and details the

consequences of not reducing the "average annual aggregate emissions of toxic air

pollutants" in certain areas.  42 U.S.C. § 7545(k)(1)(B)(v)(II).  The reference to an

average there is narrow and specific.  It does not inform what Section 7521(a),

which addresses vehicle emissions, allows EPA to do.  The same is true of the

Energy Policy and Conservation Act, which directs NHTSA to regulate fuel

economy.  Section 7521(a) is necessarily written more broadly than the fuel-

economy provisions because it authorizes EPA to regulate many pollutants, with

each requiring standards with distinct features.  *E.g.*, 89 Fed. Reg. at 27930/1-2.

None of Petitioners' arguments, in short, shows that fleet averaging under Section 7521(a) creates tension with other statutory provisions.

### b.    Ozone precursors.

The only criteria-pollutant standards that use averaging are those regulating ozone precursors. But these standards use bins averaging, which works differently than the averaging used for greenhouse-gas standards.

In bins averaging, both the fleetwide standard and the individual-vehicle standard exist as numerical limits and are known before the model year starts. *Supra* Statement of the Case § II.B. So bins averaging implicates none of the concerns that Petitioners raise about not knowing, at the start of the model year, the precise emission limit that applies to a vehicle. Fuel Br. 41-42. And because each vehicle is certified to a specific emission level, bins averaging requires individual-vehicle compliance. *Contra id.* at 41. So even if the Court were to agree with Petitioners' arguments as to greenhouse gases, it should uphold EPA's use of averaging for ozone-precursor standards. *See* 89 Fed. Reg. at 28143/3-44/2 (explaining that each portion of the rule is severable from the rest).

*    *    *

Because Section 7521(a) and statutory history make clear that Congress authorized EPA to use fleet averaging, the Court should uphold that authority.

**C.    The major-questions doctrine offers no reason to depart from statutory text.**

The major-questions doctrine is a "tool of statutory interpretation." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024). It instructs courts only in "certain extraordinary cases" involving transformative claims of statutory authority. *West Virginia*, 597 U.S. at 723. And it is not a license for this Court to override a statute's plain text. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring)

Cases applying the major-questions doctrine are rare. *See West Virginia*, 597 U.S. at 721-22 (citing only a handful). In those cases, given the "history and the breadth" of the newly asserted authority and where that authority has such profound economic and political significance, there is "reason to hesitate" before concluding that Congress meant to confer that authority. *Id.* at 721. Thus in *West Virginia* the Supreme Court invoked the doctrine when it concluded that EPA found, in the "vague language" of a "rarely used," "ancillary" statutory provision, an "unheralded power" representing a "transformative expansion" of its authority. *Id.* at 724. In that scenario, the Court demanded "clear congressional authorization." *Id.* at 723.

Though clear authorization exists here, *see supra* Argument § III.A-B, the major-questions doctrine does not even apply. Petitioners' real disagreement with

EPA is over a policy judgment that Congress entrusted to the agency (subject to arbitrary-and-capricious review), not over statutory interpretation.

And the hallmarks of an extraordinary case are absent: EPA acted within the heartland of its Section 7521(a) authority in setting fleet-average standards that apply to all vehicles in covered classes. That is what EPA has done in every vehicle greenhouse-gas rule (and even earlier in criteria-pollutant rules). By focusing on making the regulated source cleaner, EPA followed the approach approved in *West Virginia*. In every way that matters, this case bears no resemblance to those extraordinary ones that trigger the major-questions doctrine.

### 1. Petitioners' "major question" is untethered to an interpretive question.

As a tool of statutory interpretation, the major-questions doctrine is anchored in questions of statutory meaning. *See Save Jobs USA*, 111 F.4th at 80. Its function is "simple—to help courts figure out what a statute means." *Id.* The doctrine is not a free-roaming inquiry into whether EPA can "effectively mandate a nationwide transition from internal-combustion-engine vehicles to electric ones," Fuel Br. 4, or take actions with big impacts, State Br. 14.

Petitioners present no textual question to be interpreted under the major-questions doctrine. State Petitioners' discussion of the doctrine offers no clear textual interpretation that is contrary to EPA's. *Id.* at 14-26. Meanwhile, the major-questions section of Fuel Petitioners' brief refers to Section 7521's text only

once, Fuel Br. 37-38, and never gives a plausible competing textual interpretation that would address the purported "major question" about vehicle electrification, *id.* at 22-38.

Fuel Petitioners do offer two textual arguments in the second part of their brief. One is that EPA lacks authority to use fleet averaging. *Id.* at 39-49. The other is that EPA lacks authority to regulate zero-emission vehicles. *Id.* at 50-62. But neither argument addresses Petitioners' major question, whether EPA can mandate a shift to electric vehicles.

To begin, Fuel Petitioners' averaging arguments do not address electric vehicles as such; they would apply even if a fleet has only gas vehicles. *See id.* at 39-49. Petitioners' "major question" invocation, however, centers on electric vehicles. *Id.* at 4, 22-38. Because Petitioners offer no textual reading tethered to their stated major question, the doctrine cannot apply. Put another way, even if Petitioners were right about averaging and averaging were to be barred, that would not mean that EPA lacks authority to require individual vehicles to use electric motors for emission control;[23] it would just mean that EPA could no longer give automakers compliance flexibility through averaging.

---

[23] For example, EPA could set individual-vehicle standards that, if reasonably feasible, require zero tailpipe emissions.

Fuel Petitioners' alternative argument also does not align with their major-questions theory. That argument contends that Section 7521(a) allows EPA to regulate only vehicles that emit pollutants. Fuel Br. 18, 50-62. If that were really their textual reading, then Petitioners should agree that EPA can regulate plug-in hybrids, which undisputedly emit pollutants. Yet they would bar EPA from regulating plug-in hybrids insofar as they operate in electricity mode. *See supra* n. 16. To Petitioners, the real problem with plug-in hybrids, as with electric vehicles, is not whether or when they emit pollutants; it is that they "us[e] electricity derived from an outside source." Fuel Br. 9 n.2. Petitioners seem to have no problems with EPA regulating other hybrids even though those vehicles, like plug-in hybrids, use electricity to cut gasoline use. *See* 40 C.F.R. § 86.1803-01. The difference is that these hybrids do not recharge from an outside source. But Petitioners identify no textual basis for this distinction.

