**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 24-1087 (and consolidated cases)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COMMONWEALTH OF KENTUCKY, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
et al.,

*Respondents.*

**PROOF BRIEF OF STATE AND PUBLIC INTEREST
RESPONDENT-INTERVENORS**

ROB BONTA
*Attorney General of California*
TRACY L. WINSOR
*Senior Assistant Attorney General*
DENNIS L. BECK, JR.
*Acting Senior Assistant Attorney General*
MYUNG J. PARK
*Supervising Deputy Attorney General*
KAVITA P. LESSER
*Acting Supervising Deputy Attorney
  General*

MICAELA M. HARMS
M. ELAINE MECKENSTOCK
THEODORE A.B. MCCOMBS
*Deputy Attorneys General*
  600 W. Broadway, Suite 1800
  San Diego, CA 92186-5266
  Telephone: (619) 738-9003
  Theodore.McCombs@doj.ca.gov

*Attorneys for Respondent-Intervenor State of California*

*Additional counsel listed in signature block*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, the undersigned counsel provides the following information for all consolidated cases.

### A.    Parties and Amici

**1.** All parties, intervenors, and amici appearing in these consolidated cases are listed in the Initial Brief for State Petitioners (ECF No. 2073629), Initial Brief for Private Petitioners (ECF No. 2073654), and the Environmental Protection Agency's (EPA) Proof Answering Brief (ECF No. 2086969), with the exception of the following:

*Amici for Respondents*:

National League of Cities and the U.S. Conference of Mayors; American Thoracic Society, American Academy of Family Physicians, American Academy of Pediatrics, American College of Physicians, American Medical Association, and other major medical organizations; Margo T. Oge and John Hannon; Consumer Reports; Climate Scientists Michael Oppenheimer, Noah S. Diffenbaugh, Christopher B. Field, Stephen W. Pacala, Daniel P. Schrag, and Susan Solomon; International Council on Clean Transportation and University of California, Davis Institute of Transportation Studies; Institute for Policy Integrity at New York University School of Law; and Constitutional Accountability Center.

**2.** The Respondent-Intervenor Public Interest Organizations joining this brief are Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, Appalachian Mountain Club, Center for Biological Diversity, Clean Air Council, Conservation Law Foundation, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Public Citizen, and Sierra Club. All are non-profit public interest organizations; none of them has any parent corporation; and no publicly held entity owns 10 percent or more of any of them.

### B.    Rulings Under Review

The agency action under review is entitled, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27,842 (Apr. 18, 2024).

### C.    Related Cases

The state and private petitioners in *Nebraska v. EPA*, No. 24-1129 (D.C. Cir.), which concerns EPA's greenhouse gas emission standards for heavy-duty vehicles, overlap significantly with the Petitioners here, and they bring many of the same arguments. *See* Case No. 24-1129, ECF Nos. 2080261, 2080266. However, neither set of petitioners have styled these cases as related.

ii

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Statutes and Regulations ........................................................................... 3

Statement of the Case ................................................................................ 3

Summary of the Argument ........................................................................ 3

Argument .................................................................................................... 4

    I.   Petitioners' Statutory Authority Arguments Are Untimely ................. 4

    II.  Section 202 Does Not Exclude Zero-Emission Technologies ............. 5

        A.   Section 202 Authorizes Standards that Reflect the Increased Application of Advanced Pollution Technologies ..................... 6

        B.   Section 202 Contains No Technology Exclusion for Non-Polluting Propulsion Systems ........................................................ 9

        C.   Petitioners' Arguments for a Technology Exclusion Are Unavailing ............................................................................... 14

    III.  Section 202 Authorizes Fleet-Average Standards ............................ 24

    IV.  The Major Questions Doctrine Does Not Apply ............................. 28

Conclusion ............................................................................................... 31

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Coalition for Responsible Regulation, Inc. v. Environmental Protection
    Agency, 684 F.3d 102 (D.C. Cir. 2012) ...................................................... 18

Cyan, Inc. v. Beaver County Employees Retirement Fund,
    583 U.S. 416 (2018) ...................................................................................... 19

Facebook, Inc. v. Duguid,
    141 S.Ct. 1163 (2021) .................................................................................. 19

Growth Energy v. Environmental Protection Agency,
    5 F.4th 1 (D.C. Cir. 2021) ............................................................................ 5

International Harvester Co. v. Ruckelshaus,
    478 F.2d 615 (D.C. Cir. 1973) ...................................................................... 8

Loper Bright Enterprises v. Raimondo,
    144 S.Ct. 2244 (2024) .................................................................................. 8

Massachusetts v. Environmental Protection Agency,
    549 U.S. 497 (2007) ...................................................................................... 9

*Natural Resources Defense Council v. Environmental Protection
    Agency, 655 F.2d 318 (D.C. Cir. 1981) ....................................................... 7-8

*Natural Resources Defense Council v. Thomas,
    805 F.2d 410 (D.C. Cir. 1986) ...................................................................... 26

Rotkiske v. Klemm,
    589 U.S. 8 (2019) .......................................................................................... 23

Save Jobs USA v. Department of Homeland Security,
    111 F.4th 76 (D.C. Cir. 2024) ...................................................................... 28

* Authorities on which this brief chiefly relies are marked with an asterisk.

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)................................................................25

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022)...........................................................28-30

*Whitman v. American Trucking Associations, Inc.*,
    531 U.S. 457 (2001)................................................................30

### STATUTES

United States Code, Title 42
    §7401(a)(3) ......................................................................16
    §7401(c) ..........................................................................14
    *§7521(a)(1) ......................... 4, 6, 7, 9-11, 15, 17-18, 19, 24
    *§7521(a)(2) ...............................................................6-7, 25
    §7521(a)(3) ...........................................................19, 20-21
    §7521(a)(6) ......................................................................27
    §7521(e) ..........................................................................13
    *§7521(g) ....................................................................8, 27
    §7521(h) ..........................................................................27
    §7521(i) ............................................................................8
    §7521(j) ...........................................................................27
    §7525(a) ..........................................................................27
    §7586 ..............................................................................22
    §7607(b)(1) ..............................................................3, 4, 5

United States Code, Title 49
    §32901(a)(8) ....................................................................21
    §32902(h)(1) ....................................................................21

iii

## TABLE OF AUTHORITIES
### (continued)

Page

**FEDERAL REGULATORY MATERIAL**

40 C.F.R. §86.090-5(b) ................................................................24

27 Fed. Reg. 2152 (Mar. 6, 1962) .................................................16

31 Fed. Reg. 5170 (Mar. 30, 1966) .................................................7

32 Fed. Reg. 8622 (Jun. 15, 1967) ................................................16

35 Fed. Reg. 17,288 (Nov. 10, 1970) ..............................................7

39 Fed. Reg. 21,068 (Jun. 18, 1974) .............................................13

45 Fed. Reg. 14,496 (Mar. 5, 1980) ..............................................25

45 Fed. Reg. 79,382 (Nov. 28, 1980) .............................................25

48 Fed. Reg. 33,456 (Jul. 21, 1983) ..............................................25

54 Fed. Reg. 22,652 (May 25, 1989) .............................................26

55 Fed. Reg. 30,584 (Jul. 26, 1990) ..............................................26

56 Fed. Reg. 25,724 (Jun. 5, 1991) ...............................................28

65 Fed. Reg. 6698 (Feb. 10, 2000) ..............................................8-9

79 Fed. Reg. 23,414 (Apr. 28, 2014) ...........................................9, 20

89 Fed. Reg. 27,842 (Apr. 18, 2024) ........... 5, 13, 17, 18, 20, 24, 25, 27, 28-30

89 Fed. Reg. 52,540 (Jun. 24, 2024) .............................................21


**LEGISLATIVE MATERIAL**

Pub. L. No. 89-272, 89 Stat. 992 (1965) ..........................................5

iv

# TABLE OF AUTHORITIES
## (continued)

Page

Pub. L. No. 91-604, 84 Stat. 1676 (1970)................................................5, 13, 19