So understood, Fuel Petitioners' "major question" is not whether Section 7521(a) authorizes EPA to regulate zero-emission vehicles; it is how much electrification is too much. *Cf.* 89 Fed. Reg. at 27892/2 (explaining that all vehicles, including gas vehicles, rely on electrification technologies to control emissions). This is not a matter of statutory interpretation but a policy preference. And policy preferences do not trigger the major-questions doctrine.

Because Petitioners offer no questions of textual interpretation for the major-questions doctrine to resolve, the doctrine cannot apply.

### 2. EPA broke no legal ground by tightening earlier standards.

Nor is there anything extraordinary here to trigger the major-questions doctrine. The doctrine singles out for special treatment agency actions that claim "newfound," "unheralded," "rarely … used" powers to transform society. *West Virginia*, 597 U.S. at 724. It does not apply here because EPA simply tightened existing emission standards under its longstanding and oft-invoked authority. *See* Resp. to Comments 294-98, JA_____-__.

That authority is Section 7521(a), which EPA has used time and again to set and tighten vehicle-emission standards. All EPA's greenhouse-gas rules apply to electric vehicles in regulated classes and use fleet averaging. *Supra* Table 1. EPA's criteria-pollutant rules have done these things for even longer. *Id.* The 2024 rule is no exception. It is just "one more entry in an unbroken list" of many vehicle-emission rules. *West Virginia*, 597 U.S. at 726; *see* Resp. to Comments 294, JA_____ (explaining that the rule is an "iterative strengthening of existing emission standards"); *Biden v. Missouri*, 595 U.S. 87, 94 (2022) (per curiam) (noting agency's "longstanding practice" of imposing the kind of condition at dispute and not applying major-questions doctrine despite challengers' request). Intervention by automakers, the regulated entities, to support EPA confirms that

the rule is a "straightforward and predictable" example of regulations authorized under Section 7521(a). *Biden v. Missouri*, 595 U.S. at 95 (noting that healthcare workers "overwhelmingly support" vaccine mandate for healthcare workers in federally funded facilities). There is nothing staggering or novel about EPA's latest use of its authority. *See* Fuel Br. 22-38; *West Virginia*, 597 U.S. at 725 ("[E]stablished practice may shed light on the extent of power conveyed by general statutory language").

Instead, the main difference between the 2024 rule and its predecessors is its stringency. Resp. to Comments 297-98, JA\_\_\_\_-\_\_. That stringency underlies Petitioners' basic critique of the rule. *See* Fuel Br. 1 (stating that the rule is "so stringent" that automakers would need to use electric vehicles).[24] But stringency is reviewed under the arbitrary-and-capricious standard. It is not reason to apply the major-questions doctrine, which must be tethered to questions of statutory interpretation. Nor should disagreement with an agency's exercise of its authority masquerade as the reason that the agency lacks such authority.

At heart, the major-questions doctrine centers on novel assertions of agency authority, not the degree to which an agency used its existing authority. Thus in

---

[24] In a similar vein, Petitioners contend that only Congress can set standards that impose steep emission cuts. State Br. 23, 25. But Congress rejected that argument by specifying that EPA can go further by "revis[ing]" statutory standards. 42 U.S.C. § 7521(a)(1); *see id.* § 7521(b)(1)(C), (i)(3)(B); 89 Fed. Reg. at 27893/1 & n.477.

*West Virginia*, the Supreme Court balked at what it described as "newfound power" discovered "in a long-extant statute"—authority that it thought would restructure the American power market. 597 U.S. at 724. Similar concerns dominated cases that *West Virginia* relied on. *Id.* at 721-22; *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (authority to regulate tobacco after authority disavowed for years);[25] *Gonzalez v. Oregon*, 546 U.S. 243, 267 (2006) ("broad and unusual authority" to define medical standards); *Util. Air Regul. Grp.*, 573 U.S. at 309-10, 323-28 (authority to regulate many previously unregulated smaller sources under a program intended for large industrial sources); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 761 (2021) ("rarely … invoked" authority to impose eviction moratorium); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 112-13, 119 (2022) (per curiam) (authority to broadly mandate vaccines for first time); *see also Biden v. Nebraska*, 143 S. Ct. at 2369 (authority to create a "novel and fundamentally different loan forgiveness program" that was unlike the "minor" and "most[ly] … procedural" changes made earlier).

These concerns illuminate the limits of the major-questions doctrine. The doctrine does not care about an agency's continued progress down the same path

---

[25] *See also Massachusetts*, 549 U.S. at 531-31 (distinguishing *Brown & Williamson*, including that the agency had repeatedly disavowed authority).

where it has long trod.  It cares about an agency blazing a trail into an unexpected new realm.  *West Virginia*, 597 U.S. at 724-25.  Because the 2024 rule falls into the former category, the major-questions doctrine does not apply.

### 3.     The rule hews to the regulatory approach blessed in *West Virginia*.

Petitioners play up supposed similarities between the 2024 rule and the Clean Power Plan challenged in *West Virginia*—similarities that are, at best, superficial.  *E.g.*, Fuel Br. 2-3, 23.  In reality, the rule does precisely what the Supreme Court criticized the Clean Power Plan for not doing: focus on ensuring that regulated sources "operate more cleanly."  597 U.S. at 725-27.  Far from "expan[ding]" its authority in "transformative" ways, EPA continues to regulate the same source—motor vehicles—that it has always regulated, using the same regulatory framework that it has always used.  *Id.* at 724.

The Supreme Court viewed the Clean Power Plan as a novel attempt to restructure the entire power system.  *Id.* at 724-28.  EPA did not take a "technology-based approach" and limit itself to trying to make fossil-fuel-fired plants (the regulated sources) operate more cleanly.  *Id.* at 724-27.  It instead designed the plan to shift power generation to wind- and solar-powered sources, which it had no authority to regulate under the relevant provision.  *See id.* at 709, 712-14, 724-29.

This approach, the Supreme Court said, "fundamental[ly] revis[ed]" the statute, "changing it from one sort of scheme of regulation into an entirely different kind." *Id.* at 728 (internal brackets, ellipses, and quotation marks omitted); *see Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 119 (criticizing agency for regulating "everyday" risk rather than "occupational" risk); *Ala. Ass'n*, 594 U.S. at 763-64 (distinguishing regulations that "direct[ly] target[]" disease transmission from "far more indirect[]" regulation that bans evictions). The Court also faulted EPA for locating its "newfound power" in the "vague language of an ancillary provision" of the Clean Air Act. *West Virginia*, 597 U.S. at 724 (internal brackets and quotation marks omitted).