Pub. L. No. 94-413, 90 Stat. 1260 (1976)........................................................16

Pub. L. No. 95-95, 91 Stat. 685 (1977)...........................................................19

Pub. L. No. 100-494, 102 Stat. 2441 (1988)...............................................21-22

Pub. L. No. 101-549, 104 Stat. 2613 (1990)....................................................22

Pub. L. No. 102-486, 106 Stat. 2776 (1992)....................................................23

S.306, 89th Cong. (Jan. 7, 1965)...............................................................10, 11

S.306, 89th Cong. (Aug. 31, 1965).............................................................10, 12

111 Cong. Rec. 25064 (Sept. 24, 1965)......................................................15-16

111 Cong. Rec. 25065 (Sept. 24, 1965)............................................................6

111 Cong. Rec. 25073 (Sept. 24, 1965)...........................................................12

Hearings before the House Committee on Interstate & Foreign
    Commerce on S.306, 89th Cong. (1965).............................................10, 11

Hearings before the Senate Committee on Public Works, 88th Cong.
    (1964)...........................................................................................6, 7, 11

Hearings before the Senate Committee on Public Works on S.306, 89th
    Cong. (1965) ......................................................................................6, 10

Joint Hearings before the Senate Committees on Commerce and Public
    Works on S.451 and S.453, 90th Cong. (1967)....................................12, 13

Message from the President regarding Air Pollution, 90th Cong. (Jan.
    30, 1967) ...............................................................................................15

*Environmental Pollution: A Challenge to Science and Technology*,
    Report to the House Committee on Science & Astronautics (1966)..........13

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

EPA, Annual Report to Congress under Section 202(b)(4) (1971) ................... 7

NHTSA, *Federal Regulations Needing Amendment to Stimulate the Production and Introduction of Electric/Solar Vehicles: A Report to Congress* (Jan. 1990) ................................................................. 22

OTHER AUTHORITIES

J. Ingraham, "'60 Electric Automobile Shown; Cent-a-Mile Operation Claimed," N.Y. TIMES (Mar. 22, 1960) ...................................................... 12

U.S. Dept. of Energy, *The History of the Electric Car* (Sept. 15, 2014), https://www.energy.gov/articles/history-electric-car ................................ 12

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act, 42 U.S.C. §7401 *et seq.* |
| EPA | U.S. Environmental Protection Agency |
| EPA Br. | EPA's Answering Brief |
| Fuel Br. | Brief for Private Petitioners |
| JA | Joint Appendix |
| Kentucky Br. | Brief for State Petitioners |
| NHTSA | National Highway Traffic Safety Administration |
| NOx | nitrogen oxides |
| Rule | U.S. EPA, "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 Fed. Reg. 27,842 (Apr. 18, 2024) |

vii

**INTRODUCTION**

Since 1965, federal motor vehicle standards under Section 202 of the Clean Air Act have been a cornerstone of Congress's efforts to reduce dangerous air pollution. By directing the regulation of emissions from classes of vehicles based on feasible technologies, Congress charged EPA with eliminating billions of tons of smog precursors, soot, and greenhouse gases from the nation's air. Then and now, the harm of vehicle pollution has come from the aggregate emissions of millions of diffuse, mobile sources. As the vehicle population has grown—from 80 million in 1965 to over 280 million today—EPA has continued to employ Section 202 to mitigate increasing threats to public health and the environment from this enormous pollution source.

Contending that EPA's latest Rule exceeds its authority, Petitioners claim EPA cannot (1) regulate electric vehicles or (2) set fleet-average standards. Those challenges are untimely because they contest longstanding elements of EPA's vehicle regulations. The Rule's multipollutant standards incorporate zero-emission technologies, including electric vehicles, as has every light-duty vehicle standard since 2000. That consistent history follows from both Congress's and EPA's focus, over nearly six decades of Section 202 amendments and regulations, on securing emission reductions through the most effective pollution technologies. The Rule also uses the same two-tiered structure—regulating at both the individual vehicle

1

and fleet-average levels—that EPA has employed for forty years. The Rule's more stringent standards for greenhouse gases, hydrocarbons, nitrogen oxides, and particulate matter thus do not reflect any new interpretation of the Act, but rather automakers' increased capability to prevent and control pollution.

Against this history, Petitioners push a radical rewriting of the statute that would exclude three established technologies—battery-electric, fuel-cell, and plug-in hybrid powertrains—from EPA's authority, and prohibit *all* fleet-average standards. But reading Section 202 to inhibit the deployment of proven technologies would be antithetical to the Act's text and history, as well as its primary goal of pollution prevention.

With no text to support their technology exclusion, Petitioners invoke the major questions doctrine. That doctrine, which the Supreme Court has explained is reserved for extraordinary cases, disfavors interpretations of statutory text that give an agency unprecedented, extravagant powers that Congress did not clearly provide. Petitioners, however, never tie their major-questions arguments to any interpretive question. Instead, they try to frame their challenges as a dispute over "mandat[ing] electric vehicles," Fuel Br. 22, or "prohibit[ing]" combustion-engine technologies, Kentucky Br. 21. But the Rule does neither. At bottom, Petitioners attack EPA's decision to continue regulating the light-duty vehicle classes under

fleet-average standards at a time when electric vehicles make up a growing share of those classes. That is not a major question.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations that are not reproduced in the addenda to Petitioners' and Respondents' briefs are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

The statutory and regulatory background is set forth in EPA's Statement of the Case.

## SUMMARY OF THE ARGUMENT

I.  Petitioners' objections to EPA's authority are untimely because they challenge elements of the Rule that are unchanged from decades-old emissions standards. 42 U.S.C. §7607(b)(1).

II.  Petitioners' statutory authority arguments are also wrong on the merits. Section 202 directs EPA to prescribe standards based on the emissions reductions that feasible technology can achieve. EPA followed this directive here, prescribing standards that reflect the capabilities of all relevant technologies, including widespread, commercially mature electrified powertrains that eliminate exhaust emissions. The long history of EPA standards based on advanced technology reinforces this straightforward reading of Section 202. Petitioners' reconception of Section 202—that it *prohibits* EPA from accounting for technologies that, by design, produce no exhaust pollution—is contrary to that provision's text, which

3

ensures that Section 202 standards apply to vehicles "designed as complete systems" to "prevent" emissions. *Id.* §7521(a)(1).

III.  Fleet-average standards carry out Congress's directive to reduce aggregate emissions from "classes"—*i.e.*, groups—of vehicles, while giving appropriate consideration to manufacturer lead time and costs. *Id.* §7521(a)(1)-(2). Unable to identify anything in Section 202 that forbids averaging, Petitioners claim averaging is inconsistent with the Act's compliance and enforcement provisions, which, they assert, contemplate compliance at the individual vehicle level. But EPA's standards require compliance at both the fleet-average *and* vehicle levels, as do fleet phase-in provisions that Congress mandated elsewhere in Section 202. Those phase-in provisions foreclose Petitioners' contention that averaging is inconsistent with the statute.

IV.  The major questions doctrine—a statutory interpretation tool reserved for novel and transformative assertions of agency authority—does not support any of Petitioners' arguments and would not apply in any event. Rather, it is Petitioners' transformative reinterpretation of the Act that warrants skepticism.