Had EPA followed the Clean Power Plan playbook here, it would have tackled the entire transportation system. It would have sought to phase out sources it regulates (motor vehicles) in favor of transportation it does not (bicycles, for example). And it would have done so by setting emission standards that regulated vehicles cannot meet. *See* Resp. to Comments 310, JA_____.

That, of course, is not what happened. The 2024 rule regulates only the sources that Section 7521(a) authorizes EPA to regulate, motor vehicles. And rather than trying to reduce overall emissions from the nation's transportation system, the rule focuses on making "the regulated source … operate more cleanly" by using more and better emission-control technologies. *West Virginia*, 597 U.S.

at 725.  Nor is there dispute about feasibility.  And because the Clean Air Act authorizes EPA to regulate motor vehicles, electric or not, there is no phasing out of regulated sources for unregulated ones.  *See* 42 U.S.C. § 7550(2); *supra* Argument § III.A.1.

By confining the rule to motor vehicles, EPA did not "transform national energy policy."  Fuel Br. 23.  It instead sought a feasible way to continue to reduce emissions from light- and medium-duty motor vehicles, a task that indisputably falls within EPA's core expertise.  *See* 89 Fed. Reg. at 27898/1-2.  Automakers' support underscores EPA's success in that task.

Petitioners contend that the major-questions doctrine applies because EPA asserted the power to "shift[] vehicles from internal combustion to electricity" by effectively "mandating" electric vehicles.  Fuel Br. 23; *see* State Br. 24-26.  This argument misunderstands the statute, the 2024 rule, and *West Virginia*.

First and most importantly, Petitioners' mandate theory—that EPA is requiring a shift from one kind of motor vehicles to another—turns on a distinction without a legal difference.  Section 7521(a) does not distinguish between different types of motor vehicles.  *See supra* Argument § III.A.1.  Absent a statutory hook, Petitioners' distinction cannot be the basis for applying the major-questions doctrine.  *See Save Jobs USA*, 111 F.4th at 80.

Second, the rule does not mandate any particular emission-control technology. Rather, EPA gave multiple examples of how automakers might comply with the standards using different control technologies. *See* 89 Fed. Reg. at 28057-84 (various tables). It is true that by tightening standards, EPA in effect required the light- and medium-duty fleets to use more emission-control technologies overall. But the standards are performance-based: They do not mandate which technologies, much less how much of it, to use. That decision is up to automakers.[26] And automakers' use of certain technologies does not transform standards into a mandate for those technologies. After all, every gas vehicle now has a catalytic converter to control ozone precursors and carbon monoxide. That does not make EPA's standards unlawful; it simply shows that the catalytic converter is a far more effective technology than others. Resp. to Comments 314-15, JA_____-__.

Petitioners also ignore changes in the vehicles market. A shift to electric vehicles is already well underway—thanks to market forces and other federal and state policies. 89 Fed. Reg. at 28094/1-95/1. Once a niche product, electric

---

[26] Historically, automakers *have* adopted different compliance strategies than what EPA had expected. Take the 2001 nitrogen-oxide standards for heavy-duty vehicles. EPA had concluded that the nitrogen-oxide absorber was the "only likely" control available given major barriers to using the alternative, selective catalyst reduction. Automakers, however, used selective catalyst reduction. Resp. to Comments 312-13, JA_____-__ (giving other examples).

vehicles are now becoming mainstream as costs fall, charging infrastructure builds up, and consumers gain familiarity with these vehicles. *Id.* at 27846/2-47/3, 28026/3, 28095/1. Many automakers plan to continue to electrify their fleets over the next decade, with the goal of reaching 40 to 50% electric-vehicle sales in 2030. *Id.* at 27848/2.[27] As EPA's analysis shows:

- In 2023, electric vehicles and plug-in hybrids accounted for 12% of light-duty sales. Resp. to Comments 314, JA_____.

- *Without* the 2024 rule, by 2032, electric vehicles and plug-in hybrids are expected to account for about 47% of new light-duty production. 89 Fed. Reg. at 28058 (tbl. 76) (no-action case).

- *With* the 2024 rule, by 2032, electric vehicles and plug-in hybrids are expected to account for 68% of new light-duty production. *Id.* at 28057 (tbl. 75).

In claiming that the rule will cause the electric-vehicle market to go from "7.5% … in 2022 to 68% … by 2032," Petitioners thus conflate the rule's effects with the much bigger effects of market forces and congressional subsidies. Fuel Br. 24.

---

[27] Though automakers reiterated these plans in their comments, some later said they were focusing more on plug-in hybrids. To reflect potential changes in automakers' product lineup, EPA in the final rule slowed the rate of stringency increases in the standards' early years. 89 Fed. Reg. at 27850/2.

Note too that the 68% scenario that Petitioners seize on—made up of 55% electric vehicles and 13% plug-in hybrids—is only one possible way to comply. *See* 89 Fed. Reg. at 28057-58 (tbls. 75 and 77). EPA modeled other alternate pathways that entail lower percentages of electric vehicles in complying fleets. *Id.* at 28068/1-78/3, 28982/1-84/3. For example, it is technologically feasible to meet the standards with only plug-in hybrids. *Id.* at 28087/3; Reg. Impact Analysis 2-57 to 59, JA_____-__; *contra* Fuel Br. 14.[28] Another potential pathway shows that it is technologically feasible for automakers to meet the standards with electric vehicles making up only 5% of their fleets (half of current levels). 89 Fed. Reg. at 27845/1, 28082/1-84/3. Though Petitioners quibble that this analysis "lock[s] in" a percentage of electric vehicles in automakers' fleets, Fuel Br. 14, they miss the point. Nothing in the record suggests that sales of electric vehicles will drop below 5% (or even current levels) without the rule. All evidence points the other way: The market is moving toward widespread adoption of electric vehicles. 89 Fed. Reg. at 27846/2-47/3, 28026/3, 28095/1. EPA expects automakers to choose their

---

[28] The Court cannot consider the extra-record document cited by Petitioners as evidence that no hybrid meets its footprint-based target levels in model-year 2032. Fuel Br. 14; *see* 42 U.S.C. § 7607(d)(7)(A). That information was not presented to the agency in time and anyway, it mischaracterizes plug-in hybrids. *See* Reg. Impact Analysis 2-58 to 59, JA_____-__. The Court likewise cannot consider Petitioners' extra-record press release describing EPA's proposed standards, which were more ambitious than the final ones. Fuel Br. 26-27.

compliance strategies given that reality. But that expectation does not diminish EPA's statutory authority.