## ARGUMENT

### I.  PETITIONERS' STATUTORY AUTHORITY ARGUMENTS ARE UNTIMELY

As EPA explains (Br. 30-32), Petitioners' statutory authority arguments are untimely under 42 U.S.C. §7607(b)(1), because they challenge elements of EPA's

program that have existed for decades, *see Growth Energy v. EPA*, 5 F.4th 1, 21-22 (D.C. Cir. 2021) (holding §7607(b)(1) barred 2019 challenge to program element adopted in 2007). EPA's criteria pollutant standards have used fleet-averaging and accounted for electric vehicles' zero tailpipe emissions within those fleet averages since 2000. Its greenhouse gas standards have done the same since 2010. Because neither element was reopened in this rulemaking, the Court should dismiss Petitioners' statutory authority arguments.

## II. SECTION 202 DOES NOT EXCLUDE ZERO-EMISSION TECHNOLOGIES

Section 202 authorizes standards that reflect the emission-reduction capabilities of advanced vehicle technologies, including zero-emission technologies like the battery-electric powertrain found in electric vehicles.[1] Petitioners' contrary arguments distort the provision's text and strip it of context, ignoring the long history of electric vehicles and emissions control that informed Congress's choice *not* to limit the agency to combustion-engine technologies.

Congress adopted almost all of Section 202(a)(1) and (2)'s current language in the Motor Vehicle Pollution Control Act of 1965, Pub. L. No. 89-272, §101, and the Clean Air Amendments of 1970, Pub. L. No. 91-604, §6(a). In the 1960s, as today, "[t]he problem of air pollution from motor vehicles [was] of paramount

---

[1] The battery-electric powertrain is an integrated system delivering energy stored in batteries to the vehicle's wheels through an electric motor. *See* 89 Fed. Reg. 27,842, 27,846 n.16, 27,881 (Apr. 18, 2024).

importance."[2] Together with industrial emissions, the rapidly growing vehicle population had created air pollution that killed hundreds of people, made thousands sick, and turned urban areas into "vast aerial garbage heap[s]."[3] Meanwhile, California's groundbreaking vehicle emissions program had spurred dramatic technological breakthroughs. Industry witnesses told Congress their engineers were fundamentally reconceiving vehicle and engine design to reduce emissions.[4] When Congress demanded technology-based standards to reduce pollution from one of the nation's largest pollution sources, it understandably made no carveout to exclude consideration of the most effective technologies.

### A.   Section 202 Authorizes Standards that Reflect the Increased Application of Advanced Pollution Technologies

Section 202 directs EPA to prescribe standards "applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7521(a)(1). EPA must afford manufacturers the lead time "necessary to permit the development and application of the requisite technology," with "appropriate

---

[2] Hearings before the Comm. on Public Works on S.306, 89th Cong. 22 (1965) (1965 Senate Hearings).

[3] 111 Cong. Rec. 25065 (1965).

[4] Hearings before the Comm. on Public Works, 88th Cong. 860, 862 (1964) (1964 Senate Hearings).

6

consideration" of compliance costs. *Id.* §7521(a)(2). And EPA's standards must apply to vehicles and engines "for their useful life," "whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution." *Id.* §7521(a)(1).

By providing for lead time "necessary [for] the development and application of the requisite technology," Section 202 expressly authorizes standards that "requi[re]" technology and obligate the industry to "appl[y]" those technologies to a greater extent than it previously had. *Id.* §7521(a)(2). Indeed, the first 202(a) standards, for model year 1968, required the complete elimination of crankcase emissions, effectively requiring blowby systems on all new light-duty vehicles.[5] 31 Fed. Reg. 5170, 5171 (Mar. 30, 1966). Subsequent standards for 1972-74 required 69-80% reductions in exhaust emissions through greater "application of current control technology."[6] 35 Fed. Reg. 17,288 (Nov. 10, 1970). EPA has also prescribed standards—upheld by this Court—premised on *anticipated* technology. *NRDC v. EPA*, 655 F.2d 318, 326-27, 332-33 & n.25 (D.C. Cir. 1981); *see also*

---

[5] "Crankcase emissions" are the unburned fuel-air mixture that "blow by" the piston rings and escape through the engine's crankcase; these once constituted 30-40% of gasoline-fueled vehicles' emissions. In 1960, responding to California's vehicle pollution program, automakers installed blowby systems to capture and recirculate these emissions. 1964 Senate Hearings at 860, 862.

[6] *See* EPA, Annual Report to Congress under Section 202(b)(4), at 5-1 to 5-11 (1971) (reviewing available technologies), https://tinyurl.com/2j3csamj.

7

Oge-Hannon Amicus Br. 12-14. This "longstanding practice of the government," *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2258 (2024), confirms what Section 202's text makes clear: The standards' stringency is determined according to the reductions that vehicle and engine technologies can feasibly achieve. *NRDC v. EPA*, 655 F.2d at 327-28, 336.

Congress has not only embraced this consistent view of Section 202 but directed EPA to push technologies further. In the 1970 Clean Air Amendments, Congress, impatient with the progress of catalytic-converter technology, "grasped the nettle" and directed EPA to use its Section 202 authority to require "at least 90 per cent" emissions reductions by model year 1975, driving the state of technology forward. *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 623 (D.C. Cir. 1973). In the 1990 amendments, Congress reaffirmed EPA's authority to adopt standards more protective and technologically ambitious than those Congress prescribed. Thus, Section 202(g) set stringent "Tier 1" criteria pollutant standards, and Section 202(i) directed EPA to study standards 50% more stringent than Tier 1 standards. 42 U.S.C. §7521(g)(1), (i)(1)-(2). If the results of EPA's study were favorable, EPA was to promulgate the more stringent standards for 2003 or shortly thereafter; whatever the results, EPA retained its "authority under subsection (a) to promulgate more stringent standards" than Tier 1 at any time after 2003. *Id.* §7521(i)(3)(B), (C). In fact, EPA's subsequent "Tier 2" NOx standards were 88-

8

95% more stringent than Tier 1 standards, 65 Fed. Reg. 6698, 6702 & n.2 (Feb. 10, 2000), and its "Tier 3" standards were 70-80% tighter than Tier 2 standards, 79 Fed. Reg. 23,414, 23,417 (Apr. 28, 2014).

As 202(a) standards have done for over fifty years, the Rule challenged here identifies reductions attainable from feasible technology and updates the standards' stringency accordingly. EPA Br. 20-23. The Rule thus falls squarely within EPA's authority.

### B. Section 202 Contains No Technology Exclusion for Non-Polluting Propulsion Systems

In 1965, vehicle pollution was a dynamic scientific field, and Congress committed the technological basis of emissions standards to reasoned agency decisionmaking so that standards would keep pace with "changing circumstances and scientific developments" and avoid "obsolescence." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). Congress also purposely chose capacious language to ensure standards would reflect the full breadth of vehicle technologies, from add-on "devices" to "vehicles and engines … designed as complete systems." 42 U.S.C. §7521(a)(1). Consistent with this plain language, EPA has never carved out non-polluting propulsion systems such as electrified powertrains (or any other vehicle or engine technology) from its standard-setting considerations. On the contrary, EPA has increasingly relied on electrified powertrains' capabilities as those technologies have matured.