Third, greater technology penetration is no reason to apply the major-questions doctrine. *Contra* Fuel Br. 25-26, 29, 31-32. Section 7521(a) itself authorizes EPA to push for the "development and application" of better, more effective technologies. 42 U.S.C. § 7521(a)(2); *see Int'l Harvester*, 478 F.2d at 628-29, 635; *NRDC v. EPA*, 655 F.2d at 328. Greater fleet adoption of better control technologies—like electric vehicles—is what is supposed to happen. And it is normal for regulations to cause "incidental" changes and even dislocations in a regulated industry. *West Virginia*, 597 U.S. at 731 n.4. Those changes, the Supreme Court said, differ in kind from the Clean Power Plan, which "simply announc[ed] what the market share of coal, natural gas, wind, and solar must be, and then requir[ed] plants to reduce operations or subsidize their competitors to get there." *Id.* Thus in *West Virginia* the Supreme Court saw nothing wrong with requiring fossil-fuel-fired sources to adopt source-based emission-control technologies. *See id.* at 727. Those kinds of controls, the Court said, were what EPA should have focused on, rather than dictating a "shift throughout the power grid from one type of energy source to another." *Id.* at 727-28; *see id.* at 727 (noting, with approval, EPA's history of "select[ing]" systems of emission

reduction like "efficiency improvements, fuel-switching, and add-on controls" (internal quotation marks omitted)).

In the end, Petitioners overstate *West Virginia*. The 2024 rule sets the kind of conventional emission standards—standards attainable by applying emission-control technologies to regulated sources—that *West Virginia* blessed. Nothing in *West Virginia* suggests that when EPA sets standards for covered classes of motor vehicles, that ordinary exercise of authority triggers the major-questions doctrine. This Court should reject Petitioners' misreading.

### 4. Petitioners' other arguments are meritless.

Petitioners' remaining major-questions arguments are just as flawed.

Though Petitioners trumpet the rule's significant costs, costs alone do not trigger the major-questions doctrine. *E.g.*, Fuel Br. 24-25; State Br. 14-16. To the contrary, courts normally resolve multi-billion dollar cases without invoking that doctrine. *See Biden v. Missouri*, 595 U.S. at 89; *Becerra v. Empire Health Found.*, 597 U.S. 424 (2022); *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022); *EME Homer City Generation, L.P.*, 572 U.S. 489 (2014); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005); *New York v. FERC*, 535 U.S. 1 (2002). Ordinary principles of statutory interpretation suffice for almost all cases.

This case is no different.  Congress decided to regulate motor vehicles using technology-based standards.  That approach, Congress knew, would be costly.  After all, "most Americans drive" and hundreds of millions of motor vehicles traverse the nation's roads.  State Br. 16; 2023 Trends Report 9, 46, JA_____, _____.  Even so, Congress accepted that price for reducing harmful emissions.  *See Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1118 (D.C. Cir. 1979) (reviewing legislative history and concluding that Section 7521's "cost of compliance" requirement was meant to avoid "undue economic disruption" for automakers and "doubling or tripling" motor-vehicle prices).  The prospect that the rule has the effects that Congress envisioned gives no "reason to hesitate" and thus apply the major-questions doctrine.  *West Virginia*, 597 U.S. at 721.

Otherwise, the doctrine would apply to every vehicle rule.  That cannot be right because the doctrine is reserved for "extraordinary" cases, not every time EPA tightens vehicle-emission standards.  *Id.* at 723.  More important to the major-questions analysis is an action's impact relative to what the agency had done earlier.  *See, e.g.*, *id.* at 725; *Biden v. Nebraska*, 143 S. Ct. at 2369.  The costs of the 2024 rule, however, are well in line with those of its predecessors:

|  | 2010 rule | 2012 rule | 2021 rule | 2024 rule |
|---|---|---|---|---|
| Model years covered | 2012-2026 | 2017-2025 | 2023-2026 | 2027-2032 |
| Total compliance costs (billions, in 2022 dollars) | $475 | $689 | $323 | $760 |
| Light-duty per-vehicle compliance costs (in 2022 dollars) | $1302 | $2429 | $1153 | $2074 |

Resp. to Comments 305, JA_____. In fact, this comparison is conservative. The earlier rules listed here regulate only greenhouse-gas emissions. The 2024 rule regulates greenhouse-gas *and* criteria-pollutant emissions. Even so, the 2024 rule's per-vehicle compliance costs for light-duty vehicles are comparable to and even less than those of earlier rules. *See id.* at 307, JA_____. Though the 2024 rule's total costs are higher, that is partly because the rule, unlike others in the table, also covers medium-duty vehicles and criteria pollutants. 89 Fed. Reg. at 27861 (tbls. 9-10) (showing that medium-duty vehicles have higher costs than light-duty vehicles), 27947/2 (discussing costs of controls for gas vehicles to comply with particulate-matter standards).[29]

Next, Petitioners criticize the rule's indirect effects on the energy markets, national security, and jobs. *See* Fuel Br. 27-28; State Br. 14-17. Petitioners'

---

[29] Petitioners' indignation about the rule's compliance costs rings hollow. Those costs are borne not by Petitioners but by automakers, who have intervened to support EPA.

argument proves too much. Most regulations, including past EPA vehicle standards, have indirect effects that ripple across the economy and society at large. Resp. to Comments 318-19, JA_____-__. Yet Congress authorized EPA to regulate motor vehicles using technology-based standards. That authority would necessarily affect everyone and impose costs in the product chain—automakers, fuel producers, consumers, employees, and others in domestic and global economies—even if electrification were not in play. *Id.* Broad effects alone do not trigger the doctrine.