9

**1.**  As automakers explained in hearings on the 1965 Motor Vehicle Pollution Act, the "rapid evolution in air pollution technology" indicated the "[t]echnical details of exhaust-emissions standards should not be written into law," but instead determined in regulation.[7] At the Johnson Administration's request, the House revised the Senate bill's prescriptive standards into an express delegation to set standards administratively, so that standards would be "upgraded and improved as the state of the art permits."[8]

Section 202's final text also included language to ensure the technological bases for standards would be comprehensive. In providing that standards shall apply to vehicles "for their useful life," Section 202 requires EPA to ensure the durability of the technologies automakers apply to achieve those standards. 42 U.S.C. §7521(a)(1). And the last clause of Section 202(a)(1) specifies that EPA must do so "whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution." *Id.* This language confirms that the technologies Congress expected automakers would use to achieve

---

[7] *See, e.g.*, Hearings before the Comm. on Interstate & Foreign Commerce on S.306, 89th Cong. 282 (1965) (1965 House Hearings).

[8] 1965 Senate Hearings at 13 (Anthony Celebrezze, Sec'y of Health, Educ. & Welfare); *compare* S.306, 89th Cong. 4-5, (Jan. 7, 1965) *with* S.306, 89th Cong. 21 (Aug. 31, 1965). Before EPA's creation in 1970, the Department of Health, Education, and Welfare was responsible for Section 202 standards.

10

202(a) standards could range from installable "gadget[s]"[9] to integral, complex systems informing the entire vehicle's design.[10] EPA Br. 39-40, 44. Indeed, the "systems" and "devices" proviso appears to reflect congressional testimony that California had amended its vehicle pollution law to allow this "systems engineering" approach, after a narrow focus on pollution-control "devices" had delayed the deployment of pollution technologies.[11]

   **2.**  In particular, Section 202 contemplates the development and application of low- and non-polluting powertrains as complete systems to "prevent or control" pollution. 42 U.S.C. §7521(a)(1). Indeed, Congress *removed* bill language that would have restricted EPA's authority to gasoline- and diesel-fueled propulsion systems. Senator Muskie's original bill provided standard-setting authority for "gasoline powered" and "diesel powered vehicles" only.[12] But the House removed

---

   [9] 1965 House Hearings at 288.

   [10] *See, e.g.*, 1964 Senate Hearings at 860, 862 (Harry Williams, Auto Mfr. Ass'n) ("Literally, the advent of the vehicle emissions problem has added a new dimension to the design of automobiles. … Now all automotive engineers assess new engine and vehicle designs by a fourth major criterion—vehicle emissions.").

   [11] *See id.* at 864.

   [12] S.306, 89th Cong. 1, 4-5 (Jan. 7, 1965).

those limits and instead defined "motor vehicle" as "*any* self-propelled vehicle designed for transporting persons or property on a street or highway."[13]

By broadening the definition of "motor vehicle"—and thus the scope of 202(a) authority—beyond gasoline- and diesel-fueled vehicles, Congress left room for the development of non-polluting propulsion systems, including electrified powertrains. *See* EPA Br. 33 & n.9. Electric vehicles were a well-understood technology in 1965; in fact, electric vehicles predate Ford's Model T.[14] More than one hundred automakers produced electric vehicles in the early twentieth century, and features that are now synonymous with the automobile, like steering wheels, first appeared on electric models.[15] *See also* Oge-Hannon Amicus Br. 16-17. Electric vehicles thus would have fallen within the natural meaning of "any self-propelled vehicle." While combustion-engine vehicles had taken over the vehicle market by midcentury, the fact that the entire market had already once transitioned

---

[13] S.306, 89th Cong. 21, 27 (Aug. 31, 1965) (emphasis added); 111 Cong. Rec. 25073 (Sept. 24, 1965) (amending title to remove restriction to gasoline and diesel vehicles).

[14] U.S. Dep't of Energy, *The History of the Electric Car* (Sept. 15, 2014), https://www.energy.gov/articles/history-electric-car. *See also* J. Ingraham, "'60 Electric Automobile Shown; Cent-a-Mile Operation Claimed," N.Y. TIMES (Mar. 22, 1960).

[15] Federal Power Comm'n, *Development of Electrically Powered Vehicles* 3 (1967), *reproduced in* Joint Hearings before the Committees on Commerce and Public Works on S.451 and S.453, 90th Cong. 15 (1967) (1967 Joint Hearings).

12

between propulsion technologies is important context for Congress's choice not to fix fuel or engine technology into statute.

Subsequently, in the 1970 amendments, Congress directed federal resources toward "inherently low-polluting propulsion technology," Pub. L. No. 91-604, §10, 84 Stat. 1702, because of its potential to meet 202(a) standards. *See* 42 U.S.C. §7521(e) (prescribing how "new power source[s] or propulsion system[s] for new motor vehicles" should be certified to meet 202(a) regulations); EPA Br. 16-17, 35-36.[16] Indeed, the development of these systems was considered essential, given contemporary reports that the booming vehicle population would eventually cancel out emissions reductions from then-current control technology.[17]

**3.** Sure enough, as electrification technologies developed, the stringency of EPA's standards reflected these technologies' ability to deliver unparalleled emissions reductions. Electrified powertrains include a spectrum beyond battery-electric vehicles, including plug-in hybrids, "strong," "intermediate," and "mild" hybrids, and now-ubiquitous technologies like start-stop ignition. *See* 89 Fed. Reg.

---

[16] *See also* 1967 Joint Hearings at 69 (Alan Boyd, Sec'y of Transp.) (recommending research on electric vehicles as "a practical means of meeting standards of air pollution established by the Federal Government"); 39 Fed. Reg. 21,068 (Jun. 18, 1974) (certifying six battery-electric models as meeting 202(a) standards through inherently low-emitting propulsion systems).

[17] *Environmental Pollution: A Challenge to Science and Technology*, Report to the H. Comm. on Science & Astronautics 20 (1966).

13

at 28,086. As EPA details (Br. 18-20 & Tbl.1), those technologies have played an increasing role in EPA's feasibility analyses and industry compliance strategies as the technologies matured, particularly over the last two decades. *See also* Resp. to Comments 299-302, JA__-__. EPA's most recent Rule, which reflects the same technologies and their emission-reduction capabilities, represents no change in the agency's understanding of 202(a) authority, only the maturity of those technologies.

### C.    Petitioners' Arguments for a Technology Exclusion Are Unavailing

Petitioners' attempt to write a special exclusion for the most effective emission-reduction technologies into Section 202 contradicts both the Act's text and its "primary goal" of "pollution prevention." 42 U.S.C. §7401(c). Although they couch their arguments in terms of "counting [electric vehicles] as zeros" in fleet-average standards, Fuel Br. 49-50, in reality, Petitioners seek a categorical carveout for battery-electric, fuel-cell, and plug-in hybrid powertrains, arguing that EPA may "set standards *only* for" vehicles lacking those technologies. *Id.* at 9 n.2, 52. Nor would Petitioners' argument allow EPA to factor automakers' anticipated use of those technologies into any 202(a) standard's stringency. *See id.* at 60. Congress never enacted this radical position into law, and Petitioners offer no valid reason for this Court to suddenly read it into the Act.

14

**1.** Petitioners' argument fails on Section 202's text, which provides that 202(a) standards "shall be applicable" to vehicles whether they are "designed as complete systems or incorporate devices to prevent or control such pollution." 42 U.S.C. §7521(a)(1). This language unambiguously extends EPA's regulations to electric, fuel-cell, and hybrid vehicles, which are "designed as complete systems" to "prevent" pollution. *Supra* 10-11.

Petitioners try to avoid that text's natural meaning by suggesting that "prevent" refers only to measures that allow pollution to form and then "block or capture" it. Fuel Br. 61. Under that reading, however, "prevent" offers no distinct meaning from "control." Even according to Petitioners' own dictionary, "prevent" covers non-polluting propulsion systems that "keep [pollution] from happening," as distinct from "control" methods that "check" emissions after they occur. Fuel Br. 60-61 (quoting 1969 dictionary); EPA Br. 40.