At any rate, after consulting a host of other agencies ranging from NHTSA to the Department of Energy to the Department of State and more, EPA concluded that the 2024 rule would not have the kind of disruptive indirect impacts that Petitioners forecast. Resp. to Comments 321 & n.181, JA_____; 89 Fed. Reg. at 27982/1-3.[30]

To begin, EPA projected that "over 80% of the onroad fleet will still be [internal-combustion] vehicles." Resp. to Comments 3381, JA_____. This heavily gasoline-powered fleet is expected to increase total U.S. electricity consumption by only 7.6% by 2050. Reg. Impact Analysis 5-14, JA_____. Based

---

[30] EPA has expertise to assess these impacts. *Contra* Fuel Br. 31-33. Congress entrusted EPA to assess non-environmental impacts under the Clean Air Act. *See* Resp. to Comments 320, JA_____ (giving examples of Congress directing EPA to consider cost, energy, and safety); 89 Fed. Reg. at 28029/1 (noting EPA's many years of experience in assessing critical-minerals supplies).

on extensive analysis and consultation with the Department of Energy, EPA concluded that the power sector can continue to support more electric vehicles and plug-in hybrids—even accounting for its recent rules affecting that sector. *Id.* at 5-63 to 64, JA_____-__. Further, software can manage vehicle-charging time to reduce any stress on the electric grid. 89 Fed. Reg. at 28023/2-3. And vehicle-to-grid technology allows some electric vehicles to discharge electricity to the grid and *improve* its reliability. *Id.*

Equally wrong are Petitioners' assertions that the rule supposedly jeopardizes national security. Fuel Br. 33. The rule is projected to improve energy independence and security by reducing U.S. reliance on oil imports. 89 Fed. Reg. at 28113/2-14/1 & tbl. 219; *see* Resp. to Comments 3345, JA_____ (noting that increased electrification diversifies energy sources).

Beyond energy security, EPA also considered security issues of importing batteries and the minerals used to make them. After reviewing extensive literature on the subject and consulting with the Department of Energy, the Department of State, and NHTSA, EPA concluded that critical-mineral supply chains, both domestically and abroad, are developing in a "robust" way that will support compliance with the standards. Resp. to Comments 2569, JA_____; *see id.* at

2567-68, JA\_\_\_\_\_-\_\_.[31]  For example, automakers and other suppliers are securing

supplies of batteries and critical minerals while also investing in domestic supply

chains.  89 Fed. Reg. at 28029/3-30/1, 27852/1-2.  Meanwhile, Congress and the

Executive Branch have invested in U.S. and allied supply chains.  *Id.* at 28030/1.

Nor does the record support Petitioners' claim about impact on jobs.  Fuel

Br. 27.  Detailed analysis shows that manufacturing electric vehicles (when battery

packs are included) "will require more labor."  Reg. Impact Analysis 4-72,

JA\_\_\_\_\_; *contra* Fuel Br. 27.  So although it can be hard to fully quantify electric

vehicles' impact on employment, available evidence suggests a likely increase in

jobs.  Reg. Impact Analysis 4-72, JA\_\_\_\_\_.

Nothing in the record suggests that the 2024 rule is extraordinary.  This is a

routine dispute about stricter emission standards, the latest in a long line of

emission standards, all cast in the same regulatory mold.  The major-questions

doctrine does not apply.

---

[31] The Court should reject Petitioners' attempts to rely on various extra-record
material.  42 U.S.C. § 7607(d)(7)(A); *see* Fuel Br. 28 (citing Cooper declaration
and U.S. Energy Information Administration's website), 33 (citing NHTSA
statement); State Br. 17 (citing 2022 Department of Energy report).  Anyhow, none
of that material undermines the soundness of EPA's analysis.  For example, the
extra-record NHTSA statement focuses solely on domestic mining capacity.  It
does not cast doubt on EPA's analysis, which examines access to robust and secure
supply chains both domestically and in friendly countries.  89 Fed. Reg. at
28028/3-56/1.

### 5. Even under the major-questions doctrine, clear congressional authorization exists.

Even if the major-questions doctrine were to apply, the Court should still uphold the 2024 rule. For the reasons above, Section 7521(a)'s text provides the "clear congressional authorization" that the doctrine demands. *West Virginia*, 597 U.S. at 723. Congress authorized EPA to regulate classes of "motor vehicles," a term that captures electric vehicles. 42 U.S.C.§ 7550(2).

Having done so, Congress need not separately authorize EPA to regulate motor vehicles powered by electricity rather than gasoline. Petitioners would turn a clear-authorization requirement into one for Congress to list every single potential *application* of an authority it had expressly granted. *See* Fuel Br. 37; Resp. to Comments 291-94, JA_____-__. That ignores Congress's definition of motor vehicles and instruction for EPA to regulate them.

As if this instruction were not clear enough, Congress specified which vehicles are covered by emission standards: motor vehicles, "whether [they] are designed as complete systems or incorporate devices to prevent or control such pollution." 42 U.S.C. § 7521(a)(1). In other words: The standards apply to motor vehicles, including electric vehicles.

In the end, "[t]here is no reason, much less a compelling reason, … to read ambiguity into a clear statute." *Massachusetts*, 549 U.S. at 531. Whether the Court concludes that the major-questions doctrine does not apply or that

81

Congress's intent is clear, it should decline to convert the doctrine from a tool to interpret congressional intent into a tool to thwart it.

## IV. The 2024 rule is reasonable.

Petitioners' record-based arguments lack merit.

### A. EPA reasonably considered all vehicles' upstream emissions in setting standards.

For all types of motor vehicles—including electric vehicles—EPA used the same approach when assessing emissions. It considered upstream emissions when *evaluating possible standards*. But those emissions play no role in *assessing compliance* with the final standards. This approach accounts for upstream emissions while treating all vehicles the same way. *Contra* Fuel Br. 62-66.

To assess the impact of its action, EPA considered, among other factors, potential standards' reasonably foreseeable effects on air quality. That included assessing effects from direct vehicle emissions, like tailpipe emissions. *See* 89 Fed. Reg. at 28093/2-98/3 & tbl. 204. It also included assessing upstream emissions from, for example, electricity generation and petroleum production. *Id.* at 27858/1 & tbl. 4, 28006/3; *see* Resp. to Comments 594-95, JA_____-__; Reg. Impact Analysis Ch. 7, JA_____-__. This upstream analysis applied to all vehicles, be they gas or electric. Together, the direct and upstream analyses showed that though the standards are expected to increase emissions from electricity generation, those increases are dwarfed by reductions in vehicle and

refinery emissions.  89 Fed. Reg. at 27858 (tbls. 4-6).  Put another way, the

standards are expected to result in net emission reductions.

In assessing *compliance* with promulgated standards, however, EPA counts

only emissions from the regulated source, motor vehicles—not emissions from

refineries, power plants, or anything else.  Upstream emissions thus play no role in

compliance under Section 7521(a).  That is true whether a vehicle runs on gasoline

or electricity.  Resp. to Comments 3267, JA_____.