Contemporary usage reinforces that distinction. President Johnson's 1967 message to Congress observed that the "sheer number of motor vehicles may, within a decade or two, defy the best pollution *control* methods we can develop," therefore necessitating "[n]ew types of internal combustion engines—or indeed new propulsion systems."[18] And contemporaneous regulations using the "prevent

---

[18] Message from the President regarding Air Pollution, 90th Cong. 5 (Jan. 30, 1967) (emphasis added); *accord* 111 Cong. Rec. 25064 (Sept. 24, 1965)

(continued…)

or control" formulation illustrate that it includes efforts to avoid the formation of harmful conditions altogether. *See, e.g.*, 32 Fed. Reg. 8622 (Jun. 15, 1967) (discussing measures to "prevent or control" fires in aircraft engines); 27 Fed. Reg. 2152 (Mar. 6, 1962) (requiring efforts to "prevent or control" drinking water pollution). In those examples, "prevent or control" would clearly include measures that keep engine fires or drinking water contamination from occurring in the first place. So too, 202(a) standards naturally encompass technologies that eliminate pollution before it forms. 42 U.S.C. §7401(a)(3) ("pollution prevention" includes the "elimination, *through any measures*, of the amount of pollutants produced or created at the source" (emphasis added)).

While Petitioners manufacture a distinction between vehicles equipped with "technologically achievable emission controls," on the one hand, and electric vehicles, on the other, Fuel Br. 54, electrified powertrains have long been understood to be emission-reduction technologies, *supra* 13-14.[19] Indeed, battery-electric vehicles are merely the strongest form of such systems, and "nothing in the

(statement of Rep. Reuss) ("As the automobile population rises … the problems inherent in *controlling* hydrocarbons and carbon monoxide from the current type of spark ignition engine may necessitate the development of propulsion systems for automobiles radically different from those which are currently in use." (emphasis added)).

[19] *See also* Electric & Hybrid Vehicle Research, Development, & Demonstration Act, Pub. L. No. 94-413, §2(a)(5)(F), 90 Stat. 1260 (1976) (finding deployment of electric vehicles advantageous because of their zero emissions).

16

statute suggests that certain kinds of electrified technologies are appropriate for consideration while other kinds of electrified technologies are not." 89 Fed. Reg. at 27,892. Petitioners' arguments on this point are internally incoherent: they offer no reason why strong-hybrid powertrains are "emission controls," but plug-in hybrid powertrains—which have combustion engines and associated exhaust emissions—are categorically different technologies somehow excluded from Section 202. EPA Br. 46-47, 64. In fact, *all* electrified powertrains are systems that prevent pollution, by using battery power to reduce demand on a gasoline engine, and thus comfortably fall within Section 202's scope as a matter of text and purpose alike.

**2.** Petitioners' reading relies on a dubious grammatical parsing of Section 202's endangerment and contribution clause to argue that standards cannot apply to any vehicle that does not emit specific pollutants. Fuel Br. 50-54. As EPA explains, this argument ignores non-tailpipe emissions from electric vehicles—and becomes unintelligible when applied to plug-in hybrids, which do have tailpipe emissions. EPA Br. 46-48. More fundamentally, Petitioners misread that provision. Section 202 directs EPA to regulate dangerous emissions *from classes* of vehicles; it does not require that every individual vehicle itself cause or contribute to endangerment. *Id.* at 42-43.

Petitioners observe, correctly, that "the things for which EPA sets standards must 'in [EPA's] judgment cause, or contribute to, air pollution.'" Fuel Br. 51

17

(quoting 42 U.S.C. §7521(a)(1)). But this Court has already explained that "motor-vehicle emissions" are what must cause or contribute to the dangerous pollution. *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 117 (D.C. Cir. 2012), *cert. denied in relevant part*, 571 U.S. 951 (2013). Thus, "the things for which EPA sets standards" under this provision are emissions. *See* 42 U.S.C. §7521(a)(1) ("standards applicable to the emission of any air pollutant…").

The question, then, becomes: emissions *from what*? The text provides a ready answer: EPA must set standards for "the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines." *Id.* This single, integrated clause confirms that the emissions from the relevant *class* (or group) of vehicles must cause or contribute to endangerment, but not necessarily that, within that class, every individual vehicle's emissions must do so. EPA has *always* interpreted the provision this way. 89 Fed. Reg. at 27,889. And that makes sense: this best reading of Section 202 is consistent with Congress's focus on aggregate emissions from the growing vehicle population. To make their contrary argument work, Petitioners effectively strike "any class or classes of" from the statute.

Petitioners insist that the phrase "cause, or contribute to" must modify a plural noun—not the singular "emission"—and invoke the last antecedent rule to argue "new motor vehicles," not "classes of new motor vehicles," must be that

plural modificand. Fuel Br. 51-53. They are wrong at both steps. First, the

singular/plural forms of "cause," "contribute," and "emission" reveal nothing of

Congress's intent here, where the two verbs have flipped back and forth between

singular and plural between amendments, with no evident change in meaning,[20]

and the statute likewise uses "emission" and "emissions" interchangeably.[21]

Further, even if the "cause, or contribute to" phrase modified either "classes" or

"vehicles," the last antecedent rule does not favor the latter because "class or

classes of new motor vehicles" is a "concise and 'integrated' clause" that "hangs

together as a unified whole, referring to a single thing." *Cyan, Inc. v. Beaver Cty.

Emps. Ret. Fund*, 583 U.S. 416, 440 (2018). Nor does the last antecedent rule hold

where, as here, a comma separates the limiting phrase ("which … cause, or

contribute to") from the antecedents. *See Facebook, Inc. v. Duguid*, 592 U.S. 395,

403-04 (2021). Petitioners' arguments thus give no reason for this Court to depart

from its prior reading of Section 202(a)(1).

---

[20] *Compare* Pub. L. No. 91-604, §6(a), 84 Stat. 1690 ("causes or contributes to"), *with* Pub. L. No. 95-95, §401(d)(1), 91 Stat. 685, 791 (1977) ("cause, or contribute to").

[21] *Compare* 42 U.S.C. §7521(a)(1) (standards "applicable to the emission of any air pollutant"), *with id.* §7521(a)(3)(A)(i) (standards "applicable to emissions of hydrocarbons …"); *compare also id.* §7521(b)(2) ("emission standards"), *with id.* §7521(c)(1) ("emissions standards").

19

**3.** While Petitioners focus on certain electrified powertrains, their statutory arguments would preclude EPA from accounting for *any* technology that achieved 100% pollution reduction. Even a "perfect catalytic converter" that eliminates all pollution from combustion-engine exhaust could not inform the standards' stringency under Petitioners' reading, because vehicles with such technologies "do not cause or contribute to greenhouse-gas or criteria pollution."[22] Fuel Br. 52. Of course, when EPA sets its standards, the vehicles to which such a perfect converter (or a battery-electric powertrain) could be applied *are* pollution-emitting vehicles. 89 Fed. Reg. at 27,902. Yet Petitioners insist that when EPA calculates the stringency of its standards, "it cannot average in a bunch of zeros to represent" the vehicles that *will* or *would* apply zero-emission technology. Fuel Br. 59-60. In other words, EPA cannot consider the anticipated use of zero-emission technology to comply with standards in setting those standards' stringency.

Petitioners cannot explain why Congress would have directed EPA to consider technologies that achieve 1-99%, but not 100%, pollution reduction. 89 Fed. Reg. at 27,902. The text of the Act confirms it did not. For example, Section 202(a)(3) mandates, for certain criteria pollutants from heavy-duty vehicles, the

---

[22] That possibility is plausible: the 2014 Tier 3 standards reflected advanced catalyst systems that "maintain[] zero or near zero running [criteria] emissions." 79 Fed. Reg. at 23,461-62.