Petitioners do not challenge this approach as it applies to most vehicles.

And they do not urge changing the compliance analysis for gas vehicles so that

their emissions would now include upstream emissions from oil extraction and

refining.  But for electric vehicles (and plug-in hybrids in electric mode),

Petitioners think upstream emissions—from mining operations, battery production,

and power plants—should count toward compliance.  Fuel Br. 62-66.  Yet those

emissions, EPA explained, are not, as the statute provides, "from" classes of motor

vehicles and thus should not count in determining compliance with vehicle-

emission standards.  42 U.S.C. § 7521(a)(1); Resp. to Comments 3267-68,

JA_____-__.  That rationale also adheres to the Clean Air Act's structure.  Title I

governs stationary sources.  42 U.S.C. §§ 7401-15.  Title II, home of Section

7521(a), governs mobile sources.  *Id.* §§ 7521-90.  EPA cannot regulate emissions

from *stationary* sources using its *mobile*-source authority.  89 Fed. Reg. at

27923/2-3.

Nor did Congress require EPA to consider upstream electricity generation

under Section 7521(a).  *Contra* Fuel Br. 64 (citing 49 U.S.C. § 32904(a)(2)).

Petitioners conflate Section 7521(a) with the Energy Policy and Conservation Act,

which governs NHTSA's fuel-economy program.  *See Massachusetts*, 549 U.S. at

531-32.

To be clear, EPA does not "turn a blind eye" to upstream emissions.  Fuel

Br. 65.  To the extent that electric vehicles "shift nearly all operational emissions

upstream (to the power sector)," *id.* at 64, those emissions are regulated by EPA—

under its Title I authority, *see, e.g.*, 89 Fed. Reg. 39798 (May 9, 2024).  The same

is true of upstream emissions attributable to gas vehicles.  *See, e.g.*, 89 Fed. Reg.

16820 (Mar. 8, 2024) (oil-and-natural-gas facilities); 88 Fed. Reg. 11556 (Feb. 23,

2023) (lead-acid-battery manufacturing); Resp. to Comments 3267-69, JA_____.

The line that EPA draws between stationary sources and mobile sources also

makes practical sense.  Section 7521 makes automakers responsible for emissions

from all components of their vehicles, be it the air-conditioning system or test fuel.

That is sensible because automakers control their vehicles' emissions.  But

counting upstream emissions would require automakers to account for emissions

that they cannot control.  That, EPA reasonably decided, is inappropriate.  89 Fed.

Reg. at 27923/3; *see* Fuel Br. 65 (improperly equating test fuel used in vehicles with upstream sources).

As for EPA's different view earlier, Fuel Br. 64, that view did not reflect EPA's traditional approach, 75 Fed. Reg. at 25341/2, and has been rejected. The current approach to emission-counting for greenhouse gases, by contrast, has been used for more than a decade. It also better accounts for the Clean Air Act's structure. 89 Fed. Reg. at 27923/1-3.

At bottom, EPA assessed the standards' reasonably foreseeable impacts—and thus considered significant upstream emissions—when assessing potential standards. The compliance analysis, by contrast, asks whether automakers meet the standards. In both analyses, EPA reasonably treated the upstream emissions of all vehicles the same way. The Court should reject Petitioners' argument.

## B. EPA reasonably rejected regulating fuels.

Petitioners next claim that EPA should have considered requiring greater use of high-octane fuels or biofuels as a "solution to the issue of pollution from vehicle emissions." Fuel Br. 66. But Section 7521(a) directs EPA to adopt standards for *vehicles*, not *fuels*. What is more, the Clean Air Act prohibits EPA from regulating fuels to control air pollution except after considering "other technologically or economically feasible means of achieving emission standards under section 7521." 42 U.S.C. § 7545(c)(2)(A). To that end, EPA tightened existing vehicle-emission

standards.  The agency thus did what it was supposed to under the Act.  *See* Resp. to Comments 3147, JA_____.

Nor do the standards conflict with the Renewable Fuel Standard program. Congress specified that renewable-fuel requirements do not limit EPA's ability to regulate greenhouse-gas emissions through other Clean Air Act programs.  42 U.S.C. § 7545(o)(12); *see* Resp. to Comments 326, JA_____.  Renewable fuels thus simply offer one avenue for EPA to address greenhouse-gas emissions.  Resp. to Comments 346, JA_____; *see* Fuel Br. 66-67 (ignoring EPA's explanation).

EPA thus reasonably declined to consider regulating fuels here.  *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (explaining that EPA need not consider "every alternative proposed").

## C.    The cost-benefit analysis was not a basis for the rule and anyway, it is reasonable.

To set the standards' stringency, EPA focused on statutory factors:  Section 7521(a) directs EPA to regulate harmful emissions, while accounting for the standards' feasibility.  42 U.S.C. § 7521(a)(2).

In its statutory analysis, EPA assessed the feasibility of various control technologies.  *E.g.*, 89 Fed. Reg. at 28094/1-95/2.  It explained that electric vehicles—which can achieve major emission reductions—are already on the market and growing in popularity.  *Id.* at 28086/2.  And the standards' compliance costs are generally in line with those in past greenhouse-gas rules (even though the

2024 rule also regulates criteria pollutants and medium-duty vehicles). Resp. to Comments 305 (tbl. 2), JA_____. Against these factors, EPA considered the 2024 rule's significant emission reductions. 89 Fed. Reg. at 28095/2. Given that Section 7521(a)'s primary goal is to reduce harmful emissions and given the reasonable compliance costs within the available lead time, EPA concluded that the final standards are appropriate. *Id.* at 28096/3.

Petitioners do not challenge EPA's analysis of the statutory factors. What they do challenge is EPA's monetized cost-benefit analysis. Fuel Br. 67-70; State Br. 29-31. This analysis is not required (or even mentioned) by Section 7521(a). It was instead done under Executive Order 12866. 89 Fed. Reg. at 28091/3. And the cost-benefit analysis did not drive EPA's selection of the standards. The analysis, which showed that the standards are expected to have substantial net benefits, merely "reinforce[d]" EPA's conclusion that the final standards were appropriate. *Id.* At any rate, EPA's cost-benefit analysis was reasonable and entitled to deference. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (stating that courts review cost-benefit analyses deferentially and given their complexity, petitioners' burden to show error is high); *Growth Energy*, 5 F.4th at 15 ("The court is particularly deferential to agencies' predictive judgments, requiring only that the agency acknowledges factual uncertainties and

identify the considerations it found persuasive." (internal quotation marks omitted)).