(Page 30 of Total)

"greatest degree of emission reduction achievable." 42 U.S.C. §7521(a)(3)(A)(i). If available technology can achieve 100% reduction at reasonable cost, Section 202(a)(3) *requires* EPA to account for such technology in its standards. Petitioners cannot reconcile their reading of 202(a)(1) with that mandate.

Petitioners ultimately defend their reading with a non-answer: "Congress was concerned not only with emission reduction but also with technological feasibility and preserving 'some productive economic activity.'" Fuel Br. 59. But Petitioners' reading excludes zero-emission technology regardless of feasibility or economic productivity. And it does so even in the situation where—as here—market trends and the industry's own business plans show broad embrace of the technology. Consumer Reports Amicus Br. 13-18.

**4.** If Congress had meant to exclude electric vehicles from 202(a) standards, it would have done so expressly. Elsewhere, Congress *has* written a comparable exclusion: In the Energy Policy and Conservation Act's fuel-economy program, Congress excluded alternative-fueled vehicles' fuel economy from NHTSA's technological-feasibility analyses. 49 U.S.C. §§32901(a)(8), 32902(h)(1); *see* 89 Fed. Reg. 52,540, 52,832 (Jun. 24, 2024). Yet during the same timeframe, Congress declined to include such a provision in the Clean Air Act.

Congress first added the technology carveout to NHTSA's fuel-economy program in 1988, excluding alcohol- and natural-gas propulsion technology while

otherwise incentivizing production of these vehicles. Pub. L. No. 100-494, §6, 102 Stat. 2441, 2450, 2452 (1988). That law also directed NHTSA to study how vehicle regulatory programs might be amended to promote electric vehicles. *Id.* §7(a). NHTSA's resulting report to Congress (written in consultation with EPA) expressly identified EPA's 202(a) emission standards as "apply[ing] to all motor vehicles whether powered by electric motors or [internal combustion engines]."[23]

Later that same year, Congress amended the Clean Air Act to add several subparagraphs to Section 202, and although it cabined EPA's technology-based authority in other provisions involving other sources,[24] it adopted nothing like the propulsion-system carveout that Petitioners now seek to read into Section 202. Congress also expressly recognized zero-emission vehicles as a viable pollution-reduction technology in its clean-fuel fleets program. 42 U.S.C. §7586(f)(4).[25] In short, Congress in 1990 had the perfect opportunity to add the technology exclusion Petitioners posit. It knew exactly how to create such an exclusion; it

---

[23] NHTSA, *Federal Regulations Needing Amendment to Stimulate the Production and Introduction of Electric/Solar Vehicles: A Report to Congress* II-1 (Jan. 1990), https://tinyurl.com/mr3sd7xw.

[24] *See, e.g.*, Pub. L. No. 101-549, §407, 104 Stat. 2399, 2613-15 (1990) (cabining EPA's discretion over "best retrofit technology" for certain utility boilers as limited to low-NOx burners).

[25] That program required states with certain nonattainment areas to phase in clean-fuel vehicles in large, centrally fueled fleets. 42 U.S.C. §7586(a), (b). The program credited fleet operators who purchased vehicles that met California's zero-emission vehicle standards, adopted earlier that year. *Id.* §7586(f).

22

understood that zero-emission technologies were being used to reduce vehicle pollution; and it knew that EPA understood Section 202 to cover those technologies. Yet Congress declined to write any such exclusion into the Act.

Disregarding this history, Petitioners focus inexplicably on what Congress contemplated "in 1977," without explaining why—if Congress wanted to block EPA from considering electric vehicles—it did not do so in 1990. Fuel Br. 57. In fact, two years later, Congress extended the fuel-economy program's alternative-fuels incentive and corresponding technology carveout to cover electric vehicles. Pub. L. No. 102-486, §§302, 403, 106 Stat. 2776, 2868-71, 2876-79 (1992). Yet it *still* imposed no equivalent carveout on EPA's 202(a) authority. If ever there were a case to apply the "fundamental principle" against atextual "judicial supplementation" where "Congress has shown that it knows how to adopt the omitted language," this is it. *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

**5.** As a fallback, Petitioners briefly contend that, even if Section 202's "cause, or contribute to" clause applies to emissions from vehicle classes rather than individual vehicles, EPA cannot classify emitting and non-emitting vehicles together, arguing "a class of objects that does something" indicates that "*all* the members of the class do that thing." Fuel Br. 53-54. EPA's classification satisfies that requirement: all members of the light-duty class carry 12 or fewer passengers on public roads. EPA Br. 7, 41. Not surprisingly, EPA has never taken up

23

Petitioners' circular proposal—to make a contribution finding for a class defined by its contribution. EPA instead uses a stable class definition "based on weight and functionality," then regulates that class "based upon its consideration of all available technologies." 89 Fed. Reg. at 27,902.

Ultimately, Petitioners' purported fallback argument is just as extreme as their lead argument, as, presumably, a distinct electric-vehicle class would not satisfy their reading of Section 202's contribution criterion. That would exempt those vehicles from *all* 202(a) standards, even the general standards, which provide that no pollution control device or system may cause an "unsafe condition" or emissions of "noxious or toxic substance[s]." 40 C.F.R. §86.090-5(b)(1). Petitioners never explain why Congress would have exempted any pollution technology from EPA's regulation as soon as it succeeds in its purpose.

## III. SECTION 202 AUTHORIZES FLEET-AVERAGE STANDARDS

**1.** Section 202 reflects Congress's concern with pollution from the total vehicle population, rather than from individual vehicles. By requiring standards applicable to emissions "from any class or classes" of new motor vehicles, the statute directs EPA to regulate this pollution source in bulk. 42 U.S.C. §7521(a)(1). Fleet-average standards are consistent with that text; they carry out Congress's mandate to reduce aggregate emissions from "classes"—*i.e.*, groups—of new vehicles. *Id.*

24

Fleet-average standards also carry out Congress's directive to provide automakers lead time and give "appropriate consideration" to their "cost of compliance." *Id.* §7521(a)(2). Averaging allows automakers to phase in technologies in a way that is "economically efficient, … supports vehicle redesign cycles, and responds to market fluctuations," in turn resulting in overall "emissions reductions at lower cost and with less lead time." 89 Fed. Reg. at 27,901. By securing greater emission reductions at lower cost, fleet-average standards benefit automakers, consumers, and public health.

**2.** The longstanding, thoroughly considered nature of EPA's averaging program reinforces its validity. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In 1980, at automakers' suggestion, EPA began studying whether fleet-averaging was consistent with the Act. 45 Fed. Reg. 14,496, 14,502 (Mar. 5, 1980); 45 Fed. Reg. 79,382, 79,383 (Nov. 28, 1980). After careful consideration, EPA in 1983 adopted a two-tiered program, under which compliance was measured at both the fleet-average and individual vehicle levels. Individual vehicles would meet an emission limit specific to their engine family—and be subject to all of the Act's testing, certification, and warranty requirements—while an automaker's overall production fleet would have to meet the regulatory standard based on a weighted average of its vehicles' family emission limits. 48 Fed. Reg. 33,456, 33,456-58 (July 21, 1983).