### 1. EPA reasonably estimated costs.

In critiquing EPA's cost estimates, Petitioners fail to grapple with the extensive record. State Br. 29-31; Fuel Br. 67-69. That record shows that EPA reasonably estimated the standards' costs.

To begin, EPA fully accounted for the standards' expected costs on the power sector. *See* Reg. Impact Analysis, Ch. 5, JA_____ -__; Resp. to Comments 2816-18, JA_____-__; *contra* State Br. 29-31. In this analysis, EPA used a state-of-the-art, peer-reviewed model to assess the rule's effects on electricity prices, electric-power sector emissions, as well as electricity generation, transmission, and distribution. 89 Fed. Reg. at 28020/1-26/1; Reg. Impact Analysis Ch. 5, JA_____-__.

That analysis showed that the standards would result in at most a 3% increase in annual upgrade costs and, by 2055, only a 2.5% increase in retail electricity prices. 89 Fed. Reg. at 28018/1; Reg. Impact Analysis 5-18, JA_____. And the need for new transmission lines will be "very small," roughly 1% or less of current capacity. Reg. Impact Analysis 5-24, JA_____. The Court cannot consider Petitioners' extra-record declarations. State Br. 30; *see* 42 U.S.C. § 7607(d)(7)(A). This material, moreover, relies on an anecdote about one

California city's experience, generalized to wildly different settings.  State Br. 30.

That cannot undercut EPA's data-driven analysis.  *See Pub. Emps. for Env't Resp.*

*v. EPA*, 77 F.4th 899, 918 (D.C. Cir. 2023) (stating that courts are "highly

deferential" in considering EPA's weighing of various factors like anecdotal

evidence).

 EPA also analyzed the combined effects on grid reliability from its vehicle

standards and recent power-sector rules.  Reg. Impact Analysis 5-63 to 64,

JA_____-__; Resource Adequacy Analysis, JA_____-__; *contra* State Br. 30.  Its

analysis concluded that those cumulative impacts are well within the range

expected to preserve grid reliability.  Resource Adequacy Analysis 2, JA_____.

EPA also concluded that combined net costs for generation and transmission will

decrease year over year, mainly because of power-sector improvements from the

Inflation Reduction Act.  Reg. Impact Analysis 5-58, JA_____.  Many utility-

sector commenters confirmed that the standards would support more investments

in grid reliability.  89 Fed. Reg. at 28017/2-3 n.947.

 Next, Petitioners' criticism of EPA's per-vehicle cost estimates only

highlights their reasonableness.  Fuel Br. 67-68.  EPA estimated the average

incremental vehicle cost—the cost (including indirect costs) to bring a fleet into

compliance with its fleet-average standard, spread out across the entire fleet—to be

$2,074 per light-duty vehicle in 2032 and $1,203 per light-duty vehicle on average

between 2027 and 2032. 89 Fed. Reg. at 27861 (tbl. 9), 27861/1; Reg. Impact

Analysis 2-71, JA_____; Resp. to Comments 1793, JA_____. Petitioners question

that approach, pointing to an automaker's securities filing. Fuel Br. 68. But one

automaker's choice about how to present quarterly financial results to

shareholders—spreading certain costs across only electric vehicles—says nothing

about the reasonableness of EPA's choice about how to estimate costs of its fleet-

average standards. *See* Resp. to Comments 1793-94, JA_____-__.

Finally, though Petitioners fault EPA for not explaining why some

automakers' incremental costs will decline under the rule, Fuel Br. 68, the blame

falls on them for not raising the issue in comments. *See* Draft Reg. Impact

Analysis 13-26, JA_____; Reg. Impact Analysis 12-25 (tbl. 12-42), JA_____. The

Court should not consider this argument. 42 U.S.C. § 7607(d)(7)(B). Anyway,

lots of variables—from redesign cycles to product lineup to tax credits to greater

production know-how and more—can affect a given automakers' costs. So

declining costs among some automakers in some years do not undermine the

reasonableness of EPA's overall cost estimate.

## 2. Evidence supports projected fuel savings.

EPA estimated that the standards would lead to $1 trillion in fuel savings.

That estimate is supported by ample evidence. 89 Fed. Reg. at 27860 (tbl. 8);

*contra* Fuel Br. 69-70.

Standard economic theory posits that in a perfect market—where rational actors are armed with full information and enjoy perfect competition—consumers would, all else being equal, buy more fuel-efficient vehicles to save money. Reg. Impact Analysis 4-56 to 59, JA_____; Resp. to Comments 2404-05, JA_____. But practice has shown that the vehicles market is far from perfect. 89 Fed. Reg. at 28137/1. This market failure—new emission technologies not being adopted even though their additional costs are quickly paid by fuel savings—is called the energy-efficiency gap. *Id.* at 28136/3-37/2. For years, EPA has observed this gap in a range of such technologies. *Id.* Yet once EPA has adopted stricter emission standards, those technologies have quickly proliferated. *Id.*; Reg. Impact Analysis 4-56 to 59, JA_____-__.

Petitioners make two arguments about the energy-efficiency gap. First, they say EPA provided no evidence of the gap's existence. As support, they cite only EPA's observation that there is no consensus on *why* the gap exists. Fuel Br. 69. But that does not erase the gap's *existence*, which the agency has documented for over a decade. 89 Fed. Reg. at 28136/3 & n.1546.

Second, Petitioners contend that no market failure exists because efficiency compromises horsepower, towing capacity, and other vehicle attributes. Fuel Br. 70. But EPA considered and rejected that theory after reviewing multiple published studies. Those studies found that technologies have "improved fuel

economy without hindering performance, and in some cases, while also improving performance." Reg. Impact Analysis 4-56, JA_____; *see* 89 Fed. Reg. at 28137/1 & n.1547. EPA's estimate of the standards' fuel savings was thus reasonable.

### 3. EPA's climate-benefit estimate is sound.

Petitioners also challenge EPA's estimate of the standards' climate benefits. State Br. 26-29. But as with the rest of the cost-benefit analysis, monetized climate benefits played no role in EPA's choice of standards. *See* 89 Fed. Reg. at 28091/3.