25

This Court then upheld EPA's averaging program, *NRDC v. Thomas*, 805 F.2d 410, 425 (D.C. Cir. 1986), while raising some questions "for the agency's consideration and possible explanation in future proceedings," *id.* at 425 n.24. EPA subsequently considered and addressed those concerns in expanding the averaging program to include banking and trading. 54 Fed. Reg. 22,652, 22,665-67 (May 25, 1989); 55 Fed. Reg. 30,584, 30,593-94 (July 26, 1990). Specifically, in 1990, EPA noted that the program's two-tiered approach ensured it could continue to hold each vehicle accountable to an identifiable limit under the Act's compliance provisions, while providing flexibility to manufacturers and achieving Congress's intended reductions from vehicles in the aggregate. 55 Fed. Reg. at 30,594. Later that year, in the 1990 Clean Air Act amendments, Congress specifically considered—and declined to curtail—EPA's averaging program. EPA Br. 15-16, 53-54. Since then, Congress has repeatedly recognized and incorporated EPA's fleet-average approach under Section 202 into various other statutory programs. *See* EPA Br. 54 n.21 (citing provisions).

**3.** Petitioners point to nothing in Section 202 that would prohibit fleet-average standards. Nor do they dispute the long-recognized benefits of averaging or contend that it is contrary to Section 202's stated objectives. Instead, Petitioners claim only an implied prohibition in the compliance and enforcement provisions of

26

Sections 205-207, which, they assert, contemplate compliance only at the individual vehicle level. *See* Fuel Br. 39-46.

Petitioners' premise—that averaging is mutually exclusive with vehicle-specific compliance—is wrong. As noted above, EPA's averaging program has always operated at both the fleet and individual vehicle levels. 89 Fed. Reg. at 27,901. EPA sets a fleet-average standard ensuring total reductions, while holding individual vehicles to specific emissions levels, whether expressed as "family emission limits," "bins," or "in-use standards." *Supra* 25-26; EPA Br. 9-15, 54-60. This two-tiered structure is consistent with Congress's instruction that EPA devise a compliance program it "deems appropriate" to conform to the relevant standards. 42 U.S.C. §7525(a)(1).

Petitioners construct a false dichotomy between fleet-average standards and vehicle-specific standards, whereas the real question is whether the Act prohibits standards that require compliance at *both* the fleet and vehicle levels. It does not.

Congress definitively resolved that question in 1990 when it amended the Act to add several fleet phase-in provisions to Section 202. There, Congress directed EPA to promulgate standards under Section 202(a) requiring an increasing percentage of a manufacturer's fleet to achieve a specified emission limit or to apply a specific technology for each model year. 42 U.S.C. §7521(a)(6), (g), (h), (j). Like EPA's fleet-average standards, EPA's standards implementing those

27

provisions necessarily evaluate a manufacturer's compliance at both the vehicle and fleet level (and at both the time of sale and the end of the model year). EPA Br. 58; 56 Fed. Reg. 25,724, 25,728-29, 25,749-50 (Jun. 5, 1991) (implementing §202(g)-(j) phase-in provisions). The standards mandated by Congress in these provisions "recognized that pre-production certification would be based on a projection of production for the upcoming model year, with actual compliance with the required percentages not demonstrated until after the end of the model year." 89 Fed. Reg. at 27,895. "Compliance was evaluated not only with respect to individual vehicles, but with respect to the fleet as a whole." *Id.* Petitioners fail to reconcile their cramped reading of the Act's compliance and enforcement provisions with those congressionally mandated fleetwide phase-in standards.

## IV.  THE MAJOR QUESTIONS DOCTRINE DOES NOT APPLY

The major questions doctrine does not aid Petitioners either. That doctrine states that in "certain extraordinary cases," courts should "hesitate" to accept an agency's "novel reading" of its authority if it goes beyond what "Congress could be reasonably understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 716, 723-24 (2022). The doctrine is not a free-floating substantive limit on an agency's exercise of its authority, but rather, as this Court has explained, a "tool of statutory interpretation" that functions solely "to help courts figure out what a statute means." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024).

28

As EPA notes, Petitioners' invocation of the major questions doctrine is unmoored from either of their interpretive arguments. EPA Br. 62-64. Petitioners never identify what statutory text should be interpreted under the doctrine. Instead, Petitioners premise their major-questions theory—and claim of novelty—on the contention that EPA is now attempting to "mandate" electric vehicles, Fuel Br. 22, 34-36; Kentucky Br. 24, even though, as EPA has explained, the Rule does not mandate any particular technology and is demonstrably achievable through many different technological pathways. EPA Br. 71, 73 (citing 89 Fed. Reg. at 28,045, 28,057-84). Regardless, because the Rule merely continues to apply longstanding fleet-average standards to the light-duty classes, any purported novelty under Petitioners' theory would be the result of the Rule's *stringency*—not any newfound *interpretation* of the statute by EPA. *See* EPA Br. 66. By contrast, Petitioners' new interpretation of Section 202, if correct, would be transformative: it would not only prevent EPA from "effectively mandat[ing]" electric vehicles but also put a stop to automakers using any zero-emission vehicles as a compliance "flexibility" under EPA's standards. *See* Fuel Br. 33-34.

Petitioners' comparison to *West Virginia*, Fuel Br. 2-3, misses the mark. In *West Virginia*, the Supreme Court found EPA had attempted to wield "newfound power," locating highly consequential authority to restructure the nation's power generation in an "ancillary provision" of the Clean Air Act that had "rarely been

29

used in the preceding decades." 597 U.S. at 724 (cleaned up). The Court faulted the agency for employing an "unprecedented" regulatory approach that departed from EPA's prior practice under that provision, transforming it from one regulatory scheme to an "entirely different kind." *Id.* at 728.

The Rule here, in contrast, does not involve any novel assertion of authority. It is a straightforward application of Section 202—employing the same regulatory approaches, and the same consideration of all available technologies, that EPA has exercised under that provision for decades. *Supra* 4-5, 7-9, 13-14. Nor do the Rule's effects give any reason to hesitate: Congress always understood and intended EPA's 202(a) authority to be a "highly consequential power." *West Virginia*, 597 U.S. at 724; *see supra* 7-9. Indeed, Petitioners' central historical argument—that EPA has adopted rules with significant emissions reductions or technology-forcing effects only at Congress's express prescription—is simply untrue. *Supra* 7-9; *accord* 89 Fed. Reg. at 27,845; Resp. to Comments 305, JA__.

In short, EPA's Rule is a straightforward application of the statute, consistent with decades of previous rules. By contrast, Petitioners' interpretation—whose only textual hook is the "subtle device" of two verbs' plural form, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)—would frustrate the statute's purpose, transform the regulatory scheme (from a pollution-prevention to a fuel-

30

protective one), and wipe out decades of industry investment. It is Petitioners'

interpretation—not EPA's—that warrants judicial skepticism.

## CONCLUSION

This Court should deny the petitions.