In fact, the crux of Petitioners' arguments is that EPA overestimated the rule's climate benefits. State Br. 27-29. But in the cost-benefit analysis, even if climate benefits had been zero, the rule would still have net benefits. *See* 89 Fed. Reg. at 27860 (tbl. 8). Climate benefits thus affected the magnitude, but not existence, of the rule's net benefits. And in setting standards, EPA "did not seek to select standards that would maximize net benefits" from the cost-benefit analysis. Resp. to Comments 1523, JA_____. So any error in estimating climate benefits is harmless. *Id.* at 1520, JA_____; *City of Portland v. EPA*, 507 F.3d 706, 711 (D.C. Cir. 2007).

The Court should, in any event, reject Petitioners' climate-benefit argument. The Executive Branch has long sought to monetize the impacts to society from changing greenhouse-gas emissions. 89 Fed. Reg. at 28115/3-16/1. We refer to

monetized net benefits from expected greenhouse-gas reductions as "climate benefits."

EPA calculated the present value of climate benefits using discount rates. *Id.* at 27859/2; *see* Circular A-4 (2003) at 31-33, JA\_\_\_\_-\_\_ (explaining relationship between present value and discount rates). Citing Circular A-4 (2003), Petitioners fault EPA for not using a 7% discount rate. State Br. 28. That argument ignores the nature of climate benefits. Regulatory effects can fall on both capital and consumption. A 7% discount rate was intended to address the costs of displacing capital. Circular A-4 (2003) at 33, JA\_\_\_\_. Consumption effects, by contrast, use a lower discount rate. *Id.* Climate benefits are consumption-based. Reg. Impact Analysis 6-12, JA\_\_\_\_. So discounting climate benefits using 7%—the rate used for capital—would "inappropriately underestimate" those benefits. *Id.*; *cf.* Circular A-4 at 77-79 (2023) (no longer recommending use of higher discount rate for capital); 89 Fed. Reg. at 27985/1 n.723 (explaining that EPA sought to incorporate the updated Circular A-4 when possible). In addition, the Office of Management and Budget recently confirmed that special considerations arise in the kind of intergenerational discounting involved in climate-change analysis and that 7% is "not considered appropriate." Greenhouse-gas Report 9 n.14, JA\_\_\_\_; *see also* Circular A-4 (2003) at 36, JA\_\_\_\_.

Petitioners also err in contending that EPA updated its methodology without giving a chance to comment.  State Br. 28.  In reality, at proposal EPA alerted everyone that its climate-benefit estimates relied on "interim" values that were meant to be used "until updated estimates of the impacts of climate change can be developed based on the best available climate science and economics."  88 Fed. Reg. 29184, 29372/1 (May 5, 2023).  EPA then noted that it was developing updated methodologies to estimate climate benefits, and even pointed the public to a draft, which was being proposed for use in another rule.  *Id.* at 29372/2-3.  These statements "gave commenters meaningful notice" that the methodology for estimating climate benefits "might change, and thus provided an opportunity for them to comment."  *Window Covering Mfrs Ass'n v. CPSC*, 82 F.4th 1273, 1285-86 (D.C. Cir. 2023).  Anyway, EPA explained that it would have finalized the same standards even if it had used the proposed estimates, which relied on the interim methodology.  Resp. to Comments 1523 n. 380, JA_____; Reg. Impact Analysis A9-6, 9-21 to 22, JA_____, _____-__.

Even if there were any procedural error, it would be harmless because there is no "substantial likelihood" that the rule would have been "significantly changed" absent such error.  42 U.S.C. § 7607(d)(8); *see Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 852 (D.C. Cir. 2024).  EPA's updated methodology was used

to estimate climate benefits, one component of EPA's cost-benefit analysis. But EPA did "not … rely" on that analysis to set the standards. 89 Fed. Reg. 27857/3.

Next, Petitioners criticize EPA for "relying" on an emission scenario known as "RCP8.5." State Br. 27. The Court cannot consider this argument because it was not raised in comments. 42 U.S.C. § 7607(d)(7)(B). And EPA did not rely on RCP8.5. *See* Greenhouse-gas Report at 24-33, JA\_\_\_\_-\_\_ (explaining why EPA's chosen projections are preferred over RCP8.5 and other scenarios).

EPA also properly considered the global effects of reducing emissions. *Contra* State Br. 5, 29. Climate change harms U.S. interests through impacts within U.S. borders, as well as impacts outside U.S. borders that affect the welfare of Americans through the interconnected global economy, supply-chain effects, and spillover impacts of climate actions elsewhere. Greenhouse-gas Report 12-19, JA\_\_\_\_. Focusing on climate impacts occurring solely within U.S. borders, as Petitioners urge (State Br. 29), would "underestimate" benefits of greenhouse-gas mitigation for U.S. citizens and residents. Greenhouse-gas Report at 16, JA\_\_\_\_.

Nor does the Clean Air Act bar EPA from considering global impacts. For support Petitioners cite the Act's goal of improving the nation's air quality—hardly a requirement to *ignore* overseas impacts. 42 U.S.C. § 7401(b)(1); State Br. 29. And the presumption against extraterritorial application is irrelevant because the standards apply only to vehicles sold in the United States. State Br. 29.

# CONCLUSION

The Court should dismiss or deny the petitions.[32]

Submitted on November 26, 2024

| | |
|---|---|
| *Of counsel* | Todd Kim |
| Ryland Shengzhi Li | Assistant Attorney General |
| David P.W. Orlin | |
| Seth Nolbaum | */s/ Sue Chen* |
| Kyle Durch | Sue Chen |
| U.S. Environmental Protection | Alex J. Hardee |
| Agency | Jin Hyung Lee |
| Office of General Counsel | U.S. Department of Justice |
| Washington, D.C. | Environment & Natural Resources Div. |
| | Environmental Defense Section |
| | P.O. Box 7611 |
| | Washington, D.C. 20044 |
| | 202.305.0283 (Chen) |
| | 202.305.5105 (Hardee) |
| | 202.514.2640 (Lee) |
| | sue.chen@usdoj.gov |
| | alex.hardee@usdoj.gov |
| | jin.hyung.lee@usdoj.gov |

---

[32] Were the Court to disagree, EPA requests the chance to brief remedies.

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font.

I also certify that this brief complies with the Court's July 17, 2024, order because by Microsoft Word's count, it has 20,758 words, excluding the parts of the brief exempted under Rule 32(f).

Finally, I certify that on November 26, 2024, I electronically filed this brief with the Court's CM/ECF system, which will serve each party.

*/s/ Sue Chen*