Dated:  December 23, 2024

Respectfully submitted,

/s/ *Ian Fein*

IAN FEIN
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org

JULIA K. FORGIE
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
(310) 434-2300
jforgie@nrdc.org

*Counsel for Natural Resources Defense Council, Inc.*

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
DENNIS L. BECK, JR.
Acting Senior Assistant Attorney General
MYUNG J. PARK
Supervising Deputy Attorney General
KAVITA M. LESSER
Acting Supervising Deputy Attorney General
MICAELA M. HARMS
M. ELAINE MECKENSTOCK
Deputy Attorneys General

/s/ *Theodore A. McCombs*

THEODORE A. MCCOMBS
Deputy Attorney General
(619) 738-9003
theodore.mccombs@doj.ca.gov

*Attorneys for the State of California*

31

FOR THE STATE OF ARIZONA

KRISTIN K. MAYES
ATTORNEY GENERAL

/s/ Kristin M. Wrobel

KRISTEN M. WROBEL
Assistant Attorney General
Environmental Protection Unit
Office of the Attorney General for the
State of Arizona
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8594
ENVProtect@azag.gov

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General

/s/ Carrie Noteboom

CARRIE NOTEBOOM
Assistant Deputy Attorney General
DAVID A. BECKSTROM
Senior Assistant Attorney General
Natural Resources and Environment Section
Ralph C. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
(720) 508-6285
carrie.noteboom@coag.gov

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

MATTHEW I. LEVINE
Deputy Associate Attorney General

/s/ Scott N. Koschwitz

SCOTT N. KOSCHWITZ
Assistant Attorney General
Connecticut Office of the Attorney
General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
scott.koschwitz@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
ATTORNEY GENERAL

/s/ Vanessa L. Kassab

CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

32

FOR THE DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
ATTORNEY GENERAL

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the
District of Columbia
400 6th Street N.W., Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

FOR THE STATE OF HAWAII

ANNE E. LOPEZ
ATTORNEY GENERAL

/s/ Lyle T. Leonard
LYLE T. LEONARD
Deputy Attorney General
465 S. King Street, #200
Honolulu, Hawaii 96813
(808) 587-3050
lyle.t.leonard@hawaii.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
ATTORNEY GENERAL

/s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

FOR THE STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL

/s/ Emma Akrawi
EMMA AKRAWI
Assistant Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

33

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
ATTORNEY GENERAL

/s/ Michael F. Strande
MICHAEL F. STRANDE
Assistant Attorney General
Maryland Department of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3421
Michael.Strande@maryland.gov

FOR THE COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

TURNER H. SMITH
Assistant Attorney General,
Deputy Chief, Energy and Environment Bureau

/s/ Matthew Ireland
MATTHEW IRELAND
Assistant Attorney General
SETH SCHOFIELD
Senior Appellate Counsel
Office of the Attorney General
Energy and Environment Bureau
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
matthew.ireland@mass.gov

FOR THE STATE OF MICHIGAN

DANA NESSEL
ATTORNEY GENERAL

/s/ Margaret A. Bettenhausen
Margaret A. Bettenhausen
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
bettenhausenm@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL

/s/ Peter Surdo
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2127
(651) 757-1061
peter.surdo@ag.state.mn.us

34

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
ATTORNEY GENERAL

/s/ Nell Hryshko
NELL HRYSHKO
Deputy Attorney General
Division of Law
25 Market St., P.O. Box 093
Trenton, NJ 08625
(609) 376-2735
nell.hryshko@law.njoag.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL

JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
YUEH-RU CHU
Chief, Affirmative Litigation Section
Environmental Protection Bureau

/s/ Gavin G. McCabe
GAVIN G. McCABE
ASHLEY M. GREGOR
Assistant Attorneys General
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8469
gavin.mccabe@ag.ny.gov

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
ATTORNEY GENERAL

/s/ William Grantham
William Grantham
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
ATTORNEY GENERAL

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

/s/ Asher P. Spiller
ASHER P. SPILLER
Special Deputy Attorney General
ASHTON ROBERTS
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

35

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

/s/ Paul Garrahan

PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA

MICHELLE A. HENRY
Attorney General

/s/ Ann R. Johnston

ANN R. JOHNSTON
Assistant Chief Deputy Attorney General
Civil Environmental Enforcement Unit
Office of Attorney General
Strawberry Square
14th Floor
Harrisburg, PA 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL

/s/ Nicholas M. Vaz

Nicholas M. Vaz
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

/s/ Hannah Yindra

HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

36

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
ATTORNEY GENERAL

/s/ Alexandria Doolittle
ALEXANDRIA K. DOOLITTLE
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL

/s/ Bradley J. Motl
BRADLEY J. MOTL
JENNIFER S. LIMBACH
Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us
limbachjs@doj.state.wi.us

FOR THE CITY AND COUNTY OF
DENVER

KERRY TIPPER
City Attorney

/s/ Robert A. Wolf
ROBERT A. WOLF
Assistant City Attorney
Denver City Attorney's Office
1200 Federal Blvd.
Denver, CO 80204
(720) 944-2626
robert.wolf@denvergov.org

FOR THE CITY OF CHICAGO

MARY B. RICHARDSON-LOWRY
Corporation Counsel

/s/ Myriam Zreczny Kasper
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel - Appeals
Division
City of Chicago Department of Law
2 North LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 744-3564
Myriam.Kasper@cityofchicago.org

37

FOR THE CITY OF LOS ANGELES

HYDEE FELDSTEIN SOTO
LOS ANGELES CITY ATTORNEY

/s/ Michael J. Bostrom
MICHAEL J. BOSTROM
Senior Assistant City Attorney
201 N. Figueroa St., 13th Floor
Los Angeles, CA 90012
(213) 978-1867
Michael.Bostrom@lacity.org

FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
CORPORATION COUNSEL

ALICE R. BAKER
Senior Counsel

/s/ Christopher G. King
CHRISTOPHER G. KING
Senior Counsel
New York City Law Department
100 Church Street
New York, New York
(212) 356-2074
cking@law.nyc.gov

/s/ Sean H. Donahue
ANDREW P. SU
VICKIE L. PATTON
PETER ZALZAL
ALICE M. HENDERSON
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7236
asu@edf.org

SEAN H. DONAHUE
MEGAN M. HERZOG
Donahue, Goldberg & Herzog
1008 Pennsylvania Avenue, SE
Washington, DC 20003
(202) 683-6895
sean@donahuegoldberg.com

*Counsel for Environmental Defense Fund*

/s/ Shaun Goho
SHAUN GOHO
VERONICA SALTZMAN
Clean Air Task Force
114 State St. 6th Floor
Boston, MA 02109
(617) 624-0234
sgoho@catf.us

*Counsel for Alliance of Nurses for Healthy
Environments, American Lung
Association, American Public Health
Association, Appalachian Mountain Club,
Clean Air Council, and National Parks
Conservation Association*

38

/s/ Maya Golden-Krasner

MAYA GOLDEN-KRASNER
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7119
mgoldenkrasner@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

/s/ Emily K. Green

EMILY K. GREEN
Conservation Law Foundation
53 Exchange Street, Suite 200
Portland, ME 04101
(207) 210-6439
egreen@clf.org

*Counsel for Conservation Law Foundation*

/s/ Allison M. Zieve

ALLISON M. ZIEVE
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
azieve@citizen.org

*Counsel for Public Citizen, Inc.*

/s/ David C. Scott

DAVID C. SCOTT
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
dscott@elpc.org

*Counsel for Environmental Law & Policy Center*

39

/s/ Joshua Berman
_____

JOANNE SPALDING
ANDREA ISSOD
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org

JOSHUA BERMAN
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 650-6062
josh.berman@sierraclub.org

VERA PARDEE
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*Counsel for Sierra Club*

40

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of the applicable rules and this Court's briefing format order dated July 17, 2024 (ECF No. 2065237). According to Microsoft Word, the portions of this document not excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) contain 6,635 words. Combined with the word count of the other Respondent-Intervenors briefs, this does not exceed the 14,700 words the Court allocated to all Respondent-Intervenors.

I further certify that this brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font.

Dated: December 23, 2023

*/s/ Theodore McCombs*
THEODORE MCCOMBS
*Attorney for Respondent-Intervenor*
*State of California*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing **PROOF BRIEF OF STATE AND PUBLIC INTEREST RESPONDENT-INTERVENORS** with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system.

I further certify that all parties are participating in the Court's CM/ECF system and will be served electronically by that system.

Dated:          December 23, 2024

                                        */s/ Theodore McCombs*
                                        THEODORE MCCOMBS